IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 23-51139-JAW |
| | . | |
| HUGOTON OPERATING COMPANY, | . | |
| INC., | . | United States Courthouse |
| | . | 501 East Court Street |
| Debtor. | . | Jackson, MS 39201 |
| . . . . . . . . . . . . . . . . | | |
| | . | |
| IN RE: | . | Case No. 23-51715-JAW |
| | . | |
| EL DORADO GAS & OIL, INC., | . | |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . . . . | | |
| | . | |
| IN RE: | . | Case No. 24-50223-JAW |
| | . | |
| BLUESTONE NATURAL RESOURCES | . | |
| II - SOUTH TEXAS, LLC, | . | |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . . . . | | |
| | . | |
| IN RE: | . | Case No. 24-50224-JAW |
| | . | |
| WORLD AIRCRAFT, INC., | . | |
| | . | |
| Debtor. | . | April 23, 2024 |
| . . . . . . . . . . . . . . . | . | 1:00 p.m. |

TRANSCRIPT OF HEARING ON:

MOTION TO USE CASH COLLATERAL;

OBJECTIONS TO EMERGENCY MOTION TO USE CASH COLLATERAL &
OBTAIN POST-PETITION FINANCING

BEFORE THE HONORABLE JAMIE A. WILSON
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording, transcript
produced by a transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

2

APPEARANCES:

| | |
|---|---|
| For the Chapter 11 Trustee<br>Dawn Ragan: | Hood & Bolen, PLLC<br>BY:  R. MICHAEL BOLEN, ESQ.<br>3770 Highway 80 West<br>Jackson, MS 39209 |
| | Kelly Hart & Hallman LLP<br>BY:  KATHERINE T. HOPKINS, ESQ.<br>     NANCY L. RIBAUDO, ESQ.<br>201 Main Street<br>Suite 2500<br>Fort Worth, TX 76102 |
| For First Service Bank: | Butler, Snow LLP<br>BY:  JOHN A. CRAWFORD, JR., ESQ.<br>P.O. Box 6010<br>Ridgeland, MS 39158-6010 |
| | Okin Adams LLP<br>BY:  DAVID CURRY, JR., ESQ.<br>1113 Vine Street<br>Suite 240<br>Houston, TX 77002 |
| For Mestena, LLC: | Baker Donelson, PC<br>BY:  ALAN LEE SMITH, ESQ.<br>     AUSTIN JAMES TULP, ESQ.<br>100 Vision Drive<br>Suite 400<br>Jackson, MS 39211 |
| For the Chapter 11 Trustee<br>Drew McManigle: | Jones Walker LLP<br>BY:  JEFFREY RYAN BARBER, ESQ.<br>P.O. Box 427<br>Jackson, MS 39205 |
| | Jones Walker LLP<br>BY:  OLIVIA GREENBERG, ESQ.<br>811 Main Street<br>Suite 2900<br>Houston, TX 77002 |
| For the Debtors: | Sheehan & Ramsey<br>BY:  PATRICK A. SHEEHAN, ESQ.<br>429 Porter Avenue<br>Ocean Springs, MS 39564 |
| For Thomas Swarek: | THOMAS SWAREK, *Pro Se* |

**WWW.JJCOURT.COM**

3

APPEARANCES (Cont'd):

| | |
|---|---|
| For Metropolitan Life Insurance Company: | Adams and Reese LLP<br>BY:  TIMOTHY J. ANZENBERGER, ESQ.<br>1018 Highland Colony Parkway<br>Suite 800<br>Ridgeland, MS 39157 |
| For the U.S. Trustee: | Office of the U.S. Trustee<br>BY:  ABIGAIL M. MARBURY, ESQ.<br>     CHRISTOPHER J. STEISKAL,<br>     SR., ESQ.<br>501 East Court Street<br>Suite 6-430<br>Jackson, MS 39201 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For J-W Power Company: | Miller Mentzer Walker, P.C.<br>BY:  JULIE WALKER, ESQ.<br>PO Box 130<br>100 N. Main Street<br>Palmer, TX 75201-3340 |
| For Thomas Pilot Logistics, LLC: | Bonds Ellis Eppich Schafer Jones LLP<br>BY:  ERIC HAITZ, ESQ.<br>420 Throckmorton Street<br>Suite 1000<br>Fort Worth, Texas 76102 |
| For ArchRock Partners Operating, LLC: | Anderson, Lehrman, Barre & Maraist, L.L.P.<br>BY:  KEVIN MARAIST, ESQ.<br>1001 Third Street<br>Suite 1<br>Corpus Christi, TX 78404 |
| For Park Energy Services, LLC: | Dore Rothberg Law, P.C.<br>BY:  CONNOR J. SMITH, ESQ.<br>16225 Park Ten Place Dr.<br>Suite 700<br>Houston, TX 77084 |
| For the Chapter 11 Trustee Drew McManigle: | Jones Walker LLP<br>BY:  JOSEPH ERIC BAIN, ESQ.<br>811 Main Street<br>Suite 2900<br>Houston, TX 77002 |

**WWW.JJCOURT.COM**

4

TELEPHONIC APPEARANCES (Cont'd):

For MS Facilities, LLC:        Greenberg Traurig, LLP
                               BY:  JOHN HUTTON, ESQ.
                               300 West 6th Street
                               Suite 2050
                               Austin, TX 78701

For Columbus Energy, LLC:      McDowell Knight Roedder &
                                 Sledge, LLC
                               BY:  RICHARD M. GAAL, ESQ.
                               11 North Walter Street
                               Suite 13290
                               Mobile, AL 36602

For Zack Maxey & Bullzeye:

                               BY:   KIM NEALON, ESQ.


                       - - -

5

# I N D E X

**PAGE**

**EXHIBITS**

Exhibit 1 Credit Agreement & DIP Term Sheet        62

6

THE COURT: All right. Good afternoon, everyone. We're here on the 1 p.m. docket. We have multiple matters set this afternoon in the Hugoton Operating Company case, Case 23-51139, the El Dorado Gas and Oil, Inc., 23-51715, Bluestone Natural Resources - South Texas, LLC, Case 24-50223, World Aircraft, Inc., 24-50224. All right. There's multiple matters.

Let's go through and take appearances, and then we'll go through the matters one at a time, as opposed to me calling out the same pleadings that have been filed multiple times over and over again. Mr. Bolen, you want to start us off?

MR. BOLEN: Yes, Your Honor. Good afternoon. We're here for Dawn Ragan in the El Dorado/Hugoton matters. And Ms. Ribaudo is here, along with Katherine Hopkins. And I believe everything involving El Dorado is moot except for the financing and cash collateral.

THE COURT: Okay, Mr. Crawford, come on up.

MR. CRAWFORD: Good afternoon, Your Honor. I'm Jack Crawford with Butler Snow. I'm here on behalf of First Service Bank and David Curry with the Okin Adams firm is also here for First Service Bank.

THE COURT: Thank you.

MR. CRAWFORD: Thank you.

MR. SMITH: Yes, Your Honor. Alan Smith, along with James Tulp, on behalf of Mestena, LLC.

THE COURT: Thank you.

MR. BARBER: Jeff Barber for Drew McManigle, the Escambia Trustee. I'm here with Olivia Greenberg.

THE COURT: Thank you.

MS. MARTINEZ: Christine Martinez, employee.

THE COURT: Thank you, Ms. Martinez. Hold on just a second and I'll circle back around to everyone on the phone. I'm taking appearances from all the attorneys in the courtroom right now.

MR. SHEEHAN: Good afternoon, Your Honor. I'm Pat Sheehan. I'm here representing today Bluestone Natural Resources II - South Texas, LLC and World Aircraft, Incorporated.

THE COURT: Thank you.

MR. SWAREK: I'm Tom Swarek, representing myself pro se.

THE COURT: Good afternoon.

MR. SWAREK: Good afternoon, Your Honor.

MR. ANZENBERGER: Good afternoon, Your Honor. Tim Anzenberger for Metropolitan Life Insurance Company.

THE COURT: Good afternoon. Not everybody run up to the podium at one time. Who else?

MS. MARBURY: That may be all that's left, Your Honor.

THE COURT: Okay.

MS. MARBURY:  For the United States Trustee's Office, Abbie Marbury, and joining me is Christopher Steiskal, jointly on all matters called.

THE COURT:  Anyone else in the courtroom that needs to make an appearance?

(No audible response)

THE COURT:  Let's start with the individuals on the phone.  If you're on the phone and need to make an appearance in the case, go ahead and get started.

MS. WALKER:  Julie Walker on behalf of J-W Power Company.

THE COURT:  Thank you.

MR. HAITZ:  Eric Haitz on behalf of Pilot Thomas Logistics.

THE COURT:  Thank you.

