IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| IN RE: | . Case No. 23-51715-JAW |
| | . |
| EL DORADO GAS & OIL, INC., | . United States Courthouse |
| INC., | . 501 East Court Street |
| | . Jackson, MS  39201 |
| Debtor. | . |
| | . January 28, 2025 |
| . . . . . . . . . . . . . . . . . | . 10:17 A.M. |

TRANSCRIPT OF HEARING ON
MOTION TO EXTEND AUTOMATIC STAY
FILED BY FSB (997), MOTION TO POSTPONE
OR RESET TODAY'S HEARING (1123)

BEFORE THE HONORABLE JAMIE A. WILSON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor-in Possession, El Dorado Gas & Oil, Inc., Bluestone Natural Resources II - South and World Aircraft, Inc. | Sheehan & Ramsey BY: PATRICK A. SHEEHAN, ESQ. 429 Porter Avenue Ocean Springs, MS 39564 |
| For the U.S. Trustee: | Office of the U.S. Trustee By:  ABIGAIL M. MARBURY, ESQ. STEVEN ESRY, ESQ. 501 E Court Street Suite 6-430 Jackson, MS 39201 |
| For Drew McManigle, Trustee for Escambia Estate: | Jones Walker LLP BY: JEFFREY RYAN BARBER, ESQ. 811 Main Street Suite 2900 Houston, TX 77002 |

Proceedings recorded by electronic sound recording, transcript
produced by a transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

For Chapter 11 Trustee        Hood & Bolen, PLLC
Dawn Ragan:                   By:  R. MICHAEL BOLEN, ESQ.
                              3770 Highway 80 West
                              Jackson, MS  39209

                              Kelly Hart & Hallman LLP
                              By:  KATHERINE HOPKINS, ESQ.
                                  NANCY RIBAUDO, ESQ.
                              201 Main Street, Suite 2500
                              Fort Worth, TX 76102

For Mestena, LLC:             Baker Donelson
                              By: ALAN LEE SMITH, ESQ.
                              100 Vision Drive
                              Suite 400
                              Jackson, MS 39211

For Metropolitan Life         Adams and Reese LLP
Insurance Company:            By: TIMOTHY J. ANZENBERGER, ESQ.
                              1018 Highland Colony Parkway,
                              Suite 800
                              Ridgeland, MS 39157

For First Service Bank:       Okin Adams Bartlett Curry LLP
                              By: DAVID CURRY, JR., ESQ.
                                  EDWARD A. CLARKSON, ESQ.
                              1113 Vine Street
                              Suite 240
                              Houston, TX 77002

                              Butler, Snow, O'Mara, Stevens &
                               Cana
                              By: JACK A. CRAWFORD, ESQ.
                              P.O. Drawer 22567
                              Jackson, MS 39225

For Thomas Swarek:            Holcomb Law Group
                              By:  BRADLEY GOLMAN, ESQ.
                              5760 I-55 North, 3rd Floor
                              Jackson, Mississippi 39211

For Texas Railroad Commission Office of the Attorney General
and Texas Transportation      By: SAHRISH SOLEA, AAG
                              300 W. 15th Street
                              Austin, TX 78701

Audio Operator:               Candice Ramage

- - -

3

## I N D E X

|                                                                    | PAGE |
|--------------------------------------------------------------------|------|
| **MOTION TO POSTPONE OR RESET HEARING**                            |      |
| **ARGUMENT**                                                        |      |
|   By Mr. Golman                                                     | 15   |
|                                                                    |      |
| **DECISION**                                                        | 18   |
|                                                                    |      |
| **WITNESSES**                                                       |      |
| DARLA McJUNKINS                                                     |      |
|   Direct Examination by Mr. Crawford                               | 35   |
|   Cross Examination by Mr. Golman                                  | 50   |
|   Redirect Examination by Mr. Crawford                            | 71   |
|                                                                    |      |
| DAWN RAGAN                                                          |      |
|   Direct Examination by Mr. Curry                                 | 81   |
|   Cross Examination by Mr. Golman                                  | 125  |
|   Redirect Examination by Mr. Curry                              | 127  |
|   Cross Examination by Ms. Hopkins                                | 140  |
|   Recross Examination by Mr. Golman                              | 147  |
|   Continued Redirect Examination by Mr. Curry                     | 149  |

| **EXHIBITS**                                                        | ID  | EVD. |
|--------------------------------------------------------------------|-----|------|
| FSB-1 - Trustee's preliminary report 1/31/2024                    | --  | 24   |
| FSB-2 - Trustee's second status report 8/6/23                     | --  |      |
|         Docket 674                                                 | --  | 24   |
| FSB-6 - EDGO's amended Chapter 11 petition                        |     |      |
|         Docket 11                                                  | --  | 24   |
| FSB-7 - EDGO's Chapter 11 petition, Docket 1                      | --  | 24   |
| FSB-11 - EDGO Global notes, Docket 11                            | --  | 24   |
| FSB-24 - EDOG 2019 tax return                                     | --  | 24   |
| FSB-25 - EDOG 2020 tax return                                     | --  | 24   |
| FSB-26 - EDOG 2021 tax return                                     | --  | 24   |
| FSB-27 - EDOG 2022 tax return                                     | --  | 24   |
| FSB-30 - Thomas Swarek 2019 return                               | --  | 24   |
| FSB-31 - Thomas Swarek 2020 tax return                           | --  | 24   |
| FSB-32 - Thomas Swarek 2021 tax return                           | --  | 24   |
| FSB-35 - Bluestone Chapter 11 petition, Docket 1                 | --  | 24   |
| FSB-41 - Bluestone summary of assets, Docket 76                  | --  | 24   |
| FSB-44 - Escambia Chapter 11 petition, Docket 1                  | --  | 24   |
| FSB-45 - Hugoton Chapter 11 petition, Docket 1                   | --  | 25   |
| FSB-47 - Hugoton original schedules, Docket 38                   | --  | 25   |
| FSB-49 - World Aircraft Chapter 11 petition                      |     |      |
|          Docket 1                                                 | --  | 25   |
| FSB-55 - World AG, May 9th, 2018 resolution EDGO                 | --  | 25   |
| FSB-74 - Declaration of Jeremy Rasmussen                          | --  | 25   |

4

**I N D E X (Cont'd):**

|  | **PAGE** | |
|---|---|---|
| **EXHIBITS** | **ID** | **EVD.** |
| FSB-51 - World Aircraft schedules | -- | 25 |
| FSB-52 - World AG 2/23/18 resolution | -- | 25 |
| FSB-53 - World AG EGO 2/27/28 resolution | -- | 25 |
| FSB-54 - World AG 5/9/18 resolution | -- | 25 |
| FSB-36 - Bluestone schedules A/B | -- | 26 |
| FSB-37 - Bluestone schedules D | -- | 26 |
| FSB-38 - Bluestone schedules G | -- | 26 |
| FSB-39 - Bluestone schedules H | -- | 26 |
| FSB-40 - Bluestone statement of financial affairs | -- | 26 |
| FSB-68 - Loan guarantee/El Dorado/World AG | -- | 41 |
| FSB-69 - Continuing guarantee Swarek/World AG | -- | 43 |
| FSB-70 - Continuing guarantee, 2/13/19 | -- | 45 |
| FSB-73 - Bank statements | -- | 49 |
| FSB-17 - W-9 of EDGO | -- | 50 |
| | | |
| SWAREK 1 - Loan request | 55 | 55 |
| SWAREK 2 - Financial statement | 61 | -- |
| SWAREK 3 - Financial statement, 5/31/20 | 62 | 65 |
| SWAREK 4 - Document from Rachel Reese, Esq. | 68 | 68 |
| SWAREK 5 - Title opinions 1997 | 69 | -- |
| SWAREK 6 - FSB debt schedule | 70 | -- |
| | | |
| | | |
| FSB-18 - Statement/assets and liabilities 11/30/21 | -- | 73 |
| FSB-19 - Statement/assets and liabilities 11/30/22 | -- | 74 |
| FSB-20 - Statement/assets and liabilities 11/30/23 | -- | 75 |
| FSB-56 - E-mail/Ragan | -- | 117 |
| FSB-75 - Rental Agreement | 119 | 121 |
| | | |
| SWAREK 7 - Document | -- | 148 |
| SWAREK 8 - Stock Certificate | -- | 149 |
| | | |
| FSB-60 - Notarized Stock Document | -- | 154 |
| FSB-76 - Document | -- | 157 |

5

(Proceedings commenced at 10:17 a.m.)

THE COURT:  All right.  That gets us back to El Dorado, main case 23-51715.  The motion to extend automatic stay filed by FSB at 997.  The response filed on behalf of Mr. Swarek at 1084.  The response filed by Metropolitan Life Insurance Company at Docket 1102, First Service Bank's rebuttal at Docket 1114.

The motion to postpone or reset today's hearing, that was filed last night at five o'clock at 1123 and FSB's response or objection to that motion.

All right.  Unless someone gets up and says otherwise, I'm going to carry all the appearances from the beginning.  All right.  Ms. Hopkins, you stated you had a update you wanted to get to first?

MS. HOPKINS:  Yes, Your Honor, if it's permissible with the Court and I also think it's likely that, for example, the buyer's counsel, Mr. Sanders, who's appearing telephonically, I'm not sure if he's staying for the remainder of the hearing, but, I do think this specific issue is relevant for purposes of his client to appreciate the time if I just give the Court an update.

As the Court is aware, last week the Court entered the three different sale orders approving the Mecom and south Texas and AWP asset sales.  Each of those orders were agreed upon with specific language by the various objecting parties.

6

We appreciate the Court's patience as we worked through with all those parties to get, you know, signature approval and all of that.

We are planning to close the sales on the AWP and south Texas assets no later than January 31st, this week, but, we do have an issue related to the Mecom sale that has resulted in closing not going forward.

Just to kind of give the Court a little background, we were first here, or excuse me, the sale hearing was on January 7th. Mecom was originally supposed to close on January 17th, but, due to this issue, we have not been able to close.

Since the sale hearing we have continued to do title work and research which is, you know, very typical for this type of sale. And we've discovered that a portion or the oil and gas interests here that were subject to the Mecom sale order and were specified in the Mecom sale motion and exhibits, were assigned pre-petition to a related non-debtor third party. The name is El Dorado Oil and Gas Operating Company, Inc. And, for purposes of today, I'll just say OPCO.

Through the Court's understanding, the Mecom sale order, a PSA and the motion contemplates that there would be a sale of 99 percent of the working interests in the Mecom Ranch assets. But, we just found out about this assignment, that apparently appeared pre-petition, did transfer 19 percent of that 99 percent to the OPCO.

7

After researching it, it looks like OPCO is really just an assignee holding company of the debtors. This related entity appears to be created as a show entity to hold mineral interests that should have been conveyed to the debtors prepetition. OPCO was never capitalized, hasn't been financial reporting, has no bank account, did not fund the purchase of these mineral interests pursuant to this pre-petition assignment rather, the debtors funded that.

Ultimately, the interests here were funded and purchased by the debtor. The trustee asserts that these are interests subject to the sale motion and are property of the estate which are also identified in the debtor's schedules.

So, to the extent, our understanding is that Mr. Swarek and OPCO are disputing ownership of these interests and so, the trustee disputes that.

Since this discovery last week we have attempted to try to work with Mr. Swarek in accordance with the sale order that specifically provides that these third parties are claiming an interest in this property that's being sold and those parties shall execute documents to release that interest. At this point we have not been successful in those efforts.

In fact, it's my understanding that when the trustee approached Mr. Swarek, Mr. Swarek, unfortunately, took a position that this was now his opportunity to horse trade and wanted to get paid in connection with his signature here.

8

And, after that, the trustee understands that Mr. Swarek also reached out to buyer's counsel to negotiate a similar deal, essentially contemplation in exchange for his signature which is required under the sale order. Not the contemplation, but, just his signature.

I do want to clarify for purposes of the record that the specific interests that are now being claimed to be owned by OPCO were disclosed in Exhibit S to the sale motion that was served on thousands of people, thousands of parties in interest, including Mr. Swarek.

The Exhibit S specifically identified this full 99 percent working interest in all of these wells that was being sold. Mr. Swarek was aware of the proposed sale of these interests and never has objected. The motion was filed August 9th, the sale objection deadline was September 9th. We never received an objection then. Further, Mr. Swarek was present at the hearing on January 7th and never received an objection or no objection was articulated at that hearing.

If there was any issue with the sale of these assets, that should have been previously asserted and under the sale order the failure to object is now deemed consent to the sale.

Just for purposes of reminding all the parties, there were numerous title objections that we dealt with in connection with the sale motion. There were actual filed objections as well as asserted objections that were informal. We specified

9

and resolved those issues in the language of those sale orders. Mr. Swarek, again, received sufficient notice, the trustee believes, and never asserted an objection.

We are at a difficult fork in the road here as we believe, again, that there was sufficient notice and that the estate potentially may hold causes of action against OPCO and Mr. Swarek for the delay in closing that has occurred so far and the trustee does reserve those, however, at this point we just want to move forward. We want to close this sale, we want to get the necessary documentation pursuant to the sale order and go forward for the benefits of all the parties in interest including Mr. Swarek as an equity interest holder here.

Just to point out some, I think, very relevant provisions in the sale order, it's very clear that the refusal to assign the interest --

THE COURT: Let me stop you. What does the purchaser need to close the sale?

MS. HOPKINS: The purchaser specifically needs an assignment from OPCO to the debtors and then that would effectuate ownership or solidify that which was already believed to be owned by the debtors.

We have presented that assignment to Mr. Swarek, however, he has refused to do so, to execute it.

THE COURT: All right. So, Mr. Swarek won't execute, how are you going to clean it up?

10

MS. HOPKINS:  Well, the issue is that we do believe that his failure to execute is a violation of the sale order, which is why we're coming to Your Honor for direction and guidance here.  Specifically, parties are obligated, it's a shall under a sale order that they shall enter into such documents or execute such documents necessary to effectuate the sale on behalf of the trustee.

Furthermore, any interest that he may assert has also been released under the sale order and that, you know, it was other provisions that say that all persons who are in possession of any portion of the property shall promptly surrender possession.

There's a number of the provisions that apply which Mr. Swarek and OPCO are specifically in violation of, and since we're here, we wanted to bring this to the Court's attention to get this resolved as soon as possible and get that direction as we do believe that Mr. Swarek has waived any objection and those interests are truly owned by the debtors rather than a shell entity OPCO.

THE COURT:  So, as far as the procedural vehicle to effectuate all that, are you thinking a motion to enforce the sale order?

MS. HOPKINS:  Your Honor, to the extent necessary, I believe it would be a motion to compel.  There is a provision under the sale order that says that the trustee or buyer, et

11

cetera, can seek to compel parties to comply with the terms of the sale order. So, if necessary, we can file that and we would request that to be heard on an emergency basis. Although the fact that we're all here, we did want to preview this for the Court to get the Court's instruction and further guidance.

THE COURT: And I appreciate you bringing it, I mean, to my attention. This is a problem. That was -- there's a lot of work done to get to the motion to sell.

MS. HOPKINS: Correct. And just to clarify, this --

THE COURT: A lot of expense to get to the motion to sell.

MS. HOPKINS: And this represents roughly 600,000 or so, 20 percent of the sale price with the Mecom assets. I mean, it is a very significant issue from the trustee's perspective.

THE COURT: Twenty percent?

MS. HOPKINS: Yes, Your Honor.

THE COURT: Not to put the purchaser on the spot, but I'm wondering is purchaser still going to have interest in this after we undertake all of the efforts it's going to take to correct this problem.

MS. HOPKINS: Your Honor, we do believe that it is an easy correction to the extent we can get Mr. Swarek to act in accordance with the sale order, which he needs to execute --

THE COURT: You shouldn't have said it's going to be

12

easy.

MS. HOPKINS:  Yes, Your Honor, nothing is easy in this case.

THE COURT:  Let me just plainly tell you what I'm concerned about, is that we jump, or the attorneys for the trustee jump through all these hoops to the motion to enforce the sale order which I'm thinking you're going to have to serve that.  Everybody that got a copy of the motion to sell.  This is going to be an expensive proposition.  We're going to have to have a hearing on this.  I don't want to extend all that and be concerned that the purchaser is no longer interested, is my concern.  And I realize there may not be any answer to that today, but --

MR. CURRY:  Your Honor, and I can't speak for the purchaser either, but, I do think some of those concerns are addressed with the fact that this is our DIP participant and is credit bidding for these assets.  So, they want to get repaid.

THE COURT:  I forgot about that, you're right.  I forgot about that.  I'm getting the two intertwined.

MR. CURRY:  And, Your Honor --

THE COURT:  Okay.

MR. CURRY:  Yeah.  And it goes without saying, but, obviously, this issue, we think has bearing on what we're about to get into from an evidentiary point of view.  It's another example of Mr. Swarek trying to leverage just horrendous

13

corporate accounting and record keeping to obtain some benefit out of these estates as an equity interest holder. And, that just flies in the face of bankruptcy priority.

THE COURT: Well, again, Ms. Hopkins I appreciate you bringing it to my attention. It is very upsetting just because of the amount of work that had to be done to get the debtor in a position to sell the assets. I don't even want to hazard a guess how much the two motions cost to get us to a sale order. But, I'll look for your motion.

MS. HOPKINS: Yes, Your Honor. And, as I mentioned a moment ago, we would likely ask for it to be on an emergency basis. I understand the Court's consideration of that either way, but, do want to, you know, inform the Court of that in advance. And, I will say that this is not an issue related to all of the other parties in the case. This really is -- you know, I mean, the parties involved are here today.

We have -- you know, so we have theories of concern from the Court's -- I recall that the Court mentioned, you know, when it comes to notice, serving all the parties in the case, however, there's only one or really two parties that are violating -- from the trustee's perspective violating the sale order.

So, we would respectfully request that that be able to kind of -- if that would hopefully provide the Court with some comfort that the appropriate parties who are at issue and

14

that there are disputes with would be receiving further proper notice.

THE COURT:  I'll have to think about that, Ms. Hopkins, I understand.  I'm finding no comfort at all this morning in this situation.  I'll have to think about the notice.  I mean, clearly my knee jerk is that everybody's got to be served, but, let me think about that because --

MR. CURRY:  Your Honor, Mr. Crawford had a suggestion, I'm giving him credit for it.  It's something that we had seen courts do in this circumstance, but, the Court has the authority to sua sponte issue a show cause order and you could set that for as soon as you have availability, then Mr. Swarek can show cause why he's refusing to comply with the sale order.  And if it's an ownership issue, then he can come in and present the ownership.

THE COURT:  I'd rather do it by motion so that folks get more notice because my show cause order won't have any details as to what happened.  And, I feel like people need to understand why all of a sudden there's an issue with the sale and my show cause is just a one paragraph show cause order.  I feel like Ms. Hopkins could give folks a better idea of what the real issue is.

MS. HOPKINS:  Yes, Your Honor, I'd be happy to take the stand on that motion.

THE COURT:  Okay.  I'm sorry.  If you're on the phone

15

can you mute your line, please.  Mr. Swarek, I see you signing up.  Mr. Golman, does your client have something he'd like to add to this?

MR. GOLMAN:  No, ma'am.  We'll await the filing of this motion, we'll take a look at the order, take a look at --

THE COURT:  Okay.  Come on up to the podium.

MR. GOLMAN:  Yes.  We will take a look at the motion when it's filed, take a look at the order, take a look what is provided inside the bankruptcy rules themselves.  As it stands right now, I don't have any of that in front of me on these assertions and we'll deal with it when they are filed.

And, to the extent an emergency hearing needs to be set, we're fine with that being done on a hurry up kind of basis.

THE COURT:  Well, Mr. Golman, you've heard what I said and I know you're new to the case, but, the fact that this issue has just come up, there was a lot of work on those motions to sell.  Mr. Swarek, your attorney is here to speak on your behalf today.

MR. SWAREK:  Yes, ma'am.

THE COURT:  If you need to address the Court, you can do that through counsel.

MR. SWAREK:  Yes.

THE COURT:  All right.  Anything else, Mr. Golman?

MR. GOLMAN:  No, ma'am.

16

THE COURT:  All right.  Ms. Hopkins.

MS. HOPKINS:  Yes, Your Honor.  And one thing, I just clarify again, that these were assets scheduled in Bluestone's schedules which were prepared by Mr. Swarek, but, we will -- we appreciate Your Honor taking a few minutes to discuss this on the record with everyone on it and we will have a motion filed shortly.

THE COURT:  All right.  So, that gets us -- anything else before we get to the main event for today?  Motion to extend the automatic stay by FSB.  All right, Mr. Curry, I'm going to invoke the rule, let's go back to that issue.

MR. CURRY:  Did you want to take up the motion for continuance?

THE COURT:  I can, I can go ahead and knock that out.

MR. CURRY:  Thank you.

MR. A. SMITH:  And, Your Honor, I'm going to be excused --

THE COURT:  Oh, yes, sir, thank you, Mr. Smith.

MR. A. SMITH:  Thank you.

THE COURT:  All right.  Mr. Curry is right.  We need to take up the motion to postpone today's evidentiary hearing filed by Mr. Swarek last night at Docket 1123 and FSB's response.  Mr. Golman, did you know this was filed last night?

MR. GOLMAN:  Your Honor, I did see it when it was filed.  The idea inside that motion is that there is an

17

important witness, the individual who worked for First Service Bank who shepherded the Main Street loan through that process. That's not the only proof that exists.  Clearly his testimony will be important.

What is interesting in this case is on Friday, there was a notice of deposition filed setting his deposition for Monday, which was going to be fine with me and I would have been there to do it and then a few hours later that was cancelled.  That's not a promise.  The filing of a notice of deposition is not a promise that it's going to go forward and I'm not -- but, that is a concession, but, for Service Bank that he's got important information.  That's the import behind that paper that was filed.

