IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:                          .  Case No. 23-51715-JAW
                                .  (Jointly Administered)
                                .
EL DORADO GAS & OIL, INC.,      .  United States Courthouse
et al.,                         .  501 East Court Street
                                .  Jackson, MS  39201
                                .
              Debtors.          .  April 10, 2025
. . . . . . . . . . . . . . . .  10:21 a.m.


 TRANSCRIPT OF HEARING ON MOTION TO ENFORCE SALE ORDER FILED BY
 GRAYSTREET (DKT. #1200), TRUSTEE'S RESPONSE (DKT. #1262), and
      OBJECTION FILED BY FIRST SERVICE BANK (DKT. #1263)

            BEFORE THE HONORABLE JAMIE A. WILSON
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor-in           Sheehan & Ramsey
Possession, El Dorado       BY: PATRICK A. SHEEHAN, ESQ.
Gas & Oil, Inc., Bluestone  429 Porter Avenue
Natural Resources II - South Ocean Springs, MS 39564
and World Aircraft, Inc.:

For GrayStreet Credit, LLC: Fletcher & Sippel, LLC
                            By:  GARRETT ALAN ANDERSON, ESQ.
                            4400 Old Canton Road, Suite 220
                            Jackson, MS 39211

For the U.S. Trustee:       Office of the U.S. Trustee
                            By:  STEVEN USRY, ESQ.
                            501 E Court Street Suite 6-430
                            Jackson, MS 39201




Audio Operator:             Candice Ramage



Proceedings recorded by electronic sound recording, transcript
            produced by a transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

For Chapter 11 Trustee          Hood & Bolen, PLLC
Dawn Ragan:                     By:  R. MICHAEL BOLEN, ESQ.
                                3770 Highway 80 West
                                Jackson, MS  39209

                                Kelly Hart & Hallman LLP
                                By:  KATHERINE HOPKINS, ESQ.
                                     NANCY RIBAUDO, ESQ.
                                201 Main Street, Suite 2500
                                Fort Worth, TX 76102


For First Service Bank:         Okin Adams Bartlett Curry LLP
                                By: DAVID CURRY, JR., ESQ.
                                1113 Vine Street
                                Suite 240
                                Houston, TX 77002

                                Butler, Snow, O'Mara, Stevens &
                                 Cana
                                By: JACK A. CRAWFORD, ESQ.
                                P.O. Drawer 22567
                                Jackson, MS 39225

                                - - -

3

# I N D E X

PAGE

**WITNESSES**

KEVIN COVEY

| | |
|---|---|
| Direct Examination by Mr. Anderson | 15 |
| Cross Examination by Ms. Hopkins | 22 |
| Cross Examination by Mr. Curry | 35 |
| Redirect Examination by Mr. Anderson | 40 |

DAWN RAGAN

| | |
|---|---|
| Direct Examination by Mr. Anderson | 43 |
| Cross Examination by Ms. Hopkins | 49 |
| Cross Examination by Mr. Curry | 62 |
| Redirect Examination by Mr. Anderson | 67 |
| Recross Examination by Ms. Hopkins | 74 |

| **EXHIBITS** | | **ID** | **EVD.** |
|---|---|---|---|
| M-28 | Email dated 1/30/25 from Dawn Ragan to Kevin Covey re: backup bidder status | 16 | 18 |
| M-15 | Email dated 1/3/25 from Kevin Covey to Michael Sanders re: PSA signature page | 21 | 22 |
| Trustee-L | Declaration of Kevin Covey | 25 | 25 |
| Trustee-O | Email dated 2/4/24 between Dawn Ragan and Kevin Covey | 29 | 30 |
| Trustee-H | PSA GrayStreet (Dkt. #1158-1) | 31 | 65 |
| Trustee-N | Email dated 12/17/24 between Dawn Ragan and Paul Black | 57 | 59 |
| Trustee-A | Bid Procedures Order (Dkt. #737) | 64 | 64 |
| Trustee-E | Sale Order (Dkt. #1104) | 68 | 68 |

4

(Proceedings commenced at 10:21 a.m.)

THE COURT:  All right.  We're back on the record in El Dorado Gas & Oil, Case 23-51715.

I've been handed the GrayStreet Credit's witness and exhibit list that was filed at 8:59 this morning.  I was already on the bench this morning when this was filed.

What are we doing?

MR. ANDERSON:  Good morning, Your Honor.  Garrett Anderson on behalf of GrayStreet Credit, LLC, the movant on the motion to enforce the Court's sale order.

Your Honor, we're seeking enforcement of the Court's sale order.  And, you know, just to preface the argument.  We believe that the contract terms of the Purchase and Sale Agreement at Docket 1158-1 are unambiguous and provide GrayStreet with a right to a breakup fee for its position as the backup bidder in light of the closing of the South Texas and AWP asset sales to Varas Energy.

However, under Texas law and as an alternative argument, the Texas Supreme Court has held that even if there is some disagreement between the parties as to the meaning of an unambiguous provision, that evidence, extrinsic evidence of the parties' negotiations is relevant and admissible.  And that's, most of these, Your Honor, are emails between the parties and counsel for the parties.

THE COURT:  Are the parties going to stipulate to the

5

admissibility of the emails?

MS. RIBAUDO:  No, Your Honor.

MS. HOPKINS:  No, Your Honor.  If I could briefly address.  Yes, Your Honor.  Counsel for GrayStreet mentions that their first argument is that the PSA is unambiguous.  We would agree with that.  As a result, you don't even get to the alternative argument, so I don't know why.

We have stipulated to two of the emails.  However, many of the emails go back to October, go back before the auction, go back before the closing of the PSA.  We're having difficulty, even if they were to be considered, which we think that the parties agree this is unambiguous, you should look at the four corners here when it comes to what the PSA says.

But even if you were to say it was ambiguous, then I think there are evidentiary objections that we have, such as hearsay.  I believe hearsay is in almost every single one.  Relevance objections certainly.  Potentially the doctrine of optional completeness.

I don't know how complete all of these emails are.  I mean we did just receive a massive amount of documents.  We tried our best to, you know, briefly go through and stipulate to the extent we can.

I do want to clarify that the Trustee's position is that there's two different issues here today, what does the PSA say and, separate and apart from that, whether or not the

6

Trustee designated a stalking horse in connection with the bid procedures.

So when it comes to the PSA, again, we would argue that it's, we agree, that it's unambiguous and there's no need for extrinsic evidence here.

THE COURT: All right. I want to back up even further. Are we ready to proceed today? Because I expected this to be a short hearing, in fact you all told me two hours. Now I understand you all are exchanging exhibits ten minutes before we start this morning, there's witnesses designated. Are we ready to try this today in two hours?

Mr. Curry, you want to jump ahead of --

MR. CURRY: I would. Your Honor, I think we can try it in about ten minutes actually because you entered a bid procedures order in this case and it detailed specific things that had to happen in order for a purchaser to be entitled to stalking horse protections. None of those things happened.

The Court can take judicial notice of Her order at 955 and then take judicial notice that there was never a stalking horse notice provided. And why that's really important in this process is, as the Court has noted, there are a lot of parties that are getting notice and watching this.

The purpose of the stalking horse notice was to provide an objection period. The way that this played out and the way that GrayStreet is now arguing this, you denied almost

7

all the creditor body that ability to object to there even being a stalking horse. They're just saying, hey, we put in our APA. But, Your Honor, they can't be a stalking horse if they don't comply with your procedures.

So I think, yes, we're ready to go, but I think the evidence and all the other stuff that's being dropped on you is a waste of everyone's time.

THE COURT: Well, that's my question. GrayStreet has filed an objection. I'm going to let them prosecute their objection. My question is, are you really ready to go? Because I'm going to cut you off at 1:00 today because you told me two hours, I've got other things that I have to be at today. I'm going to cut you off at 1:00 today.

MR. ANDERSON: Yes, Your Honor. Thank you. Court's indulgence.

THE COURT: Sure.

MR. ANDERSON: Just one moment, please.

MS. HOPKINS: Your Honor, with respect to the Trustee, we're learning of new witnesses, for example I'm listed as a witness. I was not previously informed of that. I don't know, we think that with Ms. Regan or even without it, we can briefly present our case, however we're not the movant, so. I think the majority of the case of the case will be up to the movant which we understand that --

THE COURT: So you're not sure if you're a witness or

8

not?

MS. HOPKINS: I'm listed as a witness. But, and yes, we found out 30 minutes ago. But, regardless, to the extent we have to -- I don't know how long it's going to be for the movant. I understand their ability to prosecute their motion. However, we will have to rebut accordingly. So that may potentially change the length from our side.

THE COURT: Mr. Anderson, what are you thinking about timing wise, how long to present your objection?

MR. ANDERSON: Your Honor, we don't believe that it will take very long and the, at least the opening arguments portion.

However, we do understand that if we receive further objections to admissibility of some of these emails, all of which are between the parties and contain redlined copies of the Purchase and Sale Agreement and sale orders, then it may take a little bit longer.

But, and just to clarify, Your Honor, as far as to respond to Mr. Curry. GrayStreet is not arguing in its motion that it is a stalking horse, a stalking horse bidder here. So any evidence on that is -- we're not looking for that.

THE COURT: So you're not arguing you're a stalking horse?

MS. HOPKINS: Again, Your Honor, I think that we would look at the APA then and see that this specific provision

9

references stalking horse protections.  So there's no ambiguity is what it says.  I don't know why it is relevant to get in 31 different documents from the history of the parties negotiating it a significant and long PSA.  If the Court finds that's --

THE COURT:  Oh, Ms. Hopkins, can you step up to this microphone, please?

MS. HOPKINS:  Yes, Your Honor.  If the Court finds that it's unambiguous, none of this would be necessary anyway, at least on the point as to what the PSA says.  I think Mr. Curry has sufficiently explained the process, and I think just even looking at the record, reflects what happened in the case when it comes to designation of the stalking horse.  It simply did not occur and that was communicated.

However, I do not see a need for admission of a multitude of these exhibits based on the lack of ambiguity that the parties specifically agree does not exist.

THE COURT:  All right.  So, Mr. Anderson, let me make sure I'm following you.

MR. ANDERSON:  Yes, Your Honor.

THE COURT:  You're saying that you're not the stalking horse, but you think that you're entitled to the breakup and expense reimbursement.

MR. ANDERSON:  Correct, Your Honor.  Based on GrayStreet Credit, LLC's classification as a backup bidder.  Throughout the PSA at Docket 1158-1, which is the fully

10

executed version that was approved by this Court, it includes language in Section 6.6 of the Purchase and Sale Agreement that says that if an alternative transaction is approved by the Court, then GrayStreet is entitled to three things, but we're only here for two, one of those being an expense reimbursement up to $150,000 for due diligence, attorneys fees, and whatnot prior to the sale.

And then the second portion is the breakup fee, which is 3% of the sale price of any of the property, and that's a capitalized and defined term in the PSA, that any of the property that is sold to a party that is not the buyer and that happens as a result, or not as a result of GrayStreet Credit's breach of the agreement.

Varas closed on the South Texas and AWP assets on January 31st and the PSA itself defines property by pointing to certain mineral interests.  I believe that's Section 10.2, Your Honor.  I'll have to go back and look.  It may be 1.2.

But the definition of property in the PSA is that it is certain interest in property and then it defines it by pointing to exhibits to the PSA which include assets that were transferred to Varas Energy through the South Texas and AWP sales.

So our argument, Your Honor, is that the PSA unambiguously entitles GrayStreet Credit, LLC to the breakup fee here.

11

MR. CURRY:  Your Honor, David Curry again.  I'm going to be a little bit blunt.  I'm a little shocked at the obfuscation and disingenuousness that is being presented to the Court.

There was a procedure for getting this kind of relief and what you just heard was, Your Honor, we're not arguing that we followed that procedure.  We're arguing that we slipped it into a 70-page document and sprung it on you at the last minute and it's binding on you even though nobody talked about it or did it.

