IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-51715-JAW |
| | . | (Jointly Administered) |
| | . | |
| EL DORADO GAS & OIL, INC., | . | United States Courthouse |
| et al., | . | 501 East Court Street |
| | . | Jackson, MS  39201 |
| | . | |
| Debtors. | . | July 22, 2025 |
| . . . . . . . . . . . . . . . . | . | 11:31 a.m. |


TRANSCRIPT OF HEARING ON TRUSTEE'S MOTION TO
PAY PERMITTED LIEN (DKT. #1257)

BEFORE THE HONORABLE JAMIE A. WILSON
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

| | |
|---|---|
| For Chapter 11 Trustee<br>Dawn Ragan: | Hood & Bolen, PLLC<br>By:  R. MICHAEL BOLEN, ESQ.<br>3770 Highway 80 West<br>Jackson, MS  39209 |
| | Kelly Hart & Hallman LLP<br>By:  KATHERINE HOPKINS, ESQ.<br>     NANCY RIBAUDO, ESQ.<br>201 Main Street, Suite 2500<br>Fort Worth, TX 76102 |
| For The Bracken Group: | Phelps Dunbar LLP<br>By:  SARAH BETH WILSON, ESQ.<br>1905 Community Bank Way, Ste 200<br>P.O. Box 320159<br>Flowood, MS  39232 |
| Audio Operator: | Keisha Moore |

Proceedings recorded by electronic sound recording, transcript
produced by a transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

For Archrock Partners          Newman & Newman
Operating, LLC:                By:  J. WALTER NEWMAN, IV, ESQ.
                               601 Renaissance Way, Suite A
                               Ridgeland, MS  39157

                               Anderson, Lehrman, Barre &
                                 Maraist, LLP
                               By:  KEVIN M. MARAIST, ESQ.
                               1001 Third Street, Suite 1
                               Corpus Christi, TX  78404

For First Service Bank:        Okin Adams Bartlett Curry LLP
                               By:  DAVID CURRY, JR., ESQ.
                               1113 Vine Street, Suite 240
                               Houston, TX 77002

                               Butler, Snow, O'Mara, Stevens &
                                 Cana LLP
                               By:  JOHN A. CRAWFORD, ESQ.
                               P.O. Box 6010
                               Ridgeland, MS 39158-6010

                        - - - - -

3

# I N D E X

| CHAPTER 11 TRUSTEE EXHIBITS | | ID | EVD. |
|---|---|---|---|
| A | Order (Dkt. #1104) entered 1/23/2025 | -- | 7 |
| B | Order (Dkt. #1105) entered 1/23/2025 | -- | 7 |
| C | Purchase & Sale Agreement – Buyer:  Varas Energy AWP, LLC | -- | 7 |
| D | Purchase & Sale Agreement – Buyer: Graystreet Credit, LLC | -- | 7 |
| E | Texas Committee Report | 7 | -- |

**ARCHROCK PARTNERS OPERATING LLC EXHIBITS**

| | | | |
|---|---|---|---|
| 1 | Schedule "A" to Master Compression Services Agreement | -- | 6 |
| 2 | Master Compression Services Agreement of Contract | -- | 6 |
| 3 | Lease Takeover and Proposed Assignment | -- | 6 |
| 4 | Lien Affidavit | -- | 6 |
| 5 | Archrock 5 | -- | 6 |
| 6 | Deed of Trust | -- | 6 |
| 7 | Declaration of Tisha K. Wathen | -- | 6 |

| THE BRACKEN GROUP EXHIBITS | | ID | EVD. |
|---|---|---|---|
| B1 | Proof of Claim 57-1 | -- | 9 |
| B2 | Proof of Claim 58-1 | -- | 9 |
| B3 | Proof of Claim 58-2 | -- | 9 |
| Before | Proof of Claim 59-1 | | -- 9 |
| B5 | Proof of Claim 59-2 | -- | 9 |
| 30(b)(6) | Proof of Claim 60-1 | | -- 9 |
| B7 | Proof of Claim 60-2 | -- | 9 |
| B8 | Proof of Claim 61-1 | -- | 9 |
| B9 | Proof of Claim 62-1 | -- | 9 |
| B10 | Proof of Claim 63-1 | -- | 9 |
| B11 | Proof of Claim 63-2 | -- | 9 |
| B12 | Proof of Claim 64-1 | -- | 9 |
| B13 | Proof of Claim 65-1 | -- | 9 |
| B14 | Proof of Claim 74-1 | -- | 9 |
| B15 | Proof of Claim 75-1 | -- | 9 |
| B16 | Proof of Claim 75-2 | -- | 9 |
| B17 | Proof of Claim 76-1 | -- | 9 |
| B18 | Proof of Claim 76-2 | -- | 9 |
| B19 | Proof of Claim 79-1 | -- | 9 |
| B20 | Proof of Claim 80-1 | -- | 9 |
| B21 | Proof of Claim 81-1 | -- | 9 |