MR. MARAIST:  Kevin Maraist on behalf of Archrock Partners Operating, LLC.

THE COURT:  Thank you.

MR. SMITH:  Connor Smith on behalf of Park Energy Services, LLC.

THE COURT:  Thank you.

MR. BAIN:  Joseph Bain on behalf of the Escambia Trustee.  Good afternoon, Your Honor.

THE COURT:  Thank you.

MR. HUTTON:  Good afternoon, Your Honor.  John Hutton

on behalf of MS Facilities, LLC.

THE COURT:  Thank you.

MR. GAAL:  Your Honor, this is Richard Gaal.  I'm appearing by phone for Columbus Energy, LLC in the Hugoton Operating Company Chapter 11 case.  Thank you for letting me attend by phone.

THE COURT:  Of course.  Thank you, Mr. Gaal.

MR. NEALON:  Kim Nealon (phonetic) for Zack Maxey and Bullzeye.

THE COURT:  Thank you.

MS. MARTINEZ:  Christine Martinez, South Texas employee.

THE COURT:  Thank you, Ms. Martinez.

MS. MARTINEZ:  Thank you.

THE COURT:  Anyone else on the phone that needs to make an appearance?

(No audible response)

THE COURT:  Just a reminder for the individuals on the phone.  You may not record or disseminate this proceeding in any manner.  Candace, go ahead and see if you can move them to listening only at this point.  All right.  All right.  Mr. Bolen, let's circle back around to you, and you tell me which matters that we need to go ahead and mark off.

MR. BOLEN:  Your Honor, I believe everything is off concerning El Dorado and Hugoton, except for the financing and

10

cash collateral motion. It was filed last Monday, Your Honor.

THE COURT: All right. So -- hold on. Motion for adequate protection, Docket 30, off?

MR. BOLEN: That's off. I think everything is off that was filed before Ms. Ragan's appointment.

THE COURT: All right. Then really, all we have today is the status conferences and the debt financing, is what you're telling me?

MR. BOLEN: As far as we're concerned.

THE COURT: We're going to need you to file a withdraw, so that I don't have an orphan pleading on the docket.

MR. BOLEN: We can do that.

THE COURT: Yeah, just file a notice of withdraw and reference the docket number and it'll take care of it. It'll pick up all the objections as well.

MR. BOLEN: Thank you.

THE COURT: Thank you, Mr. Bolen. All right. So, when I prepared -- the pleadings were filed in all of the cases, but I used the pleadings in 23-51715. So, I'm looking at the emergency motion to use cash collateral at Docket 329. The supplement would be Docket 346. The limited objection and reservation of rights at 347. The limited objection by Metropolitan Life at Docket 348, and the limited objection by Mestena at 349. It's the Trustee's motion.

MS. MARBURY: Your Honor, we did -- there is a Docket 350. The U.S.T. did file an objection to Number 329 and El Dorado, 60 and 54, in Bluestone and World Aircraft respectively. Granted, it was filed shortly, but it's there.

THE COURT: You may proceed.

MS. RIBAUDO: Thank you, Your Honor, and good afternoon. My name is Nancy Ribaudo with Kelly Hart & Hallman. I'm counsel for the Chapter 11 Trustee for El Dorado Gas & Oil and Hugoton Operating. Appearances were already provided. I want to thank you, Your Honor, for granting our request to hear this on a expedited basis.

As the Court is aware, we filed the motion a week ago Monday. And it's a joint motion for entry of an interim order today, and eventually final orders authorizing post-petition financing, use of cash collateral, granting of various liens, et cetera, and scheduling a final hearing. This feels a little bit close and loud. Okay.

And, Your Honor, just this morning we filed a supplement that included the credit agreement and the budget. Notice of today's hearing was filed and served on April 17th. The motion was filed and served -- filed on the 15th and served on the 16th. The exhibits to the motion include the DIP term sheet, which is Exhibit A, the budget and the credit agreement, which were filed this morning, and then also the interim order that we filed last week. In addition, we would like to have

12

Ms. Ragan testify today in support of the motion.

Your Honor's aware that we have -- some objections have been filed, as well as we've received some informal comments, which we hope to address with language for the -- proposed language for the interim order. And I'd like to go ahead and turn to that at the end of the presentation today, circle back to that.

For now, Your Honor, I'd like to move forward with a presentation on the motion. This is a joint motion on behalf of the Trustee for El Dorado and Hugoton together with the debtors, debtors in possession, World Aircraft and Bluestone. The amount of the facility that's being requested is $2.5 million on an interim basis, and that's inclusive of the $500,000 advance that was previously provided and approved by stipulated agreed order last month. The overall financing vehicle that would be approved on a final basis is $7.5 million plus an additional 1. -- $1,250,000 for lender reimbursements.

So, Your Honor, the facility terms are really set forth in the interim order, and the DIP term sheet, I think, is a good summary of what the material terms are. To assist the Court's review, I would recommend turning to the -- either the interim order or the DIP term sheet. Just as an overview, and we'll get into more specifics with Ms. Ragan, but, you know, as typical, and I guess I'll turn to the interim order here, starting on Paragraph 5.

THE COURT: Before you get started and to the terms, let's -- let's focus on the biggest issue. Its notice. Supplement was this morning. I have barely had time to get through all that before the hearing. Why is it such an emergency where we can't even get it filed prior to the hearing date?

MS. RIBAUDO: Your Honor, agree. And apologies for the late filing of those documents only this morning. The Trustee only received comments from the pre-petition lender to the credit agreement yesterday, and approval to file the credit agreement and the budget last night. And so we were able to file it first thing this morning, Your Honor.

I also bring to the Court's attention that after filing the agreed interim order last week, we received this morning's revisions to the interim order also from the bank, that we have not yet had a chance to review them, but we'll circle back onto that also. So, Your Honor, I apologize and I do understand, it's not our -- it was certainly not our intentions that things would take so long to be filed, but that was just the way the negotiations rolled out. And the Trustee was waiting for approvals and i's dotted, t's crossed, before these documents were filed.

So, with respect to the need for financing, Your Honor, we are -- the Trustee's in a situation where understanding that the notice issue, we're asking for interim

14

approval today after we present our evidence, with the hope that any issues with respect to notice, with respect to objections, we can address on a final basis and roll that to a final hearing would be our request.

Given the urgent need for financing by the end -- by the end of this month, the Trustee is needing to get an approval of the financing on at least an interim basis as soon as possible, so that she can continue to fund the necessary expenses for these operations for the debtors.  I wish I had a better answer, Your Honor, than to tell you --

THE COURT:  I do too.

MS. RIBAUDO:  -- that it's simply a matter of how the negotiations went and when the Trustee received final comments of these documents that have been heavily negotiated.  It's been an ongoing, arduous process, and we have worked diligently and as hard as possible to try to get things finalized and before the Court with notice to all parties as soon as possibly -- as soon as possible, Your Honor.  And so we filed the DIP motion last week with the terms and an interim order, and left the credit agreement and the budget that needed final -- final revisions, reviews, approvals, and authorities that we did not obtain until late yesterday.

THE COURT:  Have any of the -- Mr. Curry, hold on one second.  Have any of the objections that were filed been resolved?

MS. RIBAUDO:  Yes, Your Honor.  We have with two or three of them, and Ms. Hopkins can address that better than I -- have worked on some agreed language to include in the interim order to resolve those.  Ms. Hopkins, do you want to address more specifically than that?

MS. HOPKINS:  Yes, Your Honor.  Katherine Hopkins on behalf of the Trustee.  As Your Honor has noted, there were, I believe, four filed objections with the Court.  There are also two informal comment -- two parties that requested certain provisions via e-mail, and we've had communications with them just to kind of briefly go through those.  I'll start with the filed objections.

First of all, Escambia, the Trustee, Drew McManigle, filed for the Escambia estates, filed a limited objection and reservation of rights.  I'm not objecting to the motion itself, but rather seeking to preserve certain rights.  As Your Honor may recall, there are some issues and allegations between the parties, specifically some set forth in an agreed order entered in, I believe, the Blue Diamond case, that provides, you know, that certain -- that funds were used to buy other assets of Mr. Swarek's entities.  And those would become, you know, deemed, I believe, to be Escambia assets.

Essentially, and we've had very good communications with the Escambia team, and come to terms that essentially preserve all rights with respect to the Escambia estates.  Also

16

the debtors, the Trustee, as well as First Service Bank, that have been approved by all the parties.  And I can -- it's rather lengthy, so we can read it on the record, and I think also Mr. Barber maybe has copies, I believe.  So, depending on the Court's preference, happy to read it on the record, I just want to preface, it's long.

THE COURT:  Hold on.  So, Mr. Barber, this agreement resolves your objection?

MR. BARBER:  That's correct, Your Honor.