And, I understand the details of the rule cited by Mr. Crawford, but, I do want to make the Court aware of the rationale and the thinking behind that piece of paper that was filed.

THE COURT:  Well, my first question is, why didn't you file it?

MR. GOLMAN:  Because I was not instructed to file it. I did not file it because I was not instructed to file it.

THE COURT:  Well, I know you understand this, but, if you're going to represent Mr. Swarek --

MR. GOLMAN:  Yes, ma'am.

THE COURT:  -- I need you as the attorney to file the

pleadings.

MR. GOLMAN:  Yes, ma'am.

THE COURT:  Aside from that procedural issue, this matter has been set, I mean the motion was filed back in December.  If you and/or Mr. Swarek thought this individual was an important witness, you should have subpoenaed him already.

MR. GOLMAN:  Yes, ma'am.

THE COURT:  We're here, I got a courtroom full of attorneys, many of whom have flown in, many came in last night. Your motion is denied.  I mean, obviously, we're going forward today.  This is an important issue, it cannot be delayed and as a practical matter, I don't understand how somebody at the bank has to file about your client's ownership when it seems that, Number 1, if you really felt they were that important you all would have subpoenaed them and, Number 2, he's the one claiming the ownership interest in it.  I can't continue today's matter based on that motion.  So, the motion is denied.

MR. GOLMAN:  Yes, ma'am.

THE COURT:  All right.  Mr. Curry.

MR. CURRY:  Thank you, Your Honor.  We would like to start with invoking the rule.

THE COURT:  All right.  Who is on the phone that you're concerned about?

MR. CURRY:  I don't know.  That's the concern, I don't know who is on the phone.

THE COURT: All right. Candice, this is the list of everybody that's on the phone? All right. Here is who we've got on the phone, Mr. Curry. Texas Attorney General, Michael Gable. GT Law. Who is GT Law?

MR. CURRY: That's Greenberg Traurig.

THE COURT: Okay. Randy Jones. Mr. McManigle if he's still on. Pablo Bonjour.

MR. BONJOUR: Yes, ma'am.

THE COURT: Michael Sanders. Greg Baracato. I've got someone on the phone, the last four digits 0721. Whose telephone number ends in 0721?

MS. ANDREWS: That's me, Your Honor, Sharon Andrews.

THE COURT: Okay. Thank you, Ms. Andrews.

MS. ANDREWS: I'm just monitoring for Park Energy.

THE COURT: Thank you. And then I need 6-5-0-8 to identify themselves. 6-5-0-8. Okay. 6-5-0-8 just dropped off. All right. That's everybody we've got, Mr. Curry, on the phone.

MS. SASSER: I'm on the phone, my name is Christina Sasser. I didn't hear my name called. I'm with Mestena LLC.

THE COURT: She's for Mestena. Thank you, Ms. Sasser. Ms. Sasser is with Mestena, I believe.

MR. CURRY: Mestena, correct. I don't believe that she would be a witness.

Your Honor, there were two individuals at the

20

beginning and I was having some technical issues and I didn't get, there was a Randy and then right before that.

THE COURT:  Jones Ranch, I'm sorry, I said Randy Jones, but it's Jones Ranch LLC.

MR. CURRY:  Okay.

MS. SASSER:  Judge, this is Christine Sasser, my cell phone says Jones Ranch.  That's my caller ID.

THE COURT:  Okay.

MR. CURRY:  Okay.

THE COURT:  That solves it, thank you, Ms. Sasser.

MR. CURRY:  And then there was one right before that, an individual that I didn't recognize.

THE COURT:  Michael Gable?

MR. CURRY:  That one.

MR. GABLE:  Yes.  I'm an operator in Alabama for the well going into the Big Escambia Creek Plant.

THE COURT:  Okay.  Thank you, Mr. Gable.

MR. CURRY:  Your Honor, based on those and I did speak to Ms. Hopkins, I'm not sure about Mr. Gable and so, I would -- I don't know what his interest in the El Dorado proceedings are as an Alabama person, so I don't know if he has any affiliation with Mr. Swarek.  Maybe Mr. Swarek's lawyer can clear that up.

But, to be fair and consistent, Mr. --

MR. GABLE:  No affiliation, I was just curious what

21

was going to.  I was called about the matter earlier.

THE COURT:  Thank you for that.

MR. CURRY:  But, to be consistent, Mr. Vericato (phonetic) probably needs to drop.

THE COURT:  Okay.

MR. CURRY:  He's dropping.

THE COURT:  All right.  So, Mr. Vericato is going to drop off.  All right.  Mr. Curry, to make sure I'm clear, given Mr. Gable's explanation, are you fine with him remaining on the line?

MR. CURRY:  (Inaudible).

THE COURT:  Okay.  So, no issue with Mr. Gable.  Okay.  So, now we have locked the line, nobody else can call in.

MR. CURRY:  Thank you, Your Honor.

THE COURT:  Sure.

MR. CURRY:  And, then, I guess in the courtroom, for FSB, Ms. Darla McJunkins will stay as FSB's corporate rep.

THE COURT:  She's your corporate rep?  Okay.

MR. CURRY:  And then we would need Mr. Swarek to -- or Mr. Swarek's counsel to identify -- and actually, Your Honor, the capacity in which they're staying.  So, if someone is staying as a corporate rep for one or the other companies, that would be relevant.

THE COURT:  All right.  Mr. Golman.

22

MR. GOLMAN:  Yes, ma'am.

THE COURT:  Are you going to have witnesses today?

MR. GOLMAN:  I'm going to have Mr. Tom Swarek is a witness.

THE COURT:  Okay.  And in what capacity is he going to appear today?

MR. GOLMAN: He's going to appear as the equity owner of World AG and the equity owner of El Dorado.

THE COURT:  All right.

MR. CURRY:  I can tell that Ms. -- I recognize her, Ms. Swarek's here, and, if she doesn't get called by them on direct, there's a good chance she gets called by us in rebuttal because of some of the allegations that are there.  So, we would ask that she be excluded from the courtroom until she's called.

They shared their exhibits with us.  It's the position --

THE COURT:  Well, she's leaving now.

MR. CURRY:  Oh, okay, okay.

THE COURT:  I mean, Mr. Golman, do you want to see if she wanted to stay?

MR. GOLMAN:  I don't have a problem with (indiscernible) in that fashion.

THE COURT:  Okay.  All right.  So, that solves that issue.  All right, Mr. Curry, I need a roadmap for today.

23

MR. CURRY: Yes, Your Honor.

THE COURT: How many witnesses are you going to call?

MR. CURRY: We have two witnesses in our case-in-chief.

THE COURT: Okay. And 70 some odd exhibits.

MR. CURRY: Yes, Your Honor. Frankly, we didn't really know what we would be facing, so we over prepared and we may not admit all of those, but, I did speak to Mr. Golman before the hearing because we do have certain exhibits that we believed could be admitted by stipulation.

THE COURT: Okay.

MR. CURRY: And, are you ready to address that?

MR. GOLMAN: Sure.

MR. CURRY: Okay, Your Honor. I believe that we produced the witness and exhibit list in the binder, so, we have agreement on FSB-1 and 2, FSB-6 and 7, FSB-11, FSB-24 through 27, FSB-30 through 32, FSB-35 through 41, FSB-44 through 47, FSB-49 through 55 and FSB-74.

THE COURT: All right. Mr. Golman, so no objection to those coming into evidence?

MR. GOLMAN: I don't have any objection to those coming into evidence. I didn't watch as those things were read, but, they are the things highlighted in yellow. Would you mind e-mailing that to me?

MR. CURRY: No problem.

24

MR. GOLMAN: As marked.

MR. CURRY: The highlighted ones.

MR. GOLMAN: Yes.

MR. CURRY: Will do. I'm going to erase one thing, though. It's just -- I had some handwritten notes.

MR. GOLMAN: Sure.

MR. CURRY: And that's not what we talked about.

THE COURT: All right. Let me run through the list for the record.

FSB-1, Trustee's preliminary report dated January the 31st, 2024. It's going to be admitted.

FSB-2, Trustee's Second status report dated August the 6th, 2024 and I assume these are the docket numbers?

MR. CURRY: Yes, Your Honor.

THE COURT: It's Docket 674, it will be admitted.

FSB-6, EDGO's amended Chapter 11 petition at Docket 11, admitted. FSB-7, EDGO's Chapter 11 petition at Docket 1, admitted. FSB-11, EDGO Global notes at Docket 114, will be admitted.

FSB-24, EDOG 2019 tax return, admitted. FSB-25, EDOG 2020 tax return, admitted. FSB-26, EDOG 2021 tax return, admitted. FSB-27, EDOG 2022 tax return, admitted. FSB-30, Thomas Swarek 2019 return, admitted. FSB-31, Thomas Swarek 2020 tax return, admitted. FSB-32, Thomas Swarek 2021 tax return, admitted. FSB-35, Bluestone Chapter 11 petition at

25

Docket 1, in that case, admitted.

FSB-41, Bluestone summary of assets at Docket 76 in that case, admitted.  FSB-44, Escambia Chapter 11 petition at Docket 1 in that case admitted.  FSB-45, Hugoton Chapter 11 petition at Docket 1 in that case, admitted.  FSB-47, Hugoton original schedules at Docket 38 in that case, admitted.  FSB-49, World Aircraft Chapter 11 petition at Docket 1 in that case, admitted.  FSB-55, World AG May 9th, 2018 resolution EDGO, admitted.  FSB-74, Declaration of Jeremy Rasmussen, admitted.

MR. CURRY:  Your Honor, if you said them, I missed them but I think we also have FSB-51 through 54.

THE COURT:  Nope, I didn't have them.  All right. So, FSB-51, World Aircraft schedules at Docket 43.  Any objection?

MR. GOLMAN:  No, ma'am.

THE COURT:  Admitted.  FSB-52, World AG February 23rd, 2018 resolution.  Any objection?

MR. GOLMAN:  No, ma'am.

THE COURT:  Admitted.  FSB-53, World AG February 27th, 2018 resolution EDGO, any objection?

MR. GOLMAN:  No, ma'am.

THE COURT:  And FSB-54, World AG, May 9th, 2018 resolution.  Any objection?

MR. GOLMAN:  No, ma'am.

26

THE COURT:  All right.  Did we get them all that time, Mr. Curry?

MR. CURRY:  Yes, we did, Your Honor.

MR. GOLMAN:  Yeah, I think so.

THE COURT:  Mr. Curry, you had 35 and 41, correct, but, not 35 through 41.

MR. CURRY:  Oh, no, it is.  It's 35 through 41.

THE COURT:  All right.  So, that gets us back to FSB-36, Bluestone Schedule A through B at Docket 77 in that case.  Any objection?

MR. GOLMAN:  No, ma'am.

THE COURT:  Okay.  FSB-37, Bluestone Schedule D at Docket 78, in that case.  Any objection?

MR. GOLMAN:  No, ma'am.

THE COURT:  FSB-38, Bluestone Schedule G at Docket 80, any objection?

MR. GOLMAN:  No, ma'am.

THE COURT:  FSB-39, Bluestone Schedule H at Docket 81 in that case, any objection?

MR. GOLMAN:  No, ma'am.

THE COURT:  FSB-40, Bluestone Statement of financial affairs at Docket 82, any objection?

MR. GOLMAN:  No, ma'am.

THE COURT:  All right.  Did we get them all that time?

27

MR. CURRY:  We did.

THE COURT:  All right.  Mr. Curry, are we thinking we're going through lunch today?

MR. CURRY:  Your Honor, given the way the prior hearings have gone, I think that's likely.

THE COURT:  Are we going to have travel issues at the end of the day?

MR. CURRY:  Not on our side, we planned accordingly.

THE COURT:  Okay.  Ms. Hopkins.

MS. HOPKINS:  Yes, Your Honor.  We currently had a 4:25, but, it's our understanding that, you know, if needed, then we'll move it to tomorrow.

THE COURT:  Okay.

MS. HOPKINS:  It's not going to be an issue.  Thank you.

THE COURT:  Mr. Crawford.

MR. CRAWFORD:  Yes, Your Honor.  There's an additional individual, a man named Michael Graves is here, who's -- and he has an affiliation with Swarek and was believed keeping equipment and other things earlier in the case and we would ask that the rule be invoked that he not be present during the proceedings.

MR. CURRY:  And, for some context, he has been called as an affirmative witness by Mr. Swarek in the past.

THE COURT:  Do you intend to call him?

28

MR. CRAWFORD: No.

MR. GOLMAN: We do not intend to call him.

THE COURT: If nobody is going to call him why can't he stay?

MR. CURRY: He can.

THE COURT: Okay. Mr. Graves, you're welcome to stay.

MR. CURRY: We would ask the Court to instruct him not to speak to any of the witnesses.

THE COURT: Mr. Graves, they just want to make sure that while you're listening in you don't go out and talk to some witness about what you heard, the testimony.

MR. GRAVES: No, I won't, Your Honor. My only reason for being here is I had entered into an agreement with Macko Group to do (indiscernible) change out of the units from last year. And just trying to figure out where we are with the payment schedules, that and trying to figure out how to do that. I'm just here for that.

THE COURT: Okay. Well, no, thank you for -- yes, thank you for that clarification. All right. Thank you, Mr. Graves.

All right. Mr. Curry, before you launch into your case-in-chief, I need one point of clarification.

MR. CURRY: Yes, Your Honor.

THE COURT: In your motion to extend stay at Docket

29

997, on the second page, Paragraph 7, you talk about at the hearing on the substantive consolidation motion. Which motion, what substantive consolidation motion are you talking about?

MR. CURRY: So, Your Honor, if you will recall at the status conference when we first filed our motion, we explained that there is a motion pending as to El Dorado and Hugoton.

THE COURT: Right. It's been pending for a long time.

MR. CURRY: Right. And, the trustee, her reports have covered her analysis on that and I think it's set late March for hearing. And at the status conference we advised the Court that we would need to amend -- that that's going to need to be amended or supplemented because if you'll recall when Ms. Ragan had talked about the fact that there are over 100 and something entities that Mr. Swarek is the organizer of. And, so, Ms. Ragan has been working through, trying to figure out the connection and relationship on those and it's a little haphazard. So, it's taking a while. But, that's the motion we're talking about. And it will be supplemented and that FSB does intend to file a joiner as well.

THE COURT: All right. So, let me ask counsel for the Chapter 11 Trustee. This amendment to the motion for substantive consolidation, what are we talking about, amending to add non-debtors, how many non-debtors?

MR. CURRY: Well, the other thing is, Your Honor, one

30

thing that we're looking at and this another reason that I don't have a definitive answer for you is, depending on the admin. claim situation, we may be in the scenario where we would go forward with a plan that would include the substantive consolidation rather than do it by motion.  But, obviously, there's a lot of things that need to be done between now and then.  This hearing really needs to be the horse not the cart.

THE COURT:  Okay.  That's debatable, but --  yes, it's set for status in March, not hearing.

MR. CURRY:  Okay.

THE COURT:  But, I'm going to tell you, I have some reservations about trying to do a substantive consolidation and a plan.

MR. CURRY:  Okay.

THE COURT:  I mean, I have reservations --

MR. CURRY:  It's an admittedly unique standard, but --

THE COURT:  And that's why I'm trying to get a sense of, in these pleadings, everybody is talking about this substantive consolidation motion.  So, I go back and look and the only one that's pending had to do with El Dorado and Hugoton and it's hard for me to ascertain why you think it's so relevant when I don't know what you're going to try to do and you keep referring to it, but --

MR. CURRY:  Well, and apologies on the clarity on

31

that, Your Honor.  We should have also included references to Ms. Ragan's report which we will cover today.  But, Ms. Ragan's report has informed the Court that part of the issue that she's been struggling with was the lack of corporate separateness, lack of corporate records.  There's no inner-company balances kept, things like that.  Those are all in Ms. Ragan's report.

And, ultimately, what she had said is, and she can correct me if I'm paraphrasing wrong, but, ultimately, the way we read those reports is that she had said, so far she's seen many of the factors that wouldn't warrant substantive consolidation, but, she's not through with her analysis yet.

THE COURT:  Of just World AG or are we talking about lots of entities?

MS. HOPKINS:  I think that the status reports specifically were focused on debtors, however, in her review and analysis there have been issues coming up with non-debtors which she's continuing to analyze whether it would be appropriate to those, I mean, but, I don't think at this point we're ready to take a position on other specific non-debtors.

I know that that's not as clear as you'd like, but, I just want to kind of tell you that this issue is not as clear as we'd like as well.  So, that process is continuously ongoing here.

THE COURT:  I'm just trying to think through all the mechanics of that.

32

MR. CURRY: So, and, Your Honor, we did put that as we wanted to maintain the status quo. I would also note though, that to the extent World AG is a subsidiary of EL Dorado, we cannot have this asset being squandered while Ms. Ragan is working to liquidate her estate. The value of that stock, the value of that company is in the company's holdings, it's a holding company.

So, even without substantive consolidation the Court has authority and a basis for extending the automatic stay.

THE COURT: I mean, I think I understand what FSB is trying to do, but, I guess it's, you know, you keep referring to that substantive consolidation motion and I don't know how I'm going to rule on that.

MR. CURRY: I understand. And Your Honor, we posited this to you in the form of a preliminary injunction, so I fully intend to cover the prima facie case today for you.

THE COURT: Right.

MR. CURRY: And, look, I've been doing this a long time, I've seen a lot of fraud, I'd seen a lot of bad acts, I've never seen the level of negligence in corporate accounting and record keeping that we're dealing with here.

THE COURT: Well, and I guess I have the same question today as I did the last time that you were here and you're asking for extraordinary relief today.

MR. CURRY: Not exactly, Your Honor. I disagree with

33

that.

THE COURT: Hold on. I don't understand, why don't you go down to your district court case and get basically the same relief that you're trying to get?

MR. CURRY: Well, I can't get -- yeah, I can't get the same relief there, Your Honor, because the district court, there's no withdraw of the reference, the bankruptcy case has been assigned to this court. This court has exclusive jurisdiction over what is and is not property of the estate.

THE COURT: I agree on that point.

MR. CURRY: So, the district court is first going to want to know what this court views of -- I mean, we start this with the fact that on the SOFA, which is attached at the end of the schedule, World AG is listed as a subsidiary of El Dorado.

THE COURT: Let me just ask you this question before we get started on all this because I want to -- this is less than clear from my perspective.

MR. CURRY: Okay.

THE COURT: If FSB has a stock pledge --

MR. CURRY: We do not, Your Honor, that's -- we noted that. The lien in the stock comes through the DIP loan and through our adequate protection, not from a prepetition stock pledge.

THE COURT: So, you think you have a stock pledge only by way of the DIP loans.

34

MR. CURRY: Correct.

THE COURT: Okay.

MR. CURRY: And the adequate protection lien. The prepetition secured lender also has a lien against all of the assets for the use -- to secure a diminution in value claim.

THE COURT: All right. And, go back to the protection language in the DIP loan. How were the DIP loans to be perfected, what was that provision?

MR. CURRY: Both of the DIP loans and the adequate protection loans are automatically perfected upon entry of the order without need for any subsequent filing.

THE COURT: Okay.

MR. CURRY: And, Your Honor, to my point, where I said we don't view it as that much of an extraordinary relief, is because this Court has exclusive jurisdiction over property of the estate. If the stock is owned by El Dorado then it's this court that is supervising the El Dorado estate's liquidation and it's pretty basic corporate law that if the parent orders the subsidiary to liquidate -- you couldn't do it in reverse is what I'm trying to -- but, if El Dorado was the subsidiary of AG, then World AG is never going to be without some fraudulent transfer issues. You're not looking for that entity to provide assets to fund the subsidiary's debt, that's why we set them up separately.

But, when a company holds another company as an

35

asset, then that parent company has the state law right to liquidate the subsidiary in order to pay its debts. That's the position that we believe Ms. Ragan is in right now.

But, in the interim, because World AG is not a debtor and the reason World AG is not a debtor is because Mr. Swarek didn't put in the bankruptcy. And as I said earlier on the sale order, it's our position that Mr. Swarek should not be able to leverage his poor business record keeping into a greater recovery than he would ordinarily be entitled to as an equity interest owner in these companies and that's what we see happening.

THE COURT: Let me ask Ms. Hopkins. Is there some reason why the trustee didn't formally weigh in on today's proceedings?

MS. HOPKINS: The trustee didn't file, you know, a separate pleading for a number of reasons. For one, it's kind of been all hands on deck trying to deal with these sales and make sure that we're focused on all on that.

We have been working with counsel for the bank and we do understand that Ms. Ragan will be testifying today and will testify as to her knowledge, her factual understanding and all that. So, I think that that will be very helpful toward the court as well as the parties in interest to understand what she's found in her analysis. But, there wasn't an issue either way. I mean, we're, you know, I think she's here to report on

36

her factual findings versus, you know, taking a specific position.

THE COURT: Okay. Mr. Curry, how long do you think your first witness is going to take? Should we take our short recess before we get into?

MR. CRAWFORD: Your Honor, Ms. Ragan will probably be --

THE COURT: Ms. Ramage is indicating we should take a break.

MR. CRAWFORD: Take a break.

THE COURT: I tend to follow her lead on that. Let's just take a short break. Let's say 11:15 we'll get started. All right.

MR. CRAWFORD: Thank you, Your Honor.

MR. CURRY: Thank you, Your Honor.

THE COURT: We'll be adjourned until then.

(Recess at 11:05:03 a.m./Reconvened at 11:15:12 a.m.)

THE COURT: All right, on the record. Okay, Mr. Crawford, are you ready to proceed?

MR. CRAWFORD: Yes, Your Honor.

THE COURT: Okay. Call your first witness

MR. CRAWFORD: Thank you. Jack Crawford, again, with First Service Bank and I call Darla McJunkins to the stand.