And, you know, really importantly there are three different sale orders in this case.  When we talk about the sale of AWP and South Texas, two separate sale orders.  Neither of those sale orders provide for an expense reimbursement or any kind of compensation to a backup bidder.

The Fifth Circuit has said on bid protections in general, that they have to be very carefully laid because they can chill bidding instead of doing what, you know, what the purpose is which is to establish a floor.  It can have a (indiscernible) of chilling bidding.

And so because of that, you know, generally stalking horse protections have to be approved up front so that the people going into the auction know the rules of the game.  It just simply cannot be the case that you can put something into an APA, a single paragraph or a single clause, that departs

12

from the procedures and what this Court approved from, and then come in and argue that somehow because you did it differently you can get the same relief. That's just not a process that gives everyone adequate notice or due process and it's, it should be denied.

THE COURT: Well I mean I get the argument. I'm more concerned with what we're doing today. I mean I do not want to bifurcate the proceeding. I do not want to get to 1:00 and Ms. Ragan not be able to put on her case.

I'm also concerned that we're exchanging documents ten minutes before we're set for hearing.

So it's $500,000. Are you ready to go today or do you want to reset this?

MS. HOPKINS: We'd like to continue today.

THE COURT: Okay.

MS. HOPKINS: But I do want to point out that the argument from counsel does feed into the, again, lack of ambiguity. The problem is, yes, 6.6 says, you know, that potentially you can get these fees, whatever, which are defined as stalking horse protections.

And GrayStreet has had three different sets of bankruptcy counsel throughout this case. I certainly think that their attorneys are familiar with the term stalking horse protections.

But, regardless, the beginning of that Section 6.6

13

states that in the event the Bankruptcy Court approves an alternative transaction and an alternative transaction closes, none of that relief is given unless there is, or potentially given or arguably given, unless that happens, there's an alternative transaction.

There was no alternative transaction here.  So I mean to say now that they're entitled to some relief for a different transaction that was not contemplated with the PSA, which the PSA contemplates exactly what happened here, I mean just I think, again, is disingenuous to this whole process and what we've -- the negotiations of the parties.

But circling back, I apologize.  Yes, we are ready to go forward today.

THE COURT:  All right.  Let me circle back, Mr. Anderson.

MR. ANDERSON:  Yes, Your Honor.

THE COURT:  In my haste I did not ask if anyone on the telephone wants to make an appearance in this matter.  All right.

All right.  Mr. Anderson, I do not need opening statements.  I need you to call a witness.  Let's get started.

MR. ANDERSON:  Yes, Your Honor.  And also for appearances purposes, just briefly.  Here with me at counsel table is Dawinda Heffner (phonetic), my paralegal.

THE COURT:  Good morning.

MR. ANDERSON:  Michael Sanders, an attorney for GrayStreet, but he's just, he's not advocating today he'll --

THE COURT:  Okay.

MR. ANDERSON:  He's on the witness list.  And then Kevin Covey as well.

THE COURT:  Good morning.  Otherwise I'm going to roll all the appearances from this morning.  Anybody else need to make an appearance?  Mr. Crawford, did you need to make an appearance?

MR. CRAWFORD:  Yes, Your Honor.  Jack Crawford on behalf of First Service Bank, along with David Curry.

THE COURT:  Mr. Sheehan, did you need to make an appearance?

MR. SHEEHAN:  Pat Sheehan for the El Dorado related debtors.

THE COURT:  All right.  And, Mr. Bolen, I think we got you earlier, so we should have everyone's appearance on the record.  All right.

MS. HOPKINS:  Your Honor, apologies.  I think with everything going on I mistakenly forgot to bring a copy of the exhibits up to the bench.

THE COURT:  Okay.

MS. HOPKINS:  If I may approach?

THE COURT:  Sure.  Ms. Hopkins, is this your copy for the Court or for the witnesses?

Covey - Direct/Anderson                    15

MS. HOPKINS:  For Your Honor.

THE COURT:  Okay.  Thank you.

MR. ANDERSON:  Good morning, Your Honor.  GrayStreet Credit, LLC is ready to call its first witness, Kevin Covey.

THE COURT:  You may proceed.  Mr. Covey, if you will step up.  Ms. Ramage will swear you in before you take the witness stand.

K E V I N   C O V E Y, WITNESS SWORN

THE COURT:  If you will, Mr. Covey, when you get seated, just pull that microphone down.

DIRECT EXAMINATION

BY MR. ANDERSON:

Q    Good morning, Mr. Covey.  If you would, please state your name for the record.

A    Kevin Covey.

Q    Okay.  And where are you from?

A    San Antonio, Texas.

Q    Okay.  And what do you do for a living?

A    I am in the investment management business, investing in oil and gas, real estate, and credit.

Q    Okay.  And what is your connection to the movant in today's case, GrayStreet Credit, LLC?

A    I am the Manager and Member of GrayStreet Credit, LLC.

Q    Okay.  And are you familiar with the Court's order, the Court's order on the sale motion for the Mecom assets in this

Covey - Direct/Anderson                    16

case?

A     Yes.

Q     Okay.  And are you familiar with the negotiations between GrayStreet Credit, LLC and Dawn Ragan, the Chapter 11 Trustee, leading up to the execution of the Purchase Agreement for the Mecom assets?

A     Yes.

Q     Okay.  So, Mr. Covey, you're familiar with the Purchase Agreement that was executed by GrayStreet, LLC and Dawn Ragan, the Chapter 11 Trustee.  Are you familiar with the terms and provisions of the Purchase and Sale Agreement that is on the Court's docket at 1158-1?

A     Yes.

Q     Okay.

        MR. ANDERSON:  May I approach?

        THE COURT:  Sure.

        MR. ANDERSON:  Your Honor, I just handed opposing counsel what has been premarked for identification purposes as movant's Exhibit 28.  Permission to approach the witness?

        MS. HOPKINS:  I'm sorry.  For clarification, is this Exhibit 28?

        MR. ANDERSON:  I apologize.

        THE COURT:  Mine says M-28.  Mr. Anderson, if you want to use the overhead, I believe it's on.

        MR. ANDERSON:  Thank you.

Covey - Direct/Anderson                    17

THE COURT:  Yes.

MS. HOPKINS:  Your Honor, to the extent this goes to -- I'm sorry.

MR. ANDERSON:  No, go ahead.  Go ahead.  Sorry.

MS. HOPKINS:  Okay.  To the extent this goes to any, you know, interpretation of the APA and the issues here, I would object to the lack of ambiguity at first, first of all.

Secondly, we would object to the hearsay contained within this email.

MR. CURRY:  Your Honor, it's also cumulative.  I believe the testimony just indicated that the executed APA is actually a document that is on the Court's docket and to the extent, I will join the hearsay objection to the extent the intent is to discuss anything beyond that.

MR. ANDERSON:  Your Honor, this is an email between Dawn Ragan, the Chapter 11 Trustee, and Mr. Covey.  He has personal knowledge of it.

Further, this is not being offered as hearsay for the truth of the matter asserted, but to show the parties' state of mind during the negotiations, as well as to show the existence of an agreement for the backup bidding procedures.

As to the hearsay and relevance objections, Your Honor, we have an alternative argument of course that since the parties disagree as to the meaning of Section 6.6 that this information is relevant to determine the parties' intent

Covey - Direct/Anderson                    18

surrounding Section 6.6.

And, Your Honor, the Texas Supreme Court has in 590 S.W.3d 471, has held that this type of evidence is admissible for these purposes.

MR. CURRY: Your Honor, I disagree with counsel's representation of the case. What the Texas Supreme Court has said is that the Court may consider the circumstances surrounding th entry of the contract.

The cases that you will see where that has been done, they're situations like Lloyd's Insurance Market where it's a unique market or where there are terms that may just not be commonly understood or being used in their commonly understood way.

And that's a very, very narrow hearsay or, I'm sorry, it's not hearsay, parol evidence exception. The argument from counsel today would take that narrow exception, drive a truck through it, and blow the gate down.

THE COURT: Ms. Hopkins, anything else before I rule?

MS. HOPKINS: No, Your Honor.

THE COURT: All right. The objection is overruled. M-28 will be admitted and the Court will give it the appropriate weight.

Q    Mr. Covey, can you see this?

A    Yes.

Covey - Direct/Anderson                    19

Q    Do you recognize this?

A    If you give me just a minute.  Yes.

Q    All right.  Do you recognize this document?

A    Yes.  Yes, I do.

Q    And what is it?

A    Say that again?

Q    What is it?  Can you describe it?

A    This is an email that I sent to Dawn, to Dawn Ragan.  You know we had discussed it --

THE COURT:  Hey, sir.

UNIDENTIFIED ATTORNEY:  I'm sorry.  He went and talked to my client --

THE COURT:  Do not --

UNIDENTIFIED ATTORNEY:  -- without me present.

THE COURT:  Do not move in the well of the courtroom without permission of the Court first.

UNIDENTIFIED ATTORNEY:  I apologize.

THE COURT:  Do not go see.  Let this be a reminder of where you are.  Do not move without this Court's permission.

Go ahead, Mr. Anderson.

MR. ANDERSON:  Yes.

Q    Continue, Mr. Covey.

A    This was an email.  This was an email followup to a call that I had with Dawn obviously at the end of, you know, when we get close to closing on any transactions.  And in these there's

a concern that people do not close on time or re-trade or any number of things.

And I was encouraging Dawn to utilize us in the backup role to hold Varas to account to close on time. And I don't remember where this was relative to their exact closing date, but I assume it was, it was close.

Q   And when you say we're prepared to close the backup portion of APA pursuant to its terms, what did you mean by that?

A   We had kind of -- we had simultaneously done our diligence on the assets, reserved funds for it, done legal. I mean we were ready to close. I mean that's what it means.

Q   And what did you think of Ms. Ragan's response?

A   I assumed she would leverage that, leverage my email to ensure closing.

Q   And what made you think that?

A   I guess the natural reciprocity of it and things.

Q   So after this conversation was it your understanding that the Trustee understood that GrayStreet serving as a backup bidder was there to pressure Varas into closing by the closing date?

A   Yes. Yes.

MR. ANDERSON: And, Your Honor, you said this has already been admitted, Your Honor?

THE COURT: It's admitted.

Covey - Direct/Anderson                              21

MR. ANDERSON:  Thank you.

THE COURT:  M-28 is admitted.

MR. ANDERSON:  Court's indulgence, Your Honor.

Q    And, Mr. Covey, do you recall the events leading up to the Court's hearing on the sale motion around the beginning of January of this year?

A    Generally, yes.

Q    Okay.

MR. ANDERSON:  And, Your Honor, may I approach?

THE COURT:  We're having a little bit of trouble hearing you.  Can you be sure you're speaking into that microphone?

THE WITNESS:  Yes, I'll do --

THE COURT:  Can everyone else hear him okay?

THE WITNESS:  I'll do my best to enunciate.

THE COURT:  Thank you.

Q    Mr. Covey, I'm showing you what's been premarked for identification purposes as movant's Exhibit 15.  Do you see that?

A    Yes.  I can't see the top of this.

Q    Can you tell me what that is?

A    That looks like an email from myself to Michael Sanders that has nothing in it.

Q    And --

A    Oh, an attachment to a signature page.

Covey - Direct/Anderson                    22

Q    It has an attachment to this email.

A    Okay.

Q    Do you see that?

A    Yes.

Q    And what is that?

A    That is my signature on what appears to be the APA.

Q    Okay.  And can you tell me the -- what is the date of this email?

A    Friday, January 3rd, 2:25 p.m., 2025.

          MR. ANDERSON:  Your Honor, I would -- GrayStreet would move to admit what has been premarked as Exhibit Number M-15 into evidence.

          THE COURT:  Any objection?

          MS. HOPKINS:  I guess just a continued objection as to ambiguity and not needed but no other objections so it's (indiscernible).