4

B22   Proof of Claim 82-1                                    --      9
B23   Proof of Claim 83-1                                    --      9

5

| THE BRACKEN GROUP EXHIBITS | | ID | EVD. |
|---|---|---|---|
| B24 | Proof of Claim 84-1 | -- | 9 |
| B25 | Proof of Claim 85-1 | -- | 9 |
| B26 | Proof of Claim 86-1 | -- | 9 |
| B27 | Proof of Claim 87-1 | -- | 9 |
| B28 | Proof of Claim 89-1 | -- | 9 |
| B29 | Proof of Claim 90-1 | -- | 9 |
| B30 | Proof of Claim 91-1 | -- | 9 |
| B31 | Proof of Claim 91-2 | -- | 9 |
| B32 | Proof of Claim 92-1 | -- | 9 |
| B33 | Proof of Claim 93-1 | -- | 9 |
| B34 | Proof of Claim 94-1 | -- | 9 |

6

(Proceedings commenced at 11:31 a.m.)

THE COURT: You may be seated. Okay. It's 11:30, and we're back on the record in the El Dorado Gas & Oil case, Case 23-51715.

We're set on the motion to pay permitted lien of Archrock Partners Operating, LLC, at Docket 1257; the objection filed by The Bracken Group at 1309; Archrock Partners Operating, LLC's, response at 1422; and the Trustee's reply in support of the motion at 1428.

Let's go ahead and take appearances for the record.

MS. HOPKINS: Good morning, Your Honor. Katherine Hopkins on behalf of Dawn Ragan, the Chapter 11 Trustee, for El Dorado and Hugoton's estates. We also have Nancy Ribaudo and Mike Bolen, as well as Ms. Ragan.

THE COURT: Okay.

MS. WILSON: Sarah Beth Wilson on behalf of The Bracken Group.

MR. MARAIST: Good morning, Your Honor. Kevin Maraist and Walter Newman on behalf of Archrock Partners Operating. We also have in the courtroom with us Tisha Wathen, a representative of Archrock, who is prepared to testify today.

THE COURT: Okay. Thank you.

MR. CURRY: Good morning, Your Honor. David Curry on behalf of First Service Bank. And I believe Mr. Crawford is still on the line.

7

THE COURT: Anyone else on the line that needs to make an appearance in this matter?

(No audible response)

THE COURT: All right. Ms. Hopkins, your motion.

MS. HOPKINS: Yes, Your Honor. As a brief housekeeping matter, and I'll certainly defer to the Court on whether you would prefer to address the admission of exhibits now or at the beginning of testimony or throughout testimony. Either way works. I just thought I'd go ahead and present it now in the event we wanted to discuss potential admission of exhibits.

THE COURT: All right. Let's go ahead and take it up.

I've got two sets of exhibits up here. Ms. Wilson, have you seen these exhibits?

MS. WILSON: I'm not sure which ones those are, Your Honor. If that's Archrock's, they did email exhibits in advance.

THE COURT: Okay. Let's see. I've got Archrock, seven exhibits.

MS. WILSON: No objection, Your Honor.

THE COURT: Okay. So Archrock's Exhibits 1 through 7 will be admitted.

(Archrock Exhibits 1 through 7 admitted to evidence)

MR. MARAIST: Thank you, Your Honor.

THE COURT: All right.

MS. HOPKINS: And, Your Honor, our exhibits were filed on, I can't recall if it was Thursday or Friday of last week. They were filed of record. There's four documents that were previously on the Court's docket. We have two sale orders as well as two purchase and sale agreements. And then the last, Exhibit E, is a Texas Energy Resources Committee report, which is the only document that was not -- it was filed of record with our witness and exhibit list but it was not previously on the docket.

THE COURT: Any objection?

MS. WILSON: Objection to the energy report, Your Honor.

THE COURT: Okay. The basis for the objection.

MS. WILSON: No foundation, no authenticity demonstration. Not sure --

THE COURT: All right. We'll wait and take that up. As it comes out in the testimony, we'll circle back to that.

Otherwise, you have marked yours A, B, C, and D.

MS. HOPKINS: Yes, Your Honor.

THE COURT: All right. So A, B, C, and D, which are pleadings, will be entered.

(Trustee Exhibits A, B, C, and D admitted to evidence)

THE COURT: Any other exhibits we need to take a look at before we get started?