THE COURT:  All right.  Let's go to the next objection.

MS. HOPKINS:  Sure.  So, the next one is Metropolitan Life Company filed, again, another limited objection and reservation of rights.  This, to our understanding, does not necessarily object to the financing per se, but it really seeks clarification that there are no DIP liens, adequate protection liens, finding liens, et cetera, that will be affected -- that will be impacted -- impacting Met Life's collateral, specifically that collateral is some farmland that I believe the borrower on that is World Ag, who's a non-debtor, but still a related entity.

And I spoke to counsel for Met Life prior -- immediately before this hearing.  We weren't previously aware that this objection was coming, but understand the party's position, and clarified with counsel that we were happy to

insert language in there that clarifies that we are not seeking to impose any liens on Met Life's collateral. It is separate and apart from the property at issue here. So, yes, we intend to work with Met Life and counsel to propose an agreed upon language to be inserted in the interim and final order.

THE COURT: (indiscernible)

MS. HOPKINS: Yes, Your Honor. The next one -- well, how about I go in order of agreements versus no agreements? The next one was not a -- was not a filed objection, but there were certain M&M lien holders, Pilot Thomas Logistics, Archrock, Partners Operating, LLC, and Border Well Service. They provided us with informal comments on suggested language, essentially making sure that when it comes to their asserted lien claims, which are basically in connection with 546(b), that arise under Texas Law, that's their position, they want to make sure those are preserved and not affected by the proposed liens in the motion.

And my understanding is that FSB -- because FSB has obviously been very involved in the communications as well, and we want to make sure they're approving the language that the Trustee and debtors approve. FSB, I believe, has approved all the language, and I think we're very close to approving -- the Trustee's very close to approving that language as well. Again, it looks to be just preservation of rights language. But, I want to -- we just haven't had a chance to go back

through the language prior to this hearing.  So, we're going to keep working with them and hope to, you know, agree upon that language.  And we don't anticipate any issues there.

Okay.  Also, certain taxing authorities reached out and, again, wanted to make sure that there -- that there was language providing that their pre-petition ad valorem tax liens, as well as any post-petition tax liens, to the extent either one of these are valid liens, that those were preserved and not primed by the various liens granted proposed -- granted by this order.

So, that was specifically counsel for Bexar County, Brooks County, Denton County, Duval County, Freer ISD, Hidalgo County, Jim Hogg County ISD, Jim Hogg County, Jim Wells CAD, Lavaca County, Livapad (phonetic), McMullen County, Nueces County, Pecos County, Reeves County, Reeves County Tax Districts, Rio Grande County, Rule ISD, Roma ISD, Starr County, Taylor CAD, Victoria County, Webb CISD, and Zapota County.  And we have agreed with them on the language.  And again, I can read that into the record, but we currently have it in the proposed revised interim DIP order, so we don't anticipate any other issue there.

Okay.  Now, circling back to the objections that have not been resolved.  So, the two remaining objections relate to Mestena, LLC and the U.S. Trustee.  We did not receive specific notice from either party that they were filing an objection.

19

While we understand the position certainly, the U.S. Trustee was not a complete surprise. But, we hadn't had the opportunity to understand what the party's issues were until we saw those filed. I believe the Trustee's was filed a little before the hearing, and Mestena's objection was filed, I think, around 9 or 10 a.m. this morning.

It looks like with Mestena's objection, that they are not objecting to the proposed financing, but rather to the release of the estate's claims against the bank. You know, we haven't had a chance to discuss this with the -- with Mestena's counsel. My understanding is that, there was a suggestion that we go ahead and kick the objection to the final hearing. And I believe Mestena wants to go forward with that objection today, which is fine. We anticipate putting on evidence that the release is appropriate, according to the Trustee's investigation. But, I just kind of want to let you know, that one is still outstanding and there hasn't been resolution.

And lastly, with respect to the U.S. Trustee's objection, there's a number of points and issues they have with the proposed financing and the proposed relief. We, again, only briefly went through that and have not had the opportunity to discuss resolution with the U.S. Trustee. But, we certain intend to do so, and we'll work with the U.S. Trustee's Office as well. And again, I think some of the testimony and evidence that will come out today will support some of the -- our

20

positions contrary to the U.S. Trustee's positions.

THE COURT: Ms. Marbury, can you give me an overview of the U.S.T.'s objections, since I did not get to see it?

MS. MARBURY: I can do it from here.

THE COURT: Just be sure your microphone is on.

MS. MARBURY: It looks to be on. A lot of the overarching is -- there's not -- there's not enough information or at least from our position, there's not necessarily enough information. But, one of the things that we had informally spoken to Ms. Ribaudo and Ms. Hopkins was essentially placing a trustee in all but name over World Aircraft and Bluestone. This is something we've objected to before, and at this point, we're objecting to again.

It's my understanding from those discussions, and I understand the -- I understand the reasoning and the desire for the creditors to have Ms. Ragan in charge of those. And I do understand the technicality of the position that she sits in as Trustee. However, there's not a lot of information that we have right now on World Aircraft and Bluestone. Bluestone's schedules, which are enormous, were just filed yesterday afternoon.

THE COURT: Three thousand creditors. Three thousand creditors.

MS. HOPKINS: Yes, Your Honor. And I believe, just to clarify, and I know Mr. Sheehan could provide further

insight. But, it's my understanding that the vast majority of those creditors are mineral interest owners since Bluestone has significant amount of oil and gas leases as assets. There are a substantial amount of mineral interest owners related to those leases.

MS. MARBURY: Well, I mean, one of the -- one of the main issues that we have, not only does it on its face look like an end run around of 1104 in the code in general. But, I don't know that Ms. Ragan has had really enough time to get into these and see, are there conflicts? Because her position is sitting of Trustee over Hugoton and El Dorado does not by default make it okay necessarily for her to be Trustee, whether in name or all but name over World Aircraft and Bluestone if there are conflicts that are arising in there.

And I don't know that we've had enough time or enough information to make that determination whether there have been loans from El Dorado. It's my understanding that El Dorado has essentially, for lack of a more dignified term, a cash cow. For the rest of these entities money has fallen out of El Dorado to whatever entity, I believe Mr. Swarek has deemed fit. Bluestone and World Aircraft falling into that category. Therefore, are they gifts, are they transfers that need to be looked at, as a transfer to an insider within the last two years? Is that going to pose an issue? Are they loans that are due back? Are either of these entities creditors?

These aren't -- this isn't information that we really know, so at this point, we're not entirely comfortable with just carte blanche saying, sure, go ahead and take over these two entities by agreement, or by agreement with the bank, because, I mean, if it's improper and there are conflicts, then really what you've agreed to is agreed to violate the code. But, I'll move on.

If there are assets of World Aircraft and Bluestone that aren't subject to liens, they are now. And that -- I think that's a concern that needs to be considered by the Court. I understand the need for the DIP financing. I understand the need for the money and the operational. We're just bringing up some concerns that we have.

THE COURT: And that's legitimate.

MS. MARBURY: We do have the -- we do have as yet to my knowledge, I understand that the situation between Escambia Operating Company and El Dorado has come to some sort of agreement. I don't really know what that is. But, I think that's another consideration that needs to be taken into is, we have a -- we are trying to marshal a lot of assets into one big pool. And to pay out. And when it comes to plan time, who's paying for all this? These aren't subconned cases. This is marshaling of a whole lot of assets, a number of which we haven't even had a chance to necessarily look through, since we've just had Bluestone's, World Aircraft's 341 was last week.

Three thousand pages of schedules. Granted, they may, a lot of them be mineral right owners, but this is -- this is an enormous amount of information to digest at one time. And here we are 24 -- less than 24 hours since the Bluestone schedules have been filed. That does not make us comfortable in any form or fashion.

To the extent that the motion seeks to encumber assets of a non-debtor entity, I don't feel comfortable there's jurisdiction to do that, all respect to Your Honor. But, I don't know that there's jurisdiction to do that. And even if there is, if we are wrong, then are we taking that entity liening it up and driving it toward bankruptcy? Again, I don't know who's paying for all this. If one entity is paying for it, come plan time, because we got to have separate plans at this point, what's that going to look like?

And I think considering some of the long hearings that Your Honor's been in this week with the U.S.T. present, I think these are very, very real issues that need to be considered long-term. I understand the short-term need. Long-term, I don't want to spend, all due respect to Your Honor, spending another week with you in the courtroom all day, I don't think either one of us are looking forward to that.

The other question I have is, it looks as though the budget is focusing on the operation of El Dorado. Why do we need the assets of the other ones? I understand a number of

24

the creditors in past hearings on other entities have had concerns over the DIP status of these entities, and having more comfort with the Trustee in place, or something like that. We've already touched on our position on that. But, at this point, a defacto DIP status, I don't know is enough to really put a trustee in or put a trustee in all but name. Why do we have to have the assets of two other bankruptcy entities and a non-bankruptcy entity for seven and a half million dollars unless there's a larger amount that I missed, because there's a lot of numbers floating around today.