THE COURT: If you'll step up, Ms. Ramage will swear you in.

McJunkins - Direct/Crawford                    37

D A R L A   M c J U N K I N S, WITNESS, SWORN

MR. CRAWFORD:  Here we go.

DIRECT EXAMINATION

BY MR. CRAWFORD:

Q    Good morning, Mr. McJunkins.  Would you please state your full name for the record?

A    Darla McJunkins.

Q    And where do you currently live?

A    Dennard, Arkansas.

Q    Okay.  And who is your employer?

A    First Service Bank.

Q    All right.  And, Ms. McJunkins, how long have you worked for First Service Bank?

A    I started on October of 1998, so about 27 years.

Q    Great.  And what's your current title?  S

A    SVP Commercial Loans and Risk Assessment.

Q    Who is Thomas L. Swarek?

A    He's a customer of the bank that we've had for 25 plus years.  He originally started out of our Dermott office with, Dermott, Arkansas office with Mr. Grumbles, our CEO and loan officer Angela Golden.

Q    Are you aware --

THE COURT:  Mr. Crawford, I'm so sorry to interrupt you, we're having a microphone issue.  Can you pull that microphone down.

McJunkins - Direct/Crawford                    38

THE WITNESS:  Down?  Yes, ma'am.  Okay, is that better?

THE COURT:  Much better, thank you.

Q    Ms. McJunkins, are you aware that Mr. Swarek has filed a Chapter 11 bankruptcy over a number of his businesses?

A    Yes.  It's kept us very busy.

Q    And, what is your understanding of what the issue is before the Court here today?

A    To discuss and talk about the ownership of the stock of World AG Investments, Inc.

Q    Okay.  And if I refer to World AG, do you understand that that's referring to World AG Investments, Inc.?

A    Yes, sir.

Q    Now, in January 2024, how many outstanding loans did First Service Bank have where Mr. Swarek was either a borrower or a guarantor?

A    Fourteen, including the Main Street loan.

Q    Okay.  And what is the Main Street loan?

A    It's a $50 million loan that was with El Dorado, with Hugoton Operating Company, Tom Swarek and World Aircraft, Inc., as guarantors on that.

Q    All right.  And regarding the 14 loans and your roles with First Service Bank on commercial loans, are you generally familiar with each of those?

A    Yes.  Some of the original loans, again the Dermott loan

McJunkins - Direct/Crawford                39

officer Angela Golden, was the loan officer on those, but, about that time frame I started working with her, plus I've heard him on the board committee approvals and things like that, so I was already familiar with them some, but, I've taken over the main role with all of those that involved him.

Q    Thank you.  Now, when we say El Dorado, are there two El Dorado entities that were created by Mr. Swarek?

A    Well, that became a little more clear through all of the hearings and bankruptcy stuff we've had.  There's El Dorado Gas & Oil and El Dorado Oil & Gas, but, most references with him, he just and his staff would always just call them El Dorado.

Q    Okay.  And so, today you had mentioned El Dorado Oil & Gas, can I refer to that as EDOG?

A    Yes.

Q    Okay.  And you'll know what that means?

A    Yes, sir.

Q    And then we have El Dorado Gas & Oil, and can I refer to that as EDGO?

A    Yes.

Q    Okay.  And then, Ms. McJunkins, I've seen in the loan documents and with the bank accounts, that First Service Bank used a listing where they would call it El Dorado Oil & Gas, a/k/a El Dorado Gas & Oil, or vice-versa.  EDOG a/k/a, EDGO or vice-versa.  And why did First Service Bank use the a/k/a on the documents?

McJunkins - Direct/Crawford                    40

A    We just always wanted to ensure if there's been any miscommunication or a name repeated a different way, so, we always just put that as an also known as to cover all areas of our security.  That could be the same thing if it was El Dorado, Inc. in one instance and then El Dorado without the Inc., on another one.  That happens most times on businesses, someone will drop it off or put C-O instead of actually the word Company.  And so, we'll put also know as just to cover any reference that it might have been called by.

Q    Okay.  And would Mr. Swarek and his staff in their relationship with the bank generally refer to both of those entities just as El Dorado?

A    Yes.

Q    Okay.  And did y'all then start using the a/k/a just to address that issue?

A    Yes, sir.

Q    Okay.  Because it was difficult to understand sometimes what they were talking about?

A    Correct.

Q    Okay.  And, can you give the Court some examples on how Mr. Swarek and his staff would treat El Dorado as one company or one entity with these two different companies?

A    Anytime there was any reference to it, like on the tax returns, they may have the one name but, then there would be, or one gas production that might have it referenced a different

McJunkins - Direct/Crawford                          41

way.  Mr. Swarek would always just state that that's him, he owns 100 percent of it, everything is Tom Swarek, filing it all, it's all me.

Q    Okay.  And, then on -- can you tell the Court about the use EIN numbers.  Would that be used on both companies?

A    Yes.  Yes, we had W-9's that had both names on it, with the same tax ID number.  We had beneficial ownership forms that were signed by that and a letter from the IRS that stated that.

        MR. CRAWFORD:  Your Honor, I'd like to have an exhibit shown on the screen.  I have my iPad hooked up right here.  Is there a -- there we go.  Okay.

Q    And, Ms. McJunkins, just so we can show the Court what we're talking about with the a/k/a, can you -- what I've handed you is, well, my screen is getting small on me here.  What I've handed you here is an Exhibit 68.

A    Yes.

Q    And, can you identify this document, please?

A    Yes. It's an unlimited continuing guarantee with the guarantor El Dorado Oil & Gas, Inc., a/k/a El Dorado Gas & Oil, Inc., with the borrower being World AG Investments, Inc.

        MR. CRAWFORD:  Okay.  Your Honor, we would offer Exhibit 68 at this time.

        THE COURT:  Any objection to Exhibit 68?

        MR. GOLMAN:  No objection, Your Honor.

        THE COURT:  Okay.  Sixty-eight will be admitted.

WWW.JJCOURT.COM

McJunkins - Direct/Crawford                    42

Q     Okay.  And then just briefly, Ms. McJunkins, up at the top where you see the guarantor information, where you have El Dorado Oil & Gas, Inc. a/k/a El Dorado Gas & Oil, Inc., is this an example of how y'all would use the a/k/a to address El Dorado based on the way that Mr. Swarek and his staff were communicating with y'all?

A     Yes, it is.

Q     Okay.  Did El Dorado have any bank accounts with FSB before the bankruptcy filings?

A     Yes.

Q     Okay.  Approximately how many accounts?

A     There was probably around ten.

Q     And what was the name on those bank accounts?

A     The El Dorado Gas & Oil, Inc., a/k/a El Dorado Gas & Oil. I might have reversed that, but it was the a/k/a.

Q     Okay.  All right, thank you.  And did the monies from the oil and gas operations in Texas get deposited into the EDOG, d/b/a or a/k/a EDGO bank accounts?

A     Yes.

Q     Okay.  And so, there was no distinction between the two companies as it relates to the oil and gas revenues?

A     No.

Q     And, I believe you've answered this a few minutes ago, but in their dealings with FSB, did Swarek and his staff use the same employer identification number for both EDOG and for EDGO?

McJunkins - Direct/Crawford                    43

A     Yes.

Q     Now, Ms. McJunkins, let's go back to the Main Street loan that you mentioned earlier.  In Mr. Swarek's response to First Service Bank's motion, his attorney or Mr. Swarek has asserted that First Service Bank is just trying to get something out of World AG now that it didn't get in the negotiations with the Main Street loan.  And, what I wanted to ask you was, you know, why did First Service Bank not get a personal guarantee from World AG as it related to the Main Street loan?

A     Well, we already had one on file that was an unlimited guarantee that would have covered all of Mr. Swarek's indebtedness, El Dorado's indebtedness, so it covered the World AG already, so there was no need to get an additional one.

Q     Okay.  So, let me show you Exhibit 69.  All right.  Ms. McJunkins, I've presented to you FSB-069 and it's on the screen.  Can you -- do you recognize this document?

A     Yes, sir.

Q     Okay.  And can you explain to the Court what this document is?

A     It's an unlimited continuing guarantee with the borrower Thomas L. Swarek and the guarantor World AG Investments, Inc.

          MR. CRAWFORD:  All right.  Your Honor, we'd offer Exhibit 69 at this time.

          THE COURT:  Mr. Golman, any objection to FSB-69?

          MR. GOLMAN:  No objection.

McJunkins - Direct/Crawford                    44

THE COURT:  Sixty-nine is admitted.

Q    And then, Ms. McJunkins, I wanted to focus on that part of the unlimited continuing guaranty and let me read this to you and see if I read this correctly.  Guarantor hereby unconditionally, absolutely and irrevocably guarantees to lender, and that'd be First Service Bank, correct?

A    Yes, sir.

Q    And the guarantor here is World AG, is that right?

A    Correct.

Q    Okay.  Guarantees to the lender the full and prompt payment and performance when due, whether at the maturity date or a required pre-payment acceleration or otherwise, of all obligations of the borrower, and the borrower here is Mr. Swarek, correct?

A    Yes.

Q    To the lender, notwithstanding the fact that from time-to-time there may be no indebtedness outstanding, however created, of every kind and description, and then I wanted to focus on that next language, whether now existing or hereafter arising.  Okay  And did this guarantee predate the Main Street loan?

A    Yes.

Q    Okay.  So, the Main Street loan would be a loan that was hereafter arising, correct?

A    Yes, sir.

McJunkins - Direct/Crawford                    45

Q    And Mr. Swarek had guaranteed it, correct?

A    Yes.

Q    Okay.  And then looking at the definition of obligations, let me read it.  Obligations means any and all indebtedness, obligations, undertakings, covenants, agreements and liabilities of the borrower to the lender and all claims of the lender against the borrower now existing and hereafter arising.  Did I read that correctly?

Q    Yes.

Q    Okay.  And so, even in the definition of obligations, in addition to the language that we read, it clearly covers anything that's now existing or hereafter arising, correct?

A    Correct.

Q    And, once again, the Main Street loan was an obligation that was hereafter arising, correct?

A    Correct.

Q    All right, Ms. McJunkins, let me hand you, let me introduce to you FSB-070.  Oops, I don't know how to clear that.  Let's see.  I didn't realize that screen was live, too.  And, Ms. McJunkins, can you identify this exhibit please?

A    Yes.  Can you scroll it down just a little bit from the top?  Yes, it's the unlimited continuing guarantee.  The guarantor is World AG Investment, Inc. with the borrower El Dorado Gas & Oil, Inc., a/k/a El Dorado Oil & Gas.

         MR. CRAWFORD:  Your Honor, at this time we would

McJunkins - Direct/Crawford                    46

offer Exhibit FSB-070 into evidence.

THE COURT:  Any objection?

MR. GOLMAN:  No, Your Honor, no objection.

THE COURT:  Seventy will be admitted.

Q    Okay.  And, Ms. McJunkins, just so we're clear with Exhibit FSB-70, this is where World AG is guaranteeing all of the debts of El Dorado Gas & Oil a/k/a El Dorado Oil & Gas, is that correct?

A    Yes, sir, that's correct.

Q    And then if we look down at the unlimited continuing guarantee, do you also see that language that we read earlier about whether now existing or hereafter arising?

A    Yes, sir.

Q    Okay.  And, then, likewise, in the obligations language, do you see that language also being included providing for now existing or hereafter arising?

A    Yes, sir.

Q    Okay.  And regarding the Exhibit FSB-70, this guarantee by World AG of all of EDGO, a/k/a EDOG's obligations, did Mr. Swarek ever provide FSB with a written demand or request to terminate this continuing guarantee?

A    No, sir.

Q    Okay.  And then going back to Exhibit FSB-069, that's the unlimited continuing guarantee by World AG of Mr. Swarek's obligations, did at any time Mr. Swarek provide First Service

McJunkins - Direct/Crawford                47

Bank with a written demand or request to terminate or cancel that guarantee?

A    No, sir.

Q    And just for the record, going back to Exhibit FSB-70, the date, can you state the date of that guarantee please?

A    February the 13th, 2019.

Q    Thank you.  All right.  Ms McJunkins, let's just get to the heart of the matter.  What was First Service Bank's understanding as to who owned World AG?

A    That it was El Dorado or Mr. Swarek, that it was 100 percent owned by him or one of his entities.

Q    Okay.  And, did Mr. Swarek provide a beneficial ownership statement to FSB?

A    Yes.

Q    Okay.  And in that beneficial ownership statement, did it assert that he owned World AG, either directly or indirectly?

A    Yes, sir.

Q    Okay.  And then, when the tax returns for El Dorado were submitted, what did First Service Bank glean from those?

A    That World AG was listed as subsidiary on the back attachments.

Q    Okay.  And, did those tax returns indicate also that the income from World AG was being included on those tax returns?

A    Yes, it did.

Q    And the debt that World AG had was indicated on those?

McJunkins - Direct/Crawford                    48

A      Yes.

Q      Okay.  And so, from those submissions, was it First Service Bank's understanding that El Dorado owned World AG?

A      Yes, sir.

Q      Did Mr. Swarek ever provide First Service Bank with a stock certificate of World AG?

A      No.  No, he did not.

Q      Okay.  Does First Service Bank have bank statements for World AG going back to 2018?

A      Yes.  Either 2017 or 2018, yes.

Q      All right.  Ms. McJunkins, let me hand you FSB-073 and can you identify this document for the Court, please?

A      Yes.  This is checking account at First Service Bank in the name of World AG Investment, Inc.  The account number was the 1022849.

Q      Okay.  And, with these bank statements that are on Exhibit 73, is this from November 2018 till 2024?

A      That one bank statement looks like, that exhibit I can see, is just for October 31st through November 30th of 2018.

Q      Right, I'm sorry.  And then the bank statements in this exhibit keep going.

A      Yes, sir.

Q      And did you undertake an effort to go through and review all of these bank statements to determine whether at any point in time the income from World AG was being placed into this

McJunkins - Direct/Crawford                    49

bank account at First Service Bank?

A    Yes, I did.

Q    Okay.  And what did you conclude?

A    I did not find any.

Q    Okay.  We're getting over to the last page.  Okay.  And that runs through --

A    12 --

Q    -- the end of 2023, is that correct?

A    Yes, 12/31 of '23.

        MR. CRAWFORD:  Okay.  And, Your Honor, at this time I would offer Exhibit FSB-073 into evidence.

        THE COURT:  Any objection?

        MR. GOLMAN:  No objection, Your Honor.

        THE COURT:  All right.  Wait, is it 71 or 73?

        MR. CRAWFORD:  It's FSB-073 are the bank statements.

        THE COURT:  Seventy-three is admitted.

Q    And then just one other topic, Ms. McJunkins.  We have in our motion, had indicated that the land for World AG had been sold for taxes, that the taxes hadn't been paid.  Okay.  And were you able to go and check at least one of the counties this morning to see whether or not those taxes had -- or the property had been revened (sic) and the taxes paid?

A    Yes, I did that last yesterday afternoon, close to five o'clock and they were not.

Q    Okay.  And which county did you check?

McJunkins - Direct/Crawford                    50

A     Yazoo, I believe, was the county.

Q     Okay.  And was that available on line for you to check?

A     Yes.

MR. CRAWFORD:  Okay.  Your Honor, earlier, I had asked the witness about FSB-069 and she had identified it and my co-counsel indicates that I don't think I asked for it to be admitted.  At this time, I'd ask that Exhibit FSB-069 be admitted into evidence.

THE COURT:  My notes say that it was entered, but, out of abundance of caution, Mr. Golman, any objection to FSB-69?

MR. GOLMAN:  No objection, Your Honor.

THE COURT:  Okay.

MR. CRAWFORD:  Thanks, Your Honor.

THE COURT:  Submitted again, Mr. Crawford.

MR. CRAWFORD:  Double admitted, thank you.

MR. CURRY:  Just trying to make sure I didn't miss one.

THE COURT:  Appreciate it.

Q     Okay.  And, Ms. McJunkins, just wanted to get you to look at Exhibit FSB-17 and this is, can you identify this document, please?

A     It's a W-9 form for El Dorado Gas & Oil, Inc.

Q     Okay.  And then over here on the right is, you see where it has the identification, the employer identification number?

McJunkins - Direct/Crawford                    51

A    Yes, sir.

Q    Okay.  And, these would be forms that would be from time-to-time submitted to First Service Bank?

A    Yes.

MR. CRAWFORD:  Okay.  Your Honor, at this time we'd ask that Exhibit FSB-017 be admitted.

THE COURT:  Any objection?

MR. GOLMAN:  No objection, Your Honor.

THE COURT:  Admitted.

Q    And, Ms. McJunkins, looking at this exhibit, would y'all have received a W-9 for EDOG also, from time-to-time?

A    Yes, but it would have the same tax ID number.

Q    Okay.  And, that was my point.

A    Yes.

MR. CRAWFORD:  All right, thank you.  Your Honor, that's all I have.

THE COURT:  Okay.  Mr. Golman, any cross exam of Ms. McJunkins?

MR. GOLMAN:  Yes, Your Honor.

THE COURT:  Okay.

CROSS EXAMINATION

BY MR. GOLMAN:

Q    Ms. McJunkins, you are the custodian of the records that relate to what is described as the Main Street loan, correct?

A    Yes.

McJunkins - Golman/Cross                    52

Q     Were you present at the closing of the Main Street loan?

A     Yes.

Q     All right.  Who else was present at the closing of the Main Street loan?

A     First Service Bank employee wise or do you mean --

Q     Let's start with First Service Bank, I think that's a fine place to start.

A     Tom Grumbles and Kenneth Barnard, our CEO and CFO.

Q     Who for the bank was primarily responsible for generating the paperwork and seeking approval for the Main Street loan?

A     It would have been a combination of us all three.  Kenneth Barnard handled a lot of that, but, you know, undertaking wise, I did a lot of the paperwork along with him, but, he was the one that was handing out the paperwork at the time of the closing, for everybody to facilitate the signatures.

Q     Okay.  I'm going to place a document on the screen here and that is the first page of a one -- eleven page document, it begins Main Street loan request.  Have you ever seen that before?

A     There were several documents in that, when we were doing requests.  I don't know if that one is a specific one, I'd have to probably look at the other pages of it, but, it looks like the same information that was included on a lot of them as in, you know, paying off Energy Bank and some of the other disclosures that are pertinent to that specific loan.

McJunkins - Golman/Cross                          53

Q    Okay.  On the first page here, what is it that makes you think that this does have something to do with that Main Street loan?

A    Well, it mentions it at the very top, it says El Dorado Gas & Oil, 50 million which was the amount of the loan, from the MS POS lending program, which was the Main Street program.

Q    Is this a document that would have been prepared by the bank?

A    I can't tell you that for sure with just seeing a packed up document.  I don't know for sure, I'd have to look at it and see.  It could be, it looks like there should be other pages to it.

Q    I think there are some substantial other pages.  I'd like to show you the second page.  Just read through the language that is in Roman Numeral II, description of the borrower and then look up at me when you've had a chance to review that.  I want to ask you some questions about it.

A    Okay.  So, you just want the first paragraph?

Q    Well, it's one, two -- four full paragraphs.

A    Okay.  All right.  Thomas Swarek formed El Dorado --

Q    You don't have to read it out loud unless you want to.

A    Oh, no, okay.  I thought that's what you meant.  I'm sorry.  Okay.

Q    All right.  Is it fair for me to say that under Roman Numeral II, description of the borrower, this is describing an

oil and gas business, correct?

A    Yes, it's describing either the history of someone that was in that, maybe a gap from when they did that because the years are, you know, 1986, it looks like there's an 80 something of that, and then what's going to be happening now.

Q    Does this look like a true and correct copy of the second page of the Main Street loan request?

Q    I don't have that in front of me, so, I can't say for sure that this is exactly what was submitted because there were several versions of narratives and credit proposals and putting together things that we had to supply.  It wasn't our normal credit proposal for an in-house loan.  We had to meet the Main Street regulations, so, it looks like a narrative that, yes, that was trying to describe the customer at the time that was applying for the loan.

         MR. CRAWFORD:  I would like to object, pose an objection --

         THE COURT:  We need to give her the document.

         MR. GOLMAN:  May I approach the witness, Your Honor?

Q    Just take a look at those pages, Ms. McJunkins, please.

A    Okay.

Q    Does that look like the Main Street loan request that relates to the Main Street loan that is implicated in these facts?

A    It looks like a version of it, yes.  I cannot tell you

McJunkins - Golman/Cross                    55

that was the exact one that was filed with them unless I was at my computer and could see the one that we specifically submitted, but, it looks like a very close representation of it, yes.

Q    Okay.  And this would be a regular document that is contained within the bank's own records, correct?

A    Yes.  It's -- like I said, a little different version for the Main Street because they're credit proposals are a little bit different than our in house ones, but, yes.

MR. GOLMAN:  All right.  Your Honor, I would ask that this marked and admitted.

THE COURT:  Any objection?

MR. CRAWFORD:  No objection.

THE COURT:  All right.  So, let's mark that as, we'll just say Swarek 1, is that okay, Mr. Golman.  Swarek 1 is admitted.

Q    What is your knowledge regarding the assets owned by World AG?

A    I think it's primarily farmland.

Q    Is -- on land described in Paragraph 2 of the second page of this Main Street loan request document.

A    I don't see the description of this part of it, but, I know on other credit proposals that we have with Mr. Swarek it mentioned farm related activities in his past.

Q    Okay.  Turn your attention to, well, it's right there, on

McJunkins - Golman/Cross                    56

the second page begins description of the collateral and it goes onto the next page.  And, you can look at the physical copy if that's easier for you.

A     It's fine.

Q     Okay.  Now, is that talking about what I would call row crop property?

A     No, that specific collateral is talking about oil and gas.

Q     Turning to the next page, there's an A, B, C and D listing different fields in Texas and some other information that concludes, Paragraph III, does any of that describe or discuss or talk about row crop land?