          THE COURT:  Mr. Curry?

          MR. CURRY:  And the same thing, Your Honor.  Other than the witness's statement there's nothing in this email. There's no contested issue that this evidence goes to therefore it is not relevant.

          THE COURT:  Overruled.  It will be allowed. Admitted.

Q    No further questions, Mr. Covey.

A    Okay.

Covey - Cross/Hopkins                              23

Q    Thank you.

THE COURT:  Cross exam?

MS. HOPKINS:  Yes, Your Honor, if you could just bear with me.  I want to bring up my exhibits and sometimes dabble trying to put them up electronically and hopefully it will go fine.  Okay, I think, good.  Perfect.  Thank you.

CROSS EXAMINATION

BY MS. HOPKINS:

Q    Hi, Mr. Covey.  I am Katherine Hopkins.  We've met before. And I just want to ask you some questions about this process and address some of the matters that your counsel addressed with you.

So you're history, what is your history in the finance world?

A    I've had extensive, I mean extensive experience in investing in credit, in real estate, oil and gas, and distressed and non-distressed and bankruptcy assets.

Q    Sure.  And then also what's your experience in the oil and gas industry, just as extensive?

A    About half as extensive because I only got to it halfway through my career.

Q    Understood.  And then you mentioned you have a lot of experience with bankruptcy.  What specific bankruptcy experience do you have?  Can you share?

A    Sure.  We've participated in 363 sales, DIP, DIP financing

previously, claims purchases.  I think that's the extent of it.

Q    And you actually served or, excuse me, GrayStreet served as one of the DIP lenders in this case?

A    Yes, ma'am.

Q    So you mentioned experience with 363 sales.  Does your experience in that sale process include also experience with an auction and bid procedures?

A    Yes, ma'am.

Q    And how many cases -- would you say you're familiar with that process?

A    Yes, I'm familiar with it.

Q    And how about the bid procedures in our cases, are you familiar with those?

A    Yes.

Q    Did you attend the auction on behalf of GrayStreet?

A    I did.

Q    And at the auction did GrayStreet bid on all of the different asset packages, the three different asset packages?

A    We did.

Q    Was GrayStreet the successful bidder for Mecom?

A    We were.

Q    I believe this has come out, but just for purposes of the record, and then you all were -- GrayStreet was the backup bidder when it came to the sale to Varas for AWP and South Texas, is that right?

Covey - Cross/Hopkins                         25

A     Yes.

Q     Were you at the hearing, okay, let's back up.  The hearing, the sale hearing occurred on January 7th of this year.  Do you recall that?

A     I don't, I wasn't at the hearing, but I assume it was approximately that date.  I'll obviously take your word for it.

Q     Okay.  You didn't attend the sale hearing?

A     I did not attend the sale hearing.

Q     Okay.  Did your counsel attend the sale hearing?

A     Yes, ma'am.

Q     Before the sale hearing you filed the declaration with the Court?

A     Yes.

        MS. HOPKINS:  And, Your Honor, Mr. Anderson and I spoke about the Trustee's exhibits beforehand and it's my understanding that they stipulated to the admissibility of all of the Trustee's exhibits.

        MR. ANDERSON:  We stipulated to authenticity, Your Honor.  We'll reserve any objections, but we have no problem with this one.

        THE COURT:  All right.  So now she's got Exhibit L pending.  Are you moving that in?

        MS. HOPKINS:  Yes, Your Honor, I'll go ahead and move it for admission.

        THE COURT:  Mr. Anderson, any objection to Exhibit L?

Covey - Cross/Hopkins                    26

MR. ANDERSON:  No, Your Honor.

THE COURT:  Exhibit L will be admitted.

Q    Mr. Covey, do you see Exhibit L on the screen?

A    Yes.

Q    So this is your declaration that you filed in support of the Mecom sale?

A    Yes.

Q    Now your declaration included a number of background and other things.  You included information regarding GrayStreet and its Operations Team.

A    Yes.

Q    You included information about GrayStreet's submission of its bid and ability to perform and close?

A    Yes.

Q    And you also specified, let me get there real quick, you also specified in Paragraph 16 that GrayStreet has followed the bidding procedures for Mecom in all respects.  Do you see that?

A    Yes.

Q    Okay.  And as you mentioned a minute ago, you're familiar with these bidding procedures?

A    Yes.

Q    This declaration, and I'll scroll down to it, you signed this declaration under penalty of perjury?  You see that?

A    Yes, I see it.

Q    Okay.  So based on your familiarity with the bid

procedures here, did our bid procedures provide any protections with respect to backup bidders?

MR. ANDERSON:  Your Honor, GrayStreet is going to object to relevance here.

THE COURT:  Overruled.

Q    You can answer the question.  You want me to re-ask it?

A    Yeah, sorry, ask it again.

Q    Sure.  So the bid procedures here, did they provide any protections when it came to backup bidders?

A    No, only stalking horse.

Q    Okay.  Okay.  So since you, and you testified that you're familiar with the bidding procedures in these cases, you're familiar with the fact that the Trustee had to file a notice of stalking horse designation in the event she chose one?

A    Yes, I'm aware she would have to.

Q    And you and the Trustee actually had discussions pre-auction about GrayStreet potentially serving as a stalking horse bidder?

A    We did, but we did not, we did not ultimately agree with the Trustee to become a stalking horse.

Q    Okay.  So GrayStreet did not agree to be a stalking horse?

A    That's right.

Q    Okay.  In your declaration you state that, and I'll scroll up again, thanks for bearing with me here, on Paragraph 20, GrayStreet would not enter into the Purchase Agreement and

Covey - Cross/Hopkins                                        28

would not consummate the transaction contemplating their buy of the sale of Mecom including the assignment of the assigned contracts to GrayStreet if it was not free and clear of all liens, claims, and/or interests of any kind or nature whatsoever, except as expressly set forth in the Purchase Agreement with respect to GrayStreet's assumed obligations. Did I read that correct?

A      Yes.

Q      Was there any mention in your declaration about the fact that you were relying on 6.6 protections in entering into this sale?

A      Specific enumeration, no.

Q      Okay.  Was there any implicit enumeration?

A      I assume I, in some portion of this, I agree to fulfill the APA, and it is within the APA.

Q      Okay.  Are you also familiar with the sale order entered in these cases?

A      Yes, I am.

Q      Okay.  Are you aware whether or not the sale order addresses any protections for a backup bidder?

A      I'm not.

Q      Stalking horse protections as --

A      Yeah, it does not.

Q      Okay.

A      It has stalking, I don't know if it has stalking horse or

Covey - Cross/Hopkins                          29

I don't recall the sale order that clearly, but I'm happy to look at it.

Q    Sure.  Would it surprise you if I told you that it doesn't have Section 6.6 protections with respect to a backup bidder?

A    No, it would not.

Q    Okay.  And are you aware of the fact that the sale order specifically has a provision saying that in the event there's any disagreement between the PSA and the sale order that the sale order would govern?

A    I'm not, I'm not familiar with that.  But again, I would not be surprised if it said that.

Q    Okay.  Did the Trustee ever tell you that GrayStreet would receive the Section 6.6 protections for being a backup bidder here?

A    Outside of the APA drafts, no, not specifically.

        MS. HOPKINS:  Your Honor, if I can -- I'm sorry.

Q    Mr. Covey, do you see what has been marked as Exhibit E?

A    Yes.

Q    Excuse me, O.

A    O.  Yes.

Q    It is an email chain between you and Dawn from, excuse me, the Trustee on February 4th.

A    Yes.

Q    And you see that you sent an email to Dawn at 8:35 that morning and she responded to you at 9:45 a.m.?

Covey - Cross/Hopkins                    30

A       Yes.

        MS. HOPKINS:  Your Honor, I'd like to go ahead and admit Exhibit O.

        THE COURT:  Any objection?

        MR. ANDERSON:  Yes, Your Honor, relevance and hearsay.

        MS. HOPKINS:  Your Honor, the hearsay portion with respect to Mr. Covey is specifically APO, admissions by a party opponent.

        With respect to Ms. Ragan's statements in response, I think it's important to see the mental, the present sense impression as well as the mental state in her response, as well as it shows a full picture of the doctrine of optional completeness.  I think it's important to see her response in connection with what his statements are.

        THE COURT:  Exhibit O will be admitted over objection.

Q    Okay, Mr. Covey, let me just go down to your email and let me -- I want to -- here, we'll start just at the beginning and follow along with me, let me know if I'm reading anything incorrectly.

        "Dawn, congrats on successfully closing Varas.  I said it before, but I'll say it again, this is a complex process and I do appreciate the effort it took to bring it across the finish line.  And your diligence in managing, it is

Covey - Cross/Hopkins                    31

commendable.

"Pursuant to the stalking horse provision in the APA located in 6.11" -- I presume you meant 6.6?

A    Probably.

Q    Okay.  "Please let me know what GS Credit, LLC needs to submit in order for you to process payment.  We want to ensure that we provide exactly what's required to avoid any delays. Based on our calculations the total amount owed is approximately 505,000 which includes three percent of the final purchase price, 13 million, as well as proportionate reimbursement of professional fees, 115,000.  Please confirm if our figures align with yours."

And that's a portion of the email.  Did I read that accurately?

A    Yes.

Q    So if we scroll up to Ms. Ragan's response, she states that, "Kevin, I'm a bit confused at your email because I never designated a stalking horse.  If I had, it would have been the Hillwood folks as my higher bidder -- high bidder.

"I know you're looking at an old version of the APA where you requested it, but that language got struck at some point.  See the attached final APA."

So is it your position -- I'm sorry.  Did I read that accurately?

A    Yes, you did.

Q    That portion of the email.  So it's your position today that even though that provision states stalking horse protections in Section 6.6, GrayStreet is entitled to it as a backup bidder?

A    Yes.  I'd have to reread the Section 6.6, but I read it as a breakup fee on the bids, not specifically a stalking horse.

Q    Sure.  And I can bring that up for you just to see it and --

A    I have it here as well.

Q    Okay.  I have it as Exhibit H.  I'll get it real quick for you if that's helpful.

A    I see where you're referring to under Section 6.6.  I see it now, Kat.

Q    Okay.  And you see here where it has -- identifies the various, the expense reimbursement and breakup fee as well as the performance deposit receipt, you see it's identified as stalking horse protections?

A    Yes, I see it.

Q    And you testified that you're, you know, really familiar with bankruptcy, you've done Section 363 processes, you've done -- you're experienced with the bid and auction process.  So have you ever seen a backup bidder receive stalking, what's called stalking horse protections here?

A    I've also seen --

Q    I'm sorry.  Did you -- I didn't hear your answer to the

Covey - Cross/Hopkins                                      33

question.

A    Sorry.  What was the question?  Rephrase.

Q    I was asking if you've ever seen a backup bidder receive what we refer to here as stalking horse protections.

A    I have not, but I'm very limited in my own experience. I'm not sure what's in the world at large regarding breakup fees.  And I've seen things done in bankruptcy that I would never have seen in normal legal proceedings either with -- and Trustees have powers to do things that, you know, I didn't -- I didn't really think twice about whether this was a -- this complied or didn't comply with the stalking horse notice, notices in the bidding procedures.  If that's the question.

Q    Okay.  But you said a minute ago you were familiar with the bid procedures?

A    I am.

Q    And you said you have extensive knowledge of bankruptcy 363 --

A    I do.

Q    -- sales and auctions.  And you were represented during this case, correct?

A    I was.

Q    And I believe you have had four different law firms representing you, or GrayStreet?

        MR. ANDERSON:  Objection.  Relevance, Your Honor.

        MS. HOPKINS:  Your Honor, the relevance is the fact

Covey - Cross/Hopkins                                        34

that the parties, and I'll get to it in a second, but the parties agreed on this specific definition. It did not contemplate what Mr. Covey is now stating. And he is a sophisticated party as well as had sophisticated counsel, multitude of counsel during the case.