9

MS. WILSON:  We have exhibits, Your Honor.

THE COURT:  Okay.

Have y'all exchanged exhibits already?

MS. WILSON:  No.  The exhibits that I would like to offer are a copy of each of the filed proofs of claim of record on behalf of The Bracken Group.  Its claim numbers -- it would be Exhibits 1 through 34 for The Bracken Group.

THE COURT:  All right.  If y'all have not had a chance to look at the exhibits, do you want to wait?

MR. MARAIST:  We have no objection to --

THE COURT:  If it's just a proof of claim?

MR. MARAIST:  -- to those proofs of claim, Your Honor.

THE COURT:  Okay.

MS. HOPKINS:  Yes, Your Honor, if it's just the proofs of claim that were filed of record, then I don't believe we have an issue as well.

THE COURT:  Okay.

Ms. Wilson, have you pre-marked yours?

MS. WILSON:  They have stickers, but they are not marked.

THE COURT:  Okay.

MS. WILSON:  I wasn't sure what number we would end up being.

Would you like me to mark them?

THE COURT: Whatever is easiest for you. If you've already got your examination planned out, I don't want to mess you up if you don't have your numbers.

MS. WILSON: No. I can hand them to you. You can give them whatever number is best for the Court. Or I'm happy to write an exhibit number on each of them. They each have exhibit stickers.

THE COURT: Why don't we mark yours B1 through whatever?

MS. WILSON: Okay. Sounds good.

Would you like me to do that with my handwriting?

THE COURT: Yeah.

MS. WILSON: Okay.

THE COURT: That's fine. If you've got stickers already on them, or do you need stickers?

MS. WILSON: I have stickers.

THE COURT: Okay.

(Exhibits being marked)

THE COURT: What's your last number, Ms. Wilson?

MS. WILSON: B35.

THE COURT: B35.          MS. WILSON: And I previously thought there were 34, so excuse me for the missed number.

THE COURT: All right. Thank you.

MS. WILSON: I'm sorry. I was going fast. But they

11

are in order.

THE COURT: Okay.

MS. WILSON: This is a (indiscernible).

Thank you.              THE COURT: Do you all need a break?

MS. HOPKINS: Apologies, Your Honor. It seems we would like to have an identification of which of the proofs of claim were found by The Bracken entities.

THE COURT: Okay.

MS. HOPKINS: So we will line that up.

THE COURT: All right. Let's have an organizational break.

We'll come back at noon.

MS. HOPKINS: Thank you.

MS. WILSON: Thank you, Your Honor.

(Recess taken at 11:40 a.m./Reconvened at 1:50 p.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

All right. It is 1:50 and we're back on the record in the El Dorado Gas & Oil, Inc., case, Case 23-51715.

I understand that the parties may have reached an agreement on the motion to pay the permitted lien of Archrock Partners.

Ms. Hopkins.

MS. HOPKINS: Yes, Your Honor. Katherine Hopkins on

12

behalf of the Chapter 11 Trustee, Ms. Ragan.

First of all, Your Honor, thank you for your patience.

THE COURT:  Sure.

MS. HOPKINS:  We really appreciate your time and patience as we've kind of worked through these issues as best as we could and as trying to be as productive as we could.  And I believe we have an agreement from all the parties.

There's some moving parts, so I certainly will welcome any other comments to the extent I make a small misstatement.

My understanding is that the parties are in agreement that the Trustee may pay Archrock the $200,000 within 10 days of the Court's order.  In addition, in the event that The Bracken Group proves that their liens are equal to or superior to Archrock's lien, then there will be a disgorgement of such fees in order, or excuse me, amounts in order to address The Bracken's liens.

MR. MARAIST:  (Indiscernible)

MS. HOPKINS:  Do you want to correct that a little bit?

Thanks.

MR. MARAIST:  Disgorgement -- Kevin Maraist, for the record -- would only incur in the event there are insufficient funds in the estate --

13

MS. HOPKINS:  Thank you.

MR. MARAIST:  -- to pay all of the secured claims, right?

MS. HOPKINS:  Yes, thank you.

One other aspect of this agreement is that the Trustee will use commercially reasonable efforts to provide certain documentation to The Bracken Group.  I believe we've discussed a 21-day period, as best as you can, to provide information that we are seeking from PetroLedger, which is the debtor's third-party lease accounting firm.

Specifically, my understanding, the documents requested relate to prepetition royalties in 2023 that were unpaid and that relate to the alleged lien of The Bracken Group.  There's some various data and production information that PetroLedger holds, so the Trustee is going to use commercially reasonable efforts to get that.