MR. CURRY: It's eight, seven, two, five. Eight million, seven hundred and two hundred and fifty, just to be clear.

THE COURT: Where did the 8., where did that come from?

MR. CURRY: It's a million, two fifty in fees and expenses reimbursement --

MS. MARBURY: Okay.

MR. CURRY: -- that are deemed borrowings.

MS. MARBURY: Seven and half, 8.25, we're looking at, you know, three quarters of a million dollars difference. And we don't have enough information on releasing FSB at this point. And that may be something that is resolved, but I know you asked for an overview, and I basically gave you a giant rundown, but that's where -- that's where we are.

THE COURT:  Mr. Curry?

MR. CURRY:  So, first with the Court's question about notice, I would point out that the motion, the term sheet, and the order all contain the material terms of the DIP loan, and the DIP liens, and the DIP security package.  The order specifically provides that, to the extent that there is a conflict between the credit agreement and the order, the order controls.  So, FSB's position on an emergency interim DIP, there's been seven days notice on what those material terms are.  Double that, the code allows the Court to enter a final order on it.  So, we think that that should be reasonable notice under the circumstances.

As to Ms. Marbury's concern that the DIP order would be an end run around, the appointment of a trustee, the DIP order does not approve Ms. Ragan's employment as an independent director.  It is a condition precedent to funding that Ms. Ragan have corporate and operational control over the two subsidiary entities.  The Bankruptcy Code does not suspend state corporate governance laws.  And to the extent that a debtor has authority under state law to employ a director or appoint a director or a new officer, 1104 doesn't prohibit that.

To the extent that there may be a conflict there to the retention of a professional, that's going to be addressed in the motion, as we noted in the pleading, that the retention

26

of Ms. Ragan as an independent director will be sought by separate motion. So, that's not even part of what the Court's being asked to consider today.

On the issue of new liens, I don't think I've ever seen a DIP loan where all of the debtor's assets weren't pledged on the DIP. There's no roll-up in this DIP loan. There's no expansion of the pre-petition lien package. To the extent the new liens are granted, it's securing the DIP finance money that's coming in to finance these bankruptcy cases. And so having liens on their assets, they're borrowing money to finance their cases and their operations, it's perfectly reasonable and there's certainly no other money available to finance those cases on an unsecured basis or any other terms.

Funded Dorado Drilling, the Court's not being asked to approve Dorado Drilling as a borrower. It's not a debtor. So, the parties are free to contract outside of bankruptcy. The reason that the DIP loan is before the Court is because the other borrowers are guaran -- well, Dorado's actually a guarantor. The other borrowers are before this Court. And this Court's only being asked to approve the borrowing on behalf of the debtors.

I'm just not familiar with any prohibition that would -- would give this Court concern regarding a non-debtor executing a guarantee. I just -- I don't see how this Court's -- I don't see how the motion implicates, you know, this Court

having any concern over a non-debtor executing a contract that is, in a sense related, but -- but which the Court's not being asked to approve if -- I apologize.

THE COURT:  Well, I mean, in all fairness, you apparently have been working on this for a substantial period of time.  The rest of us have not.  And so, you're asking us to have a very sophisticated understanding of a document that was filed this morning.

MR. CURRY:  We're asking for an interim order to allow financing.  Almost every provision that could be of concern is either said to be -- it's going to be addressed by another pleading.  That's the corporate governance issues.  The releases, the priming, everything else, the order which has been on file since last Monday, and we are tweaking it to address -- several parties reached out and had concerns and raised concerns, and we've been able to address those from the filing of the order and the motion.  But, all of those provisions are subject to entry of a final order.

THE COURT:  I agree.  The problem, part of the practical problem is, I don't know what all these parties have agreed to.  You're going to get me an interim order and there's a very good chance that I'm not going to approve it.  And then where are we going to be?

MR. CURRY:  In a Chapter 7.

THE COURT:  It's a lot for today, Mr. Curry.  It's a

lot for today on such short notice. All right. Ms. Hopkins, I think that gets us back to -- did we talk about Mestena's objection?

MS. HOPKINS: I briefly mentioned it in the fact that it --

THE COURT: Oh, that's right.

MS. HOPKINS: -- was unresolved.

THE COURT: You told me you thought it would be resolved for the final, or you're going to reserve it for the final.

MS. HOPKINS: Well, no. Actually, they have opposed that and want to go forward today.

THE COURT: Okay.

MS. HOPKINS: That's fine with us. We think that it certainly could go forward with all the other substantive issues at the final hearing. But, you know, certainly Mestena does not have to agree to our request, so --

THE COURT: Ms. Hopkins, two options.

MS. HOPKINS: Yes, Your Honor.

THE COURT: If the parties want to take a break and talk about if there's any other -- if there are concessions that can be made to get you through the next 30 days 'til the final hearing can be set, we could do that, or you could go straight forward to your evidence. I just don't get the feeling that everybody has had enough time and get prepared

this afternoon.  I mean, maybe --

MS. HOPKINS:  Sure, Your Honor.  We understand your concern.  And as Ms. Ribaudo stated, we certainly intended to file things earlier than they were filed, you know.  But, we are here today based on, you know, where we're here, right?  So, just for clarification, in the event we took the first option, or you know, elected the first option of let's work together with the parties right now, see what we can agree on, is it the Court's position that a final hearing cannot occur until, I believe you said 30 days?

THE COURT:  Well, I was just thinking 30 --

MS. HOPKINS:  Oh, sure.

THE COURT:  -- you needed, for some reason I thought you needed to be sure you made payroll, that -- for some reason, I thought you were basically running out of money next week.

MS. HOPKINS:  Sure.  Yes, Your Honor.  We --

THE COURT:  The immediate need was to get to the next month to be sure you had enough to get you to the final hearing.

MS. HOPKINS:  Yes, and that's accurate.

THE COURT:  So, I was just thinking 30 days.

MS. HOPKINS:  I misunderstood your statement.  I was thinking that you were saying the final hearing wouldn't occur for 30 more days, which is --

THE COURT: Well, we can -- we can give you available dates if --

MS. HOPKINS: Understood.

THE COURT: -- you're going to be pushed that tight.

MS. HOPKINS: But, yes, you're accurate that a trustee does have specific payroll and other needs that would require this funding within, you know, the next week or so. So, any type of relief that's agreed on would have to occur, you know, pretty quickly. So, if you don't mind --

THE COURT: I mean, if you want to -- if the parties want to take a break and regroup, give me a minute to regroup, like I said, I didn't even have the opportunity to see the U.S.T.'s objection before I took the bench.

MS. HOPKINS: Understood.

THE COURT: I don't know that you've had time to digest it and are prepared to address it in your presentation this afternoon or not. Mr. Barber?

MR. BARBER: Your Honor, I don't know if this would help, but I have a red line of the language that we've agreed to for the Escambia trustee, red lined against the limited objection that we filed. I'm happy to give that to the Court --

THE COURT: All right.

MR. BARBER: -- if you'd like to take a look at that, if that will help.

THE COURT:  Yeah.  I can take -- if you all have drafts of your proposed additional language for the interim order, I can take that back and look at it while you all talk.

MS. HOPKINS:  I'm sorry, Your Honor.

THE COURT:  If you have -- if you have proposed language that -- I can -- if you all want to take a break, I can go ahead and look at the proposed language and make sure if the Court doesn't have an issue with it.  Did you all want to take a few minutes?  If you want to proceed forward with your motion and call your first witness, it's completely up to you.

UNIDENTIFIED ATTORNEY:  Your Honor --

THE COURT:  Okay.

MS. HOPKINS:  Thank you.

MR. BARBER:  May I approach, Your Honor?

THE COURT:  Sure.  The red line?

MR. BARBER:  The red line.

THE COURT:  All right.  I'll take that and look at it.  How long do we want to say -- I mean, I want to say 20 minutes, and if you need additional time, just let us know.  Okay.  Thank you.  We'll be adjourned until 2:00.

(Off the record)

THE COURT:  All right.  It's 3:03 and we're back on the record.  Ms. Hopkins, how are we going to proceed?

MS. HOPKINS:  Yes, Your Honor.  Thank you for the Court's allowing the parties to take that time, and I'm pleased

32

to announce that we have at least for purposes of today resolved these issues. We spoke to counsel for Mestena, as well as counsel for the U.S. Trustee, and have some agreements there.

With respect to Mestena, their issue as I understand it from the objection is that they are opposing the proposed release in the DIP motion, right? So, we have agreed that we will go ahead, for purposes of efficiency of the estate and making sure that interim funding is possible, that we will go ahead and push that issue to the final hearing.