A     No, that's discussing the oil fields themselves.

Q     The next page is, it's Roman Number IV that begins at the bottom of the previous page, but, there are paragraphs that have to do with operational risks and then financial risks. Did those operational risks on this page have anything to do with the operational risks that accompany a row crow operation?

A     No, they do not appear to.

Q     Okay.  Is it fair for me to say that, and if this within your knowledge, is it fair for me to say that a row crop operation has different kinds of risks than an oil and gas operation?

A     Yes.

Q     Hail and storms and floods, right?

A     They could affect those, but, yes.

McJunkins - Golman/Cross                 57

Q    The next page, continuing Roman Numeral IV, discusses commodity prices.  Are those commodity prices having to do with the oil and gas business?

A    Not on this specific page, but -- yes, I'm sorry, on this specific page, it is oil and gas, yes.

Q    Is there anything on that page that has to do with the commodity prices and the variances that can occur with, say, corn or soy beans or cotton or sorghum or anything like that?

A    No, I do not see that.

Q    The bank, obviously, knew about World AG prior to the Main Street loan, that's true, correct?  The bank statements predate the Main Street loan, right?

A    Yes.

Q    And there's some guarantees that predate the Main Street loan.

A    Yes.

Q    Do you know in your status as a banking professional, how to perfect a security interest in real property?

A    Yes.

Q    All right.  It's done with a deed of trust, correct?

A    Yes.

Q    Did the bank take a deed of trust on these properties?

A    We did not on, I'm assuming you're talking about the farmland.

Q    World AG's properties.

McJunkins - Golman/Cross                    58

A    The World AG, yes.

Q    I should be more specific.

A    No, because sometimes if it's not the specific collateral, like in this instance, the specific collateral is the oil and gas assets in that industry, but, the guarantee will blanket other assets that a customer has, that we don't go out and specifically put another deed of trust or security agreement on because the guarantee is already enforcing that for it.

Q    Does the guarantee create a perfected security interest in real property?

A    It gives us -- it gives the opportunity to pursue a lien against that property.

Q    And, how do you pursue that kind of a lien through a guarantee?

A    That would be something our attorneys would have to answer, but, we would normally get an attorney and we would file suit and have to do a summary judgment or something to that effect, I would assume.

Q    Were there financial statements that were submitted supporting the Main Street loan?

A    Yes.

          MR. GOLMAN:  May I approach the witness, Your Honor?

          THE COURT:  You may.

          COURT CLERK:  Okay to mark the first one --

          THE COURT:  You marked the first one?

McJunkins - Golman/Cross                    59

MR. GOLMAN:  Your Honor, so go ahead and mark that one?

THE COURT:  Yes.  Mr. Golman, let's go ahead and give Ms. Ramage Exhibit 1 and we'll mark it.

MR. GOLMAN:  Statement, November.

Q     All right.  Will you flip through the document I just handed you?  Just take a look at it.

A     Okay.

Q     Yes.  Are you familiar with this document?

A     Yes.

Q     All right.  Is this a document that was submitted to First Service Bank as a part of the Main Street loan?

A     It appears to be one of the many financial statements, yes.

Q     Okay.  About how many were submitted?

A     Several.

Q     I only have two to ask you about today, okay.  I'm not going to go through more than that.  The second page is the letter from the CPA's, correct?

A     Correct.

Q     Is that normal for a financial statement to be submitted to the bank?

A     Yes.

Q     The third page is where the meat of the information regarding the financial statement would be.  You see there are

McJunkins - Golman/Cross                    60

lists of assets, cash and inventory, correct?

A    Yes.

Q    And then there are buildings, furniture, equipment, land and vehicles, correct?

A    Yes.

Q    That land figure is $333,488.  I'm reading that correct, am I not?

A    Yes.

Q    All right.  Do you know how many acres of row crop land World AG owns in the south end of the Mississippi Delta?

A    I do not know the specific, I know it's in the thousands, but --

Q    It's in the thousands of acres.

A    Mm-mm.

Q    All right.  Is that dollar figure there enough to be the value of the World AG property?

A    No, I would not think so.

Q    Okay.  Isn't that referring to real property assets in Texas that have to do with the oil and gas business of El Dorado?

A    It could be, I can't tell you for sure because he doesn't have an itemized list of what that actually entails.

Q    All right.  Go down to liabilities and stockholders equity.  Actually, I have one stop to make before we get to that.  Under

McJunkins - Golman/Cross                61

other assets, you see investment in Flooring Mart?

A     Yes.

Q     Do you know what that refers to?

A     The Flooring Mart, the only thing I know about that is that's where his main office space is in Gulf Port.  That was called the Flooring Mart as far as I know.  Not sure exactly on the investment part, but, that's what I would think it'd be referencing.

Q     Okay.  Flooring Mart, did you -- are you aware that Mr. Swarek had for some period of time run a carpet store in Gulf Port?

A     I don't know if he personally ran it, but, yes, the top part of that Flooring Mart was where his office space was and the bottom part was the carpet flooring business.

Q     All right.  So, that's a value on the financial statement, correct?

A     Yes.

Q     Do you see any value here that would reflect stock in World AG?

A     I don't see anything on there right now that would reference that amount.

Q     All right.  And, the Main Street loan was approved, in part, in reliance on this financial statement.

A     This and several others, yes.

Q     In part.

McJunkins - Golman/Cross                    62

A       Mm-mm.

MR. GOLMAN:  Your Honor, I would like to mark this as and admit this as S-2.

THE COURT:  Any objection?

MR. CRAWFORD:  Your Honor, I -- we object.  There's handwriting that's on this document and I don't know where that came from.  He hasn't addressed that with the witness.  So we would object, that would be --

THE COURT:  Do you want to cover that real quick?

MR. GOLMAN:  I'll withdraw it.

Q    Turning to the third page -- that's not the third page, I've got them out of order.  Turning to the third page, do you have any knowledge of the handwriting that is on this page?

A       I do not.

Q    Let me show you another financial statement.

THE COURT:  Mr. Golman, are you going to move, still move to enter S-2?

MR. GOLMAN:  I want it identified at this time.  I'm not trying to move it, to enter it right now.

THE COURT:  Okay, all right.

MR. GOLMAN:  Just marked for identification as S-2, please.

THE COURT:  So noted.

MR. GOLMAN:  And, I believe I have one has no handwriting on it.

McJunkins - Golman/Cross                63

Q    Is this a subsequent -- well, let me approach, may I approach te witness, Your Honor?

THE COURT:  Yes.  All right.  So, we're going to premark this one as S-3, Swarek 3?  Is this the same copy or is this a different financial statement?

MR. GOLMAN:  It's a different financial statement.

THE COURT:  Okay.

MR. GOLMAN:  So, this would be for ID S-3.

THE COURT:  Three.

MR. GOLMAN:  Yeah.

Q    Ms. McJunkins, I gave -- yeah, I did.  What's the date of this financial statement?

A    May 31st, 2020.

Q    And, the Main Street loan closed in September of 2020?

A    Correct.

Q    I'll give you one with a staple in it so -- the second page is something similar to the other financial statement, correct?

A    Correct.

Q    The third page has no handwriting on it, does it?

A    No, sir.

Q    That's okay, good.  This lists assets and profit and equipment including land at $333,488, correct?

A    Correct.

Q    Is that a true statement I just made?

A    Yes, sir.  That's what it says.

Q    Yes.  That three hundred and thirty-three, four hundred eighty-eight dollars -- $333,488, is not referencing the value of real property owned by World AG, correct?

A    I would assume not.

Q    This does have the same indication of investment in Flooring Mart, is that right?

A    Correct.

Q    This does not contain an indication of the value of the shares of World AG.

A    No, it does not appear to.

Q    And this is part of what was relied upon in issuing the Main Street loan to the extent of $50 million.

        MR. CRAWFORD:  Let me lodge an objection.  I don't see anywhere where this document is being identified as to where it came from.  I don't see any Bates labels on it and I don't know how the witness can tell if this document that's from their files or what.

        MR. GOLMAN:  I think she has testified that this is a financial statement submitted to First Service Bank within the course of the Main Street loan.

        THE COURT:  Well, let's just ask --

        MR. CRAWFORD:  I was on the Swarek-3.  I don't believe that questions's been asked on Swarek-2, I don't believe he asked the question for Swarek-3.

McJunkins - Golman/Cross                    65

THE COURT:  Ask her on three.

MR. CRAWFORD:  I don't know where this document came from --

MR. GOLMAN:  Your Honor, this is a speaking objection telling the client, telling the witness what to say.  I would prefer that not be done in this court.

THE COURT:  Understood.  I'm going to ask you to ask her if she recognizes what we've premarked as S-3, the 2020 financial statement.

Q    Do you recognize this 2020 financial statement?

A    I can say that I recognize that's how some of them changes, they would have that cover page and that accounting firm.  I do not have all the financial numbers, obviously, memorized to each financial statement to tell you that that is the exact one that I saw.  I would have to look at my records and see what I had on record with First Service Bank to be able to tell you these numbers and this specific financial statement match it identically.  But, it looks similar.

Q    Do you have any reason to doubt that this is a true and correct copy of the financial statement submitted May 31, 2020?

A    I do not.

MR. GOLMAN:  Your Honor, I would like to admit the May 31, 2020 financial statement of El Dorado Oil & Gas.

MR. CRAWFORD:  Your Honor, I'm just going to continue my objection in the sense that there's no proof as to where

McJunkins - Golman/Cross                    66

this came from.  So, I can't swear to the validity of this.

THE COURT:  Understood.  I'm going to overrule your objection and allow S-3 to be submitted.

Q    In your direct testimony, you related that Tom Swarek believed he owned all of these companies that he was using for these different purposes.  Did he ever relate something like that verbally to you?

A    Yes.

Q    First Service Bank does not have a deed of trust on the World AG property in the Mississippi Delta, that's true, right?

A    Correct.

Q    Those guarantees that you looked at, 69 and 70, from March of 2018 and February of 2019, right?

A    Yes.

Q    Do you know if the obligations to which those guarantees related have been paid off and satisfied?

A    I would have to look back at that and see, I'm not sure. I don't have that in front of me.

Q    Okay. So, today, you don't know whether or not the obligation to which guarantee 69 and guarantee 70, you don't know whether or not those have been paid and satisfied.

A    I do not off the top of my head, no.  But, they would encumber any further future indebtedness which we went over and what I read off the document also.

Q    You testified who was at the closing for the bank.  Who

McJunkins - Golman/Cross                    67

else was at the closing?

A     I won't remember everybody, I know that, I remember at that time Mr. Swarek had Rachel Reese, that was his attorney that was helping with that process.  And she was on the phone.  And Mr. Swarek was there.  I can't member for sure if Roslyn was there but I believe Roslyn was there.  There was a Jeff Fox or somebody that is a partner or attorney that Mr. Swarek deals with also on some of his stem cell stuff that was there.  I can't remember all the other -- I think one of his younger sons was there.

      I know there were more people but that's the most people I can remember off the top of my heard.

Q     Well, that's pretty good for that many people.  May I approach the witness Your Honor?

      THE COURT:  Yes.

Q     Take a look at that document I've handed you, please.  Have you seen this document before?

A     Yes, I believe I remember seeing it.

Q     All right.  Is this a document that was sent to the bank and is contained within the bank's own regularly kept records regarding the Main Street loan?

A     Yes, I believe so.

Q     All right.  Is this -- you said the name Rachel Reese, made me think of this paper.  Is this a paper from Rachel Reese?

A    Yes.

Q    All right.  And why would Rachael Reese have sent the bank this letter?

A    Well, like I said, she was the one that was working with Mr. Swarek at the time as his attorney with the paperwork and getting everything filed with the Main Street loan and doing the research on oil and gas and such.

Q    And beginning on the first page and into the second page, there's list of documents that she reviewed, correct?  If I could put this up here and keep it straight.

A    Correct.

Q    That doesn't include anything about World AG, does it?

A    I don't see anything listed on there, no.

Q    This is another piece of paper that is a part of the paperwork on which the Main Street loan was issued, correct?

A    Yes.

        MR. GOLMAN:  Your Honor, I'd like to mark this as -- mark and offer as an exhibit --

        THE COURT:  Any objection to S-4?

        MR. CRAWFORD:  No, Your Honor.

        THE COURT:  It'll be admitted.

Q    Prior to the issuance of the Main Street loan, First Service Bank -- did First Service Bank have tax returns for El Dorado?

A    I'm not positive on that, I would assume so since we had

McJunkins - Golman/Cross                    69

some of Mr. Swarek's business before that.  I would have to pull my records and see exactly on tax return dates what our most recent ones and furthest back ones were.

MR. GOLMAN:  Okay.  The Court's indulgence for a moment.

THE COURT:  Sure.

MR. GOLMAN:  This may be all of my questions, let me check.  May I approach the witness, Your Honor?

THE COURT:  Yes.

Q    Have you seen this document before?

A    I can't say that I have or I haven't.  There were several different leases.  I mean, we had thousands of pages, so, I'm not sure.

Q    Did the bank, in pursuit of approval of the Main Street loan, procure title opinions regarding oil and gas leases in Texas?

A    Yes.

Q    Do you think that this document is a part of that paperwork?

A    It could be.  Again, they were books that were brought to us and then they would have a cover letter with them.

MR. GOLMAN:  Your Honor, I'd like to mark this for identification only please.

THE COURT:  What are we calling this document?  S-5, but, what's the title of the document?

MR. GOLMAN:  Yeah.  Title opinion 1997.

THE COURT:  Is it El Dorado's?  S-5, just for ID purposes only.

MR. GOLMAN:  Yes, ma'am.

Q    Within the course of approving the Main Street loan, did the bank take possession of stock certificate or certificates of World AG?

A    We did not have a stock certificate for World AG.

Q    So, the answer is, the bank did not take possession of such a thing, right?

A    Not of this specific stock certificate, no.

Q    One more piece of paper.  May I approach the witness, Your Honor?  Does this look like a First Service Bank debt schedule?

A    Yes.

Q    As the bank officer who was the custodian and responsible official for the Main Street loan, do these indications of credit for stockholder, Apogee and First Service Bank, do those look like they relate to the Main Street loan?

A    Yes.

Q    What was -- I guess this was a prior obligation owed to First Service Bank, the third one?

A    I'm not sure since I'm not sure that I was he one that even completed it. Based on the dollar amount I don't know if it was just referencing one loan.  Usually, as you can see, there's a column for a loan number and for more specific

identifying information.  It looks like someone just used this little bit as a worksheet to work over some numbers to get a final version of it.

Q    Do you recognize any of the handwriting on this piece of paper?

A    I can't tell you for sure whose handwriting it is.  Honestly, I don't know.

Q    Were you aware, or are you aware now, that -- were you aware at the time that World AG had made a substantial loan to El Dorado?

A    No, I don't believe so.

Q    Have you since that time come to that knowledge?

A    I don't believe so.

        MR. GOLMAN:  I'd like to mark this for identification only, please.

        THE COURT:  S-6 will be marked for ID purposes only.

Q    Were some of the proceeds of the Main Street loan used to payoff other obligations of El Dorado?

A    They were to pay off Apogee Bank.

Q    That was one of the obligations of El Dorado at the time?

A    I don't know for sure exactly whose name that was in, I'd have to look back at my documentation, but, it was part of the proceeds, yes, with Main Street.

        MR. GOLMAN:  Those are all the questions I have for Ms. McJunkins, Your Honor.

McJunkins - Redirect/Crawford                    72

THE COURT:  Any redirect, Mr. Crawford?

MR. CRAWFORD:  Please, Your Honor.

REDIRECT EXAMINATION

BY MR. CRAWFORD:

Q    Jack Crawford on behalf of First Service Bank.  Ms.
McJunkins, you were handed Swarek 1 and were asked a number of
different questions about this Main Street loan request.  Do
you recall that?

A    Yes, sir.

Q    And you were asked about the description of the borrower
and the description of the collateral.

A    Yes, sir.

Q    And, asked if there was any reference in here about
farmland, do you remember that?

A    Yes, sir.

Q    Is there any reference in here about not paying taxes on
the farmland and allowing the farmland to be sold for taxes?

A    No, sir, I do not see.

Q    Okay.  Is there any reference in Swarek 1 about selling
$200,000 worth of farmland for $50,000?

A    No, sir, I do not see that.

Q    Ms. McJunkins, you were shown some financial statements
regarding El Dorado Oil & Gas, Inc., in your cross examination.
Do you remember that?

A    Yes, sir.

McJunkins - Redirect/Crawford                73

Q    Okay.  After the Main Street loan was funded, did El Dorado provide annual financial statements to First Service Bank?

A    Yes, I believe they're actually quarterly, or supposed to be quarterly.

Q    Quarterly.

A    I don't know that we always got those timely.

Q    All right.  Let me hand you what's been marked as  FSB-18.  Can you please identify this document?

A    Yes, it looks like it's a statement of assets and liabilities and equity tax basis as of November 30th, 2021 for El Dorado Gas & Oil, Inc.

Q    Okay.  And then there at the bottom you see the sticker FSB-018?

A    Yes, sir.

Q    Okay.  And is this a financial statement that was submitted to First Service Bank?

A    Yes, it appears so.

        MR. CRAWFORD:  Okay. Your Honor, we'd ask that Exhibit FSB-18 be admitted into evidence.

        THE COURT:  Any objection?

        MR. GOLMAN:  No objection, Your Honor.

        THE COURT:  All right.

Q    Looking at FSB-18, if you'll -- I want to focus on this down here, by the -- in the liabilities and equity section,

McJunkins - Redirect/Crawford                74

actually, in the liabilities, you see where -- on long term liabilities we now have a 360, which is the Main Street loan for 50 million.

A     Okay.

Q     And then there's a 361 note payable MetLife, you see that?

A     Correct, yes.

Q     Okay.  And it's for $26,075,694, is that correct?

A     Yes.

Q     Okay.  And what was your understanding as to what that number referenced?

A     The debt on the farmland.

Q     Okay.  This was a loan that World AG had taken out, is that correct?

A     Yes, on the farmland.

Q     And, that loan was taken out through MetLife?

A     Yes, that was my understanding.

Q     Okay.  And that debt is being included on the balance sheet for El Dorado, is that correct?

A     Yes, sir.

Q     And, specifically, EDGO, is that right?

A     Correct.

Q     And let me hand you what's been marked as FSB-19.  Can you please identify this document?

A     It's El Dorado Gas & Oil, Inc., statement of assets, liabilities and equity tax basis as of November 30th, 2022.

McJunkins - Redirect/Crawford                75

Q    And this is a financial statement that was submitted to First Service Bank?

A    Yes, it is.

MR. CRAWFORD:  Your Honor, we'd ask that this document be admitted into evidence.

THE COURT:  Any objection to 19?

MR. GOLMAN:  No objection.

THE COURT:  Nineteen will be admitted.

Q    And, Ms. McJunkins, regarding FSB-19, is the note payable to MetLife on the farmland of World AG, is it being listed as a liability on El Dorado's balance sheet?

A    Yes, it is.

Q    And can you please, let me show you Exhibit FSB-20.  Can you please identify that document?

A    El Dorado Gas & Oil, Inc., statement of assets, liabilities and equity tax basis as of November 30th, 2023.

Q    And was this financial statement submitted to First Service Bank?

A    Yes.

MR. CRAWFORD:  Okay.  Your Honor, we'd ask that Exhibit FSB-020 be admitted into evidence.

THE COURT:  Any objection?

MR. GOLMAN:  No objection, Your Honor.

Q    And the same question, Ms. McJunkins, is the MetLife loan on the World AG farmland being listed on the El Dorado balance

McJunkins - Redirect/Crawford                    76

sheet?

A    Yes, it is.

          THE COURT:  Mr. Crawford, before you move on, what's the date of this one?

          MR. CRAWFORD:  Yes.

          THE COURT:  November 30th?

Q    Ms. McJunkins, can you please identify the date of this exhibit?

A    November 30th, 2023.

          THE COURT:  And when was the bankruptcy filed?

          MR. GOLMAN:  A month later.

          MR. CRAWFORD:  December 22nd, 2023.

          THE COURT:  Okay, so, after this.  Thank you all.

          MR. CRAWFORD:  Thank you.

Q    Now, Ms. McJunkins, earlier you were shown the exhibit that was identified as Swarek 2.

A    Yes.

Q    Do you remember that?

A    Yes, sir.

Q    And, then we had, this is the way it states is, El Dorado Oil & Gas, Inc., Three Rivers, financial statement November 30th, 2019?

A    Yes.

Q    Okay.  And then I want to go back over here, I believe you had said you didn't know whose handwriting this was, is that

McJunkins - Redirect/Crawford                77

correct?

A    I do not.

Q    Okay.  And then, I want to turn -- I'm over at the third page of Exhibit Swarek 2.  And we come down here where we have long term debt that's payable and there's a number that's been stricken but it has $30,699,909, is that correct?

A    Yes, that was correct.

Q    Okay.  And, notes payable, from looking at the financial statements that we just got through looking at for '21, '22 and '23, is it fair to say that that number that's listed right there includes the MetLife loan?

A    Yes.

Q    And, so, even before the Main Street loan, in the financials for El Dorado Oil & Gas, they are listing the MetLife loan on the balance sheet of that entity, is that correct?

A    Correct.

Q    Let me hand you what's been marked as Exhibit Swarek 3.  And this is the El Dorado Oil & Gas, Inc., Three Rivers, Texas, financial statements May 31st, 2020.  And turn it over to the statement of assets, liabilities and stockholder equity or balance sheet and I want to point to the long term debt, based on the long term debt that is listed as of May 31st, 2020, which totals $29,195,644, is it fair to say that that number includes the MetLife loan on the World AG land?

McJunkins - Redirect/Crawford                78

A     Yes, it would seem so.