THE COURT: Overruled. I'll allow it.

A    I'm going to count them. GrayStreet credit had one law firm, had a second law firm, and I think has a third with Mr. Anderson here in the city. I believe. I'm trying to find the fourth, although.

Q    Ms. Kettnel (phonetic)?

A    I'm sorry?

Q    Ms. Kettnel?

A    Oh.

Q    Or maybe she's with Mr. Sanders' firm.

A    Sorry. No, no, you're right. Sorry. We had four. Ms. Kettnel was there for a brief period.

Q    Sure. And your counsel, one of them or somebody, maybe a mixture, was able to review the PSA?

A    Yes.

Q    And they reviewed the sale order?

A    Yes.

Q    So a minute ago you stated that, I believe you stated that you assumed that the Trustee would use you and you encouraged her to use your backup bid in order to close the sale with

Varas?

A    Yes.

Q    Do you have any evidence of Ms. Ragan doing that?

A    I do not.

Q    And what day did the Mecom sale close?  Do you recall? Would it surprise you if I said January 31st?

A    No.

Q    Of this year.

A    That sounds about right.

Q    Would it also surprise you to know that the Varas sale for both AWP and South Texas also closed on January 31st?

A    No.

Q    Did you ever speak to Varas about any potential closing issues with those sales and Ms. Ragan?

A    No.  It would have been inappropriate for me to do so.

        MS. HOPKINS:  Your Honor, if I can just have one minute --

        THE COURT:  Sure.

        MS. HOPKINS:  -- to confer with co-counsel.  I think I'm wrapping up.  Your Honor, we pass the witness.

        THE COURT:  Mr. Curry?

                    CROSS EXAMINATION

BY MR. CURRY:

Q    Good morning, Mr. Covey.

A    Good morning.

Covey - Cross/Curry                    36

Q    When did you personally, not GrayStreet, first become involved with El Dorado?

A    Tom Swarek approached us in the summer of 2023 to finance him in some capacity.

Q    And did you ever conduct diligence or how far along in the process did you get with Mr. Swarek?

A    We conducted diligence on several of the assets including Mecom at that time, but were never able to come to an agreement of any type with Tom Swarek.

Q    As a lender, correct?

A    Either purchasing or joint venturing to develop the assets.

Q    And, sir, after conducting your diligence, is it fair to say that there was a level of interest in the assets from GrayStreet?  GrayStreet was open at the right price to purchasing the assets?

A    Yeah, we were specifically interested in Mecom.

Q    Okay.  So we already covered that GrayStreet is a participating DIP lender.  Can you give us a little bit of background on GrayStreet's relationship with FSB?

A    Sure.  Tom Swarek had told us he had a loan outstanding to FSB.  He had walked us through his financial difficulties with repayment of that September, or I should say, of payment of one of the I think required pay downs under his loan and had proposed that we acquire the note from FSB.

Covey - Cross/Curry                                37

At that point I made contact with FSB with Tom Grumbles and Tom Grumbles sent us Tom's -- the loan file for El Dorado. We reviewed it all and that was my first contact with FSB, if that's your question.

Q    Yes. And generally around what time did that occur?

A    I would have to say it was in the fall of 2023.

Q    Do you know if that was, sir, if it's in the fall you'd agree that's after Hugoton filed, although none of us got notice, correct?

A    I was not aware that Hugoton had filed when we made contact.

Q    And FSB wasn't as well, right?

A    Correct.

Q    But your contact in beginning to work with FSB, was that before El Dorado filed bankruptcy?

A    Yes.

Q    And did you participate in the negotiations on the DIP loan?

A    Yes.

Q    And in fact were there concerns related to the quality of title for the DIP collateral at the time that the DIP loan was negotiated?

Let me ask you a different question. Do you recall from the DIP loan documents, term sheets, early stages of negotiations, a provision that provided for a default to the

Covey - Cross/Curry                                                38

extent a certain number of title defects were discovered?

A     I don't specifically recall that, but I would not be surprised if that existed.  And I do think there were concerns over title on the -- the concerns over title were related to whether or not Tom's leases were expired.

Q     Okay.  So how much did GrayStreet provide in DIP financing?

A     We provided I think $5 million.

Q     And the DIP order provides for reimbursement of the DIP lender's legal expenses related to the DIP loan, correct?

A     Yes.

Q     And has GrayStreet submitted its request for reimbursement for -- well let me back up.  GrayStreet's counsel for the DIP loan negotiations was Sidley & Austin, correct?

A     Correct.

Q     And do you know whether or not Sidley has submitted its invoices to, pursuant to the DIP order, to be reimbursed?

A     Yes, they have.

Q     And did they get paid?

A     Yes, they did.

Q     Okay.  Do you know whether or not FSB has completed its submission of its attorney fees?

A     I do not.

Q     But would you agree with me that to the extent FSB has outstanding attorneys fees that there are outstanding DIP

obligations?

A    If I'm still a participant.

Q    Just the question is more simple.

A    Okay.

Q    The DIP documents, the DIP obligations, included the estate's requirement to reimburse fees that were allowed, the reasonable fees, there's an objection process, correct?

A    Right.

Q    And so if there are fees that have not yet been reviewed related to the DIP loan and not yet been paid, then there are outstanding DIP obligations under the DIP documents, correct?

A    Yes.

Q    Okay.  And a little more fundamentally, I think you were asked about the participation at the auction.  Do you recall how the assets were presented at the auction?

A    Individually or?

Q    As in would you agree that it was -- there was the opportunity to bid for everything and opportunity to bid on the Mecom property and the opportunity to bid on AWP separately and South Texas separately?

A    Yes, I recall that.

Q    Okay.  And did GrayStreet provide an offer for all of the assets?

A    We did.

Q    Okay.  And in the bid procedures, do you remember what was

Covey - Cross/Curry                    40

required to submit a bid?  What all you had to provide?

A    I assume we had to --

Q    Well you had to provide a form of APA, correct?

A    Okay, yes.

Q    Okay.  So when the auction occurs and you're there at the auction, was GrayStreet designated as the lead bidder at the beginning of the auction, or any bucket?

A    No.

Q    Okay.  And but ultimately GrayStreet was the winning bidder for the Mecom bucket, correct?

A    That's correct.

Q    And backup bidder.  And that means you lost, right?

A    It means you're the backup bidder.

Q    Somebody else beat you, right?

A    Somebody else is the winning bidder.

Q    Okay.  And if you're not the winning bidder and the winning bidder closes, you just lost, right?  I mean you took a shot at it but you didn't get it, correct?

A    I was very happy they closed.

Q    And why was that?

A    Because I was a DIP lender and we had our method of repayment.

Q    Thank you.

          MR. CURRY:  I have no further questions, Your Honor.

                    REDIRECT EXAMINATION

Covey - Redirect/Anderson                                    41

BY MR. ANDERSON:

Q    Mr. Covey, do you recall or do you have any knowledge regarding the circumstances surrounding Varas Energy's closings on the AWP and South Texas assets on or around January 30th or 31st of 2025?

A    Do I have any knowledge of it occurring?  Yeah.

Q    Or do you have any knowledge of any parties' state of mind with respect to going forward with closing on or about January 30th or January 31st, 2025?

A    No, I was not in contact with the Varas people.

Q    Do you have any knowledge of Varas attempting to back out of its closings on the sales for the AWP and South Texas assets?

A    No.

        MR. ANDERSON:  Court's indulgence, Your Honor.

Q    Do you have any recollection of conversations you may have had with Dawn Ragan, the Chapter 11 Trustee, regarding the closing of the sales on the AWP and South Texas assets?

A    I recall having brief conversations with her about Varas, about Varas closing.  And I recall her telling me that they were moving, their lawyer was, I wish I could remember the specific words, but the inferred context to me is that their lawyer was methodical, taking its time, and that she wanted to, you know, she wanted them to close on time, as did we all.

Q    Earlier Ms. Thompson (sic) was asking you about certain

Covey - Redirect/Anderson                    42

provisions of the Purchase and Sale Agreement at Docket 1158-1, the one that was executed by GrayStreet and the Trustee for the Mecom assets.

There was a lot of talk about stalking horse status and whatnot. Are you aware or, let me rephrase it this way, do you believe that GrayStreet is the stalking horse bidder?

A    No, I do not.

Q    And why is that?

A    Because that is a court designated status. It has to have all kinds of notice. It has to be adjudicated. There's a lot of process to that that did not occur.

Q    And do you believe that GrayStreet Credit, LLC is the backup bidder, as that term is defined in Section 6.6 of the Purchase and Sale Agreement?

A    Yes.

MR. ANDERSON: No further questions, Your Honor. I tender the witness.

THE COURT: Any other cross?

MS. HOPKINS: No, Your Honor.

MR. CURRY: No, Your Honor.

MS. HOPKINS: Your Honor, if I could just make one brief statement for out of an abundance of caution.

THE COURT: Sure.

MS. HOPKINS: Mr. Curry respectfully got into some questions and testimony was elicited with respect to the DIP

Covey - Redirect/Anderson                    43

obligations.  Because we are on a short timeframe and that's not at issue today, we just want to make sure we're reserving our rights today.

THE COURT:  Understood.  You may step down.  Thank you.

MR. ANDERSON:  Your Honor, if we can request a five-minute recess, or three?  Just a short break.

THE COURT:  We're going to come back at 25 after and we're going to be ready to go.

MR. ANDERSON:  Yes, Your Honor.  Thank you.

THE COURT:  In recess until then.

(Recess)

THE COURT:  All right.  It's 11:25 and we're back on the record.

Mr. Anderson, are you ready to proceed?

MR. ANDERSON:  Yes, Your Honor.  Your Honor, GrayStreet Credit would like to call Ms. Dawn Ragan, the Chapter 11 Trustee, as an adverse witness.

THE COURT:  Okay.  Ms. Ragan, if you'll step up and let Ms. Ramage swear you in.

DAWN RAGAN, WITNESS, SWORN

MR. CURRY:  Your Honor, briefly.  Real quick.  Your Honor, what I'm throwing out to Trustee's counsel and then with GrayStreet's counsel, given the time considerations, we'd ask for cross to be open.  Ms. Ragan is also our witness so.

Ragan - Direct/Anderson                      44

THE COURT:  Any objection?

MR. ANDERSON:  No, Your Honor.

THE COURT:  All right.  That will be fine.

DIRECT EXAMINATION

BY MR. ANDERSON:

Q    Good morning, Ms. Ragan.

A    Morning.

Q    How long have you served as the Chapter 11 Trustee in this case?

A    Since January of '24.

Q    And are you familiar with the sales of the assets of the debtors, commonly referred to as AWP, Mecom, and South Texas?

A    I am.

Q    And what is your -- or let me backup.  Are you familiar with the negotiations that led up to the final version of the Purchase and Sale Agreement that was -- that's on the Court's docket at 1158-1?

A    I don't recall the docket number but, yes, I am familiar with the negotiations and the iterations and the final PSA.

Q    Okay.  And who are you represented by in this case?

A    Kelly Hart.

Q    Okay.  And did you deal with any attorneys for Varas Energy in these negotiations?

A    Yes.

Q    And who were they?  Do you remember who they were

Ragan - Direct/Anderson                                    45

represented by?

A    At the auction they were represented by, I forget whether it was Baker McKenzie or Bracewell.  I think it was Bracewell, the bankruptcy counsel at the auction.  And then subsequent to the auction when we were negotiating the documents they added oil and gas counsel from Baker Botts.

Q    Okay.  And do you recall the circumstances surrounding the closings of the sales on the AWP, South Texas, and Mecom assets?

A    Yes.

Q    Did you at any point, from either Varas or its counsel, receive or learn of any intention on behalf of Varas to back out or delay the sales of the AWP and South Texas assets?

A    There was never an intention or discussion regarding backing out.  When they brought in Baker Botts their counsel asked if they could have more time to go through, I don't remember, over 1,000 wells, the title issues.  They wanted to go through all of the documentation.