In addition, The Bracken Group has also requested bank account information for 2023 to further assist in the establishment of their alleged lien.

THE COURT:  Okay.  I understand.

MR. MARAIST:  Your Honor, if I may, Kevin Maraist, again, for the record.

With respect to the disgorgement, in the event that there are insufficient funds to pay all secured claims in the estate, it wouldn't be a total disgorgement, but it would be a

pro rata proportionate disgorgement based upon the relative secured claims of the parties. So, it wouldn't be a complete disgorgement in the event that there were insufficient funds to pay all secured claims in full.

And this only applies in the event that Bracken is determined to have a secured claim equal to or senior to the Archrock lien.

MS. WILSON: In and with respect to the AWP --

MS. HOPKINS: Thank you.

MS. WILSON: -- assets.

THE COURT: Okay. So, all --

MS. HOPKINS: Yes.

THE COURT: -- this is AWP assets, related to AWP.

MS. WILSON: Your Honor, yes. In the event that it's determined that Bracken Group's interest is equal to or superior to that held by Archrock in and with respect to the AWP assets of El Dorado debtor.

THE COURT: Okay. And then let me ask you, when you're talking about secured claims, how are we defining secured claims? Are we talking about secured claims, people with claims against the proceeds? Are we talking about secured claims made against real property? How are y'all defining secured claims?

MS. HOPKINS: For The Bracken Group to show to have a determined secured claim?

15

That would be whatever in the various AWP assets.  So that includes all of the AWP leases, the wells, related equipment and property to those wells.  It does not include, we're not discussing oil and gas production and oil and gas production proceeds.

THE COURT:  All right.  I think you had better make that clear.

MS. WILSON:  If I may.  I don't view any of these things as being part of the terms that have been discussed.  Rather, that what we're talking about is whether or not, under applicable law, it is determined that The Bracken Group's interests with respect to AWP assets in the El Dorado bankruptcy estate is of equal or superior position and priority.

THE COURT:  Okay.

MS. RIBAUDO:  I think we've got a little bit of a disconnect here that we might need to take a moment to clarify.

THE COURT:  Okay.  We can take a break.  Or y'all can step outside if you want to.

MS. RIBAUDO:  I think so.

THE COURT:  Okay.  How long do you think, Ms. Ribaudo?

MS. RIBAUDO:  Not more than 10 minutes.

THE COURT:  I'll come back at two o'clock and check on you.

16

MS. RIBAUDO:  Thank you.

THE COURT:  Okay.

(Recess taken at 1:55 p.m./Reconvened at 2:06 p.m.)

THE COURT:  All right.  It's 2:06 and we're back on the record, again, in the Eldorado Gas & Oil case, Case 23-51715.

All right.  Let's go back on the record and figure out if we've got settlement or not.

MR. MARAIST:  Thank you, Your Honor.  Kevin Maraist, for the record.  I'll try to give this a try.  There's still a little bit of ambiguity, but I think we'll see if this announcement is agreeable to everyone.

So, Archrock shall be paid a sum of $200,000 within 10 days of a final order being entered in this proceeding, subject to the following.  In the event that The Bracken Group establishes that they have a equal or senior lien in the AWP assets sold to Varris (phonetic) and the estate has insufficient funds to pay such allowed secured claim of The Bracken Group from the AWP sale proceeds, Archrock agrees to a proportionate disgorgement of the settlement payment that we're receiving under this order.

THE COURT:  Okay.

MS. HOPKINS:  In addition to the production, I'll just add the production attempts to comply with Bracken's production requests from the Trustee related to prepetition

royalties.

THE COURT:  Yes, I understand.  The Bracken Group is going to want their information, I guess, to figure out what their royalties should have been prepetition.  I understood all that.  All right.

MS. WILSON:  May I ask for some --

THE COURT:  Sure.

MS. WILSON:  I'm sorry, they went into the hall without me, so the $200,000, I mean, that's more than the amount of the claim that's -- is it not?

MS. HOPKINS:  No.  It's like 356 or so.

MS. WILSON:  So how much interest and attorneys fees are you all including in this amount?

(ONLY ON BACKUP AUDIO)

MR. MARAIST:  Less than (indiscernible).  You've got a pretty good deal.

MS. HOPKINS:  It's in his --

MR. MARAIST:  If you look at Archrock Exhibit 5, there is an accounting from two different dates, the January 2023 date when the total amount due under the contract documents and the Texas Property Code was 275,000, approximately.  That's when we made the agreement with the estate to settle it for 200.

As we sit here today, as indicated in Exhibit 5, the number with attorney fees continuing to accrue with all the

18

briefing and everything we've done, is like $325,000.  We're still settling for $200,000.