THE COURT: So, you're going to just delete that part of the interim order?

MS. HOPKINS: We are going to --

THE COURT: Or you're going to put it in the --

MS. HOPKINS: So, what we're going to do is, we've requested Mestena -- counsel for Mestena submit to us proposed language that would essentially reserve their rights to assert the objection to the release, and that would carry forward to the final hearing.

THE COURT: Mr. Smith?

MR. SMITH: And, yes, Your Honor, let's make that clear. The reason Mestena's willing to make that concession today is going to be exchanged for some very clear no waiver, no equitable estoppel, no release of any sorts of rights to assert that objection in a final law hearing capacity.

THE COURT: But, it's only your clients. It's only going to be reserved for your client, is that correct?

MR. SMITH: You know, because the Trustee had a similar issue as well. We should probably talk about that. I hadn't thought of this.

MS. MARBURY: Well, we had the concern piggybacking -- piggybacking off of Mestena was that, at this time we didn't have a whole lot of information in front of us as to whether there were causes of action -- potential causes of action against FSB that needed to be pursued. We did have some conversations with Ms. Ragan about what it is she knows at this point. And my understanding is that the interim order would essentially say nothing is released right now, and that would be reserved for a final hearing.

THE COURT: So, you are going to take it out, basically, for the interim?

MS. HOPKINS: Well, my understanding is that the current interim, that the release is only effective upon entry of a final order. But, we can certainly make sure that it is reflective in the interim order.

THE COURT: I'm fine with that, reserving it. But, can we make that bold, very distinct language, so that there's no confusion that that issue is reserved for final?

MS. HOPKINS: Absolutely.

MR. SMITH: And, Your Honor, based on your question,

were you wanting that issue reserved as to any and all of the parties that might --

THE COURT: Yes, everybody.

MR. SMITH: -- care to raise this?

MS. HOPKINS: Yes.

THE COURT: Because I'm not --

MR. SMITH: Not just Mestena?

THE COURT: Yeah. Unless we reserve it and hold it 'til final, I'm not going to sign an interim order that grants releases.

MR. CURRY: And, Your Honor, the form of order we submitted, the clause says subject to entry of the final order the estate grants these releases. Happy to emphasize that subject --

THE COURT: Yes.

MR. CURRY: -- to entry of the final order and, you know, just so the Court hears FSB's point of view. That's our understanding of what we proposed anyway, that that issue is a final order issue.

THE COURT: Okay. Good. All right.

MS. HOPKINS: Thank you. Okay. Moving on to the U.S. Trustee's objection. And I apologize, because I don't have a hard copy, I only have it on my phone. And, Ms. Marbury, please --

MS. MARBURY: Would you like me to bring it to the

35

podium so we can share?

MS. HOPKINS:  That would be great.

MS. MARBURY:  Sure.

MS. HOPKINS:  Thank you.  And I certainly would appreciate your input as to making sure I'm representing everything accurate -- accurately, based on our agreement. But, essentially, Your Honor, we are -- well, okay, I'll just go through it.

(Pause)

MS. HOPKINS:  That would be great.  Thank you.

MS. MARBURY:  I'm going to pinch hit today, Your Honor.  Essentially, our concern with Ms. Ragan being put in a position over -- control over World Aircraft and Bluestone, it's my understanding from counsel for the Trustee that they are, I think this week, filing a separate and distinct motion to address that in more detail.

THE COURT:  All right.

MS. MARBURY:  So, we're sort of saving that fight for another day, another motion.  But, this interim order should specify that under no -- in no way is she being given control over any other entity other than what she currently has as an appointed trustee.

THE COURT:  All right.

MS. HOPKINS:  And just to echo Ms. Marbury, yes, the Trustee will be filing a motion this week anticipating doing it

this week, essentially requesting the relief would be in the form of her serving as an independent director. Similarly to Highland (phonetic) and other cases it will certainly insert case law to that effect. But, she would serve as an independent director with respect to Bluestone and World Aircraft.

THE COURT: Why don't you get closer to the microphone?

MS. HOPKINS: Would you like me to repeat that?

THE COURT: No, no, I got it. I just can hear half of their conversation.

MS. HOPKINS: Okay.

MS. MARBURY: Well, that may -- we may have a snag in that, per Mr. Curry.

MR. CURRY: FSB's understanding of what we agreed is that we would file the motion. Our view is this is no different than any time an estate hires a professional. There's going to be an application to employ, and the Court's going to rule on that. But, in almost every instance that a professional is retained on behalf of an estate, there's a gap period between when the Court hears that.

Our view is that, in that interim if state law permits and it's done pursuant to the corporate governance documents of the debtor, until the Court says, no, Ms. Ragan would have apparent authority under state law and the corporate

governance.

MS. MARBURY:  And at this time we don't have a whole lot of information as to know what conflicts may or may not exist between World Aircraft and the other two entities and Bluestone and the other two entities.  So, it may very well be that we did not reach an agreement on that point.

THE COURT:  Mr. Curry, tell me -- tell me exactly why FSB wants her to be able to control these entities in the interim.  What's the significance of the provision?

MR. CURRY:  We don't feel confident that the collateral is secured if Mr. Swarek has the ability to move collateral or make corporate decisions for the two subsidiaries.

MS. MARBURY:  Sounds like a Trustee motion.

MR. CURRY:  Which I can bring up the draft.  There's -- we're settling that issue by the debtor agreeing to hire an independent fiduciary.  And there's ample case law directly on point.  When the motion gets filed and it gets dealt with, what I'm saying is, this is just like if the debtor hired counsel and filed an application to employ counsel, you know.  There's about a 51 --

THE COURT:  But, can't you really hire somebody to be the DIP?

MS. HOPKINS:  Well, it --

MR. CURRY:  Yes, you can.

MS. HOPKINS: It's not our -- it's not the Trustee's position this would be an application to employ her as an independent director. It would be a motion to seeking appointment of her as independent director, and pursuant to corporate consents and resolutions from each entity.

MR. CURRY: And, Your Honor, as I said, there's ample authority. We've drafted the motion out. It's gone back and forth. There's been some conversations with Ms. Marbury, you know, about potential tweaks. But, in our view, just like, you know, there's about a 51-day gap between when debtor's counsel is hired and when the Court approves it. Debtor's counsel still appears in court and makes representations and has apparent authority to represent the debtor until the Court says there's a conflict and they can't.

And that's what we're proposing to do here. And if Ms. Marbury's objection holds then, you know, Ms. Ragan's appointment as the independent director would not be approved, and we'd have to look at something else. And it may well be a conversion to a 7, because we're not going to leave the assets with the current DIP. But --

MS. HOPKINS: I think the Trustee --

THE COURT: Has there been something that has happened that has inspired FSB for this action? Because really, I mean, it sounds like you're getting to the same point, whether you do it this way, which is unusual to this

39

Court, or if you were just to file a motion to appoint trustee as Ms. Marbury suggests. I'm trying to understand where you're coming from on this.

MR. CURRY: Sure. The issue is that what we're proposing is legally supported and it puts it in the Court's hands. And with all due respect to Ms. Marbury's client, they are not willing to assure us that we won't have competing fiduciaries in this case, and this case can't support that. And the bank's not willing to lend into a fight between two trustees.

MS. HOPKINS: And just for purposes of the record, the Trustee does not feel comfortable acting in that --

THE COURT: Without authority, I get it.

MS. HOPKINS: -- capacity without a Court order. When it comes to appointment of a trustee and her serving as the Chapter 11 trustee with respect to Bluestone and World Aircraft, I don't think she would oppose that. However, I understand that's not -- FSB has communicated that just as well that they're not in favor of that option.

THE COURT: Mr. Swarek, hold on just a second and let me talk to the lawyers just a few more minutes, so that we can kind of flush out this issue. What about to Ms. Marbury's point that -- to simplify it, what happens in 30 or 45 days when a conflict pops up?

MR. CURRY: We've vetted those issues, Your Honor,

40

and we're confident that it's not going to be a problem.

MS. MARBURY:  We don't have any testimony or evidence about what it is they have or haven't vetted.  And that's -- that's the main concern is, we are sort of in the dark as to what other parties may or may not know.  And at this point, it still looks like a backdoor trustee, which --

MR. CURRY:  But, that issue is not before the Court --

MS. MARBURY:  -- (indiscernible) --

MR. CURRY:  -- on the DIP.

MS. HOPKINS:  Correct.  And again, we will be seeking that pursuant to another motion.

MS. MARBURY:  Which we'll have to have another hearing date, and if I understand Mr. Curry correctly, unless Ms. Ragan is in control of it, they're pulling the plug on the funding.