          MR. CRAWFORD:  Thank you.  Thank you.  Keep just expecting it to happen.

Q     Okay.  Ms. McJunkins, I want to go back to Exhibit FSB-69.

A     Yes.

Q     Okay.  And then this is one of the continuing guaranty where World AG Investments, guaranteed all of the debts, obligations of Thomas L. Swarek, do you remember that?

A     Yes, sir.

Q     Okay.  And then I want you to look at, do you see where it has Loan Number 396817?

A     Yes.

Q     Okay.  Isn't that the loan number that deals with Pass Road and Eight Bayou?

A     Yes, I believe so.

Q     Okay.  And then there was a question that was asked whether these loans for which these guarantees were given, this guarantee and the other loan, I'll cover with you in a minute, if they'd been paid off, right?  Has the Pass Road, Eight Bayou loan been paid off?

A     No, we have foreclosed on those properties, they're in the process of that, yes.

Q     Great.  And there's still an outstanding balance that's owed to First Service Bank?

A     Yes.

McJunkins - Redirect/Crawford                    79

Q    Okay.  And so, that obligation is still outstanding.

A    Yes, it is.

Q    And then there's loan -- I'm sorry, let me hand you what's been marked as Exhibit FSB-070 and this was the guarantee, the unlimited continuing guarantee whereby World AG Investment guarantee all of the obligations of El Dorado Gas & Oil, a/d/a El Dorado Oil & Gas.  And then there is Loan Number 396857, do you see that?

A    Yes, sir.

Q    Is that the Three Rivers loan?

A    Yes, that may be.

Q    Okay.  And on the Three Rivers loan, is First Service Bank still owed monies on that loan?

A    Yes, it is.

Q    Okay.  And so the loan for which this guarantee was given still has an outstanding balance, correct?

A    Yes, it does.

MR. CRAWFORD:  Okay, thank you.  No further questions, Your Honor.

THE COURT:  Mr. Crawford, before you step back, can you go back to FSB Exhibit 20, and put it back up.  That's the financial statement of El Dorado as of November the 30th.

MR. CRAWFORD:  Yes, ma'am.  And that's FSB-20.

THE COURT:  Scroll to the assets part.  Both sides spent a decent amount of time talking about financial

McJunkins - Redirect/Crawford                    80

statements, but, I'm looking at the debtor's schedules filed a month after FSB-20, it's not remotely look the same. I mean, is this the entire financial statement?

MR. CURRY: Your Honor, it's one of them. I think Ms. McJunkins has already testified that they got a number of financial statements in various form and I'm going to cover this a little bit with Ms. Ragan as well, but, that's a near observations, it's inconsistent.

THE COURT: Okay. I mean, I don't want to get ahead of you all, I'm just --

MR. CRAWFORD: Your Honor, may I ask the witness one followup question since we've raised this?

THE COURT: Sure.

Q    Regarding FSB-20, and I want to flip over to the income statement, Ms. McJunkins. And for Line 045, now this is a financial statement that was submitted to First Service Bank as of November 30, 2023, is that correct?

A    Yes, sir.

Q    Okay. In rent income, okay, does First Service Bank understand the rent income reflected to the rental income from the farmland on World AG?

A    Yes, we do.

MR. CRAWFORD: Okay, thank you.

THE COURT: All right. So, does that conclude Ms. McJunkins testimony? Anything else Mr. Golman?

McJunkins - Redirect/Crawford                 81

MR. GOLMAN:  Yes, ma'am, I believe so.

THE COURT:  Okay.  May she be excused?

MR. GOLMAN:  Mr. Swarek, yes.

MR. CURRY:  And yes for FSB, and to the extent he's still nearby, we had an agreement with Mr. Golman that with Ms. McJunkins completing her testimony, Justin can come back.

THE COURT:  Okay.  Is that correct, Mr. Golman?

MR. GOLMAN:  Yes, ma'am.

THE COURT:  All right.  Thank you, Ms, McJunkins, you may step down.

All right.  Do we want to take another little break or -- okay.  How long do you all want to take for this break? It is lunch time, I know we're going try to work on through but, if you want to take a few extra minutes and run downstairs and get a snack to tied you over.

MR. CURRY:  Your Honor, I was going to propose to have enough time to go over and get lunch, but, if we could come back at 1:15?

THE COURT:  Yes.  I would say unless you're getting soup.

MR. CURRY:  Well, do they have gumbo soup.

THE COURT:  It is good.  Any objection to 1:15?

MR. GOLMAN:  That's fine, Your Honor.

THE COURT:  Okay.  We'll come back at 1:15.  Thank you all.

Ragan - Direct/Curry                    82

(Recess at 12:34:23 p.m./Reconvened at 1:18:59 p.m)

THE COURT: All right, it's 1:18, we're back on the record in the El Dorado Gas & Oil case, Case 23-51715. Mr. Curry, are you ready to proceed with your second witness?

MR. CURRY: Yes, Your Honor. At this time, FSB would call Dawn Ragan, the Chapter 11 Trustee.

THE COURT: Ms. Ragan, Ms. Ramage will swear you in.

DAWN RAGAN, WITNESS, SWORN

DIRECT EXAMINATION

BY MR. CURRY:

Q    Good afternoon, Ms. Ragan.

A    Good afternoon.

Q    Would you go ahead and state your name for the record.

A    Dawn Ragan, Chapter 11 Trustee.

Q    Ms. Ragan, I think we've covered this before, but, you've been a trustee for a while now, right?

A    Yes. I was appointed in Hugoton in January and El Dorado in February of '24.

Q    And, that was going to be my next question, but, in general, this is not your first trustee job, right?

A    That's correct.

Q    Okay. About how many Chapter 11 trustee positions would you say that you've held or in your capacity as the the partner at CR3 have worked closely with -- to do -- to fulfill the Chapter 11 trustee duties?

Ragan - Direct/Curry                        83

A     I've been a court appointed trustee, I'd say maybe four times and I've been a fiduciary as a CRO, I don't know, 10, 15.

Q     Okay.  And how would you describe those cases and I'm sure they run the gamut, but, you have experience with, I will say, relatively straightforward cases and then you've also been the CRO of some fairly complicated, difficult situations, correct?

A     Yes.

Q     So, when you get appointed as a Chapter 11 trustee in a case, what is your typical approach?

A     Secure the cash.

Q     And after you got the cash secured, next?

A     I meet with management, the principles, the professionals in the case, the U.S. Trustee who's appointed.  I try to get all the salient data that I can.  I review everything I can on the dockets, I try to get familiar with the case.  I try to assess what assets there are, who the primary or fulcrum creditors are.  If there are administrative expenses that need to be addressed.  What I need to do about managing creditors, constituents, that sort of thing.

Q     And did you do that in this case?

A     Yes.

Q     And so, when you began assessing -- well, let's back up. There's a gap period, right, between when you were appointed as the El Dorado trustee and when you were appointed as the Hugoton trustee, right?

Ragan - Direct/Curry                          84

A     Yeah, it was a week or so.

Q     And during that gap period you conducted an initial investigation, correct?

A     Yes.

Q     And, in fact, prior to the hearing that we had last year around this time, that was February 1st, you filed a preliminary report indicating some of your initial observations?

A     That's right, yes.

Q     And is there anything in that report that you feel that you need to change or that is, you've learned is inaccurate or is that report still an accurate reflection of your observations?

A     To the best of my knowledge, it's an accurate representation of what I knew at the time, which I think was addressing El Dorado/Hugoton and I think also World Aircraft.

Q     So, the preliminary report where you were the Hugoton trustee, at that time you are aware that debtor's counsel had filed an emergency motion for substantive consolidation of Hugoton and El Dorado, correct?

A     Yes.

Q     Okay.  And, your report addressed the issues raised in that motion, in part, correct?

A     I believe so.

Q     And, of course, at the time you said that you could not

Ragan - Direct/Curry                                85

yet take a position because you needed to conduct a more thorough observation, I mean a more thorough investigation, correct?

A     Yes.

Q     But, in that initial report do you recall noting anything related to whether or not it would be difficult to segregate or ascertain individual assets and liability as to Hugoton and El Dorado?

A     I believe I said in that report and in my subsequent report that everything was hopelessly entwined and would be difficult to pull apart and if it could be pulled apart it would take a pretty significant forensic analysis.

Q     And, in your opinion would that be a cost burden that this estate could bear?

A     It would be very costly and no, I don't believe that the estate could afford that expenditure.

Q     Okay.  In your initial, and I think this carried through, but do you know whether or not any of Mr. Swarek's entities rely on consolidated financial statement for any purposes?

A     Yes.

Q     Specifically, several of the entities filed consolidated tax returns, correct?

A     Yes.

Q     Okay.  Based on your understanding of what has been referred to as the El Dorado Companies or the companies that

Ragan - Direct/Curry                               86

were operated at Gulfport -- not at the glass building, we already covered that, but at the other office.  Is it --

A     Pass Road.

Q     Pass Road.  Thank you.  My brain sometimes just blanks on me.  At the Pass Road office.  Have you observed that there was, amongst the businesses that are managed from Pass Road, was there a commingling of assets or business functions or both?

A     Yes.  Both.

Q     Both?  Thank you.  And directly or indirectly, each of those companies are owned by Mr. Swarek, correct?

A     You said both directly or indirectly?

Q     Yes.

A     Yes to both.

Q     And what about inter-company debt?

A     The accounting folks do not track inter-company accounts.

Q     Okay.  Are you aware of any inter-corporate guarantees?

A     Yes.

Q     And --

        THE COURT:  Mr. Curry, hold on just one second.  Let's make sure this is clear.

        Ms. Ragan, you're telling the Court that through your investigation that the books and records of El Dorado did not reflect any company transfers between all these -- El Dorado and all these transfers at all?

Ragan - Direct/Curry                          87

A     That's right.  Everything was reported on a consolidated basis.  There are no due to's and due from's.

THE COURT:  So, you couldn't tell what entity owed what amount to which entity?

A     No, that's why you would have to do a forensic analysis. There are some large items that I inquired into but I didn't get -- I didn't do an audit.

Q     Okay.  And regarding the transfer of assets, or use of assets by one company versus another, were you able to find any documentation or other evidence of any kind of formal observance of typical corporate formalities?

A     No, I found the opposite.

Q     Can you elaborate on that?

A     The -- Mr. Swarek and his staff -- I don't know a kinder way to say this, but they're not financially sophisticated. Mr. Swarek has always had a number of businesses.  His staff has worked with him for over a decade -- 15, 20 years, maybe longer, I don't remember.  They didn't work at other companies so they didn't understand best practices.  They didn't understand corporate governance.  They're not degreed accountants or CPAs or have education in the field.

So, when I inquired and investigated initially, I asked why they were doing things the way they were doing and why they weren't doing things that you expect to be done, the corporate separateness, the intercompany accounting, tracing

obligations across the entities.  And I was told that their understanding was that it was all Mr. Swarek's businesses so it could be reported together.

Q    And now pivoting now a little bit.  Did you make an effort upon appointment to familiarize yourself with the status of operations of the Oil & Gas assets?

A    Yes.

Q    Okay.  And what was the status of operation?

A    When I was appointed, it was late January.  The employees, I was told, had walked off in December and January.  They had not been paid since, I believe, it was December 4th.  And so they walked off and shut in the wells.  We did discover that there were some wells that were still producing but the majority of them had been shut in.  And there were no employees to manage the business.

Q    And --

A    With respect to the field.

Q    With respect to the fields.  And as to the leases that give the debtor the right to conduct oil and gas operations in those fields, what's the impact of being shut in as you understand it?

A    The ultimate result is that leases can terminate.

Q    And so, at your appointment, would you say that there were any leases that were at risk of loss?

A    Yes.

Q    Many?

A    Yes.

Q    And when you met with the company to get an understanding of these assets, what was your understanding about how the oil and gas assets were owned?  Which entities owned oil and gas assets?

A    I initially understood that they were owned by El Dorado Gas & Oil for Hugoton.  I later came to understand the relationship between Hugoton and Bluestone that those were related.

Q    What about Dorado Drilling?  Are you familiar with that entity?

A    Yes.

Q    So, in your initial meetings with the debtor, what was your understanding of Dorado Drilling's corporate purpose?

A    I was told that Dorado Drilling was an operator of a handful of wells.  I later learned in the sale process that they were an -- actually an owner.  They were listed as the owner.

Q    And, in general, would you say that you've experienced that same kind of confusion in talking to the debtor and the debtor's management where their narrative description of the ownership of assets has not matched what you ultimately found in your investigation?

A    I would say initially at the outset, that's correct

Ragan - Direct/Curry                                  90

because I developed my understanding based on my discussions

with them.  but when I found other facts, I would go back to

them for further validation and then I would get the additional

supporting documents.

Q    And how would you characterize the responses that you got

when you came back with the new information and asked the

follow up questions of you told me that Dorado Drilling didn't

own anything but now I've learned that it does.  What was the

explanation?

A    I can't tell you I remember the specific words but the

general discussion was, you know, overlooked it because it was

minor because everything's viewed to be El Dorado and Hugoton.

The Dorado Drilling is, I forget, it's a handful of wells.

Q    And does that tie back to you testimony a moment ago about

it's all owned by Swarek?

A    Yes.

Q    That that was the understanding at the office is that if

there were these irregularities, they were minor because

ultimately everything was owned by Mr. Swarek?

A    Yes.  I think that's fair.

Q    And so would it be fair to say that there was a general

lack of understanding regarding corporate issues like

separateness?

A    Yes.

Q    What did you observe regarding the debtor's corporate

record keeping habits?

A    Could you be more specific?

Q    What was the condition of the debtor's records relating to its businesses?

A    Well, there's paper everywhere.  There's hundreds and hundreds and hundreds of boxes of well files and leases and information related to the wells.  In the office there's boxes and boxes and file cabinets full of documentation related to financial statements, bank statements, payables.  And then the financial reporting is done on QuickBooks.

Q    And the boxes of paper, how are they organized?

A    So, the things that were in the warehouse were organized in banker boxes by group, for the most part, by groups of assets.  So, like the Mecom boxes, the Bluestone boxes, AWP or APW et cetera.  In the office, most of the well information was in three-ring binders.  A lot of notebooks on shelves that were all marked with, you know, who they related to.

        THE COURT:  Mr. Curry, let me ask.

        Ms. Ragan, if you got a call from an interest owner asking about their particular interest, how would you go find their file?

A    I wouldn't even begin to look for the file.  I would call PetroLedger which is the third party company that managed the leases and the royalties and the accounting.  But I generally would start with Ms. Roslyn Chapman who kept most of the

Ragan - Direct/Curry                              92

records in the Gulfport office.

Q    And on PetroLedger, what was the status of PetroLedger's engagement at your appointment?  Were they performing work for the debtor at that time?

A    No, they had also stopped working for failure to get paid. I re-engaged them and asked them to get caught up.

Q    And that took a substantial amount of time and work, correct?

A    Yes.

Q    We've already covered the inter-company accounting.  I won't go to that again, but what did you learn about employees? And I'm going to break that down into some categories.  So, let's talk about field operations.  What did you learn regarding whether or not the debtor had employees or not?

A    Well, I learned two things.  One is that they were all deemed to be 1099 contractors, not W-2 employees and that they were paid/employed through what we call a PEO.  It's a third party payroll company.  In this case it was called Excell or Excell Operating or something like that.

It was an entity that was owned or run by one of Mr. Swarek's -- I think it was one of his children.  That was the payroll entity and they handled the payroll, the physical payroll for the employees.  But it was my understanding they were all 1099s.

Q    So, what's the significance of a 1099 employee versus a W-

Ragan - Direct/Curry                                    93

4 employee?

A     Primarily, withholding taxes.

Q     So, by classifying the employees as 1099 employees, El Dorado did not withhold employer taxes for those wages, correct?

A     They would not have withheld employee taxes and they would not have made the matching employer payments.

Q     Okay.  And did you ever have any conversations with any of the workers in the field regarding the status of their employment?  Or did anyone at your direction have those conversations?

A     In the very beginning when we were hiring the employees back, myself and one of my colleagues, Greg Baracato, he's on the phone this morning, he's my oil and gas expert and he's the one who handles everything for me in the field.  We had conversations with employees in the field.

Q     And, ultimately, did you continue employing the field workers as 1099 employees?

A     No.

Q     Why not?

A     Because I thought it was appropriate that they be W-2 employees.  There's rules about what constitutes a contractor verus an employee and I thought it was appropriate that they be W-2 employees.

Q     Okay.  And on the back office staff, so, Ms. Chapman and

the folks that worked there, who were they employed by?

A    I believe it was the same treatment.

Q    El Dorado?

A    Well, Excell.

Q    Excell?

A    Yeah.   That's my recollection.

Q    Okay.   And as far as the back office operations, are you aware of any separate corporate headquarters for any of Mr. Swarek's companies?  Or primary offices on the glass road?

A    So, I know that in Gulfport there is another location that we called the glass building.  It's actually owned by an Escambia related company.  There was a woman who worked there who, I understood, did the Escambia accounting.  To my knowledge, she did nothing for El Dorado or my group of companies.  And then there were some field offices which were basically, like, single-wide trailers out in the field.

Q    And so -- I'm asking you these because I'm sure that the Court's going to want to know, but Escambia is another debtor before this Court, correct?

A    Yes.

Q    And so when we were talking about the sub con issues, we're not talking about Escambia, are we?

A    No.

Q    And can you explain to the Court what's different about Escambia -- why that's not included?

Ragan - Direct/Curry                                    95

A    Escambia is in Alabama.  Given everything I've seen about the commingling, I don't know why they didn't combine that with the other companies.  But I believe, based on my discussions with Mr. Swarek and Ms. Chapman, is that it was decided to keep that separate because of the risk that was associated with that gas plant.  That's my recollection.

Q    And so, as to the Escambia assets, there was actually an effort to keep -- maybe not a good effort, but there was some effort to keep the Escambia operation separate from the El Dorado family?

A    For the most part, I understood from Ms. Chapman that there was not overlap on the business records and the operations but there has been overlap or commingling with respect to cash, as we've discussed before, related to World Aircraft, money came from both El Dorado and Escambia to buy assets that ended up getting titled under the name World Aircraft.

Q    And have you reached an understanding with the Chapter 11 Trustee and Escambia over how that issue, the commingling of funds and assets, should be addressed?

A    Yes.  That's part of our 9019 that I think keeps getting punted.

Q    Okay.  And so fair to say, then, if it was documented and put in a 9019, we were able to ascertain a process that both estates felt was a burden that could be borne by those estates?

Ragan - Direct/Curry                           96

A     Yes.

Q     Unlike what you said about the forensic accounting that would be needed to separate all the El Dorado entities and their assets?

A     Yes, it's more distinct with Escambia.

Q     And subsequent to your appointment, there were two more, I'm going to call them El Dorado companies just for ease of reference, El Dorado companies that it was determined needed to file voluntary petitions, correct?

A     Yes.

Q     And those are World Aircraft and Bluestone, correct?

A     Yes.

Q     What was the basis for your determination and recommendation that Bluestone file?

A     That day -- Bluestone was filed on one day's notice.  So I received a letter that morning from someone with the Mestena parties, which are part of Bluestone, where my recollection is they said that they were, I don't know, I guess they were terminating the lease and I don't remember all the other things in the letter but it was going to be detrimental to the assets of the estate and we didn't want to allow that to happen.

         So we determined that we should immediately file to protect the assets.  And it was filed that same day.

Q     And so is it fair to say then that as a result of the financial and asset commingling, that when El Dorado and

Ragan - Direct/Curry                    97

Hugoton filed, there were substantial oil and gas assets owned by Bluestone which were not receiving the benefit of the automatic stay at that time, correct?

A    Yes.

Q    And filing Bluestone brought the bulk of those under this Court's jurisdiction?

A    Yes.

Q    Okay.  What about World Aircraft?

A    Well, as we've discussed in this court before, all of the commingling of the cash and there was millions and millions of dollars that had been taken out of the Escambia and El Dorado estates to purchase assets that were then invoiced and titled to World Aircraft.  World Aircraft didn't have an operating business, it was just getting these assets for no consideration with El Dorado and Escambia paying for it.

The Escambia Trustee and I had significant concerns about that.  We had had conversations with Mr. Sheehan and Mr. Swarek about those concerns and so when we made the determination to file Bluestone, we said, you know, let's just do World Aircraft at the same time so that it would have the court's protection because it was all viewed as, you know, co-mingled assets.

THE COURT:  Mr. Curry, while you're on this point, while Ms. Ragan is talking about the filing of those bankruptcy petitions --

MR. CURRY:  Yes, Your Honor.

THE COURT:  -- let's go back so that the record is clear.  Those were filed by virtue of her appointment as the director?

MR. CURRY:  No, Your Honor --

THE COURT:  All right.  Let's go back and clean that up.

MR. CURRY:  Sure.

Q    Ms. Ragan, when you got the letter regarding Mestena, what did you do?

A    I spoke with Mr. Swarek and Mr. Sheehan.  I was not an officer director directly of Bluestone and I asked Mr. Swarek if he would consent to do the filing.  And I asked Mr. Sheehan if he would undertake the filing since he had worked with Mr. Swarek on some of the other entities and Mr. Swarek agreed that it made sense to file so that those assets would be protected because we viewed them as part of the bigger El Dorado Hugoton estate.  And Mr. Sheehan agreed that he would undertake the responsibility of the filing -- the burden of the filing.

Q    So, as the Chapter 11 Trustee for El Dorado in Hugoton, you recommended to the debtors that these companies be filed because you felt that it was important to the administration of your two debtors, correct?

A    Yes.

Q    Okay.  Do you recall at the time whether or not you were

actively engaged in negotiations for post-petition financing with FSB or any other party?

A    Well, I think I started having discussions about DIP loans in early February and Bluestone and World Aircraft were filed February 22nd so, yes, I would have already have started the DIP loan discussions.