          We had a DIP loan that was maturing on January 31st, so I was always adamant that we had to close before the DIP loan matured.

Q    And when did Varas or its attorneys bring up the, or I guess, at what point did Varas' attorneys' investigation of the title issues or defects cease?

A    They're still ongoing today.

Ragan - Direct/Anderson                    46

Q    Ongoing today.  But with respect to the closing, did that delay closing at all with Varas?

A    No.  The issues that were taking time with Varas related to how we were going to allocate value.  I asked everybody to allocate the purchase price on a well by well basis.  Since they had over 1,000 wells, it was a significant undertaking.

MR. ANDERSON:  Court's indulgence, Your Honor.

THE COURT:  Sure.

Q    And, Ms. Ragan, are you familiar with Section 6.6 of the Purchase and Sale Agreement between GrayStreet Credit, LLC and the Trustee, yourself?

A    I believe I am.

Q    Does the or do you know if the Purchase and Sale Agreement addresses any protections for backup bidders?

A    It does not.

Q    It does not.  Okay.

MR. ANDERSON:  One moment, Your Honor.  Apologies, Your Honor.

Q    Ms. Ragan, you just testified that Section 6.6 of the Purchase and Sale Agreement at Docket 1158-1 does not contain any backup bidder protections, is that correct?  Was that your testimony?

A    Yes.

Q    Do you see Section 6.6 of the Purchase and Sale Agreement?

A    I do.

Ragan - Direct/Anderson                              47

Q    And I'm going to read out loud, but if you'll just tell me if I read this correctly.  "In the event the Bankruptcy Court approves an alternative transaction and the alternative transaction closes, and such alternative transaction is not the result of buyer's breach under this agreement, buyer shall be entitled to payment by seller of the aggregate of (1) an amount not to exceed $150,000 of buyer's out-of-pocket fees and expenses incurred in connection with this agreement, and other agreements, pleadings, documents, hearings, discovery, and transactions related here to the expense reimbursement in proportion to the portion of the purchase price for the package not sold to buyer bears to the total purchase price, (2) receipt of the performance deposit from the escrow agent, and (3) three percent of cash proceeds received in a sale to an entity who is not the buyer of any of the property breakup fee and together with the expense reimbursement and the stalking horse protections.  Buyer shall provide evidence of all such fees and expenses to seller.  If there is a dispute over the expense reimbursement, one or both of the parties may bring the dispute to the Bankruptcy Court to resolve the dispute."

          Is it still your testimony that there are no backup bidder protections provided for in this executed version of the Purchase and Sale Agreement for the Mecom assets?

A    Yes, it's clear it refers to stalking horse protections, not backup bidder protections.

Ragan - Direct/Anderson                              48

Q    However, would you agree that buyer in this case refers to GrayStreet Credit, LLC?

A    If this is the GrayStreet PSA then, yes, buyer is GrayStreet.  I believe further down in the document is another section that refers to backup bidders.

Q    There is, yes.  And let me know if I'm reading this correctly.  "In the event that the Bankruptcy Court approves the sale of the AWP and South Texas packages to Varas, subject to its rights under this agreement, buyer agrees to be backup buyer for the AWP and South Texas packages at the purchase price as stated above for these packages.

        "Trustee shall retain the performance deposit until the sale to Varas or another third party closes and the performance deposit will be refunded to the buyer upon the closing of the sale to Varas or another third party provided, however, the Trustee shall have no right to retain the performance deposit for more than 30 days after the entry of the sale order."  Did I read that correctly?

A    Yes.

Q    So is it your understanding based on Sections 6.6 and 6.7 of the PSA that GrayStreet Credit, LLC was serving as the backup bidder with respect to the South Texas and AWP assets?

A    Yes.

Q    All right.  Let's see.  And to your knowledge this version, or I guess I could scroll up to help out a little bit,

do you see the ribbon at the top of the page here?  And this is your counsel's copy.

A    You're asking me do I see the docket stamp.  Yes, I do.

Q    Yes.  So would you agree that this is a true and correct copy of the Purchase and Sale Agreement executed by you and GrayStreet Credit, LLC?

A    Yes, I would expect it is.

Q    Okay.  And you do not dispute that Section 6.6 was included in this version of the document, and for all intents and purposes, the controlling document here, correct?

A    I agree with that.

        MR. ANDERSON:  Court's indulgence.

Q    And just to be clear --

A    Let me just, I'm sorry, if I could correct myself.

Q    I'm sorry.

A    I agree that it's the controlling PSA.

Q    Understood.  Thank you.  And would you also agree that this PSA was the one approved by the Court in its sale order with respect to the Mecom assets?

A    Yes.

        MR. ANDERSON:  No further questions, Your Honor.

                    CROSS EXAMINATION

BY MS. HOPKINS:

Q    Hi, Ms. Ragan.  I'm going to go ahead and treat this as direct based on, you know, efficiency purposes and whatnot, and

try to be as limited as I can, focusing on the most important issues here.

I do want the parties to kind of get a better understanding of what a stalking horse is as well as, you know, in comparison to a backup bidder and your experience.

I think you probably testified about this before, but how much experience do you have when it comes specifically to bankruptcy sales and the processes related to it?

A    Well I don't want to date myself.  I spent nine years in investment banking where I also did bankruptcy advisory.  And I've spent over 20 years doing what I'm doing now where I have significant experience with bankruptcy sales.

Q    So suffice to say you're pretty experienced when it comes to bankruptcy sales.  You'd agree with me?

A    I think so.

Q    So can you tell us what is, your understanding, what is a stalking horse bidder?

A    I would categorize bidders in three buckets, qualified bidders, stalking horse bidders, and backup bidders.  Qualified bidders, and these are all set out in the bidding procedures that we always submit on the front end to identify what the process is going to be.

A qualified bidder is somebody who adheres to the rules and is entitled to show up at the auction and bid.

A stalking horse bidder is somebody that you usually

Ragan - Cross/Hopkins                                       51

spend significant time with on the front end to develop an Asset Purchase Agreement. And you want to make sure when you represent the debtor that the assets are going to sell and they're going to sell for a fair price.

So you try to pick somebody that you think has the ability to close, who's knowledgeable, who understands the process, and convince them to participate.

A lot of times you get push back from folks, especially when they're what we call strategic buyers, which are industry people, as opposed to financial buyers. They don't want to get drawn into a process where they're going to have to spend a lot of time, money, and effort to get bid up at an auction and then they don't win.

So we offer them stalking horse protections to get them to be the bidder on the front end where we file the sale document with a reasonable APA that we make everybody else bid against. In order to persuade them to expend the time, money, and effort, we provide the stalking horse protections.

So it's normally, the average is about three percent of the sale price of what the stalking horse offers and then in some cases it might be a little bit more, a little bit less, depending on the value of the transaction. And in other cases sometimes there might be an add on for expense reimbursement. Again, it depends on the value of the transaction.

And then there's the backup bidder. So if you're the

stalking horse bidder and you get the protections for participating in the process which helps me or the investment banker bring other people to the table, because we're not only doing this on an expedited basis, and other people are going to say I don't have the time to do all of this due diligence.

Well, you can rely on the fact that the stalking horse did the due diligence and so you don't have to spend as much time, you don't have to spend as much money.  So that's the benefit of the stalking horse in providing the protections.

Then the backup bidder, the stalking horse may decide that the pricing is too robust in the auction and they don't want to go any higher and so they stop, and somebody else bids higher and they become the winning bidder.  And the backup bidder is somebody who is going to close if the winning bidder does not close, for whatever various and sundry reasons.

Q    Okay.  And that's really helpful differentiating between the three different types.  In addition, I guess, do you typically see a stalking horse, and I'm just going to break it down a little bit, do you typically see stalking horse procedures in bid procedures orders?

A    Yes.

Q    What about do the stalking horse procedures and bid procedures orders, in your experience, have you seen them identify and specify a process for backup bidders, specifically?

Ragan - Cross/Hopkins                                  53

A     The backup bidder process identified in the bidding procedures is normally just limited to the discussion of if a designated winning bidder doesn't close, the next highest bid is the backup bidder, and they're willing to close.

Q     Have you seen any monetary protections like here or are alleged here, related to backup bidders in other cases?

A     No, I have not.

Q     So here in our cases we specifically set forth and received Court approval for our bid procedures?

A     Yes.

Q     And in those bid procedures did we have stalking horse provisions and protections?

A     Yes.

Q     What about as to backup bidders, did we address backup bidders protections in our bid procedures?

A     No.

Q     And why is that?

A     It's not customary, I've never seen it before, and nobody's ever asked for protections.  And you wouldn't, I don't know how that would be value to the estate to -- I just haven't seen it.

Q     Here can you just remind us what role did GrayStreet play post-auction, what was their role there?

A     Well GrayStreet is a 50-percent participant in the DIP loan.  And I will add that Mr. Covey in his role as a

Ragan - Cross/Hopkins                          54

participant and the DIP lender has been very helpful to me throughout the case, and for that I appreciate it.

So he and I have had discussions ongoing related to things that were going on in the case and with the DIP loan and subsequently I didn't really have to spend too much time with him on his PSA because he's very knowledgeable about oil and gas assets. But by virtue of being the DIP lender we did talk about case status periodically.

Q   Did you have any agreement with him either pre-auction or post-auction as of today regarding allowance of the similar stalking horse protections?

A   Let's see. The bid deadline was the 6th and they gave us, all bidders gave us their marked up PSA with their bid on the 6th. In the first PSA that they gave me on the 6th there was a fair amount of discussion in Section 5.9, we've been talking here about 6.6, regarding stalking horse protections.

In the version that we sent back to them, we redlined that out and I put in my note on December 8th back to Mr. Covey that we were not designating GrayStreet as a stalking horse and all of that stuff was taken out of 5.9.

Q   So was it your understanding that GrayStreet also understood they were not serving as the stalking horse bidder?

A   I'm not sure. Candidly I thought sometimes that there was confusion that stalking horse and backup bidder were used interchangeably.

Ragan - Cross/Hopkins                        55

Q     And what do you base that on?

A     Discussions, emails.

Q     A minute ago Mr. Anderson was talking to you about Section 6.6 of the APA and I just want to ask you a couple quick questions.  So Section 6.6 begins, you know, it does go on to say, discuss the stalking horse protections and entitlement. But at the very beginning it states that in the event the Bankruptcy Court approves an alternative transaction and the alternative transaction closes, buyer ... buyer shall be entitled to payment by seller of and then lists the stalking horse protections.

To your knowledge, did any alternative transaction take place?

A     No.

Q     And is there any reference in this section to a backup bidder?

A     No.

Q     And was there any alternative transaction approved by the Court?

A     No.

Q     Let's talk --

A     The purpose of the reference with alternative transaction is that I always take the position that if somebody shows up with a big check all the way up until the ink is dry on the sale order, then I'm going to consider it.  But that didn't

happen here.

Q    So there was no alternative transaction and the actual contemplated transactions all took place?

A    Correct.

Q    Okay.  When did closing occur with Varas on the AWP and Mecom assets?

A    All closings were January 31st.

Q    The closing with GrayStreet too?

A    Yes.

Q    Okay.  Did Varas ever express any intent to back out or not close their transactions?

A    No, it was actually the opposite.  I asked them if they were interested in flipping some of them because somebody inquired of me, asked me specifically to inquire of Varas if they would sell the Texas portion.  And so I made the inquiry as I was asked to do and I was told in no uncertain terms that they were buying everything.

Q    Based on your knowledge did GrayStreet do anything that motivated Varas to close on the 31st?

A    Not to my knowledge.

Q    In your opinion, were the breakup fee and expense reimbursements actual and necessary costs of preserving the debtor's estates?

A    Offering expense reimbursement and breakup fees to the stalking horse as provided for in the bidding procedures, we do

Ragan - Cross/Hopkins                              57

to provide value to the estate to make sure that we can sell the assets for a reasonable price.