MS. HOPKINS:  I understand.  And in the meantime, I located the paragraph in the original motion filed by the Trustee requesting permission to pay 200,000.  So, with that, no issue with the number provided.  Thank you.

THE COURT:  All right.  I want to go back to my question that I had before we broke last time.

You tell me where I'm going wrong, Ms. Hopkins.  We have the sales proceeds.  Mr. Curry's like, I'm up.

We have the sales proceeds of AWP from the sale, 200,000 of that is going to Archrock.

MS. HOPKINS:  Yes.

THE COURT:  Ms. Ragan has a separate pot of post-petition proceeds from oil and gas distributions.

MR. CURRY:  Yes, but that's paid current.  So --

THE COURT:  Okay.

MR. CURRY:  -- post-petition royalties from Ms. Ragan's period are paid current and there is a *de minimis* gap period, right, from when Hugoton filed with telling any of us.

THE COURT:  Well, that is the piece of the puzzle that I was worried about.  So, Ms. Ragan has paid all the post-petition production claims.

MR. CURRY:  Correct.

MS. HOPKINS: She's paid all of the post-petition, post-Trustee production claims.

THE COURT: Production claims. Okay. Since her tenure. All right.

MS. HOPKINS: Correct.

MR. CURRY: And what we're trying to agree here today is not that anybody has a lien on any particular asset. In fact, we're trying to just punt that issue and say that will be litigated later. Because they have proofs of claim that they filed and there's a number of other folks that have asserted, and so we're going to have a lien priority resolution at some point.

And I thought it would be better if we could do it all together, but then we got there, so.

MS. WILSON: And, of course, Your Honor, on account of the PetroLedger records that have been needed to calculate --

THE COURT: Right.

MS. WILSON: -- the royalties amounts, those proofs of claim will need to be amended --

THE COURT: Amended.

MS. WILSON: -- and supplemented, yes.

THE COURT: Okay.

MS. HOPKINS: We understand that.

THE COURT: All right. I think I understand where

we're going.

All right.  So how are we going to paper this up?

MR. MARAIST:  Can we circulate an order for signature by counsel?

MS. HOPKINS:  Yes.

MR. MARAIST:  Okay.

MS. WILSON:  And, of course, Ms. Marbury.

THE COURT:  All right.  So we'll do an agreed order setting out the terms.

MS. WILSON:  I have a request.

THE COURT:  Okay.

MS. WILSON:  Can we hear back on the record exactly what it was that he said the last time that he read it out loud?  Because if that's the language we're going off of, I need to make certain that it's correct in my understanding.

THE COURT:  Okay. Keisha, can you?  We can get Matt, if you can't.

THE CLERK:  (No audible response)

THE COURT:  Ms. Wilson, even if we can't get it to pull up right now, you can get the audio for little to no cost in the clerk's office.

MS. WILSON:  I understand, Your Honor.

THE COURT:  Worst case scenario.  But I'll see if I can pull it up for you.

MS. WILSON:  I just wanted to correct it now if it's

21

not --

THE COURT:  Understood.

MS. WILSON:  I want to make sure we're all on the same page.

THE COURT:  Okay.  Let's see if we can pull it up for you.

MS. WILSON:  And all it is -- it's --

(Discussion of Counsel off record)

MS. HOPKINS:  Just one moment, Your Honor.

THE COURT:  Okay.

(Discussion of Counsel off record)

THE COURT:  All right.

MR. MARAIST:  Yes, I think we're ready to clarify for the record, Your Honor.

THE COURT:  All right.  Go ahead.

MR. MARAIST:  So point number one of this agreed order will be that Archrock shall be paid $200,000 within 10 days of entry of the final order on this matter subject to the following terms and conditions.

Number two, if The Bracken Group is determined to have a equal or senior lien in the AWP assets sold to Varris or the AWP proceeds therefrom and the estate has insufficient funds to pay such allowed secured claim of The Bracken Group from the AWP sale proceeds, Archrock agrees to a proportionate disgorgement of the settlement amount.

22

Agreed?

MS. WILSON:  Yes.

THE COURT:  Okay.  Did that get it?

MS. WILSON:  Yes, Your Honor.

THE COURT:  And of course, we still --

MS. WILSON:  And of course, yes.

THE COURT:  -- have the agreement about producing the documents if you can for the prepetition production?

MS. WILSON:  Correct.  PetroLedger and bank records.

THE COURT:  Okay.

Anything else that we need to clarify?

MS. WILSON:  With respect to this matter, I don't believe so.