MR. CURRY:  But, that's an issue of state law and corporate governance, that the Court later rule that there's a conflict if there's an issue.  But, if the corporate document that -- that -- the law in the Fifth Circuit and from the Supreme Court is abundantly clear, the Bankruptcy Code does not supplant state law and corporate governance.  So, if the debtor is authorized under applicable state law and their corporate governing documents to hire and appoint a new officer or director, there is absolutely nothing in the Bankruptcy Code

41

that prohibits that. Now --

THE COURT: Has the U.S.T. -- I mean, have you all exchanged the corporate governance documents to make sure that provision's in there?

MS. HOPKINS: We have not exchanged the corporate governance documents with the U.S. Trustee to my knowledge. I will represent to the Court that the corporate governance documents are extremely -- they're very minimal and do not go into details as to this specific situation. I mean, it pretty much, if I recall, puts, you know, Mr. Swarek in control of everything.

MR. CURRY: Which then falls to the gap filler provisions under the various entity's states of organization and --

THE COURT: Well, you're asking me --

MR. CURRY: -- each of --

THE COURT: -- to approve a provision today that I'm kind of getting blind sided with.

MS. HOPKINS: No, Your Honor.

MR. CURRY: But, we're not.

THE COURT: I'm not familiar -- how am I not?

MR. CURRY: Because the DIP order doesn't address Ms. Ragan's status over these two entities in any way.

THE COURT: So, we're carving that out? To make sure we're all clear, Ms. Marbury, you're --

42

MS. MARBURY:  Are we --

THE COURT:  I'm sorry.  I thought I just -- we were having this conversation because it was going to be in there.

MR. CURRY:  No, it's not going to be in there.  Just what Ms. Marbury said was that the order would explicitly state that Ms. Ragan doesn't have any control over these entities, and that's not what we've agreed to.  We've agreed that the issue is not being insided.

MS. HOPKINS:  That it would be subject --

THE COURT:  So, that you can do it in the interim.  Okay.  You know, what happens if we come back on the final and I determine that she wasn't authorized to take any actions in that period of time between today and the final, what's the effect of that?

MS. HOPKINS:  Well, we will likely, in discussions with all the parties, likely as an expedited hearing on that motion, in order to get her authorization or get in front of the Court requesting that authorization, because the Trustee does not feel comfortable until she does have an order.

MR. CURRY:  But, as to the borrowings, Your Honor, it's set up right now for the debtors to sign them.

MS. HOPKINS:  Yes.

MR. CURRY:  So, that issue is not integral to moving forward with the interim DIP.

MS. MARBURY:  Into whose coffer is the money going?

43

Is it going into El Dorado's, because she's Chapter 11 trustee?

MR. CURRY: It's going into El Dorado's, because as Ms. Ragan has explained in her report to this Court, the way these companies were operated, all the revenue, all the expenses, are set to be paid through El Dorado's account. And it's just too much of a scrambled egg to unscramble them. We dealt with that at the last hearing.

THE COURT: So, is it accurate to say that, to the extent that the Trustee takes any action under those corporate documents between now and the time I either approve it or I may not approve it, that's the Trustee's liability?

MS. HOPKINS: Which is why the Court wants -- why the Trustee would prefer an order.

MR. CURRY: And from our point of view, we're actually looking for there to be, essentially, a standstill, and prevent things from happening. Giving Ms. Ragan the control under the state law, you know, through the state law mechanisms, is not intended necessarily for Ms. Ragan to be able to go and do anything other than the ordinary course of business that these debtors operate. It's designed to make sure that something doesn't happen outside of the ordinary course that isn't properly done.

MS. RIBAUDO: (indiscernible) I'm a little bit confused, because (indiscernible) does require Ms. Ragan to meet milestones with respect to (indiscernible).

THE COURT:  All right.

MS. RIBAUDO:  Well, unless we're adjusting milestones until a final entry (indiscernible).  I suppose that that (indiscernible) with current obligations (indiscernible).

THE COURT:  I mean, and she's correct.  One of the milestones that's supposed to happen by Thursday of this week, I think.

MR. CURRY:  It's a motion to be filed.  Again, it's retention orders.  The Court would ultimately have to approve those also.

THE COURT:  Yep.

MS. HOPKINS:  Well, and again, that's contemplated to be filed by the current debtors, Bluestone and World Aircraft.  That wouldn't necessarily be filed by Ms. Ragan, but for in her capacity in these cases as Chapter 11 trustee.

THE COURT:  Well, let me make sure I'm looking at the correct provision.  I'm looking at Page 35 of the proposed order.

MS. HOPKINS:  I'm sorry.  Let me grab the order.

THE COURT:  I'm looking under the events of default provision.

MS. HOPKINS:  I'm sorry.  What -- Page --

THE COURT:  It's on Page 35.

MS. HOPKINS:  Yes.  Specifically --

THE COURT:  So, the first one, debtors shall file the

45

DIP motion.  All right.  The second one, ten business days after the filing of the DIP motion, which is Thursday, the Bankruptcy Court shall have entered -- first of all, I don't put anything in the order that the Bankruptcy Court shall.

MR. CURRY:  Your Honor, it's not a shall.  It's saying that -- it's not an order telling the Court to do something.  This is --

THE COURT:  I would hope not, but it --

MR. CURRY:  Right.

THE COURT:  -- kind of reads that way.

MR. CURRY:  Well, what -- you have to read it in the negative actually on this, because it's if these things have not occurred.  So, if the Court hasn't entered it within ten days, it's a potential event of default.

THE COURT:  (indiscernible) to the point that we were talking about earlier, I think this is the -- you want the debtor to have filed for employment of a liquid -- equipment liquidation professional?

MR. CURRY:  Correct, Your Honor.

MS. HOPKINS:  Yes, Your Honor.

MR. CURRY:  And as we were saying, that's why the provision says the debtors, not the Trustee.  So, we were leaving that ability there.

THE COURT:  Ms. Marbury, they say they're going to file an expedited motion.

MS. MARBURY:  File it.

THE COURT:  Yeah, then file it.  I think the Trustee, she understands the risk involved in this interim period of time.  You might be getting the cart before the horse on this one.

MR. CURRY:  The way it's set up is kind of the same way we filed the DIP motion, right?  That the conflation is until that's confirmed, the debtor -- the two other debtors will, you know, they've got to have corporate authority to do whatever they're going to do anyway, right?  So, that's -- that's the path that we're taking.  That's how we view this until the Court enters the order confirming the appointment or the employment, however you look at it.

MS. HOPKINS:  And for the Court's reference, we have been and will continue to work with Mr. Sheehan as counsel for Bluestone and World Aircraft in connection with these filings, just to make sure that, you know, everything is agreed upon.  And all of the parties that are parties to these motions are, you know, able to provide any comments and, you know, any questions, all of that.

MR. CURRY:  And there are funds in the budget that reflect that for Mr. Sheehan's needs (indiscernible) approved by the Court.

THE COURT:  All right.  Let's move onto the next item.

MS. HOPKINS:  Well, I'm hoping that the other items I'm accurate about.

MS. MARBURY:  Number 2, the U.S.T.'s objection was really more of a concern more than an objection or anything for the Court's consideration, so I think we can move past that one.  Number 3, to the extent that unresolved issues between El Dorado, Hugoton, Escambia Operating, I understand that those are resolved languages going to go into an order that essentially says we will fight about assets when the sale motion is filed.  Or preferably work it out before a sale motion is filed and avoid a fight over who owns what assets.  So, that seems to handle that.

Number 4, assets of Dorado Drilling, I'm told are -- it's not going to be in the interim order requiring anything, and that Dorado Drilling as a non-bankruptcy entity can agree to do whatever it wants to do.  That's fine.  Again, that was --

THE COURT:  Take out the language saying that the liens are going to attach to Drilling?

MS. HOPKINS:  It's my understanding the interim order is not going to impact Dorado Drilling.

THE COURT:  Make sure it doesn't, because it seems like I just saw that somewhere.

MS. MARBURY:  All right.  Number 5, again, was also more of a concern than anything else for the Court's

consideration, as is Number 6.  And Number 7 of the U.S.T.'s objection pointed more toward Mestena's issue of pre-petition -- releases of pre-petition issues against FSB.  And it's my understanding that those have already been resolved pursuant to Mr. Smith and Ms. Hopkin's presentation to the Court.

THE COURT:  Okay.  On -- Ms. Hopkins, on Drilling, I'm looking at Page 21 of your proposed (indiscernible) DIP lender is hereby granted a security interest (indiscernible) of all the assets of debtors and Drilling.  That's the page (indiscernible) --

MS. MARBURY:  Your Honor, so Page 21 --

THE COURT:  I think it's Page 21.  That's what I'm looking at.