Q    And, in fact, at around that same time in your cases, we came to the Court and asked for approval for an emergency advance for you to fund payroll which the stipulation included an agreement from you that that would either be included in a subsequent DIP loan or repaid by any DIP loan, is that correct?

A    Yes.

Q    And is it far to say at that point in time that FSB and yourself were aware and concerned regarding this corporate separateness issue?

A    Related to the $500,000 advance?

Q    No, no related to the DIP loan in particular.  And in particular what I'm asking you, did --

A    Yes.  Related to the --

Q    Did FSB express concerns regarding those entities remaining under Mr. Swarek's control?

A    Yes.

Q    Okay.  So, on the World Aircraft assets, 89 million in equipment sound right to you?

A    I'm sorry, say that again?

Ragan - Direct/Curry                         100

Q    The equipment that you took possession of, was it worth 89 million?

A    Are you talking about the personal property equipment?

Q    Yes.

A    That's -- most of it has sold and it has not sold for anywhere near that.

Q    The assets that are included in that that have been sold -- there have been a number of auctions that have been noticed in the El Dorado case, correct?

A    Yes.

Q    Do you recall any of those auctions specifically including any sets of equipment that were not related to oil and gas operations?

A    Yes.

Q    And in particular, did that include medical equipment?

A    Oh, it was a myriad of things -- medical equipment, appliances, officer furniture, cardboard, styrofoam -- many other things besides oil and gas.

Q    But as far as you know, El Dorado, Hugoton, World Aircraft, Bluestone does not have any -- doesn't own any medical practices or treatment facilities or anything like that, do they?

A    Not to my knowledge, no.

Q    Okay.  Well, actually, one more thing.  Were you able to ascertain whose money was used to purchase the medical

Ragan - Direct/Curry                    101

equipment?

A    In most cases, the assets were purchased by -- with the El Dorado funds.  In some cases it was El Dorado and Escambia funds.  I don't remember specifically related to the medical supplies.  I think it came from the Main Street loan but I'm not certain.

THE COURT:  Mr. Curry, what about the Trinity Stem Cell Treatment Center?

MR. CURRY:  It's now owned by any of the debtors. It's a foreign, as in non-US operation.  And I think Ms. Ragan has discussed before, the fact that she's identified a substantial claim against that entity for the transfer of El Dorado's cash as well.  But if you'd like her to talk about it, I'll ask.

THE COURT:  Well, it's in the schedules and we're talking about the medical equipment and I'm just wondering.

MR. CURRY:  Sure.

Q    So, are you aware of Trinity Stem?

A    Yes.

Q    What is that -- what is your understanding of Trinity's relationship to El Dorado?

A    It's my understanding that the Trinity Stem Cell Company is 50 percent owned by I think it's Mr. Swarek as opposed to El Dorado.  But I haven't looked at that in some time so I don't want to say definitively on that.  And the other 50 percent is

owned by an individual, I believe named John Foxworth and it's stem cells that I think are in Columbia and Mexico -- stem cell clinids.

Q    And you have previously acknowledged or identified a potential claim or cause of action against Trinity, is that correct?

A    Yes.

Q    What's the nature of that claim or cause of action?

A    I identified approximately $5 million of funds from El Dorado that were sent to that entity and we've made a demand.

Q    When did that transfer occur?

A    Oh, I don't know -- pre-petition.

Q    Pre-petition?  Okay.

        THE COURT:  Hold on, Mr. Curry.

A    Actually, I think there might have been one small payment that was made post-petition.

        THE COURT:  So, with respect to Trinity Stem Cell, the $1.9 million January 23rd to September -- sorry, January of '23 to September of '23, you're telling me it's 5 million, not 1.9 million that's in the schedule?

A    In the schedules, the look-back period I forget is one year or two years and in the demand we looked at based on the fraudulent transfer state statute, we looked back I think it was four years.

        THE COURT:  Okay.

Q    And, Ms. Ragan, still on World Aircraft and its assets, did World Aircraft own or purchase an assets which ownership would be recorded through a certificate of title?

A    In normal circumstances, yes.

Q    Why was it difficult to answer that question?

A    Because we found in the sale process that some of the assets we were selling that had been purchased in the name of World Aircraft, had never been titled to World Aircraft.

So, after Mr. Swarek purchased the assets and they were conveyed to World Aircraft, they weren't -- the titles weren't signed or transferred, they weren't registered, primarily with regard to things that would have a VIN number.

Q    And what is your understanding of the tax status of World Aircraft?

A    The tax status?

Q    Yeah, is it a for profit company, is it not for profit, is it a tax exempt entity?

A    It is registered as a for profit entity with tax exempt status.

Q    Okay.  And do you have an understanding of from the company's point of view of the significance of World Aircraft being the purchaser of equipment?

A    It was explained to me that the tax exempt status was applied for and granted because Mr. Swarek intended to, or perhaps did at the time it was formed, buy and sell airplanes.

And it, I believe, was also intending to buy and sell some of these assets that it had been acquiring.

Q    And --

A    So it wouldn't have to pay tax on them.

Q    And if World Aircraft had transferred the assets observing corporate formalities to it's affiliates, would that have resulted in a taxable event?

A    Which part of the transaction?

Q    So, if World Aircraft sold equipment to El Dorado, would there be a sales tax obligation for El Dorado?

A    There would be a tax obligation for whoever was the purchaser.

Q    Okay.  And so by not transferring and monitoring the corporate formalities, the El Dorado companies were able to forgo paying taxes that would ordinarily be paid on the purchase of this equipment?

A    That's correct.

Q    Okay.  So, going back to the status of the books and records, on the financial reporting were you able to -- well, did you ask for a schedule of accounts payable?

A    Yes.

Q    Did you get one?

A    No.

Q    Why not?

A    Because they do their books on a cash basis and they don't

Ragan - Direct/Curry                                105

keep accruals and payables.

Q    Compound that with the fact that there is no inter-company accounting and what is the impact of that cash basis accounting that you just described with the lack of inter-company balances.  Is that part of the issue that you're describing in your report and the need for a forensic accountant?

A    Yes.  I mean, it would be a nightmare to do the claims reconciliation at some point.  And depending on whether or not there is going to be funds available for unsecured creditors would in part determine whether or not that was necessary.  I would expect to have those kind of records but they don't keep them.

Q    And so as you sit here today, if you were asked to determine the benefit of liquidation to World Aircraft creditors, hypothetical creditors -- let me scratch that.  I'm going to back up and cover one other thing.

        During this case, have you received any communication from creditors or purported mineral interest owners or other parties in interest?

A    Yes.

Q    And, in general, how would you describe your conversations with creditors regarding their understanding of who owed them money?

A    Significant confusion.

Q    What kind of confusion?

Ragan - Direct/Curry                    106

A    Creditors as well as mineral owners would call me and say, I don't know who my claim is with.  I got this stuff in the mail.  Who do I fill it out -- is it El Dorado, is it Hugoton, is it Bluestone -- didn't really understand the differences.

In the early days I had some calls about World Aircraft but most of the calls relate to confusion over El Dorado, Hugoton and in some cases Bluestone.

Q    Okay.  So --

THE COURT:  Let me ask.

MR. CURRY:  Sure.

THE COURT:  Ms. Ragan, do you have any understanding of what led to that confusion?  Was it that these individuals were receiving statements from different entities or invoices from different entities or payments from different entities?  Do you have any understanding about why these folks were so confused?

A    A lot of it was because of the cash commingling.  El Dorado and Hugoton would basically just move cash around and they would pay bills based on who had the cash.  So if they got an invoice from Hugoton and there was no cash in the Hugoton account, they might send the check out of an El Dorado account.

The same thing with the mineral owners.  I had a lot of communications from mineral owners telling me that they got a check from this entity or that entity and nothing came with it and they didn't know what it was for and how do they track

Ragan - Direct/Curry                    107

it.  And I think it was just based on the fact that they were paying bills based on where the cash was.

Q    Thank you.  And so when the creditors called and asked you where do I file the proof of claim, so they've provided services, presumably, for one debtor, correct -- or one company?  But --

A    Not necessarily.

Q    Not necessarily.  Okay.

A    Remember, Hugoton was the operator of El Dorado Wells.

Q    Got you.

A    Right.  So, those names were used together all the time.

Q    Well, then, with the reporting that you described, can you look at any one claim and tell the Court which debtor benefitted from the services provided?

A    Not unless I dug in and looked at specific claims and traced, you know, specific history.

Q    And so to do that for every creditor in the case and every claim in the case, that would be a monumental task, right?

A    Yes.

Q    Unduly burdensome in cost?

A    Cost as well as time.  I don't know that I would be successful in the analysis at the end of the day.  But it would be significant time and significant cost.

Q    Okay.  So, now I want to talk about World AG and the issue that we are addressing.  When you had your initial sit down

Ragan - Direct/Curry                          108

with the debtors, and when we say that, that sit down, that was Mr. Swarek and Ms. Chapman, correct?

A    For the most part, yes.

Q    Okay.  And from that initial conversation, what was your understanding about the ownership of World AG?

A    I don't know that I knew about World AG in the first week of January when I first met with them.

Q    Let me ask a better question.  The El Dorado 341 meeting in this case, you were appointed as Trustee of both entities by the time that meeting occurred, right?

A    Yes.

Q    And prior to the 341 meeting, what was your understanding of the ownership of World AG?

A    So, I had gone through the tax return.  I went through the statements and schedules, had a very long detailed discussion with Mr. Swarek, Mr. Sheehan and Ms. Chapman, among others and trying to understand what I had.  And when we reviewed the tax return, World AG was listed as a wholly owned sub.

We talked about all of the entities -- it wasn't the only one, I think there were ten or fifteen different entities on that tax return that were listed as wholly owned subs or subsidiaries.  And I was told that El Dorado owned those entities but Mr. Swarek took a different position when we sat down for the 341.

Q    Okay.  And that's actually where I wanted to go.  There we

go.  I have put on the screen in front of you a document filed by the U.S. Trustee's Office in this case and this document was filed on April 19, 2024 and it's notice of the 341 meeting. But do you recall whether or not the 341 meeting was commenced and concluded in one setting or were there multiple?

A     There were multiple.  It was continued several times.

Q     And what was the reason for continuing the creditor meetings?

A     Because there was information that we didn't have or that we needed to follow up on because we couldn't sufficiently answer the U.S. Trustee's questions.

Q     And, in fact, the U.S. Trustee noted some very specific things that they wanted addressed in the schedules and statements, correct?

A     Yes.

Q     Okay.  If you can look there on your screen and I'm looking at -- this is Entry Number 6, Paragraph 2, and you see (f) there referencing Line 25?

A     Yes.

Q     That says, confirm whether World AG Investment, Inc. is owned by EDGO and amend accordingly.  Has El Dorado filed an amended statement of financial affairs?

A     No.

Q     So, when we then look over here on the next page numbered Paragraph 13, we see Line B there, Line 2.16, determine whether

Ragan - Direct/Curry                        110

World AG --

A    I'm sorry.  Where are you?

Q    It's Number 13, it's on the next page, Number 13 -- let me see here --

A    Oh, I'm with you.  Okay.  I got it.

Q    Okay.  Good. And Line B.  Determine whether World AG, Inc. is owned by EDGO.  If not, remove this debt from Schedule B.

Do you know what debt is on 2.16?

A    I could probably tell if I looked at the schedule, otherwise I'd be guessing.

Q    Okay.  Well, let's do that.  I'm going to put up on the screen the schedules that were filed in this case.  I went to the wrong section. Sorry, I apologize.

THE COURT:  It's Page 93.

MR. CURRY:  I'm looking for the Schedule D-1.  Is that the 93?  I know that's where it's listed of the subsidiary, right?

THE COURT:  Yes, I'm looking at Schedule D.

MR. CURRY:  Okay.  Ninety --

THE COURT:  And I'm looking at Page 93.

MR. CURRY:  Thank you, Your Honor.

THE COURT:  I'm sorry, Page 46 of 93.

MR. CURRY:  Forty-six you said?  Yes, it is.  It is.

Q    Okay.  MS. Ragan, just call your attention to the header. That's 23-51715, that's this case, correct?

Ragan - Direct/Curry                      111

A     Yes.

Q     And that's Docket 114.  That's the filed consolidated schedules and statement of financial affairs, correct?

A     Yes.

Q     Okay.  And if you look there at 2.16, MetLife investment 25 million.

A     I see it.

Q     Okay.  And that is the MetLife loan that we heard testimony about earlier?

A     Yes.

Q     Okay.  And go back to U.S. Trustee's notice.  And so, Line 216, determine whether World AG Investments is owned by EDGO and, if not, remove this debt from Schedule D.  Has Schedule D been amended in this case?

A     We have not filed the amended schedules because we didn't have all of the data that we needed to amend them.  I provided the U.S. Trustee with one-off pieces of information related to the open items.

Q     But you would agree if a significant debt or a significant asset was improperly listed on the schedules, that you would have a duty to correct that, right?

A     Yes.

Q     And you've not made any changes to the schedules, correct?

A     I have not filed an amendment.

Q     And, in particular, as to World AG and the MetLife debt,

is there any reason why you have not amended that issue?

A    Because Mr. Swarek and I never got to a meeting of the minds as to whether World AG was owned by him or El Dorado.

Q    Okay.  And so in your efforts to try to understand who owned -- whether or not El Dorado owned World AG, what did you look at?

A    I primarily pulled up the information on the Secretary of State website for Mississippi to try to look for the corporate documents.  And I spoke with Ms. Chapman regarding any records that she had.

Q    And I think you already mentioned that you had already reviewed the tax returns?

A    Yes.

Q    And if we can --

        THE COURT:  Mr. Curry, while you are talking about that MetLife obligation, Ms. Ragan, do you know if El Dorado guaranteed the MetLife obligation?

A    I believe it did, Your Honor.

Q    Now, Ms. Ragan, I am putting up in front of you what's been admitted as FSB-27.  Do you recognize this document?  And I can scroll forward if you need me to.

A    It's the cover page of one of the tax returns.

Q    Okay.  So we flip over and we can see this is the tax return for the year 2022, correct?

A    The tax return year is 2022.  If you look at the top

Ragan - Direct/Curry                          113

center, it says the period covered is 12/22 to 11/23.  El Dorado has a different fiscal year end.

Q    Okay.  And so then the fiscal year end, 11/30/23, that's shortly before this case was commenced, correct?

A    Yes.  El Dorado was filed in December.

Q    Okay.  This is Page 9 of that exhibit.  Do you recognize this schedule?

A    Yes.

Q    Can you generally describe to the Court -- let me back up real quick and establish something.  What is your degree in?

A    Accounting and I have an MBA.

Q    And are you a CPA or no?

A    I took the CPA exam and passed it but I had no desire to be an accountant.

Q    Okay.  But fair to say, you're familiar with GAAP and basic accounting principles and tax reporting?

A    Yes.

Q    Okay.  Thank you.  Could you explain to the Court generally the purpose of Schedule 851?

A    There are two similar schedules -- Schedule O and 851 which delineate affiliations, parent, sub, common ownership entities.  And in El Dorado's case, it's a two-page schedule. This is the second page.

Q    Okay.  And as to your review, is this the page that would show us what you were seeing in the taxes -- in the tax returns

that led you to believe that World AG was a subsidiary of El Dorado?

A    It's one of them -- 851 and Schedule O are both substantially similar.

Q    Oh, substantially similar?  So if we cover 851, that should explain to the Court the significance of Schedule O as well?

A    I believe it's Schedule O where there is a box that you check that says parent subsidiary which is not on 851.  And on 851, the bottom right-hand corner is different data than what's on Schedule O.  They're similar in that they require delineation of all of these affiliates.

Q    Right.  But as we're looking here, and I just want to walk through this, Part 1 there is a line that says you can list affiliates that have a common parent corporation, correct?

A    Yes.

Q    And even though that says common parent corporation, if you had a sole proprietorship, that would be where that party would be listed, right?  In other words, if you're doing consolidated taxes for companies all owned by an individual, those would go in Paragraph 1, correct?

A    It's generally a company that's owned more than 50 percent.

Q    Okay.  And the next entry is for subsidiary corporations, correct?

Ragan - Direct/Curry                                    115

A      Yes.

Q      Now, have you asked for tax returns and received them?

A      Yes.

Q      Okay.  And you asked for the tax returns for what entity?

A      I probably asked for all of them and I was told that they were all consolidated and that there was only return filed.

Q      Okay.  And as to El Dorado Gas & Oil, was this presented to you with the understanding that this was a tax return for El Dorado Gas & Oil?

A      Yes, but I would like to clarify for the Court that the name on the return is El Dorado Oil & Gas, not Gas & Oil.  Two different entities.  They were both referenced in the petition and the statements and schedules they have one EIN number.  The EIN number that is on this return is actually incorrect.  There is a typo in the number.

THE COURT:  How do you only have one number for two entities?

Q      How do you file two bankruptcy cases for two companies in one petition?

A      So, anybody can go on the state secretary of state website and form a corporation.  It's only when you apply to the IRS for a tax ID number that one is assigned.  And so there are many of these -- there are over a hundred Swarek-related entities and many of them have no ID number.

THE COURT:  I'm trying to wrap my head around this.

Ragan - Direct/Curry                    116

So, Ms. Ragan, you're telling me this affiliations schedule basically says that El Dorado Oil owns World AG?

A    That is how --

THE COURT:  Based on this tax return?

A    Yes, that's how I interpret it.

THE COURT:  So, if Mr. Swarek --

A    And if you look in that bottom right-hand corner, that's what it says.

THE COURT:  All right.  So, if Mr. Swarek actually owned World AG, would World AG been reported on his individual return?

A    Yes.

THE COURT:  Okay.

Q    And do you know when El Dorado's tax returns first began to include World AG?

A    Not specifically.  I only looked at a couple of years.

Q    Okay.  Ms. Ragan, I am going to put in front of you a document that is marked FSB-56.  This is an e-mail chain and if we look up at the top there, this is from Mr. David Vandergriff.  And you understand Mr. Vandergriff is one of the attorneys that represents First Service Bank, correct?

A    Yes.

Q    And to you and your counsel and to various FSB attorneys and personnel, correct?

A    Yes, he was re-forwarding my e-mail to me.

Ragan - Direct/Curry                      117

Q    Yes.  That's exactly what I wanted to get to.  So I want to scroll to the first e-mail in the chain which is on Page 2. And that's from you to Yun Scarboro.  Who is Yun Scarboro

A    That is the primary person who prepares the financials and tax returns at the CPA firm for El Dorado.

Q    Okay.  And looking at this e-mail, you were asking for a separate tax return for World AG or if it was always either included in El Dorado or Tom Swarek, is that correct?

A    Yes.  I wanted to document my prior understanding.

Q    Okay.  And then the next e-mail in the chain is from Ms. Scarboro back to you, is that correct?

A    Yes.

Q    And then the very next e-mail is you forwarded that to the FSB team and Mr. Swarek, is that correct?

A    Yes.

Q    Okay.  So having reviewed those, you recognize this e-mail chain, this e-mail chain that you are both an author and a recipient in, correct?

A    Yes.

Q    And from our review, does this look like an accurate copy of your e-mail chain?

A    Yes.

        MR. CURRY:  Your Honor, at this time, I move to admit FSB-56.

        THE COURT:  Any objection, Mr. Golman?

Ragan - Direct/Curry                          118

MR. GOLMAN:  No objection.

THE COURT:  Okay.  Fifty-six will be in.

Mr. Curry --

Q    Ms. Ragan, I just want to draw your attention to Ms. Scarboro's reply.  And if you would look at the last two sentences there in that paragraph.  I'm going to ask you again, do you know when the World AG income began to be rolled up into El Dorado?

A    Well, according to this, the tax accountant was advising me that they began moving it over in 2021.

Q    And what's your understanding of the tax accountant's reason for moving it over?

A    Because the client mentioned to me there was no land rent reported on his personal return in '21 and that's what they were advised to do by El Dorado.

THE COURT:  Mr. Curry, how was the rent rolled into El Dorado?  Were the leases assigned?  Were there leases?

MR. CURRY:  There are.  El Dorado's a party to at least one of them but they filed the consolidated reports and if you recall from the financial statements that were presented, there was rental income that began appearing in '21 on those financial statements.  And then Mr. Crawford then walked through up to right before the filing and from '21 on, farm rent was included El Dorado's financial statement as income and then was reported in their taxes the same way.

Ragan - Direct/Curry                    119

A     And it was deposited into either El Dorado or Tom Swarek bank accounts for the most part.  It generally did not go through a World AG bank account.

THE COURT:  I'm just curious -- have all farmers who leased this property, were they making their checks payable to El Dorado or were they making them payable to World AG?

A     It was my understanding from my prior discussion with Ms. Chapman, when I inquired as to where are the rents, they're not in the World AG bank accounts, I asked her that question.  She said that when the checks came in payable to World AG, they would endorse them to the bank account that they were going to deposit them into which would either have been an El Dorado account or a Swarek personal account.

MR. CURRY:  And, in fact, actually, Your Honor, since you're asking about that, I've given Mr. Bolen a copy.

May I approach the witness, Your Honor?   And then may I approach the bench?

Q     Ms. Ragan, I just handed you a document there.  Do you recognize that document?

A     Yes.

Q     Okay.  What is this document?

A     It's a rental agreement with one of the gentlemen that rents and pays for some of the farmland, the World AG farmland.

Q     All right.  And so this was a document that was in your possession, correct?

Ragan - Direct/Curry                    120

A    It was a document that I found when I was searching for World AG documents in connection with the production request.

MR. CURRY:  And just for clarity, Your Honor, this is on our witness and exhibit list but we had only been able to obtain an unexecuted copy.  Ms. Ragan had reviewed our exhibits and brought me this this morning.  That's why it's not digital.

THE COURT:  It is or is not on your list of exhibits?