Here we did not have breakup fees that got paid out. We provided for them for a stalking horse, but we ultimately didn't have them.

Q    And that was because there was no stalking horse designated?

A    That's correct.

Q    Did you ever leverage GrayStreet as a backup bidder to close with Varas?

A    No.  Mr. Covey did say that to me.  I think the word he was probably looking for earlier was anal.  I probably said that Varas' counsel was being anal.  Methodical is a better word.  And I was very concerned about the DIP loan maturing.

So I was probably venting to some extent to him. Just, again, he's the DIP lender, we talk a fair amount about what was going on and my concerns about timing.  But I did not take his offer to Varas and say, hey, if you don't close these guys are going to close.  I appreciated him making the offer, but I did not rely on it with Varas.

Q    Sure.  And so you've established, you know, there wasn't an issue with Varas closing.  Did GrayStreet ever try to back out of their commitments in connection with the auction?

A    No.

Q    Did they ever try to withdraw their backup bid?

MR. ANDERSON: Objection. Asked and answered.

THE COURT: Overruled. Go ahead and answer.

A    I understood it's two different questions. GrayStreet did not try to withdraw their offer for Mecom. They made a backup bid. I think my total bid was sixteen six for the three packages. Backup bid from GrayStreet was sixteen point two.

A couple days afterwards Mr. Covey sent me an email and said that they were going to withdraw all prior bids related to the backup bid.

Q    Okay.

A    We then had some email exchanges about that.

Q    Sure. And on that, good segue into this. If you can look at the email that I've put up what's been marked as Exhibit N. So the first email is from you to a group of people including Paul Black. And, I'm sorry, who is Paul Black?

A    Mr. Covey's designated operator of the oil and gas assets.

Q    Okay. And also Mr. Covey is included on this email as well?

A    Yes.

Q    If we scroll down then we see an email before that on Tuesday, December 17th to you from I believe Paul. Was that Paul Black?

A    Yes.

Q    And then if we continue to scroll down, the initial email sent before that last one on December 17th was from Mr. Covey

Ragan - Cross/Hopkins                                    59

to you.  Do you see that?

A      Yes.

Q      Are you familiar with this email?  You've seen it before?

A      Yes.

MS. HOPKINS:  Your Honor, I'd like to move to admit Exhibit N into evidence.

THE COURT:  Any objection?

MR. ANDERSON:  Your Honor, just hearsay and relevance.

MS. HOPKINS:  Your Honor, at least with respect to the agents of GrayStreet as well as Mr. Covey as the representative of GrayStreet, those are admissions by a party opponent.  As well as Ms. Ragan's response.

I think for purposes of, and I'm blanking on the Fifth Circuit case that allows for the full context of emails and discussions to come in to see responses.  However, I'm really am only going to talk to her about the first two which come in as an APO.

THE COURT:  Exhibit N will be admitted over objection.

Q      Ms. Ragan, if we can look at the first email.  So this was, again, sent on December 17th at 11:45 from Mr. Covey to you.  Can you remind us, what day was the auction?

A      December 16th, the day prior.

Q      Okay.  So this was the day right after the auction.  All

Ragan - Cross/Hopkins                                        60

right.  Can you go ahead and read the substance of his email for purposes of the record?

A     "Very happy with the outcome from yesterday.  Trustee team did a great job.  Slept on it.  Since the auction is still open I want to reaffirm our bid is in position for clarity today.  Apart from our initial bid submitted on 12/9" -- which he actually meant 12/6, that was the deadline -- "and the bid at the auction yesterday of 3.6 million for Mecom package number two, decided to withdraw all subsequent bids including the 16.2 million bid for all assets.  Please don't read into this as disinterest in pursuing that, but I'd rather not have an official backup bid pursuant to the bid procedures order."

Q     Okay.

A     "Look forward to further comments on PSA for Mecom."

Q     Okay.  If we can go up.  Then this is the email sent on the same day at 6:05 p.m. from Mr. Black to you.  And why don't you go ahead and read that one as well.

A     "(Indiscernible) is being sent without typos."  And I believe that reference was to the date, 12/9 versus 12/6.  "On behalf of GrayStreet Credit I'm hereby withdrawing the $16.2 million bid for all assets made yesterday on the record and I look forward to closing the auction and the forthcoming necessary announcement in connection with the winning bids/bidders and backup winning bids/bidders pursuant to the terms of the bid procedures court order.  Time is of the

essence."

Q    Okay.  And what was your response to their emails?  And, I'm sorry, what was your understanding of the meaning of their emails?

A    Well I was very alarmed by it.  I understood he was withdrawing his backup bid.  I read into it just what it said.  So I sent this email.  I sent an email to Kevin Covey.  And then I got this followup email from Paul, so I cut and paste my response that I sent to Kevin into the same email to Paul and said, "As noted in my email earlier with Kevin, as you know we said on the record that your $16.2 million bid was selected as the backup bid and as such it is irrevocable per the bid procedures.  I said I was not closing the auction so that we could make the determination regarding cure amounts because of the recent Park Energy objection and related matters."

Q    So following your response to the GrayStreet team, was there any other indication of withdrawal of their backup bid?

A    Other than these related emails, that's all I recall.

Q    And you're aware that we're here today because GrayStreet is seeking monetary reimbursement and claims related to their position as the backup bidder, correct?

A    Yes.

Q    And in your opinion did GrayStreet provide value during these bankruptcy cases?

A    Yes.

Ragan - Cross/Hopkins                                    62

Q    And can you tell us what value and what that related to?

A    Mr. Covey is a very experienced oil and gas person and a finance investment professional, as he testified to.  I had a fair amount of difficulty on the front end of this case because I had an unsophisticated or I should say inexperienced secured lender who was not familiar with the oil and gas, not with bankruptcy, not with DIP loans.

Right after I had been appointed I was contacted, I forget whether it was by Mr. Covey or his counsel, that said they were familiar with the assets, wanted to talk to me about being a DIP lender or a buyer or whatever.

I was down in Houston in early February.  I met with him.  I explained to him that I was having some -- I talked to him about his history with the assets and his knowledge.

Q    I'm sorry.  February 2024.

A    '24, yes.  I suggested to him that he could be very helpful to me if he called First Service Bank and asked if he could participate in the DIP loan, which he did.

Q    And he did that.  And is that the value you're referencing?

A    That and he's been, you know, a great sounding board as a DIP participant and throughout the case.  There were times where we were renegotiating the DIP loan and I would ask him for specific help, you know, could you call the bank and talk to them about, you know, whatever issue we happened to be

Ragan - Cross/Curry                                    63

negotiating.  He was very helpful with that.

Q    So with respect to the relief they're seeking today, specifically only as to their value in connection with their backup bid, in your opinion was there any value added by GrayStreet in the sale process?

A    I believe there's always value to having a backup bidder in case something falls through.  But relative to the issue that we're here on today, that's not something that you would say that there would be value for the estate where they would pay money as a backup bidder.

            MS. HOPKINS:  Pass the witness.

            MR. CURRY:  Your Honor, if we could have just a moment for technical.  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. CURRY:

Q    It's still good morning, Ms. Ragan.  I want to talk to you a little bit about the bid procedures in particular and I'll put this up for you and let me just -- do you recognize this document, Ms. Ragan?  That helped.  Do you recognize this document?

A    Yes.

Q    Okay.  And tell us what this document is.

A    The bid procedures.

Q    Bid procedures order.

A    Yes.

Q    Yes.  So as a Trustee you wanted to sell the assets so you negotiated with parties of interest to establish procedures, we then asked this Court to approve those procedures, so that we set the framework for a full and fair auction, correct?

A    Yes.

Q    Now do you recall whether or not the bid procedures provide any limitations upon who can attend the auction?

A    Yes.

Q    Who could attend the auction?

A    Qualified bidders, the DIP lender, DIP lender's advisors, U.S. Trustee, my counsel.  I think we may have provided in the procedures that Mr. Swarek could also participate.

Q    Okay.  So to the extent someone is attending the office (sic) as a qualified bidder, that would mean that they submitted a qualified bid, correct?

A    Yes.

Q    And do you remember whether or not GrayStreet attended the auction as a qualified bidder or in its role as a DIP lender?

A    As a qualified bidder.

Q    Okay.  And so looking down at the bid procedures, when we go down to the bid requirements there, Section 7.  And going over to the next page, can you read Paragraph B starting after the provided however?

A    "And if such potential bidder is selected as the successful bidder or the backup bidder, each as defined below,

Ragan - Cross/Curry                    65

its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the successful bidder or the backup bidder and (ii) the date that is 30 days after entry of the sale order."

Q    And so anyone that submitted a qualified bid, their bid had to specifically state or acknowledge that if they were the second highest bidder they'd be a backup bidder, correct?

A    Yes.

Q    And, again, there is nothing in here for compensation or reimbursement for backup bidders, correct?

A    No.

Q    Now I want to switch over to this APA and, Ms. Ragan --

        THE COURT:  Mr. Curry, did you want to admit Exhibit A?

        MR. CURRY:  Yes, Your Honor.

        MR. ANDERSON:  No objection, Your Honor.

        THE COURT:  Okay.  A will be entered.

Q    Ms. Ragan --

        MR. CURRY:  And, Your Honor, just for so that I can keep up with it.  Has H been admitted, I believe?  I think it's already -- we've already heard testimony on it, so I'd move to admit that as well.

        THE COURT:  Any objection to Exhibit H?

        MR. ANDERSON:  No, Your Honor.

        THE COURT:  H will be admitted.

Ragan - Cross/Curry                                66

Q    Okay, Ms. Ragan, I think you've already acknowledged the APA here.  And we see Paragraph 1 here, the property, and it says the property is defined as essentially every asset on the schedule except not the excluded assets.  Would you agree with that summary?

A    Yes.

Q    Okay.  And so when we go down to the schedules.  Thank you.  So, Ms. Ragan, do you remember how many schedules there were?

A    No.

Q    No.  Okay.  So I'm going to put up here on -- we're going to start with Schedule A-1.  Schedule A was, according to the definition, the property.  So we see Schedule 1-A, the Mecom leases, correct?

A    Yes.

Q    And scrolling down to the second page, you can see that these are -- this is a schedule of the Mecom leases, correct?

A    I believe so.

Q    Yeah.  To the best of your knowledge, have all of the Mecom leases been transferred to GrayStreet?

A    To my knowledge, yes.

Q    Now keep going down here though, and maybe this is a little confusing to me, but hopefully you can help us here. Again on Exhibit A, Schedule 1-B of the AWP leases.  And if I scroll down a little bit further, we see a Schedule A --

Ragan - Cross/Curry                                67

Exhibit A, Schedule 1-C, the STX leases.  Now STX, that's South Texas, correct?

A    Yes.

Q    And so in this APA we actually have property defined as all three buckets of property that was sold at the auction, correct?

A    I think so.

Q    And at any point since this sale order was entered, has GrayStreet demanded that you transfer any of the AWP or South Texas leases?

A    No, that was part of the backup bid.

Q    And so the fact that the APA says that they're buying all of the assets that are listed on Schedule A, notwithstanding that, no one from GrayStreet has taken the position that they're entitled to purchase AWP or South Texas, correct?

A    No.

Q    And in fact there's a pretty good explanation for that. If we look at the sale order authorizing the sale to Mecom.  So a lot has been made about this defined term "property".  But as we've already discussed, the sale order controls.  Give me just a second.  I had this one bookmarked.  I went too far.

          Okay.  It's the carryover paragraph.  Do you see the Romanette little i?

A    After sale order?

Q    Yes.

Ragan - Redirect/Anderson                    68

A     Yes.

Q     Okay.  Could you read that for us all the way to little Romanette ii?

A     "Authorizing and approving the sale of certain oil and gas assets located at the Mecom Ranch, JW Martin Field, Zapata County, Texas, as defined in the purchase agreement, the property, free and clear of all liens, claims, and interests, as defined herein."