THE COURT:  All right.  So I'm going to show this matter settled.  Do you need more than 14 days to circulate because in 14 days they're going to start hounding you for the order.

MS. WILSON:  No, we don't need that long.  In fact, we should go as fast as possible --

THE COURT:  Okay.

MS. WILSON:  -- for sure.  And we've got to be 21 days on the production of the records.  That was in there? Yeah.  Okay.

THE COURT:  All right.

MS. WILSON:  Thank you.

THE COURT: All right. So this matter will be settled.

Ms. Hopkins, anything else that we need to take up today?

MS. HOPKINS: Yes, Your Honor. We have been monitoring and understand that the Court recently rescheduled the originally scheduled status conference that was scheduled for August 19th moved up to August 5th, as well as set a deadline for the Trustee to file a new status report. And the Trustee is working diligently to prepare that now and anticipate no problem with that deadline.

And we also saw another notice come through with respect to Bluestone's status conference. I believe specifically the MORs there.

THE COURT: Bluestone and World Aircraft.

MS. HOPKINS: Yes, Your Honor.

So our understanding is that the status conference relates to various debtors' MORs and schedules. And we certainly want to be prepared and able to address any concerns that Your Honor has. So I just wanted to take this time to inquire in the event there's anything else you need from us prior to that date or at the status conference itself other than the status report.

We'd love to get any feedback if Your Honor is agreeable to that.

THE COURT:  I'm ready to give it.

All right.  I printed a copy of the August 5th schedule just so that we could kind of run through it today. The big thing is the motion for interim distribution payment to FSB.  Two things about that give me a moment's pause already.

First is FSB's claim.  There's been a lot of moving parts and FSB has a whole lot of proof of claims on the docket.

The first thing I want to know is where are we on FSB's claim?  What is the current balance?  We declared a balance in the DIP financing order.  Has that balance moved up or down?  I would like to know the updated balance on that. Has any interest accrued post-petition?

And Mr. Curry, I see you shaking your head.  You're going to have to explain to me why interest is accruing post-petition on that.  That's why I'm wanting to know an update.  Not today.

MR. CURRY:  It's just accruing up to the value of the collateral, Your Honor.

THE COURT:  Well, I don't know what the value of the collateral is.

MR. CURRY:  We don't either.

THE COURT:  Well, okay.  Then you see why I'm asking.

But I want to get an understanding of where we are on the FSB claim, on the big $50 million loan.  But then we also have all of these FSB claims that are on the claims registry,

and I think some of them have been paid off.

For some reason, I was thinking that some of those proofs of claim had to do with guarantees, maybe that were associated with Bridget Swarek's loans.  I'm just trying to figure out where we are in the grand scheme of the FSB.

MR. CURRY:  And we'll work on that, Your Honor.  The non-mainstream items are primarily handled by Mr. Crawford, and --

THE COURT:  Okay.

MR. CURRY:  -- he dropped.  So I'll get with him and get clarification on that.

THE COURT:  Yeah, I'm trying to figure out where exactly we are in the case, which is why I've set all these status conferences.

The other thing that the motion for interim distribution that nobody even mentioned, even in passing, was the fact that there's a pending adversary against one of the lenders.  I don't know what importance that has as we sit here today, but there is technically an adversary proceeding that's pending that challenges that loan.  All right.  That's on the motion for interim distribution.

On the monthly operating reports and the amended schedules, I just kind of want to run through those.  It's been a minute since I've looked at them, but I have gone through them.  And what stood out to me was that the debtor still has a

lot of stuff, like airplanes all over the place.  Are we paying rent for those airplanes to be stored all over the country?

MS. HOPKINS:  Just to briefly add a comment on that. I understand, per my request, you're giving us great information that we can help further answer some of these concerns.  But just on that one.  When the Trustee amended the schedules, she did so as of the petition date.  So a lot of --

THE COURT:  Okay.

MS. HOPKINS:  A lot of those assets are no longer --

THE COURT:  Okay.

MS. HOPKINS:  -- property of the estate.  But we can provide more information with the status report as well as on the 5th.

THE COURT:  All right.  Yeah.

There's been a lot of sales.  I do remember we sold some airplanes.  But without a lot of time and effort, it's hard to go back and figure out what's -- it was just overwhelming how much stuff is out there.  So I want to kind of figure out what's left to sell and kind of what the plan is on that.

I'm trying to remember if there was anything else.  I made notes, but I didn't bring them out.  A lot of information in those amended schedules.

The operating reports, for example, on Bluestone and World Aircraft, I'm looking at those operating reports and they

are still showing huge numbers of assets.  Can that possibly be correct?