MS. HOPKINS:  Yes, Your Honor.  We can strike that.

THE COURT:  And then what about the avoidance actions?

MR. CURRY:  Like with the cash collateral, the avoidance actions are included in the DIP package, but there is a last look provision that says that the DIP lender would not look to the avoidance actions for any recovery unless and until it exhausted all other collateral.

THE COURT:  Okay.

MS. CURRY:  Which -- to tell you where we're coming from, that's market right now.

THE COURT:  My concern was more along the lines, she

had an ample opportunity to determine what potential actions are even out there.  I mean, to be able to say --

MR. CURRY:  For purposes of granting a lien?

THE COURT:  Yeah.

MR. CURRY:  I don't know that it -- any of us know what we're going to find when we -- I mean, a large part -- and frankly, that's exactly why it's important to the lender. We're putting seven and a half million into a black hole.  And if everything evaporates except litigation, there has to be some source of recovery or some lien, some protection, for the lender to finance to get to -- if this were in a Chapter 7 trying to get somebody to do this on a contingency fee basis with absolutely no ability to investigate or do any kind of due diligence on it, I mean, I can't imagine a firm would take this on a pure contingency fee basis.

So, there just has to be a mechanism to get us, you know, further down the road.  It's similar to what I said -- I was here on the Chapter 7 motion.  There's a huge mess and it needs to be unwound.  And while that's being done, you have to keep these assets operating, because without them operating, they have no value.

THE COURT:  I don't disagree with that.  I'm just --

MS. HOPKINS:  Sure.  And to address the Court's concerns about, you know, whether the Trustees had the ability and ample time to look into that, she has investigated whether

or not there are avoidance actions. I mean, for example, she looked into the 90-day preference period and believes that there were little to no transfers within that period. I believe there were maybe two payments to factoring companies. But, otherwise, nothing that caused her concern, which is, I think, why she feels comfortable providing this as another source of collateral to the DIP lender.

THE COURT: All right. So, let me ask a couple of just very specific questions so I make sure I understand. First withdraw will be $2.5 million? First distribution, $2.5.

MR. CURRY: So, five hundred's already been advanced.

THE COURT: Five hundred already's been -- that was the original at the very beginning of the case?

MR. CURRY: Yes, Your Honor. And so the next (indiscernible) is the $2 million.

THE COURT: All right. So, you're going to get another $2 million dollars of, I'll call it new cash, for lack of a better explanation for it. $1.2 is going to pay FSB's fees.

MR. CURRY: That's in there. There is a review process that's set up in there --

THE COURT: I saw it.

MR. CURRY: -- for us to go to get our stuff to -- so, it's up to but, I think we're probably going to be there.

THE COURT: All right. So, we got $2 mil -- go

51

ahead.

MS. RIBAUDO:  Well, I think, Your Honor, I think the $2 million would be for operations.  And I think the lender will reimburse (indiscernible) over and above the –- the amount, the seven and a half million would be paid (indiscernible).  But, the actual amount of the loan amount would also include up to one point --

THE COURT:  And that's how you get to the $8.?

MS. HOPKINS:  Yes.

MR. CURRY:  Your Honor, it's exactly what you said.  It's –- that amount is there and added to the balance of the borrowing.  And the way the interim order and the way the term sheet is written, those fees are due and payable upon entry of the interim order.

THE COURT:  So, we'll get $2 million dollars, cash infusion, for operational purposes?  There's –- what I would –- a small amount carved out for professionals.  How long is that $2 million going to last?  And I can kind of see that –- well, everybody can it see now, that we're contemplating sales of assets.  But, it looks like we're headed to litigation and not reorganization.  Am I reading too much into that?

MS. HOPKINS:  That's what's required under the (indiscernible) in connection with the debt.

THE COURT:  So, I guess –-

MR. CURRY:  Subject to the fiduciary carve-out.

MS. HOPKINS:  Absolutely.

THE COURT:  Right.  Are we going to be able to get there?  And this is why I asked this, because Bluestone, I looked at the hot-off-the-press schedules.  Bluestone was reporting, like, $36 million dollars of assets.  There were about $2 million dollars of debt, just round numbers.  If those schedules are correct, and I have no idea if they are, that's a lot of equity.  So --

MR. CURRY:  We'd all be very happy.

THE COURT:  If that was correct?

MR. CURRY:  Yes, ma'am.

THE COURT:  I just -- I don't want us to fall short.  If it's liquidation, that's fine.  But, I want -- I don't want us to fall short, because now you're going to have all the collateral.

MR. CURRY:  And, Your Honor, one of the things that is significant, that is why one of the early milestones is the engagement of a reserve engineer.  Because, frankly, every debtor hopes that they have a ton of equity in there, but we -- when you're dealing with oil and gas reserves, it's a very specialized expertise, and so we need that same bridge, as I was talking about earlier, to have someone come in and confirm what's there and whether or not -- and so then, you know, we also have in there employment of an investment banker.  You know, we're proceeding through this with the hope that -- that

there is substantial value and enough to cover these estates' debts. I can tell you, as far as the debt side of the Bluestone schedules, we don't agree they're accurate.

THE COURT: Well, so Bluestone was not part of FSB's original $50 million dollar facility?

MR. CURRY: Actually, acquisition of Bluestone was the business plan that was presented to get the main (indiscernible). If you recall from the testimony what happened, Hugoton bought the assets. They were owned by Hugoton. They were right to first refusal, but there are deeds of trust filed that were granted by Hugoton on those leases. They've been without knowledge to the lender executor rescission agreement, and then purchased the equity in Bluestone. That'll be an issue that may or may not be addressed. We're not going to fund litigation against ourselves. But, you know, our position is that we still have liens on those assets.

THE COURT: That answers my question, because I could not recall if Bluestone was part of that facility or not.

MS. HOPKINS: My understanding is Bluestone itself was not a party to that facility. But, we've had communications with FSB as to their position and our position and trying to, you know, decipher all of that. But, I mean, we don't have conclusive, I guess, information as to all of that.

MS. RIBAUDO: And I think, Your Honor, for purposes

54

of the DIP loan, the Trustee is (indiscernible).

THE COURT: Pull your microphone.

MS. RIBAUDO: Yes. The Trustee's comfortable for purposes of the DIP collateral package (indiscernible) particularly because El Dorado and Hugoton operate those assets on behalf of Bluestone so really to fund the operations for those two entities help Bluestone in managing (indiscernible). For that reason, the Trustee (indiscernible).

THE COURT: All right. I'm sorry, Ms. Hopkins, I just have a lot of questions about --

MS. HOPKINS: That's okay. I understand.

THE COURT: On the equipment, what equipment are we selling? Is this equipment going to be subject to the claims of all the other debtors? Are we going to have title issues to the equipment that you seek to sell in this (indiscernible)?

MR. CURRY: Not yet.

MS. HOPKINS: There may be issues that come up in connection with sale motion. I mean, I imagine Escambia may assert, you know, additional preservational rights, or we're going to kind of cross that bridge when we get there. We've been working together to inform each other in advance, hey, we're going to be filing this; hey, we're work -- you know, doing this.

So, we're -- I think we have a very good relationship. And until maybe one day we don't and we're

fighting over proceeds, but again, we think that's for litigation for a later day to really even figure out what are we -- what is the value here that we're even arguing about? And, you know, where do we go from that -- from there?

MR. CURRY: That's really the purpose of the DIP in general, but especially as to the interim. It's life support so that we can keep the plate spinning to figure out what they're worth. And then, you know, best case scenario, there's enough money that nobody fights, you know. How often does that happen? But, you know, we have to go through the steps to get there. And, Your Honor --

THE COURT: Just hiring your professional to evaluate it.

MS. HOPKINS: And the Trustee does believe that this path forward will maximize value in her business judgment.

MR. CURRY: And, Your Honor, I have to beg complete forgiveness. I have a hearing at 9:30 in the morning in Houston, and the latest flight I could get was at 5:30, so I'm asking to be excused and tag Mr. Crawford in.

THE COURT: Okay.

(Laughter)

MR. CRAWFORD: It's going to be real short, Your Honor.

(Laughter)

THE COURT: I understand. Safe travels.

MR. CURRY:  Thank you.

THE COURT:  Mr. Crawford, were you just standing up to take Mr. Curry's spot?

MR. CRAWFORD:  He waved me over here.

THE COURT:  Begrudgingly.

MR. CRAWFORD:  I'm just going to let Katherine go a little bit, and to the extent I'm needed, I will be here.

THE COURT:  All right.  Ms. Marbury, I hear your objection.  I agree.  Ms. Hop -- you got to file -- you got to file your motions.  Mr. Swarek, I see that you're standing up. Is there something that you would like to add?  You need to come to a microphone.