MR. CURRY:  I'm sorry.

THE COURT:  Is it on your list that you gave me?

MR. CURRY:  No, it's -- well --

THE COURT:  Do you just want to mark this one and --

MR. CURRY:  I think we'll just mark this one as an additional one and not move to admit the unexecuted version.

THE COURT:  I'm going to mark this FSB-75.

MR. CURRY:  Yes, Your Honor.

Q    Ms. Ragan, just looking at the very first paragraph of this document, you see that this is a lease with Bill Buffington individually and Cottonwood Recreation Land, GS Holdings and GS Partnership and Thomas L. Swarek, El Dorado Gas & Oil, Inc. and World AG Investment, correct?

A    Yes.

Q    And so to the Court's question to you a moment ago, at least from this lease, Mr. Buffington should have at least been on notice at El Dorado was a party to his lease?

A    I would assume so.

Ragan - Direct/Curry                                121

Q    And I think you just said, you stated this is a document that you found in the debtor's records?

A    Yes.

Q    Was it included in the documents that were provided by Mr. Swarek in connection with his 2004 exam or before that?

A    I can't tell you that.  I remember specifically Mr. Swarek gave me a bunch of documents that he thought were responsive -- some of them were, some of them weren't.  Some of them I took, some of them I didn't.  I don't remember which group it was in.

Q    Okay.  But your understanding is that this is an accurate record of either World AG or El Dorado and that it related to the ownership issue that we have propounded discovery on?

A    Yes.

        MR. CURRY:  Your Honor, we would move to admit FSB-75.

        THE COURT:  Any objection?

        UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

        THE COURT:  Seventy-five will be admitted.

        MR. CURRY:  Thank you.

Q    Ms. Ragan, do you know whether or not World AG recorded positive net revenue or negative net revenue for the years '21 through '23?

A    There are not separate books kept for World AG that I'm aware of.

Q    Okay.  But to the best of your knowledge, do you know if

Ragan - Direct/Curry                           122

World AG has any operating expenses?

A    The only revenues and expenses that I am aware of are the rents that come in, the debt service for MetLife and I believe Ms. Chapman told me at one point that there were some bills for somebody to cut the grass.

Q    Well, speaking of the debt service to MetLife, who actually pays that?  Prior to the bankruptcy, who actually paid that?  El Dorado or World AG?

A    I -- oh, I believe the payments were made by El Dorado primarily.  I didn't see any payments out of the World AG accounts.

Q    And so when we look back to the November 30th '23 financial statement and we look at the statement of income there and, again, this is for El Dorado, EDGO, to give it some clarity, and we look at the revenue there and you can see -- if you see the investment income, it's a negative number, correct?

A    Yes.

Q    Okay.  And the rental income, though, that's a positive number?

A    Yes.

Q    Okay.  So, do you know whether or not El Dorado claimed operating losses in any of the years for '21, '22 or '23?

A    Yes.  I believe El Dorado had operating losses.  I don't remember if it was all of those years.

Q    Okay.  And so with the consolidated tax reporting, to the

Ragan - Direct/Curry                    123

extent that World AG had positive income, that income would have been offset by El Dorado's losses, correct?

A    Yes.

Q    That would not have been the case if the farm rental had continued to be reported on Mr. Swarek's taxes, correct?

A    That's right.

MR. CURRY:  I have no further questions, Your Honor.

THE COURT:  I do.

MR. CURRY:  Okay.

THE COURT:  So, Ms. Ragan, since you have been the Chapter 11 Trustee, have you received any of the rental proceeds?

A    No.

THE COURT:  Where are these funds going?

A    It's my understanding that they were going to Mr. Swarek. He was collecting the rents and he was paying the debt service. And at one point in time, the rents exceeded the debt service but more recently he wasn't collecting all of the rents so there was a deficit.  So there was a higher cash need than there where cash receipts.

MR. CURRY:  Your Honor, I think Ms. McJunkins has already covered it but -- and it's a follow up based on your question, Your Honor.  I apologize.

THE COURT:  No, go ahead.

MR. CURRY:  I know I said I was done.

Ragan - Direct/Curry                               124

Q    Ms. Ragan, do you have an understanding of the current status of the ad valorem taxes that are due on the Mississippi farmland?

A    I understand they're delinquent.

Q    And had they been sold at a tax sale subject to redemption?  Is that your understanding?

A    That is my understanding.

Q    And do you recall a conversation with Mr. Swarek in November around the time that we took his 2004 exam and Mr. Swarek promised that those taxes would be paid that month?

A    I don't specifically recall that.

Q    But is it fair to say Mr. Swarek has represented to you that he would be paying those taxes soon?

A    Yes.

Q    Kind of like the offers to buy the Oil & Gas assets, has the money ever shown up?

A    Mr. Swarek doesn't have any excess cash, to my knowledge, to pay the taxes or buy Oil & Gas assets.

Q    And if El Dorado owns World AG and Mr. Swarek doesn't pay the taxes, what happens to the value of the World AG stock in El Dorado's hands?

A    It would decrease.

Q    Completely?

A    Well, in my experience, when you get to the point where the taxes can't be redeemed, the secured lender pays the taxes

so that they don't lose the land.

Q    But MetLife doesn't have a lien on all the farmland, correct?

A    I believe that's right.  They do not.

Q    And so that unencumbered portion, there's significant risk of loss to the El Dorado estate if El Dorado owns World AG and those taxes aren't paid, correct?

A    Yes.

Q    While we're on that, what's your current projection for payments to priority unsecured creditors?

A    I don't have a projection of an amount that will be available to priority unsecured creditors.

Q    If the El Dorado case administration were to end this month and you have the assets -- you've liquidated the assets that you have in your estate, is there a path or a recovery for unsecured creditors under that situation if World AG is not owned by El Dorado?

A    I do not believe that there would be a recovery for unsecured creditors based on where the case is today.

Q    And with the understanding that this is not an opinion of value or anything else, but have you seen any documents referencing the cumulative value of the World AG farmland?

A    Yes, I reviewed an appraisal.

Q    And based on your review of the documents, if El Dorado is able to direct its subsidiary, World AG, to liquidate assets

Ragan - Cross/Golman                              126

and divvy that money up, is there a path to recovery for unsecured creditors?

A    Likely, yes.

MR. CURRY:  Now I have no further questions.

THE COURT:  Mr. Golman, do you want to take a little bit of a break or do you want to go ahead and get started on your cross?

MR. GOLMAN:  I don't have very many questions, I would just assume do it now.

THE COURT:  Okay.  You may proceed with your cross.

CROSS EXAMINATION

BY MR. GOLMAN:

Q    Ms. Ragan, you just testified that you had seen an appraisal relating to the World AG property, correct?

A    Yes.

Q    Do you know the date of that appraisal?

A    I believe it was November of '23.

Q    So that would have been prior to the Chapter 11 petition?

A    Yes.

Q    Filed in El Dorado?

A    Yes.

Q    Well, what is the value in that November 2023 appraisal -- total value?

A    I believe it was 77 million.

Q    That's the figure that is listed in the schedules,

Ragan - Redirect/Curry                127

correct?

A     Yes.

Q     In your review of the El Dorado financial papers, through all the different things you've looked at -- and you've looked at a great many different pieces of paper, did any of those reflect a value of $77 million in land in El Dorado?

A     No.

Q     Did any of those reflect stock ownership or value of that same figure through another company?

A     Not to my knowledge.

Q     You've seen some records of El Dorado that indicate that World AG is a subsidiary of El Dorado, correct, you've testified to that?

A     Yes.

Q     Have you seen other records that indicate that Tom Swarek is the owner of the stock in World AG?

A     Yes.

Q     Thinking about those two different categories of documents and I'm not going to try to get you to list which existing -- which category, but does one predominate in your mind against the other?

A     In my mind, yes.

Q     And that's the tax returns?

A     Yes.

Q     But there are other documents that do say that Tom Swarek

Ragan - Redirect/Curry                    128

is the owner of World AG?

A    Yes.

          MR. GOLMAN:  Those are all the questions I have.

          THE COURT:  Any redirect, Mr. Curry?

          MR. CURRY:  Sure, Your Honor.

                    REDIRECT EXAMINATION

BY MR. CURRY:

Q    Ms. Ragan, at the 341 meeting is when this issue first came up and is it correct to characterize that what Mr. Swarek said is consistent with what you were just asked, that Mr. Swarek owned World AG and he challenged the schedules, that's correct?

A    Yes.

Q    Have you seen any documents that show -- well, let me back up, has that story stayed consistent?

A    No.

Q    Can you elaborate?

A    At one point after the 341 meeting, Mr. Swarek told me that the land had been put in trust for his children.  And at another point in time he told me that he had given or conveyed somehow the stock to his wife.

Q    So, how would you characterize Mr. Swarek's description of the ownership of the World AG assets to you over time?

A    It's changed.

Q    Based on what?

129

A     I don't know.

MR. CURRY:  No further questions, Your Honor.

THE COURT:  Ms. Ragan, did you ever ask to see a copy of the stock certificates?

A     I was told that there are no -- that there were no stock certificates and in the bylaws that I was provided for World AG, it says that the company -- I don't remember exactly the wording but I think it said the company can issue stock without certificates or something along that line.  Mr. Swarek told me that he obtained certificates at the time that he was deciding to convey it to his wife.

THE COURT:  Where are the bylaws?

A     I saw them when we had the deposition in the document production.  I don't know where they are now -- if they're in somebody's exhibits.

MR. CURRY:  Your Honor, that was the purpose of the MetLife affidavit in large part and, so, already admitted are certain resolutions related to World AG and El Dorado.  And then this was not covered in the MetLife affidavit but we have and to the extent Mr. Swarek testifies, we would ask him to authenticate it but at FSB-59 we do have the World AG bylaws.

Well, actually, I guess, based on what you just asked --

THE COURT:  You didn't enter those.

MR. CURRY:  No, no, I didn't -- no, we didn't but

130

based on what you just --

THE COURT:  I mean, I want to see the bylaws.  I want to know if the bylaws have ever been amended.  I want to see whatever corporate documents exist.  I want to see them.  Today is the day.

MR. CURRY:  Yeah, Your Honor, we asked for those in discovery and we didn't get them.  We've had to go find them from other people.  So, if we're talking about what Mr. Swarek can provide as to corporate governance documents, the answer is he's produced nothing.

Ms. Ragan did help him and find some stuff and we were able to go to MetLife and get some more stuff but Mr. Swarek has not produced anything on this topic.  And to the extent he gets up here and starts trying to -- we need to see it but we're going to have some objections if there's some surprise documents that pop up today because we've been asking for them for awhile.  We've been telling the Court this is a major issue.  And, in fact, I think you instructed him at the status conference to deliver those documents to Ms. Ragan.

I'd go back to what I said at the very beginning, Your Honor.  I'm reticent to attribute a motive to any of it but at the end of the day, what is happening is that there is a corporate debtor in front of you that has atrocious corporate records.  Has failed to maintain corporate separateness throughout its operations and now, as we're trying to

131

administer these assets so that Mr. Swarek's creditors can be paid, Ms. Ragan is constantly having to try to unscramble an egg that just cannot be unscrambled.

And any time there is even the hint of an opportunity for Mr. Swarek to try to extract some value, either a nuisance value settlement or something or cloud up the record, it just seems to happen.  And it's not clear if that's because he can't remember what he said before or not but, you know, Your Honor, I'll remind you, and I was reading back on this and this is why I was asking Ms. Ragan about this but a little over a year ago on January 9th, Mr. Swarek sat on that stand.

He swore to you that his employees had not walked off and that all of this properties were being properly operated. But yet to your astonishment he could not tell you how far behind he was on payroll.  And what you just heard from Ms. Ragan is the exact opposite.  That, in fact, the employees had walked off.  And I think, if Your Honor goes back and look at that transcript, if it's not already clear today, I think what you'll see is that what Mr. Swarek believes is happening in his business doesn't always match what is on paper and in reality.

And the question before the Court is should he be able to extract a greater benefit from having improperly documented his intercompany businesses or should those assets be available to pay his creditors.

THE COURT:  Well, I understand where you're coming

132

from but --

MR. CURRY:  And, I mean, frankly, Your Honor, if your finding is that El Dorado doesn't own World AG, I would assume that that's going to come with a referral because you have admitted into evidence the tax returns, the most recent tax returns.

THE COURT:  Speaking of the tax returns, the parties agreed to admit several of the exhibits but you haven't used all the exhibits.  And I should have reminded all of you at the beginning, just because you admit something, doesn't mean that I'm going to go take it upon myself to read every word about that and try to figure out what you felt was relevant about it.

MR. CURRY:  I assumed that we will have --

THE COURT:  I've already done a lot of preparation just for today.  So, I need you to take these exhibits that you all have entered and if they're relevant, you think they're important, I need you to backtrack and tell me why they're important.  You didn't put in the tax returns of Mr. Swarek. You haven't put in the bylaws.  I mean, if we want to take a break, it's a good time so that you all can circle back.

MR. CURRY:  Well, Your Honor, a couple procedural things here.  I understand your point but we're right at the end of our case-in-chief, next would be their case-in-chief.

THE COURT:  That's why I'm telling you.

MR. CURRY:  Well, but I assume that -- so this

133

portion is to get evidence in, correct?  And then we're going to close.  And I would agree with you if at the end of my closing you still don't know why an exhibited was admitted, then don't consider it.  But that's where it's my job to tell you what the evidence that we've put before you, what our position is it shows.  That's not the witness' job.

THE COURT:  Well, you're assuming I'm going to let you close.  We didn't talk about that, but --

MR. CURRY:  Well, if we don't close, there is a record of evidence that's been admitted either by stipulation --

THE COURT:  Right.

MR. CURRY:  I mean, I see it as no different if we did a stipulation.  These are the documents that are relevant. I don't think there's anything in there that we haven't already talked about in our pleadings that we've admitted, but I'm happy to -- I will go over everything.  I'm happy to go over everything that we admitted.  Quite frankly, a lot of it is stuff that Mr. Swarek has either authorized to file in this court or signed himself.  And Your Honor already noted the most salient point on that that we wanted to show you which is that it's inconsistent and changes and it depends on what day you look at it.

THE COURT:  Let's take a little bit of a break.  It's your case-in-chief.  Let's take a break.  And if you say you're

done with your case-in-chief, then you can be done with your case-in-chief and we'll move on and let Mr. Golman put his witnesses up after the break.  How long do you all want to take?

UNIDENTIFIED ATTORNEY:  Ten minutes?

THE COURT:  All right.  Let's just say til three o'clock and we'll come back.

Ms. Hopkins?

MS. HOPKINS:  Apologies, Your Honor, and I know that the trustee has not specifically filed a pleading here but we do have a few minutes of questioning just to kind of clarify a few issues with Ms. Ragan.  And we can do it when we get back or now.

THE COURT:  All right.  Let me ask.  Any objection to Ms. Hopkins taking the Trustee through some questions?

UNIDENTIFIED ATTORNEY:  No objection.

THE COURT:  Why don't we just do that when we come back from our break.  All right.  We'll come back at 3.

(Recess at 2:50 p.m./Reconvened at 3:09 p.m.)

THE COURT:  All right.  It's 3:09 and we're back on the record.

Mr. Curry?

MR. CURRY:  Thank you, Your Honor.  We discussed it on break and I've spoken to Mr. Golman and there are a couple of documents that I want to reopen Ms. Ragan's exam and ask her

Ragan - Redirect/Curry                    135

about for you.  And then I'm going to represent to you, the rest of the stuff that we've asked you to admit are either filings in the four cases and those are just filed to show that Mr. Swarek was signing them, filing them.  He's done this a few times.  The other documents, to the extent they're not used in cross examination, the Court can disregard them.

THE COURT:  Understood.

MR. CURRY:  Okay.

THE COURT:  All right.  Mr. Golman, any objection to --

MR. GOLMAN:  I have no objection.

THE COURT:  Okay.  Let's go through the documents.

MR. CURRY:  Thank you.

Q    Ms. Ragan, I am going to put a document up for you.  Are you able to see the document?  I know it's a little fuzzy.

A    Yes.

Q    Okay.  Have you ever reviewed this document before?

A    I don't think so.

Q    Okay.  Would you take a moment and look this over please?

Had a chance to review it?

A    Yes.

Q    Okay.  I want to call your attention -- you know Steve Jobs is wrong, your finger is not the best stylist -- all right, it's a crap job at bringing it up but I've pulled up the title there for us to look at.  And so we see this is a

resolution of the sole shareholder and the board of directors of World AG Investment.

Is it consistent withe the rest of the document you reviewed?

A    Yes.

Q    Okay.  And then what I want to draw your attention to next is --

THE COURT:  I was just going to suggest, Mr. Crawford, that maybe you could provide some assistance?

MR. CURRY:  Yeah, why don't you do it, Jack.

Okay.  Thank you.

Q    So, pulling this out, Ms. Ragan, this is a resolution of World AG related to its application to borrow money from MetLife, would you agree?

A    Yes.

Q    Okay.  And so, by background, corporate resolution as a transaction document, if you were looking through transaction documents, this is a document that you would expect to see if a corporation was engaging in a commercial loan or real estate transaction, something along those lines, this would be a normal due diligence item, correct?

A    A corporate resolution?  Yes.

Q    Yeah.  And what's the general purpose of this from MetLife's point of view, in your experience?

A    They would want to make sure that the corporation was

Ragan - Redirect/Curry                            137

authorized to enter into the loan.

Q    Okay.  And in making sure of that, so, Ms. Ragan, we've pulled this up.  It's dated February 23 -- February 2018.  Can you tell the Court, according to this document, who is the sole shareholder of World AG?

A    El Dorado Gas & Oil.

MR. CURRY:  And, Your Honor, that is Exhibit 52 that was already --

THE COURT:  Can you highlight that portion for me?

MR. CURRY:  Yes, ma'am.

THE COURT:  Mr. Crawford, can you highlight that portion for me?  All right.  I see it.  Go back up to the first paragraph.  Okay.  Thank you.

MR. CURRY:  And so, Your Honor, you see the undersigned sole director signed by El Dorado --

THE COURT:  Yes.

MR. CURRY:  -- signed by Mr. Swarek but in his capacity as president of El Dorado.

Q    And, Ms. Ragan, we put up FSB-53 and you see here that this is corporate resolution from El Dorado related to the MetLife loan.  Now, if El Dorado owned World AG at the time, and that was Met Life's understanding, is this a document you would have expected to see in the diligence file?

A    Potentially, yes.

Q    Okay.  Because just like you said before, MetLife wants to

Ragan - Redirect/Curry                    138

ensue that its borrower has the corporate authority to do what it is purporting to do, right?

A    Yes.

MR. CURRY:  And then, Jack, will you highlight the date and the signatures for us?

Q    And so here, on the El Dorado signature block, I draw your attention to the difference here.  Here Mr. Swarek is signing as the sole shareholder and sole director of El Dorado, correct?

A    Yes.

Q    And that's different than the signature blocks we just looked at, whereas in that one Mr. Swarek signed as the president of El Dorado and then a director of World AG, correct?

A    Yes.

MR. CURRY:  And then there's another MetLife loan. Yeah, we'll go to the next one.  And, again, this is dated February 27, 2018, Your Honor.

Q    Next, this is Exhibit 54.  Ms. Ragan, I'll represent to you this is a subsequent borrowing from MetLife.  This is a $4 million plus loan but we see there at the title, the resolution of the sole shareholder and board of directors of World AG Investment, Inc.

And, again, the same paragraph, Your Honor, that you asked to look at before.

And then when we go down and we can pull up the signature line and date and, again, here, Ms. Ragan, would you agree that El Dorado is executing this document as the sole shareholder of World AG?

A    Yes.

Q    And that was as of May 9, 2018, correct?

A    Yes.

Q    And this document indicates that Mr. Swarek's relationship to World AG is the sole director of World AG, correct, and the president of El Dorado?

A    President and director of El Dorado Gas & Oil.

Q    Yes.  Okay.  And then if we go to the next one and, Ms. Ragan, we've drawn up the title there, it's a resolution of the sole shareholder and board of directors of El Dorado Gas & Oil, Inc., right, you see that?

A    Yes.

MR. CURRY:  And then, Jack, if you will bring up the second paragraph?

Q    And again we see that this is a resolution executed in connection with World AG borrowing money from Metropolitan Life, correct?

A    Yes.

Q    Okay.  And again we see this is May 9th and here on El Dorado's corporate resolution we see that Mr. Swarek's signature block indicates that he is signing as the sole

Ragan - Cross/Hopkins                        140

shareholder and sole director of El Dorado Gas & Oil, correct?

A    Yes.

Q    And, Ms. Ragan, do these documents confirm or conflict with your understanding that El Dorado owns World AG?

A    This would confirm that El Dorado is the owner of World Ag.

Q    Or at the very least that World AG represented to MetLife in 2018 that it was owned by El Dorado, correct?

A    Yes.

MR. CURRY:  That's it, Your Honor.

THE COURT:  Ms. Hopkins, do you want to go ahead?

Mr. Golman, are you fine with Ms. Hopkins in front of you?

MS. GOLMAN:  Yes, ma'am, I'm fine.

THE COURT:  Okay.  Thank you.

MR. CRAWFORD:  And, Your Honor, thank you for indulging.

THE COURT:  Oh, no problem.

All right.  Ms. Hopkins?

MS. HOPKINS:  Thank you, Your Honor.  Should be pretty brief.

CROSS EXAMINATION

BY MS. HOPKINS:

Q    I just want to kind of go over and address some other things that you answered on direct and just want to clear up

Ragan - Cross/Hopkins                    141

some things.

So, a minute ago with counsel you discussed the filings of Bluestone and World Aircraft.  And so at the time of the bankruptcy filings for those two entities, did you serve as the officer or director for either one of those?

A    No.

Q    Did you serve in any control capacity for either or those?