Q     So the order establishes a definition for the term "property" and limits that definition to the Mecom assets, correct?

A     Yes.

          MR. CURRY:  No further questions, Your Honor.

                    REDIRECT EXAMINATION

BY MR. ANDERSON:

Q     So, Ms. Ragan, I believe Docket 1104 was admitted by Mr. Curry as Exhibit E.  So just to go back.

          THE COURT:  Mr. Anderson, we did not --

          MR. ANDERSON:  Oh, I'm sorry.

          THE COURT:  -- admit Exhibit E.

          MR. ANDERSON:  Well, I thought it was.

          MR. CURRY:  Your Honor, we have no objection.

          THE COURT:  All right.  So Exhibit E will be entered.

          MR. ANDERSON:  Thank you, Your Honor.

Q     So, Ms. Ragan, this is the bid procedure order, correct?

Ragan - Redirect/Anderson                    69

A      No, it's --

Q      Oh, I'm sorry.  I apologize.  I'm using the wrong one.
It's the sale order.  But let's go back to Exhibit A that I
believe you were reviewing with your counsel and Mr. Curry.  Is
this the bid procedures order?

A      Yes.

Q      Okay.  And like you said earlier, this at Docket 1104,
Exhibit E, is the sale order for the Mecom assets, correct?

A      Yes.

Q      And it is this sale order that approved the form of
purchase agreement that you and GrayStreet Credit, LLC executed
for the sale of the Mecom assets?

A      I believe so.

Q      I want to talk a little bit about some language that you
read out of the bid procedures order a moment ago.  But I just
want to take a quick look at, let's see, all right, this is
still the bid procedures order.  Let's see.  Do you see the
Arabic numeral 1 paragraph number right there?

A      Yes.

Q      Would you mind reading that paragraph starting, well, just
if you wouldn't mind reading it in its entirety, please?

A      "Sale motion is granted in its entirety in respect to the
property in the purchase agreement with the successful bidder
or backup bidder in the event buyer fails to consummate the
sale and the transactions contemplated thereby are approved in

all respects.

"In the event buyer fails to consummate the sale in accordance with the Purchase Agreement and Trustee instead consummates the sale with the backup bidder pursuant to its backup bid, all references to buyer herein shall mean the backup bidder."

Q    Thank you.  So I guess let me go back.  Did you understand what you just read to mean that the Court in its order, the sale order here, approved the Purchase Agreement that was later executed by yourself and GrayStreet Credit, LLC with respect to the Mecom assets?

A    Yes.

Q    Ms. Ragan, can you take a look at Paragraph 45 of the sale order for me and would you mind reading that out loud?

A    "To the extent that this sale order is inconsistent with any prior order or pleading with respect to the sale motion, the terms of this sale order shall govern."

Q    And if we're looking back here, we can see the filing date or I guess the entry date of the Court's sale order, correct?

A    Yes.

Q    And here we're once again looking at what has been admitted as Trustee's Exhibit A, the bid procedures order, correct?

A    Yes.

Q    And I believe this one was entered in, what does that say,

Ragan - Redirect/Anderson                              71

September 4th, 2024, is that correct?

A    Yes.

Q    At Docket Number 737?

A    Yes.

Q    And the order governing the Purchase and Sale Agreement for the Mecom assets, this was entered on January 23rd, 2025?

A    Yes.

Q    At Docket 1104?

A    Yes.

Q    And so would you agree that the bid procedures order is a prior order than the one entered with the sale order?  Thank you.  Back to the PSA here.

MR. CURRY:  Your Honor, I have a completeness objection because the way that counsel presented that is very deceiving.  The key provision here is Paragraph 45 which says that if there's a conflict of -- I mean, yeah, Paragraph 46.

MR. ANDERSON:  I'll ask her.

MR. CURRY:  Not 45.  Not 45.

MR. ANDERSON:  I'll ask her about 46 if that's.

Q    Please let me know if I'm reading this correctly.  "To the extent that there are any inconsistencies between the terms of this sale order and the bid procedures order on the one hand, and the Purchase Agreement or any transaction document on the other hand, the terms of this sale order shall govern, as applicable."  Correct?"

Ragan - Redirect/Anderson                           72

A     Yes.

Q     It sounds like the sale order trumps the bid procedures order, right?

A     That's what it says.  But, yes, that's how I would interpret it.

Q     Thank you.  Okay.  I want to take you back to Mr. Curry's examination earlier.  You testified more or less or along the lines of that GrayStreet Credit, LLC serving as a backup bidder was not an actual or, I apologize, its expense reimbursement and the breakup fee outlined in Section 6.6 of the Purchase and Sale Agreement, was not an actual necessary cause to preserving the debtor's estate.

A     I said that providing expense reimbursement and stalking horse protections, when we do bid procedures, we present them as a necessary cost of the estate because we're trying to make sure that we can maximize value in the sale process.

Q     Can you see Section 6.6.2?

A     Yes.

Q     Let me know if I'm reading this correctly.  "Buyer's right to payment of the expense reimbursement shall constitute an administrative expense in the bankruptcy case pursuant to Section 503(b) or 507(a)(2) of the Bankruptcy Code with priority over any and all administrative expenses of a kind specified in Sections 503(b) and 507(a) of the Bankruptcy Code and senior to all other superpriority administrative expenses

Ragan - Redirect/Anderson                              73

in the bankruptcy case."  Did I read that correctly?

A    Yes.

Q    Let's go back to the property definition that Mr. Curry was discussing.  Okay.  So do you recognize this provision of the Purchase and Sale Agreement?

A    I think so.  I think it's what I just looked at before.

Q    Okay.  And I just want to pare this down as much as possible.  Excuse me.  All right.  Starting with the third sentence of Paragraph 1.1.  Let me know if I'm reading this correctly.  "Subject to the terms and conditions of this agreement, seller shall sell, convey" --

A    Hang on.  Let me try and find out where you are.

Q    Oh, I'm sorry.  Beginning with the word "subject".

A    Third line or the third sentence?

Q    Third sentence.

A    Okay, I'm there.

Q    In 1.1.

A    Sorry.

Q    "Subject to the terms and conditions of this agreement, seller shall sell, convey, and assign to buyer or his designee, and buyer or his designee, shall purchase, pay for, and accept, all of seller's right and title to, and interest in, and all privileges appurtenant to, the following described property rights, interests, and privileges.  Such property rights, interests, and privileges save and except the excluded assets

Ragan - Redirect/Anderson                    74

described in 1.2, are hereafter referred to collectively as the property." Did I read that correctly?

A    Yes.

Q    And we see in 1.1.1 that included within this definition of the property are the oil, gas, and oil leases described in Exhibit A, Schedules 1-A, 1-B, and 1-C, insofar and only insofar as those interests, rights, and leases cover and include the lands, debts, and rights described in Exhibit A, Schedules 1-A, 1-B, and 1-C, collectively the leases. Did I read that correctly?

A    Yes.

Q    Okay. So Mr. Curry already took you through Exhibit A, Schedule 1-A and you agree that that covers Mecom leases, correct?

A    I believe so, yes.

Q    Okay. And we see here Exhibit A, Schedule 1-B, AWP leases. And these are with respect to the AWP property that was sold to Varas, correct?

A    Yes.

Q    And looking at Exhibit A, Schedule 1-C, STX leases. What does STX stand for?

A    South Texas.

Q    These are the South Texas leases, is that correct?

A    I believe that's correct.

Q    Let me rephrase. Would these leases under your

understanding of the terms of the Purchase and Sale Agreement, refer to leases affecting real property that was included in the sale of what was commonly referred to as the South Texas assets to Varas Energy?

A    That's my expectation, yes.

Q    And looking at Exhibit A, Schedule 2-A.

MR. ANDERSON:  I apologize.  One moment, Your Honor. No further questions, Your Honor.

THE COURT:  Any other questions for Ms. Ragan?

MS. HOPKINS:  Yes, Your Honor.

THE COURT:  Okay.  Ms. Hopkins.

RECROSS EXAMINATION

BY MS. HOPKINS:

Q    Ms. Ragan, after the bid deadline but before the auction, did you still, did you have communications with GrayStreet about them still potentially serving as a stalking horse bidder?

A    So between the 6th and the 16th.  I believe I testified earlier that I had exchanged some communications with Mr. Covey on the 8th where I said I was not designating a stalking horse and I wasn't designating GrayStreet as a stalking horse.

Q    After the bid deadline on the 6th, did you give GrayStreet the opportunity to increase their bid in order to serve as a stalking horse?

A    I did.

Ragan - Recross/Hopkins                                    76

Q    And can you tell us what happened there?

A    I asked them to increase their bid to 16 million.  So the bid on 12/6 was just shy of $7 million.  When we had the stalking horse discussion, I told him he wasn't the stalking horse, I wasn't designating a stalking horse.  But if he would increase his bid, then I would get support from the bank to support a stalking horse bidder, and I asked him to increase his bid to 16 million.  He declined and said that if I wouldn't accept him as the stalking horse, they would still show up at the auction and bid an amount of 10.7.

Q    Okay.  So we've been talking a lot about Section 6.6 and these stalking horse protections.  Did you leave that section in because at that time there was a possibility that those negotiations were going on and GrayStreet could potentially serve as the stalking horse?

A    Potentially.  I thought that there might have been a stalking horse, not just GrayStreet.  There were other folks that I was trying to convince to be the stalking horse, to come up in their bid.  But ultimately I couldn't get anybody as high as I wanted them.

Q    Okay.  And I know we mentioned earlier, you talked about the fact that there weren't specific backup bidder protections in the PSA.  Is that because it wasn't customary and really didn't provide value to the estates or what's the basis there?

A    Both of those.  It's not customary.  You provide expense

reimbursement and protections to a stalking horse, not to a backup bidder.  It wasn't discussed that we would provide any reimbursement to a backup bidder.

Q    And last question.  Mr. Anderson was going through the fact that the PSA with GrayStreet includes not just the Mecom assets but also the AWP and the South Texas assets.  So were those assets included in this PSA in the event GrayStreet did end up serving as the buyer should Varas not close?

A    Yes.  It was meant to be a dual purpose APA.

MS. HOPKINS:  No further questions.

THE COURT:  Any other questions for Ms. Ragan?

MR. ANDERSON:  No, Your Honor.

THE COURT:  Okay.

MR. ANDERSON:  If we could just have the Court's indulgence one moment --

THE COURT:  Sure.

MR. ANDERSON:  -- so I can confer with opposing counsel?

THE COURT:  Do we need to take a proper recess?

MR. ANDERSON:  Yes, Your Honor.  Sorry.

THE COURT:  Okay.  About five minutes.  We'll come back around 25 'til.  We'll be in recess until then.

(Recess - Audio off)

THE COURT:  All right.  It's 12:35 and we're back on the record.  Any further questions for Ms. Ragan?

78

MR. ANDERSON:  None from GrayStreet, Your Honor.

THE COURT:  Okay.  All right.  Ms. Ragan, you may step down.  Any additional witnesses?

MR. ANDERSON:  No additional witnesses at this time, Your Honor.  GrayStreet rests and would request a brief five-minute closing.

THE COURT:  All right.  I'll give you five minutes, I'll give Ms. Hopkins five minutes.  Okay.

MR. ANDERSON:  Thank you, Your Honor.  First and foremost, GrayStreet has put on evidence and the Court has heard testimony and seen documentary evidence that the Purchase and Sale Agreement at Docket 1158-1 is the controlling agreement here.

Your Honor's order approving the sale controls over the bid procedures order.  The fact remains that the Purchase and Sale Agreement includes provisions which allow GrayStreet Credit, LLC or provide for GrayStreet Credit, LLC's recovery of expense reimbursements and a breakup fee if an alternative transaction is approved by the Court.  And within that same paragraph we see --

THE COURT:  Tell me, and I'm sorry to interrupt you, but tell me what you believe the alternative transaction is.