MS. HOPKINS:  No.  I think that both of those debtors have minimal assets now.

MS. RAGAN:  Oh, I can get Mr. Sheehan on that and get that corrected.

THE COURT:  Yeah.  Because to me, I'm looking at these monthly operating reports, and every month they're still showing these huge amounts of assets, and I don't think that's correct.

MS. HOPKINS:  Yes, Your Honor, you're accurate.  I mean, the vast majority, I believe, of all those two debtors' assets have been sold.

THE COURT:  Yeah.

MS. HOPKINS:  Or are no longer property --

THE COURT:  And so my concern, candidly, what good is a monthly operating report that is completely inaccurate?  Monthly operating reports are for creditors and the courts to be able to track the progress.  And I'm just noticing on some of the monthly operating reports, I'm looking at them, scratching my head, thinking to myself, there's no way this could be accurate.

So the purpose of them is to give notice to everybody what's happening in the case, and that's what I want to do.  If those are not correct, and there's no way that we can

28

accurately give that information to creditors, then they need to be amended with some kind of disclosure that we've done the best we could, that these estimates are just estimates, that they are probably not accurate, something. Because, otherwise, Joe Smith, looking at a monthly operating report that there's $200 million of assets is going to be wondering where his payment is.

MS. HOPKINS: Yes, Your Honor. We understand.

THE COURT: Ms. Ragan.

MS. RAGAN: (Indiscernible) take care of that, Your Honor, with Mr. Sheehan.

THE COURT: Okay. Because I'm wanting to make sure that what we're putting out to the public is accurate. Because there is going to come a day when we're going to get down to paying claims and we've got a bunch of operating reports. It looks like we have enough for a 100 percent case, and I don't know that we're a 100 percent case. I just don't know that yet. So that's kind of what I'm looking for, for that.

And then the motion to consolidate, that's later in the month on August, but I'm just trying to get this August 5th, a feel of where we are and how much money is left, and --

MS. HOPKINS: Yes, Your Honor. I think all of that insight is very helpful and helps us guide in the process of preparing the status report as well as preparing for that

29

hearing and status conference. So we can make sure to address some of those concerns, as well as additional updates I know the Trustee wants to include in the status report, but then address some of these other things at the status conference and provide answers and information for you to have, and creditors.

THE COURT: That's really the gist of what I had envisioned for August 5th. Can you think of anything else?

MS. HOPKINS: No, Your Honor. I think that that covers it from our end, but really appreciate your feedback.

THE COURT: Okay.

All right. Here's going to be my new rule in these cases. When we have a hearing scheduled at 10:00 a.m., the attorneys are going to report at 9:00 a.m. I'm not going to issue an order on it, but when you have something and you have opposing counsel, you need to tell them the Court's informal rule is that the attorneys are to be here an hour before the hearing is scheduled to go through exhibits, to go through settlement discussions, to make sure that we run on time.

So that's my new rule. If you have a hearing, both sides need to be here an hour ahead of time.

MS. HOPKINS: Just for purposes, and we'll certainly, before each hearing, do the best we can to make sure the active participants in each hearing are aware of that. Would the Court be opposed to us potentially just perhaps filing a notice of, I don't know, just a notification so everybody at least has

ECF?

Because if there's other parties that may want to appear telephonically, we may not always know about that.  And I don't know.  I'm just kind of exploring a way to put other parties on notice, especially if it's maybe like an expedited hearing where maybe you can show up at the hearing and object.

THE COURT:  Well, the reason why I hesitated to make it a formal notice is that I don't want everybody --

MS. HOPKINS:  Yes.

THE COURT:  -- to think they have to be here ahead of time.  If you have somebody on your side that is appearing telephonically that is going to be involved in any, I hate to call it pretrial, or any discussions pre-hearing, then you need to figure out how to get them on the phone.

The whole point in making everybody get here an hour ahead of time is because it's obvious that none of this happens until the hearing dates.  And that's got to stop.  I mean, it's got to stop.

MS. HOPKINS:  Sure.  And we appreciate that.  Yeah.  We'll make sure that the parties involved, objecting parties or aligned parties, are aware of that in advance of other hearings.

THE COURT:  And if there's an issue and you get pushback, then by all means let the Court know and I'll solve that problem.

31

MS. HOPKINS:  I can't imagine we'll get pushback.  I think it could result in -- will result in productive discussions, and --

THE COURT:  Well, I hope so.

Mr. Curry, was there something you want to add?

MR. CURRY:  Well, Your Honor, I was just going to mention, when I thought about this morning when we were dealing with Ms. Wilson's exhibits.  I think one of the things that we've struggled with is that there is no local rule here on the exchange of witness and exhibit lists.  And often, where we practice, those are exchanged 48 hours ahead of time and the conversations that you're saying didn't occur before this morning are supposed to occur over those two days.