MR. SWAREK:  Yes, Your Honor.  I want to point out, there's been no evidence ever presented to this Court that I moved anything, or that I misapplied anything.  And I question the standing of First Service Bank, because 95 percent of it was a Federal Government Cares Act loan, PPP type, where they're supposed to be forgiven interest and extending the principal payment, which I've never been offered.

First Service doesn't have $50 million dollars in this loan.  The money was furnished by the Cares Act when we kept employees going during that COVID period.  And I also point out that we have not moved anything, and this Court was -- had convened one Friday evening about some fantastic (indiscernible) deal that I'd called the airport and fueled up

57

my jet to go to Argentina, et cetera, et cetera, you know what happened.  And none of that was true.  The affidavit was not true, Your Honor.

THE COURT:  I recall the testimony.

MR. SWAREK:  Yes, ma'am.  And so -- but, if we want to liquidate, let's order the liquidate now.  The leases, I paid $28,250,000 for one of them leases in 2018.  I can get the people I bought it from.  It's a professional company that says it's worth double that now if they sell it.  And that's just one lease.  The equipment, Your Honor --

THE COURT:  Well, I guess for the purposes of today, Mr. Swarek, is do you have an objection --

MR. SWAREK:  Yes.

THE COURT:  -- to the loan?

MR. SWAREK:  Yes, ma'am.

THE COURT:  What is your objection to this loan?

MR. SWAREK:  One objection is, they're making it out for eight million -- eight million, five.  If they're going to just get two million, five, why don't they just make a loan for two million, five?  Let's leave it there and act, because they could decide --

THE COURT:  Well, I think what they're -- what they're doing is, for this interim period of time before we have the next hearing --

MR. SWAREK:  Yes, ma'am.

THE COURT:  -- on the final --

MR. SWAREK:  Yes, ma'am.

THE COURT:  -- it will only be the $2.5.  And then we'll have the final hearing to determine if the balance is going to be approved.

MR. SWAREK:  Yes, ma'am.  And I told Ms. Dawn that I wanted to see the credit agreement before I agreed with it.  And which, she knows that.  And I said, subject to the credit agreement being correct, which this is all came really fast for me as it did everyone, and I'd like to -- I haven't had a chance to read it myself, along with my attorney.  And I understand the need.  But, I don't understand going so fast with everything, where I can't get a look at it, where I can object.

THE COURT:  Well, and that's why we're only granting limited relief today, just so that we're basically trying to keep the company alive --

MR. SWAREK:  Right.

THE COURT:  -- for the next, we'll say, around about 30 days.

MR. SWAREK:  Right.

THE COURT:  We're just trying to stay alive --

MR. SWAREK:  Yes, ma'am.

THE COURT:  -- and keep it going until we can make more finalized decisions about additional loans.

MR. SWAREK: Yes, ma'am. The top 20 creditors are around three -- it's not very much. Ninety eight percent of everything is the bank. I'm going to question the bank's standing to ask for $50 million with a motion pretty soon. I'm talking to Ms. Marbury about it, because we need to have the federal government in here too on this loan, and they all -- they have -- they're treat -- I'm not being -- I'm being discriminated against because the other people like myself are getting interest forgiven, interest -- capitalize forgiven, as long as the principal's paid back, the federal government is happy.

But, the bank has to make interest on there. They only had five percent of it. And in the beginning they got several point closing, there's some government information out now that the banks earned enough fees from managing the government side that they have zero in it, or as the government said, no skin in the game. And that's been the rush for everything from trying to appoint receivers in Texas. One of the reasons I came here to get protection. And everything's always, I'm going to move something, you know what, Mr. Swarek, I haven't had an ever chance to defend myself on that issue. That's what I wanted to say.

THE COURT: Thank you. All right. So, Ms. Hopkins, are you going to get me a revised order?

MS. HOPKINS: Yes. And if permissible with the

60

Court, I'd like to suggest a path forward here.  So, based on all the representations today between the parties and different communications that we have that we didn't necessarily share on the record, but for example, resolving the M&M lien claimant's preservation of their -- to the extent valid liens.  We want to go ahead and present -- we want to draft those new provisions that address all of these issues, the both, the informal objections that have been communicated to us, as well as the formal objections that have been filed, and as resolved per the statements on the record.  And then, you know, and circulated to all of these parties.  And then when we all are in agreement, file a red line with the Court, as well as uploading the clean version for the Court's approval and review.

THE COURT:  The red line will be helpful.  All right. Anything else that we need to take up today?

MS. HOPKINS:  Yes, Your Honor.  I think that the other issue is, a simple one, is setting the final hearing. Ms. Ragan would prefer if the Court's available and can hear it, on or around May 15th, that time period, just to ensure appropriate funding.  I believe she has until maybe the 20th or a little later in the month.  But, we just want to make sure all our ducks are in a row.

THE COURT:  What we've got.  All right.  So, Ms. Hopkins, in your agreed order, first of all, it's got to be a pretty quick turnaround.  I have May the 15th available.  But,

the order has to go out quickly. We can't sit around for another week --

MS. HOPKINS: Agreed.

THE COURT: -- on the order. It needs to go out. But, you can use the 15th. What time would you all like to start that day?

MS. HOPKINS: In the morning, 9:30?

THE COURT: 9:30 on the 15th? Be sure that's predominantly displayed.

MS. HOPKINS: It will be in bold and underlined and all the things.

THE COURT: And then anything else that we need to take up?

(No audible response)

THE COURT: Mr. Bolen's going to withdraw the other motions to clean up the Court's docket on that?

MR. BOLEN: Yes, Your Honor.

MS. HOPKINS: And, Your Honor, one thing that we kind of didn't deal with because there's been resolution announced on the record was, when it comes to evidence, I think for purposes of the record, we'd like to go ahead and admit Exhibits 1 -- it's the credit agreement and the DIP. I think it's 1 through 3. Let me provide Your Honor with a copy of that.

THE COURT: All of that was attached to the

supplement this morning, wasn't it?

MS. HOPKINS: I think everything was, but for the --

MS. RIBAUDO: The DIP term sheet was originally attached to the motion.

THE COURT: Any objection to those exhibits being entered? It sounds like they've already been attached to a pleading. Any objection?

(No audible response)

THE COURT: They'll be entered.

MS. HOPKINS: Thank you, Your Honor. Would you like a copy?

THE COURT: We're going to make a composite one.

MS. HOPKINS: Just one copy?

THE COURT: No, no, no. I'm going to -- it's going to be a composite Exhibit 1.

MS. HOPKINS: Understood. Okay. Thank you.

THE COURT: And we'll mark it for you.

MS. HOPKINS: Thank you. And we'll get the Court one more copy. We have it over here in a second. Just one last final issue. We also didn't take up any testimony from Ms. Ragan. Would the Court prefer a proffer or testimony or, you know, anything, or are we good?

THE COURT: Does anyone want to have any cross examination of the Trustee on this issue today? This is your chance. If no one wants cross exam, I'm fine with the

63

representations. I think I asked most of the questions that you probably would have solicited anyway through her testimony, so I'm fine with not putting on testimony if no one has the desire to cross exam.

(No audible response)

THE COURT: Okay.

MS. HOPKINS: Perfect. Thank you. I think that that addresses all of our outstanding matters.

THE COURT: All right. So, on your upcoming motion that you were going to file, if you're going to file that expedited, be sure you file the motion to expedite with the motion.

MS. HOPKINS: Yes, Your Honor.

THE COURT: Candace, do you -- once the motion is filed, Candace can give you the hearing dates.

MS. HOPKINS: Okay.

THE COURT: You're going to want that. The schedule is tight, let me just say that. The schedule is very tight with the Court. I don't have very many openings available, so keep that in mind. Mr. Crawford?

MR. CRAWFORD: Thank you, Your Honor. We just (indiscernible).

THE COURT: 1:00 (indiscernible)

MS. HOPKINS: That's fine.

MS. MARBURY: I might be able to work it out.

64

MS. HOPKINS: (indiscernible) alternative, and we're fine with afternoon, but to accommodate the U.S. Trustee, we can look at other dates depending on the Court's availability.

THE COURT: Let's see. We could do the 16th, which is that Thursday.

MR. CRAWFORD: Why don't we just with the morning?

THE COURT: And we'll try to make it work? Okay.

MS. HOPKINS: Okay. Thank you.

THE COURT: All right. Thank you. All right. Anything else we can take up today?

(No audible response)

THE COURT: All right. Thank you. I'll look for the agreed order.

MS. HOPKINS: Thank you. We appreciate your time.

THE COURT: Sure.

* * * * *

65

# **C E R T I F I C A T I O N**

I, KIM WEBER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Kim Weber

KIM WEBER

J&J COURT TRANSCRIBERS, INC.    DATE:  May 13, 2024