A    No.

Q    So is it safe to say that you didn't make the decision for those entities to file bankruptcy, did you?

A    No, I discussed it with Mr. Swarek and Mr. Sheehan.

Q    Sure.  And you advised, made a recommendation that you thought it was a good course of action to file bankruptcy for those?

A    Yes.

Q    And as a result of those two bankruptcy filings, do you believe that the assets of Bluestone and World Aircraft have been protected as a result of the bankruptcy protections?

A    Yes.

Q    We talked a little bit about sub con -- and all of that and just to kind of briefly address that, have you considered whether substantive consolidation is appropriate for these four debtors?

A    I have considered it and we've been evaluating it for quite a while.  We haven't made final determinations but, yes,

I've absolutely been looking at it.

Q    Is that analysis ongoing?

A    Yes.

Q    So what about when it comes to other non-debtor entities? Have you considered those entities under the analysis of substantive consolidation?

A    Well, that's my current stumbling block is I keep finding more assets that were required with El Dorado money that are in the names of other entities that I didn't know about that are non-debtors and I'm struggling with how to deal with that.  Is it through sub con or through some other mechanism.  It's a significant area that we're discussing right now.

Q    So, is that also the same with respect to your analysis of sub con as to World AG?

A    Yes.

Q    Okay.  You all briefly addressed the schedules and SOFAs earlier.  Have you learned of any -- since your appointment in this role, have you learned of any errors in the schedules or SOFAs?

A    Yes.

Q    Are you continuing to learn of errors in those filed schedules and SOFAs?

A    Likely, yes.

Q    Is it your intention to amend the schedules?

A    Yes.  Mr. Sheehan's office and I -- probably more them

than me -- have invested significant hours in amending them already but there's one more piece of data that's significant that I'd like to have before we file the amendment because it's a significant expense to notice them out to thousands and thousands of people for all those pages.

So, we're waiting to resolve that one significant issue -- or, there's probably more than one but that's -- there's one very significant issue that we're trying to resolve.

Q    Okay.  And as that issue or any other potential issues are resolved, do you then intend to file those amended schedules?

A    Yes.

Q    There was also some discussion as to the appraisal of the farmland.  I believe it was an appraisal of 77 million?

A    That's right.

Q    Are you aware of any other information related to value in connection with the farmland?

A    I have a couple of other data points on value, yes.

Q    Are they the same or different than that specific amount?

A    The data points are that the value might be more or it might be less than the appraisal.

Q    Okay.  And also, without going into, you know, I don't think I need to pull up the specific exhibits, but the tax returns here, can you tell us why are the tax returns important here in your -- in this analysis?

Ragan - Cross/Hopkins                144

A    They are the most persuasive document to me because they're filed.  The tax returns are filed with the government.  They're binding, they're sworn to, they're signed by a third party as well as Mr. Swarek.

The other documents are less persuasive to me because they -- they're self-made.  I mean, you could make a determination today of one thing and you can make a determination tomorrow of something else.  And given that I have seen significant documents that say El Dorado runs World AG and that Mr. Swarek owns World AG, I have to look at what I think is an independent third party document and to me that's the tax returns.

Q    Okay.  So, now let's kind of go into the substance of those returns.  So, what are the salient representations in those tax returns that were relevant to you in, you know, your analysis of ownership?

A    So, there are -- there are three things.  So, the financial reporting includes both the rents and the debt service of World AG in the revenue expense of the tax return.  So, that's one.  There is -- there are two affiliate schedules that I discussed before.  One is called Schedule O, the other one is called Form 851.

In El Dorado's case, those are each two-page schedules.  You can only fit so many corporations on a page -- I think it's nine or ten.  And in El Dorado's case I think

there were 15 or so, so there are maybe ten on Page 1 and 5 on Page 2. On, I believe it's Form O there are three choices, if I recall correctly that you can check for the entities that you are listing on that return.

And the one that is checked on the El Dorado return is parent subsidiary. And it notes World AG, among others, as a subsidiary of El Dorado. And if you're going to follow the rules, the entities that you're going to put on that schedule are going to be more than 50 percent owned and controlled by the parent entity. So, that is another fact that persuades me that World AG is under El Dorado.

On the other form, 851, if I'm not confusing them, I referred before when we were looking at that schedule on the monitor that the bottom right-hand -- I referenced the bottom right-hand corner. So the top part of the page will list the name of the entity and next to each entity is a number, so corporation 1, 2, 3, 4, 5. On the bottom half of those pages, it doesn't list the corporate names, lists the number -- 1, 2, 3, 4, 5. It doesn't repeat the corporate name.

And over to the right in the bottom right-hand corner of that, it asks a number of questions related to that entity. And in that one form that we were looking at, the question that I was focused on is who owns a hundred percent of the delineated entity and it had a one. One is the parent company filer which is El Dorado.

Ragan - Cross/Hopkins                      146

So, on a separate form it's saying World AG and all these other companies are one hundred percent owned by corporation 1 which was El Dorado.

Q    And I'm sorry, I just said a minute ago that I didn't think we needed to pull it up but maybe if we just briefly look at it, that can just be a good example for everybody and make it clear for the Court, your testimony.

Jack, would you mind assisting?

MR. CRAWFORD:  What do you want --

MS. HOPKINS:  I just want to go to the tax return. Is it specifically Schedule O?

A    O and 851.

MS. HOPKINS:  Just to briefly --

THE COURT:  Is it 27?

THE WITNESS:  That's the first page of Schedule A.

Q    Okay.  Do you want to just point out what you were discussing on this schedule?

A    It's highlighted in the top left, parent subsidiary.  The box is checked.

Q    Okay.  Again, this is the tax return for El Dorado, not World AG?

A    Yes.

Q    Well, here's the 851.

A    That's the first page of 851.  That's the second page of the other one.  So, this is a continuation of 851, this is the

second page of 851.  World AG is designated as subsidiary corporation number 2.

You look at the bottom, you see the company name's on the left.  Corporations are not named, again, they're only the number of boxes completed on the right for the number of corporations that are up above.  So, that's corporations 2 through 5.

Q    And then the one that was denoted at the bottom for each four of those entities, that relates to El Dorado?

A    Yes.  So if you go back over to the bottom right-hand corner, the last column there says the stock owned by corporation number and it says number 1.

MS. HOPKINS:  Thank you, both.

Q    Okay.  So, based on your analysis that it's really with primary concern with this -- the tax returns and the financial reporting, have you made a preliminary determination as to who owns World AG?

A    My determination is formed based on my reliance on the tax returns and I would say that World AG is owned by El Dorado.

MS. HOPKINS:  Thank you.

No further questions.

THE COURT:  Mr. Golman, you ready for cross?

MR. GOLMAN:  Yes, ma'am, thank you.

May I approach the witness, Your Honor?

THE COURT:  Yes.

Ragan - Recross/Golman                          148

MR. GOLMAN:  Thank you.

RECROSS EXAMINATION

BY MR. GOLMAN:

Q    Would what I just handed you be among the kinds of papers that you say you have seen that indicates that Thomas L. Swarek owns all of World AG?

A    Yes.

Q    All right.  Have you seen this paper before?

A    I skimmed over the documents that were produced by MetLife in connections with Mr. Swarek's deposition and I took note of several documents in the MetLife production  that said Tom Swarek owned a hundred percent.  This may have been in that pile.

MR. GOLMAN:  Your Honor, I do think this was part of that pile.  I'd like to enter it as our next sequential exhibit.

THE COURT:  Any objection?  And it would be S-7?

UNIDENTIFIED ATTORNEY:  No, Your Honor.

THE COURT:  Okay.  So, S-7 will be admitted.

MR. GOLMAN:  May I approach the witness?

THE COURT:  Mm-mm.

Q    Have you seen this stock certificate before?

A    I have.

Q    All right.  In what context did you see it?

A    Mr. Swarek produced it at his deposition.

Ragan - Continued Redirect/Curry                149

Q    Okay.  This is one of those documents you were describing that can be made independently of being sent to a third party, correct?

A    Sent to a third party?

Q    Yeah, you talked about tax returns as something that is filed.  This is not a kind of document that's filed, correct?

A    Correct.

Q    Have you seen any other World AG Investment stock certificate?

A    I do not believe so.

Q    Did the World AG stock certificate you saw contain the second page or the flip side of it with this endorsement on it?

A    Yes.

Q    And you received that as part of your regular duties as Trustee in this case, specifically to investigate ownership of World AG, correct?

A    I received it in connection with the production request of Mr. Swarek for his deposition.

MR. GOLMAN:  I would like to admit this as our next numbered exhibit, Your Honor.

THE COURT:  Any objection to S-8?  Admitted.

MR. GOLMAN:  No, Your Honor.

THE COURT:  It's admitted.

MR. GOLMAN:  If I may have the Court's indulgence for about two or three minutes?

THE COURT:  Sure.

MR. GOLMAN:  I need to look at the exhibits I have in.

THE COURT:  Do you want us to run through the ones that I didn't admit?

MR. GOLMAN:  I can (indiscernible).

THE COURT:  Okay.

MR. GOLMAN:  That concludes my questions.

MR. CURRY:  Let's open up some redirect.

THE COURT:  Mr. Curry, redirect?

MR. CURRY:  Thank you.

CONTINUED REDIRECT EXAMINATION

BY MR. CURRY:

Q    Ms. Ragan, I want to start with the first document that you just looked at here.  And I want to draw your attention here to the first numbered instruction, Number 1.  And do you see there where it says if it's part of a multi-tiered entity structure, additional certificates will be required for each owner entity and manager entity?

A    I see it.

Q    Okay.  And then based on the corporate resolutions that we reviewed, would that be consistent having a resolution from El Dorado authorizing World AG to enter into a debt, would that be a document that you would expect to be included if MetLife believed this to be a multi-tier organization like this says?

Ragan - Continued Redirect/Curry          151

A    I would expect so, but I don't know that it wasn't
included -- there were -- there was a lot of production.

Q    There was.  Right.  The one that we just reviewed, the
resolutions in connection with the borrowings.  Remember we --

A    Mm-mm.

Q    Okay.  Now, Ms. Ragan, in your cross examination there,
you were asked about a stock certificate provided by Mr. Swarek
and I want to revisit -- you've already testified about your
understanding of that but I want to bring it forward.  When you
initially asked Mr. Swarek if there were stock certificates,
what was the answer that you got?

A    He never said that there were certificates or produced any
certificates.

Q    And I believe you testified earlier, we'd have to go back
and check the record, but I think you said something along the
lines of he told you he created the certificate when he wanted
to give it to Emily.

A    My recollection is that, yes, he said that he'd had a
cancer scare and he had reasons for wanting to convey assets to
his wife and that's when it was done.  I think he said in 2021.

Q    Okay.  And the 2021, we're going to come back to.  But if
you wouldn't mind, look at the document that we've put up
there.  This is marked as FSB Number 60.  Have you ever seen
this document?

A    Yes, I saw it in the production for Mr. Swarek's

Ragan - Continued Redirect/Curry                152

deposition.

Q    Okay.  And this is a document that is signed by Ms. Emily Ann Swarek Lowery Swarek, is that correct?

A    That's what it looks to say, yes.

Q    Okay.  Well, in fact, it was -- it has a notary stamp on it, doesn't it?

A    Yes.

Q    So, would that then indicate to you that it's more than it appears, that this is Emily Swarek's signature, correct?

A    Yes.

Q    Okay.  And what is your understanding of what this document says?

A    Mr. Swarek had been having transaction discussions with this group referred to at the top, Sterling Planet.  There were discussions about who owned the stock.  There was discussions that he had conveyed the stock to Emily and at some point Emily signed this disclaimer related to the stock, stock ownership.

Q    So, based on your understanding -- let me back up.  Did you have any direct conversations with anybody at Sterling Planet?

A    Yes.

Q    And so do you have an understanding of the transaction that was generally being contemplated there?

A    Generally.

Q    Generally.  And based on your understanding of that

Ragan - Continued Redirect/Curry                153

general transaction, would it have been detrimental to that transaction if Emily Swarek owned a hundred percent of World AG?

A    I'm not sure.  The issue was they were trying to get their claws on the stock and because of the back and forth about who owned it, it's my understanding -- I was not there, I only understood this from Mr. Swarek, they were trying to get Emily to convey stock to them and she wouldn't do it and said she couldn't do it because she didn't own it.

Q    Okay.  And --

THE COURT:  Can you unpack that a little bit more, Mr. Curry?

MR. CURRY:  Sure.

THE COURT:  What was the nature of the purported transaction, if you know?  Why were they trying to get their hands on the stock?

A    Mr. Swarek had been having discussions with this group about lending him money, potentially using the World AG land as collateral.  And he wanted to use the proceeds of that loan to either buy El Dorado assets back or to use the proceeds to pay off some of this debts to FSB.

MR. CURRY:  And, Your Honor, I'll move on and have Ms. Ragan talk about some of those documents so you can have a better understanding of.

Before I do, though, I want to move to admit FSB

Ragan - Continued Redirect/Curry          154

Exhibit 60.  It's automatically authenticated as a notarized document.

THE COURT:  Any objection, Mr. Golman?

MR. GOLMAN:  I do object to this one because we don't have the person who signed it on the stand.  indis3:46:25 to the extent that this is admissible indis

MR. CURRY:  Your Honor, if you will give us a little bit of indulgence.  We switched it up because of Mr. Golman having asked Ms. Ragan about it.  This is Mr. Clarkson's piece of evidence, so I'm going to let him address that.

MR. CLARKSON:  Your Honor, if you look at Federal Rule 913, it's self authenticated with a notary stamp.  So you can admit it without having Ms. Swarek testify as to the authenticity.

THE COURT:  Mr. Golman, do you believe 913 doesn't apply?

MR. GOLMAN:  My general understanding, Your Honor, is that authenticity and admissibility are separate issues.  It may very well be authenticated but it's still hearsay.  It's a statement signed by someone who is not here to say that yes, I signed it.

THE COURT:  How did we get the document?

MR. CLARKSON:  I believe it was produced by Mr. Swarek in his production through his deposition.

THE COURT:  I'm going to allow it.  I'm going to go

Ragan - Continued Redirect/Curry                    155

ahead and enter it.  I mean, I understand what it is.

So, your objection, Mr. Golman, is overruled and 60 is admitted over objection.

MR. CLARKSON:  Thank you, Your Honor.

MR. CURRY:  Your Honor, may I approach the witness?

THE COURT:  Yes.

MR. CURRY:  I have an additional exhibit and I think we're on 71 --

THE COURT:  Let's check.

MR. CURRY:  Seventy-six, Your Honor.

THE COURT:  Okay.  FSB-76.

Q    Now, Ms. Ragan, the document I gave there, it's a little old and it's a little faded.  It's been copied a few times but are you able to read that document?

A    Some of it.

Q    Okay.  Can you see up there at the top enough so that you can see that this is a re-certification beneficial ownership of legal entity customer?

A    Yes, I see that.

Q    Okay.  And let's unpack that real quick.  The word beneficial owner there, that has some significance, correct?

A    Yes.

Q    And in your mind, what's the significance?  Well, in your mind, what's the difference between beneficial owner and record title owner?

A    It's you're the ultimate owner.

Q    Ultimate owner.  So, if Mr. Swarek signed a beneficial ownership statement stating that he was the one hundred percent beneficial owner of World AG and also said that he was the one hundred percent owner of El Dorado, then those statements do not necessarily contradict the representation that El Dorado owns World AG, right?

          Because if Mr. Swarek owns all of El Dorado and El Dorado owns all of World AG, then Mr. Swarek is the beneficial owner of the World AG stock, correct?

A    I think I followed that.  Yes.

          THE COURT:  I followed it.  I understand what you're saying.

          MR. CURRY:  Okay.  That's important.

          No offense.

Q    And you can see that this is a document signed by Mr. Swarek, right?

A    Yes.

Q    And the date here is very important.  It's 3/31/22, do you see that?

A    Well, I also see 11/27/18.

Q    So that's the original one.

A    Okay.

Q    And the date next to the signature is the 3/31/22.

A    Okay.

Ragan - Continued Redirect/Curry                157

Q    Do you recall the date of the purported gift to Ms. Swarek?

A    I just remember him talking about 2021.

Q    And, in fact --

THE COURT:  March of '21?

MR. CURRY:  Yes, Your Honor.

Q    So, Ms. Ragan, I've put the endorsement back up there. You could see, March 1, 2021.

A    Okay.

Q    So, after this document was purportedly executed, we see that Mr. Swarek represented to FSB that there had been no change in ownership, correct?

A    I don't recall if that was an FSB document.  I thought it was a MetLife document, isn't it?

Q    The one that I just up.  No, I'm sorry.  (indiscernible) This one is and FSB document -- FSB-76

A    Okay.  So, yes, I'd agree with that then.

Q    Okay.  Now, through my confusing question just a minute ago, maybe you could follow me again.  So, before I asked you if Tom Swarek owns El Dorado and El Dorado owns World AG, because Tom Swarek owns El Dorado, he is then the beneficial owner of World AG, correct?

A    Yes.

Q    But if Emily Swarek owned World AG, Tom Swarek would not be the beneficial owner, correct?

158

A      Correct.

MR. CURRY:  No further questions, Your Honor.

THE COURT:  Mr. Golman?

MR. GOLMAN:    I would ask if he's --

THE COURT:  Oh, I'm sorry.  Are you going to try to admit FSB-76?

MR. CURRY:  Well, Your Honor, it's a statement about a party opponent, so, yes I am.

THE COURT:  Any objection, Mr. Golman?

MR. GOLMAN:  I have no objection.

THE COURT:  All right.  So we'll admit 76.

Mr. Golman, did you get up to object or did you have something else for Ms. Ragan?

MR. GOLMAN:  I just got up to ask that this be admitted.

MR. CURRY:  He was making sure the record was clear.

THE COURT:  All right.  Any other questions for Ms. Ragan?  She's been on the stand for a good while now.

All right.  Thank you, Ms. Ragan, you may step down.

Mr. Curry, anything else in your case-in-chief?

MR. CURRY:  No, Your Honor, nothing in our case-in-chief.  However, I believe that this is an issue of documentation and at this point all of the documentation is before the Court.  And consistent with what Ms. Ragan said, we think the Court should place substantial weight on documents

159

signed under penalty of perjury.  That's the SOFA, that's the tax returns from '21 to '23.  And based on what's been admitted to the Court, I think we would move for a directed verdict now.

THE COURT:  That's denied.

All right.  Mr. Golman?

MR. GOLMAN:  Your Honor, more has come in since we last had a break.  Could I have ten minutes to contemplate?

THE COURT:  Yes.  In fact, I was going to ask you, let's talk about some housekeeping.  I'm sure several of the attorneys have cancelled their flights by now.  We're at 4.  I can go late, it's not a problem, I can just notify the marshals.  But you all need to talk and tell me do you think you can do it today and, if so, how long or do you want to come back in the morning.  I'll let you all talk about it on the break.

MR. GOLMAN:  Thank you.

THE COURT:  Okay.  We'll come back at, say, ten minutes after 4?

MR. GOLMAN:  Thank you, Your Honor.

MR. CURRY:  Thank you, Your Honor.

THE COURT:  Thank you, all.

(Recess at 3:53 p.m./Reconvened at 4:09 p.m.)

THE COURT:  Mr. Golman?

MR. GOLMAN:  Your Honor, the Trustee has asked me to inform the Court that Mr. Swarek has signed the MICO (phonetic)

160

assignment which takes one issue off the table.

THE COURT: Okay.

MR. GOLMAN: Which is certainly a good thing to say. And I'm going to say this, I think it's a good thing to say, I rest.

THE COURT: All right then.

MR. GOLMAN: The proof is what the proof is.

THE COURT: Okay. All right. Well, I didn't see that coming. Well, it's four o'clock. I'll ask the attorneys, do you want to close or do you want me to take the evidence as is? I mean, we have time. I was concerned about time before but --

MR. CURRY: Your Honor, I think with your questions before and what we walked through, as I said before, everything else that we had designated was to go over with Mr. Swarek, we certainly understand he's not taking the stand so we don't need to do that.

I think you understand the issues so I don't feel the need to give you a closing unless you want it.

THE COURT: Mr. Golman, do you?

MR. GOLMAN: I don't feel the need to do a closing, Your Honor.

THE COURT: Okay. All right. Anything else that we need to take up for today?

Go back to the assignment, Mr. Golman.

161

MR. GOLMAN:  I think the Trustee can explain what Mr. Swarek has done.  I understand that he assigned the assignment that she proposed that will move the working interest, the 19 percent working interest from the operating company to El Dorado.

MS. RAGAN:  Yes.

THE COURT:  Okay.  So then we're back on track with that.  Okay.

MS. HOPKINS:  Correct.  This was the assignment we previously proposed but at the time he indis4:11:37

THE COURT:  Okay.  All right.

MS. RAGAN:  Mr. Swarek heard what Your Honor said about time and cost and the effort and he said he didn't want the estate to incur that burden so he would agree to sign the assignment, which he has done.  And it's been notarized and I have it.

THE COURT:  Okay.  All right.  Yes, I was very concerned about that but all right, that resolves that issue.

Any else that we need to take up today?

UNIDENTIFIED ATTORNEY:  Not from FSB.

MR. GOLMAN:  Not from Mr. Swarek.

THE COURT:  All right.  I will adjourn but the attorneys need to stay back and sort your exhibits out with Ms. Ramage.  All right.  We will be adjourned.  Thank you, all.

(Proceedings adjourned at 4:12 p.m.)

162

* * * * *

# **C E R T I F I C A T I O N**

We, ELAINE HOWELL and ALYCE H. STINE, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Elaine Howell

ELAINE HOWELL


/s/ Alyce H. Stine

ALYCE H. STINE

J&J COURT TRANSCRIBERS, INC.          DATE:  March 4, 2025