MR. ANDERSON:  I believe we have to look no further than Section 6.6 itself, Your Honor.  It defines it and if I'm, well it's not up anymore, but I think we've heard enough about

79

it. But 6.6 it says that it defines a property -- I apologize. It says if any portion of the property is sold to an entity other than buyer, that's where it defines it as the backup or the breakup fee so.

THE COURT: So, and I don't want to put words in your mouth, but I'm trying to understand your argument. Are you saying that GrayStreet contends because it didn't get all three buckets that it's entitled to the fee?

MR. ANDERSON: Not in so many or somewhat, Your Honor, yes. And part of that reason is because property is defined in the operative Purchase and Sale Agreement as including assets that were sold to Varas in the South Texas and AWP sales.

So the clear language of the contract provides that if any of the property is sold to a buyer other than as defined in the PSA, GrayStreet the buyer, then it's entitled to its expense reimbursement and its breakup fee. And that's our position, Your Honor.

And it's also our position that the sale order, it adopted the Purchase and Sale Agreement at 1158-1, and that it controls over the bid procedures order. So anything about lack of a stalking horse being selected or lack of approval for protections in the bid procedures order, it's irrelevant.

THE COURT: So I just want to make sure, I'm trying to put all this together, I just want to -- your argument

80

basically hinges on the definition of property.

MR. ANDERSON:  Yes, Your Honor, in the sense that it is -- that is the alternative transaction that is included. It's the only other alternative transaction addressed by the PSA.  Yes, Your Honor.  And that the property includes part of the AWP and sale assets.  So in a sense yes, Your Honor, it hinges on that.

THE COURT:  That's the Docket Number 1158-1?

MR. ANDERSON:  Yes, Your Honor.

THE COURT:  So tell me how it is that you believe that 6.6 and all the subsections of 6.6 refer to anything other than a stalking horse.

MR. ANDERSON:  Well, Your Honor, that provision in Section 6.6, the reference to stalking horse, it's kind of surplusage.  I mean it defines more specifically the -- it defines buyer, it defines -- I apologize, Your Honor, I don't have it in front of me.  But I mean it defines buyer and nowhere else in the, I believe in the PSA is stalking horse protections even defined.  That was just surplusage left in the final draft.

However, the rest of it is clear.  It says that buyer is entitled to the breakup fee and expense reimbursement in the event that any of the property is sold to anyone other than buyer as a result or not resulting from buyer's breach of the PSA.  And that's exactly what happened here.  No one disputes

that the Trustee closed on the AWP and South Texas assets on January 31st, 2025. And I don't think anybody disputes that the definition of property points to the exhibits in the PSA which include property that was transferred to Varas, not GrayStreet, from the South Texas and AWP assets.

THE COURT: All right. Anything else?

MR. ANDERSON: Just in conclusion, Your Honor, we do request that the Court enter an order enforcing its sale order and the Purchase and Sale Agreement and award GrayStreet Credit $505,000 in the form of breakup fees and expense reimbursements.

And then just one final thing. I just want to apologize for Mr. Sanders' behavior earlier and the outburst. He's assured me that he is apologetic about it as well. I believe he's dealing with a personal matter outside at the moment. But he did want me to explain that, and Paul Black who was here earlier that Ms. Ragan discussed, wanted me to explain that the reasons for it were that Mr. Curry was talking to Paul Black outside the presence of his counsel and during the hearing.

I just -- and Mr. Black says that he's available to come testify to it if possible or if needed or desired by the Court. But I did want to apologize.

THE COURT: Thank you.

MR. ANDERSON: And explain Mr. Sanders' behavior.

82

Thank you.

MR. CURRY: He'll need to also testify about the number of times and the current status of our representation. I wasn't talking to an unrepresented party without their counsel. I am their counsel.

THE COURT: All right. Ms. Hopkins?

MS. HOPKINS: Thank you, Your Honor. Okay. I'm going to try to briefly address a few things and as well as counsel's statements.

Just to pick up where you all left off when we were talking about 6.6 versus -- and the meaning in the PSA. And I'll bring it up real quick. Let's see. There it is.

So in the PSA, right, we have this whole 6.6 provision. We've been talking about it all day. But we also have a separate Section 6.7 backup bidder. So we have this section that specifically deals with a backup bidder and addresses a backup bidder.

So why isn't 6.6, why isn't that section in connection with 6.7? I mean because they're two separate sections. 6.6 was intended to relate to potential stalking horse in the event that GrayStreet ended up being one. They weren't one. I mean the backup bidder section does not provide any protections, neither in the PSA.

There is nothing in the sale order talking about these protections and that's because that's not customary to

83

the industry, that's not customary to this process. Ms. Ragan could have I guess provided for that in our bid procedures, but we did not for a multitude of reasons.

While it is helpful and it can be helpful having a backup bidder, that is not the same and does not provide the same out-of-pocket expense, for example, as a stalking horse does have.

I mean ultimately we are talking about sophisticated parties that have experience with the bankruptcy world. If they wanted that to be part of the negotiations that could have been included. It was not.

At the end of the day this section deals with stalking horse protections just as it says and there's no -- and, again, pointing back to the beginning of this hearing when we talked about this section being unambiguous. That's what everybody agreed to, that it was unambiguous.

But now what I'm hearing is that we're trying to turn it a little bit and say that the words stalking horse protections actually don't mean what they say, and that's counterintuitive to counsel's earlier argument.

I will also point out when you have the sale order versus the bid procedure order, the sale order specifies that in the even there's an inconsistency it's going to govern, right? So there has to be an inconsistency.

I do not read anything in the bid procedures order as

84

having a, you know, somehow being superceded, the stalking horse provisions, the lack of backup bidder provisions, somehow being superceded by any of the provisions in the sale order.

Also I'm a little confused on the argument when it comes to we've got, you know, the three sets of assets included in the definition of property. As Ms. Ragan testified that was, you know, a dual purpose track. That is in order to, we included it that way in order to prevent further attorneys fees, further time. And then it could be a quick close in the event Varas failed to close and GrayStreet needed to close.

It didn't somehow encompass more. I mean, for example, it doesn't now entitle GrayStreet to be able to come in front of Your Honor and say that they're entitled to buy all three of those properties. I mean if so, I'm a little confused as to why. I mean they could have -- if that's really the issue that they think they're entitled to purchase the full three sets of assets, then why are we not here on a motion to compel, you know, something like that, versus just this distinct issue of seeking expense reimbursement and breakup fees?

Ultimately we believe that there was, while GrayStreet might have added value during the bankruptcy case, there was not the extent of value that they claim was added in connection with the backup bid certainly, and not under the provisions of all of the relevant documents we've been talking

85

about, nor any value or enough value to constitute an administrative expense claim.

Because of that and because of the fact that, you know, testimony showed that Varas closed. I mean there was no issue. While we heard testimony that there was an assumption that Varas may be wanting to push things off or get out, that didn't happen. And there was no evidence what that assumption was based on. In fact, Varas closed the same day as GrayStreet on its deals, and that's not because of the backup bidder, it's because of the fact that we worked collaboratively together to ensure that closing was happening as fast as we could, as efficiently as we could, in order for the Trustee to continue to keep her fiduciary duties ensure, you know, this isn't going on forever.

Ultimately we do think that the motion is without merit and because of that and all of the evidence you heard today, we would request that the Court deny GrayStreet's motion.

THE COURT: Mr. Curry?

MR. CURRY: I'll try to be very brief and Ms. Hopkins covered a lot of what I wanted to say.

But I think, Your Honor, at the end of the day movant's case here relies on a two-word term in the APA, alternative transaction, which is not defined. And so when we go to interpret that, we have to look at what the rest of the

86

APA says. And as Ms. Hopkins pointed out, you know, if you look at Section 2.1, it notes that there are three packages and that GrayStreet was the winning bidder for the Mecom package, but it was the backup bidder for AWP.

And what the agreement says is that just what we all know a backup bidder to be. GrayStreet has no obligation to close on the AWP and South Texas assets unless, or a right to close, unless and until the Varas transaction doesn't close.

It's hard to wrap your brain around an argument that says there's an alternative transaction when you're talking about a transaction that is -- we heard about something that it would actually has to serve as a condition precedent to you having a right to purchase these assets. That's the way the APA reads, right?

Backup bidder, there's an APA, but there's a really significant condition precedent there. The Varas transaction must not close. So the Varas transaction was not an alternative transaction under this APA. It's actually a condition precedent to GrayStreet's right to purchase. And because GrayStreet's right to purchase was never fulfilled, never ripened, then any other provisions related to an alternative transaction just don't apply to those two assets.

And, again, as Ms. Hopkins pointed out, and Your Honor asked the question, your argument rests on the definition of property. And we covered that with Ms. Ragan. The sale

87

order specifically defines what the property is and that's the Mecom assets and the Mecom assets were sold to GrayStreet, so there was no alternative transaction as to those either.

Thank you, Your Honor.

THE COURT: The Court will take this matter under advisement and issue a ruling. Anything else that we need to take up today?

MS. HOPKINS: Yes, Your Honor. One brief matter, it's actually separate and apart from all this (indiscernible).

THE COURT: Okay.

MS. HOPKINS: Your Honor, the Trustee a few weeks ago or a couple weeks ago filed a motion to sell some real estate, actually a home in Boerne, Texas.

THE COURT: For a million dollars. I remember.

MS. HOPKINS: Yes. Yes. So she's in the process of trying to deal with the personal property inside. And full disclosure, we believe that the vast majority of the personal property belongs to Mr. Tom and Mrs. Emily Swarek. So she's had a number of communications with them asking them to remove the property.

Basically she has to, you know, when she is closing on April 22nd it needs to be out. And that was a prerequisite of the sale because the buyer is having I think some contractors come in and renovate because we've actually tried to see if we could push it back a little bit to help out the

88

Swareks.

Our understanding is that the Swareks, there's been no response from Mr. Swarek to the request. And then the Trustee has been working with Emily Swarek and they've met and are continuing discussions.

But our understanding is that Mrs. Swarek gave the Trustee permission to conduct an estate sale of their personal property. So as we deal with this it's possible that we could have potentially an emergency motion. I'm hopeful that we will be able to work it out and all the property will be removed successfully. But just kind of want to put that out there in the event there is somehow an issue here.

THE COURT: When are we supposed to close on the house?

MS. HOPKINS: April 22nd. And the estate sale, I believe, is scheduled for the 18th, the 19th, and the 20th. But also I think that the objection deadline to object to the sale is maybe next Monday.

So it would be part of her duties, not only with authority from Mrs. Swarek, but also part of her duties in effectuating that sale order to ensure that the sale doesn't fall through.

THE COURT: So what Ms. Swarek is contemplating is allowing Ms. Ragan to auction off those personal items and the money is coming back into the estate as if it were a gift?

89

MS. HOPKINS:  No, it would go to the Swareks.

THE COURT:  Don't pay for the auction.

MS. HOPKINS:  It is based on a commission structure where it would come out of the sale proceeds.

THE COURT:  So basically what Ms. Ragan is doing is just offering up them an auctioneer.

MS. HOPKINS:  Yes.

THE COURT:  Okay.  Understood.

MS. HOPKINS:  Just we're hopeful that we don't have to come back in here within any issues, but just wanted to put that out there since it is --

THE COURT:  Appreciate the heads up.

MS. HOPKINS:  Otherwise I believe that's all we have.

THE COURT:  All right.  Thank you, all.  Safe travels home.

MS. HOPKINS:  Thank you, Your Honor.

MR. ANDERSON:  Thank you.

(Proceedings adjourned at 12:55:04 p.m.)

* * * * *

90

# **C E R T I F I C A T I O N**

I, JANET D. PERSONS, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Janet D. Persons

JANET D. PERSONS

J&J COURT TRANSCRIBERS, INC.          DATE:  April 29, 2025