So when you say is there anything else the Court could do to help, I thought I would mention that.

THE COURT:  Want to be on the local rules committee?

MS. WILSON:  I was literally about to ask that.

MR. CURRY:  Yeah.  Hey, that would make me -- well, it's actually already applicable.  If you know 9014 makes Rule 26 applicable to contested matters, so there is an obligation to provide initial disclosures.  Nobody does it.

THE COURT:  Well, I think, and I've been here four years now, but I think the thought before my time was that they didn't want a whole lot of local rules because they wanted more flexibility.  But as luck would have it, I'll see the other

three judges Thursday, and I'll mention that to them. And Mr. Curry, there is a local rules. You may be the only Texas lawyer -- you would be the only Texas lawyer on it, but --

MR. CURRY: I would be happy to help.

THE COURT: Yeah. But to me, I'll be quite honest, I didn't need a local rule to tell me that I needed to get with the other side and try to be efficient. And if there is a situation where we're in a time crunch, try to stipulate to things. But, yeah, technically there's no rule.

MS. WILSON: Since we're raising issues, it would also be helpful if, when there's an objection filed back in April, that there's not just suddenly large and extensive briefs filed for the first time with information that should be responded to of record like four days before the hearing. So that was also a bit problematic for our preparation purposes.

But agree with all of the things Your Honor said. And I will spread the word about the new informal rule.

THE COURT: Well, just in this case.

MS. WILSON: Yes.

Oh, just in this case. Okay.

THE COURT: Yes. Just in this case.

MS. WILSON: And I do want to say apologies to the full courtroom about the proof of claim copies. I committed to the printing of those without realizing how substantial they were, and also paralegal's getting knee surgery, so for the

33

record, yes.  That was me printing them.  So thank you all for your patience there.

THE COURT:  No problem.

If I need to put objection deadlines into things, I mean, we can.

MS. WILSON:  Reply deadlines would be.

THE COURT:  Yeah.  Honestly, I just I don't remember what our notices even said on this one.

MS. WILSON:  Nothing.

MS. HOPKINS:  I don't think there was a reply deadline.  In full disclosure, we weren't aware of the exact bases of the objections until subsequent conversations, believes that because these are such significant legal issues that we needed to provide briefing to assist the Court.

I think based on our local rule, or excuse me, the local rules here, we did not see a deadline for it.  We tried to provide it as soon as we can.  Understand if we want to put reply deadlines on there, that's fine too.  I'm certainly open to that.

THE COURT:  Well, and it may be if the other judges don't want to do formal amendments to the local rules about the deadlines for filing things, then maybe I'll just have rules for this case.  Because, honestly, it's really not an issue in any of the other cases I have.  But we can do that.

And I think, Ms. Hopkins, to the extent that you know

34

what's being filed way before I know what's being filed.  Just because you file something today, it doesn't mean it pops up on my computer.  It does not.  It pops up on my computer the week before when I'm starting to prepare for the docket for the next week.

So if you see something that you think, okay, this is going to be a real evidentiary issue, I don't mind if you email all the parties and say, hey, we need to reach out to the Court and put some deadlines in place.  Because if the deadlines will help y'all, then I'm all for it.  It's just that I may not know it because I'm not seeing your pleading immediately.

MS. HOPKINS:  Sure.  And open to that.  I've done it in other contested matters where you have an agreed upon scheduling order, even just pretty basic with reply deadlines or whatnot.  So that's fine.

THE COURT:  I'm happy to do that.  Yeah.  If it helps y'all, then it will help me.  Because I'm under the same, I'm trying to get ready.  But at least I'm not having to brief it, but I'm trying to get ready under the compressed time as well.  So, yeah, I'm happy to do that.  We can do that to help streamline things going forward.

All right.  Anybody else have any ideas, thoughts for the day?

You're going to barely make your flights.

MS. HOPKINS:  We'll make them.

THE COURT:  All right.  Well, we'll be adjourned.
Thank y'all.

MS. HOPKINS:  Thank you, Your Honor.

MS. WILSON:  Thank you, Your Honor.

THE COURT:  Safe travels.

(Proceedings concluded at 2:33 p.m.)

\* \* \* \* \*

## C E R T I F I C A T I O N

I, KAREN K. WATSON, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Karen K. Watson
KAREN K. WATSON, AAERT CET-1039

J&J COURT TRANSCRIBERS, INC.      DATE:  August 6, 2025

WWW.JJCOURT.COM