IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

```
IN RE:                            .     Case No. 23-51715-JAW
                                  .     (Jointly Administered)
                                  .
EL DORADO GAS & OIL, INC.,        .     United States Courthouse
dba EL DORADO OIL & GAS, INC.,.         501 East Court Street
et al.,                           .     Jackson, MS  39201
                                  .
                 Debtors.         .     August 19, 2025
. . . . . . . . . . . . . . . .         10:01 a.m.
```

TRANSCRIPT OF HEARING ON MOTION TO CONSOLIDATE LEAD CASE EL
DORADO GAS & OIL, INC., WITH HUGOTON OPERATING COMPANY, INC.,
BLUESTONE NATURAL RESOURCES II - SOUTH TEXAS, LLC, WORLD
AIRCRAFT, INC., AND EL DORADO OIL & GAS, INC. (1379)

BEFORE THE HONORABLE JAMIE A. WILSON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For Debtors:                Sheehan & Ramsey
                            BY: PATRICK A. SHEEHAN, ESQ.
                            429 Porter Avenue
                            Ocean Springs, MS 39564

For Chapter 11 Trustee      Hood & Bolen, PLLC
Dawn Ragan:                 BY: R. MICHAEL BOLEN, ESQ.
                            3770 Highway 80 West
                            Jackson, MS 39209

                            Kelly Hart & Hallman LLP
                            BY: KATHERINE HOPKINS, ESQ.
                               NANCY RIBAUDO, ESQ.
                            201 Main Street, Suite 2500
                            Fort Worth, TX 76102

For The Bracken Group:      Phelps Dunbar LLP
                            BY: SARAH BETH WILSON, ESQ.
                            1905 Community Bank Way, Ste 200
                            P.O. Box 320159
                            Flowood, MS 39232
```

Proceedings recorded by electronic sound recording, transcript
produced by a transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (CONTINUED):

For First Service Bank:      Okin Adams Bartlett Curry LLP
                             BY: DAVID CURRY, JR., ESQ.
                             1113 Vine Street, Suite 240
                             Houston, TX 77002

                             Butler, Snow, O'Mara, Stevens &
                                 Cana LLP
                             BY: JOHN A. CRAWFORD, ESQ.
                             P.O. Box 6010
                             Ridgeland, MS 39158

For the United States        Office of the United States Trustee
Trustee:                     BY: ABIGAIL M. MARBURY, ESQ.
                             501 E Court Street, Suite 6-430
                             Jackson, MS 39201

For Metropolitan Life:       Adams and Reese LLP
Insurance Company:           BY: GEORGE ROBERT PARROTT, II, ESQ.
                             701 Poydras Street, Suite 4500
                             New Orleans, LA 70139

                          - - - - -

3

# I N D E X

**WITNESSES**                                                           **PAGE**

FOR THE TRUSTEE:

DAWN RAGAN
  Direct Examination by Ms. Hopkins                                       31
  Cross-Examination by Mr. Curry                                          83
  Cross-Examination by Ms. Wilson                                         88
  Redirect Examination by Ms. Hopkins                                    122
  Recross-Examination by Ms. Curry                                       126
  Recross-Examination by Ms. Wilson                                      130

FOR BRACKEN GROUP:

(None)


**EXHIBITS**                                                      **ID**   **EVD**

FOR THE TRUSTEE:

| | ID | EVD |
|---|---|---|
| 1 through 7 | 8 | 8 |
| 9 | 8 | 8 |
| 10  - Proof of Claim 21 | 8 | 9 |
| 11  - Proof of Claim 21 | 8 | 9 |
| 12  - Proof of Claim 25 | 8 | 9 |
| 13  - Proof of Claim 28 | 8 | 9 |
| 14  - Proof of Claim 29 | 8 | 9 |
| 18  - Proof of Claim 28 | 8 | 9 |
| 19  - Proof of Claim 28 | 8 | 9 |
| 20 | 8 | 8 |


FOR BRACKEN GROUP:

| | ID | EVD |
|---|---|---|
| B-1 through B-34 | 9 | 9 |
| B-35 | 107 | 108 |

**WWW.JJCOURT.COM**

4

(Proceedings commenced at 10:01 a.m.)

THE COURT:  All right.  Good morning, everyone. We'll go ahead and get started on the 10:00 a.m. docket.  We have one case on the docket today, El Dorado Gas & Oil, Inc. and World Aircraft, Inc., Case 23-51715.  We've got the Chapter 11 Trustee's motion to consolidate at 1379, the objection filed by the Bracken Group at 1473, the Trustee's reply in support of the motion at 1489, and the third application for compensation for Patrick Sheehan at 1360.

Let's go ahead and take appearances for the record. Good morning.

MR. BOLEN:  Good morning, Your Honor.

Mike Bolen for Dawn Ragan, the Chapter 11 Trustee, along with Katherine Hopkins and Nancy Ribaudo.  Thank you.

MR. CRAWFORD:  Good morning, Your Honor.

Jack Crawford, Butler Snow, for First Service Bank, and I'm here with David Curry of Okin Adams.

MR. SHEEHAN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. SHEEHAN:  Pat Sheehan.  I represent Bluestone Natural Resources II - South Texas and World Aircraft, Inc. I'm here on behalf of myself on the fee app matter.

THE COURT:  Thank you.

MS. WILSON:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. WILSON: Sarah Beth Wilson of Phelps Dunbar here on behalf of the group of royalty owners known as the Bracken Group. I would like to state for the record the members of the Bracken Group --

THE COURT: All right.

MS. WILSON: -- that we are here to represent: K.S. Bracken Limited Partnership, K.S. Bracken, Bracken 1984 Childrens Trust for the benefit of A. Bracken, Bracken 1984 Childrens Trust for the benefit of H. Bracken, Bracken 1984 Childrens Trust for the benefit of R. Bracken, Bracken 1984 Childrens Trust for the benefit of J. Bracken, Bracken Childrens Trust, Bracken Partners Limited, Robert A. Bracken, S. Evans Limited, Linda Bracken, Estate of Sally Fisher, Rocking Fork Royalty Limited, Nancy A. Bracken, Estate of John Price, Mary Jon Bryan, PLC O&G Properties LP, Marshall Trust Number 1, and Price Partners LLC.

THE COURT: Thank you. Ms. Marbury?

MS. MARBURY: Your Honor, Abbie Marbury with the U.S. Trustee's Office.

THE COURT: Let me go ahead and take telephonic appearances.

MR. PARROTT: Good morning, Your Honor.

Robert Parrott for Metropolitan Life Insurance Company.

THE COURT: Good morning.

6

Anyone else on the line that needs to make an appearance?

(No audible response)

THE COURT:  All right.  We'll get started.

Are there other --

(Pause)

THE COURT:  If you're on the line telephonically, I need you to identify yourself.

MR. NEWMAN:  Good morning, Your Honor.

MR. KANE:  Good morning, Your Honor.

This is Ron Kane (phonetic) on behalf of Metropolitan Life Insurance as well.  My colleague Robert Parrott just made an appearance.

THE COURT:  Okay.

MR. KANE:  I simply attend to monitor the hearing.

THE COURT:  Thank you.

MR. KANE:  Thank you.

MR. NEWMAN:  Good morning, Your Honor.

This is Ari Newman of Greenberg Traurig on behalf of MS Facilities 2020, LLC, monitoring the hearing, as well.

THE COURT:  Thank you.

UNIDENTIFIED SPEAKER:  This is David (Indiscernible) appearance for First Service Bank.

THE COURT:  Thank you.

MS. SOLEJA:  Good morning, Your Honor.

7

Sahrish Soleja with the Texas Attorney's General's Office appearing on behalf of Texas Railroad Commission.  I'm just monitoring this hearing.

THE COURT:  Thank you.

MR. ASSINK:  Your Honor, good morning.

This is Brian Assink with Bonds Ellis Eppich Schafer Jones appearing on behalf of Pilot Thomas Logistics.  I'm just listening in today, as well.  Thank you.

THE COURT:  Thank you.

Anyone else on the line?

(No audible response)

THE COURT:  All right.  Now we'll get started.

All right.  Let's start with the motion to consolidate at 1379.  Ms. Hopkins, why don't you start by telling me what exhibits have been stipulated to.  I reviewed Dockets 1491 and 1493 which are the exhibit and witness list filed by the Trustee and the Bracken Group.  Tell me what's been stipulated to.

MS. HOPKINS:  Yes, Your Honor.  And just to address -- Katherine Hopkins on behalf of the Chapter 11 Trustee.

Just to address the Trustee's exhibits and then I'll certainly defer to Ms. Wilson to go over hers, as well.  We filed the witness and exhibit list on Friday listing 22 different exhibits.  Counsel for Bracken and counsel for the Trustee have been discussing what, if any, we can stipulate to.

I'll get to the point now.

With respect to exhibits that are stipulated to, the Trustee's Exhibits 1 through 7 -- I'll list all the ones that are stipulated first, 1 through 7, Number 9, and Number 20.  I believe that those are the only ones that are stipulated to, but I do have -- well, I do have some additional ones that are stipulated to with a small caveat that I want to make clear on the record.

With respect to Exhibits 10, 11, 12, 13, 14, 18, 19, these are all excerpts from proofs of claim that were filed with the Court and they're on the claims register.  We have agreed, counsel indicated they wanted the full document as an exhibit, and that's fine.  We've stipulated to the fact that, for example, and I can go through this, there will be a little bit of duplicity but we figured it's cleaner this way.

With respect to Exhibit 10, that will be the full Claim Number 21.  Exhibit 11, also the full Claim 21.  Exhibit 12 will be Claim Number 25.  Exhibit 13 will be Claim Number 28.  Exhibit 14 will be Claim Number 29.  And Exhibit 18 and 19 will both be Proof of Claim 28.  We have spoken with the Court, and we will provide those documents in full either on a break during this hearing or as soon as we can after the hearing in order for the Court to have the full document.  I know it's on the claims register, but I'm sure for purposes of the record, you'll want to have the hard copy.

9

With respect to testimony and asking Ms. Ragan questions today, I will only be discussing the specific excerpt page that's included in the parties' binder and that was filed.

THE COURT:  So just for clarity, on a break, you're going to go back and get the actual proof of claims for Exhibit 10, 11, 12, 13, 14, 15, 18 is going to be Proof of Claim 28 and 19 is going to be Proof of Claim 28.  And then what did you tell me about Exhibit 21?

MS. HOPKINS:  21, Counsel has objected to that --

THE COURT:  I'll take that one off.

MS. HOPKINS:  -- to that exhibit.

THE COURT:  All right.

(Trustee's Exhibit Numbers 1 through 7, 9, 10, 11, 12, 13, 14, 18, 19, and 20 admitted into evidence)

MS. HOPKINS:  I believe that is the full agreement amongst the parties as to the Trustee's exhibits.

THE COURT:  Okay.  Ms. Wilson?

MS. WILSON:  That's correct, Your Honor.

THE COURT:  All right.  What about the Bracken Group exhibits?

MS. WILSON:  Your Honor, Bracken Group has designated B-1 through B-34, exhibits all filed proofs of claim.  And it's my understanding there is no objection and that has been stipulated to.

THE COURT:  So B-1 through B-34 will be admitted.

10

MS. WILSON:  Correct, Your Honor.  Thank you.

(Bracken Group's Exhibits B-1 through B-34 admitted into evidence)

THE COURT:  All right, Ms. Hopkins, it's the Trustee's motion.

MS. HOPKINS:  Yes, Your Honor.

Thank you, Your Honor.  Katherine Hopkins again on behalf of the Chapter 11 Trustee.  As Your Honor has announced, we are here on the Trustee's motion for substantive consolidation of various entities.

Just for purposes of the record, I will be kind of using the term "entities" today as we did in the motion.  And for definition, it means El Dorado Oil & Gas, Inc.; El Dorado Gas & Oil, Inc.; Hugoton Operating Company, Inc.; Bluestone Natural Resources II - South Texas, LLC; and World Aircraft, Inc., just as a collective group for purposes of kind of moving this along and making it efficient as possible.  To the extent we're going to carve out some of those entities from the full entities, I'll certainly state that and clarify for purposes of the record.

Your Honor, if we can just go back a little bit, I kind of want to rewind to January 2024, that's when the original sub-con motion was filed by El Dorado and  Hugoton seeking specific substantive consolidation of their estates. At that time, the Trustee had just recently been appointed the

11

Trustee in the Hugoton case and had not yet been appointed Trustee, and as we all know, was subsequently appointed as the Trustee for the El Dorado case.

Based on the state of the assets and the issues that were present at the time of appointment, it was necessary for the Trustee to not focus on sub-con then but, rather, focus on the very urgent and other pressing issues that were ongoing at the time of her appointment. For example, like getting operations back online and dealing with the many urgent matters that we've discussed at multiple hearings.

However, throughout her extensive work throughout these cases, she has continued to gather evidence and information and analyze the potential applicability of sub-con in these cases. Over the last few months and especially in light of the fact that a significant amount of the assets have been sold, the Trustee has been able to really turn her focus to an analysis and determination as to sub-con.

As set forth in the motion, there is a substantial amount of evidence and information that supports sub-con in these circumstances. We certainly agree with the case law that sub-con is an extreme remedy. However, I think that the fact that we served this on thousands and thousands of parties, yet received only one objection, indicates that many of these parties, if not all, agree to this appropriateness of the sub-con in these very rare circumstances.

The Trustee has determined and will testify today to the fact that sub-con of the entities is in the best interest of the debtors, the estates, and the creditors.  The scope of sub-con is not a full sub-con where potentially liens and collateral rights would be affected.  It's a limited scope in which the Trustee is solely asking for consolidation and merger of each debtors' assets and each debtors' liabilities for purposes of administrating estate assets and making distributions to creditors.

The motion goes through the significant case law and the many different factors that a variety of courts throughout the country have considered in making this analysis and determination as to a sub-con.  There is a detailed explanation, not just in the motion but also the reply, as to the significant and specific factors that we believe support sub-con here.

As you'll see today and I won't go into each one of them right now because I think the testimony will go through all of that and kind of wrap it up in closing.  But there will be substantial evidence that supports sub-con and we believe will bring the Court comfort in granting our request.

Again, I mentioned a minute ago that the motion here was served on thousands of parties.  It was served on the full matrix, so all creditors and parties in interest were served with this motion.  I believe that was at the end of June.

13

There was an objection date of August 5th.  We did not receive any informal objections, and only one objection was filed of record.

We have discussed the objection with the Bracken Group who's the objecting party and unfortunately have not been able to reach an agreement.  I think this is a little more black and white than some of the other relief we've requested.  For example, it's not a party saying, hey, you breached the contract, you owe us a million dollars and we can meet in the middle at $500,000 payment, right?

I mean, there's either applicability of sub-con and sub-con's granted or it's not.  And I think it's important for us to keep that in mind today as to what's going to be the consequences in these cases if sub-con is not granted and whether or not it will give creditors anything else will actually improve their recovery which is our position, the Trustee's position that it will not.

Just to briefly address on Bracken's objection, they similarly to the --

THE COURT:  Let me stop you one second.

MS. HOPKINS:  Sure.

THE COURT:  I'm sorry to interrupt.

MS. HOPKINS:  No, you're fine.

THE COURT:  But while you're on the point, what is the Trustee's position if the cases do not consolidate today?

14

What's the outcome?

MS. HOPKINS: That it will be -- I will discuss that with her and there will be testimony that it will be a very cost- and time-extensive process of essentially forensic accounting. We're going to have to employ a third party, go through that, and at the end of the day, we do not have -- Trustee does not have certainty that this web will be able to be untangled, which is one of the most important factors that weighs in favors of sub-con is the fact that, you know, what's the cost going to be to the estates which we think will be significant to try to undergo this process and can it even happen. And we don't know if that can even happen.

So just to address, go back to Bracken's assertions here, as the Court recalls in connection with the motion to pay Archrock, Bracken filed an objection to that. And there's similar allegations here that Bracken asserts that they have essentially a lien that is similar to what we call like an M&M lien for service providers and bid providers under Texas law.

So there's two different statutes under the Texas Property Code that we're dealing with right now. We have Chapter 56 which is a lien statute that provides if there is a third-party vendor that provides goods and services, they're able to give a lien on the leasehold, the wells, a variety of things related to the services or goods that were provided. They do not get a lien on the oil and gas itself, nor the oil

15

and gas proceeds.

When you look at Chapter 67, which is what Bracken is asserting a lien under, that is a specific statute dealing with mineral interest owners.  So essentially, mineral interest owners, like Bracken, so a royalty interest owner, can have a lien on oil and gas itself, as well as any sale proceeds from that oil and gas.  We're not talking about the sale of the lease.  We're not talking about the sale of the wells.  These are very two different and distinct statutes.

And today Bracken is saying under that second statute, Chapter 67, that they actually get something more akin to a lien under Chapter 56.  We are not here today for adjudication or determination of their lien rights.  However, we do want to make it clear that the Trustee's position with respect to Bracken Group is that they do not have a lien similar to Chapter 56 as M&M lien right holders.  To the extent there was any oil and gas or production proceeds, they could potentially have a lien on that pursuant to Chapter 67.  But otherwise, the Trustee disputes the lien assertion by the Bracken Group.

THE COURT:  And agreed, we're not getting into --

MS. HOPKINS:  Sure.

THE COURT:  -- what Bracken's lien is or is not today?

MS. HOPKINS:  Really just for purposes of the record.

16

THE COURT: I guess my question is, how does the -- you gave me a proposed order, and in the proposed order, "Nothing in this order is intended to or shall be construed as impacting the legal and corporate structures of the debtors nor affecting pre- and post-petition creditor liens and lien rights or the collateral subject thereto."

I guess my question is what I need to understand from you and the Bracken Group today is how does that provision not protect claimants like the Bracken Group?

MS. HOPKINS: Sure. So it was our intention to the extent that there are any valid liens. Like, for example, just assuming arguendo that the Bracken Group does have a valid lien here, then they are not impacted by this proposed sub-con. That's why we specified those exact provisions in the motion as well as in the order. We wanted to make abundantly clear we are not preferring or treating somehow some secured creditor more favorably to the detriment of an unsecured creditor group. And we even inserted -- included a case law in our motion discussing that and why we wanted those provisions in there.

So, yes, to the extent Bracken does in fact have a lien, and we dispute, but regardless, if they have a lien, it's not impacted by this. So I'm a little unclear on what the issue is there. But we're here, so we want to make sure it's abundantly clear that that is not the debtor -- excuse me, the Trustee's intention here.

17

And that brings me to my next point of the Bracken's objection went through in a number of places, having an issue with the fact that allegedly the Trustee cannot make full and complete or has not made full and complete disclosures as to the debtors' assets and the debtors' liabilities.  But I think that the motion also addresses this, as well.  I mean, that's the whole point of sub-con.  I mean, that is one, you know, big issue that we're dealing with.  Because of the Trustee's inability to, with certainty, delineate each debtors' estate's liabilities, it's another reason in favor of sub-con. I mean, we are not able to get to that point.

And, again, there will be evidence to that today that, you know, it would be a costly, very time-intensive process, which, again, may not be able to be resolved.  And certainly, the Trustee has determined that it would not, even if it was resolved, it's not going to put these creditors in a better position.  It's not going to improve their recovery. So, ultimately, we believe that the evidence today will provide sufficient grounds and standing for the Court to grant our motion.  And, as a result, we ask that the Court enter the proposed order today.  Thank you.

THE COURT:  Ms. Wilson.

MS. WILSON:  Good morning, Your Honor.

The Bracken Group's concerns and the basis for its objection stem nearly wholly from the fact that we are unable

18

to determine, based on the reports and filings by the Trustee in the case, whether or not and to what extent the interests of the Bracken Group will be impacted in the event this Court permits substantive consolidation.

As Your Honor raised previously, in the event that the order, which it absolutely should, contain provisions that provides that all liens and interests will remain in place and consolidation won't impact any secured liens, to the extent there are any, the Trustee is attempting, in this instance, to demonstrate, ultimately, according to the Trustee and Counsel, that the Brackens' interests are, in fact, unsecured, as opposed to secured.

THE COURT: You think she's trying to do that in this proceeding?

MS. WILSON: No, Your Honor. What I'm concerned, the Bracken Group is concerned is because, in the event of substantive consolidation, to the best of our ability to tell, based on the filings and the cases, we are unable to determine with any measure of definite confidence about what the unsecureds' payments will look like in the event of consolidation versus in the event of separateness of the entities.

Counsel just mentioned here at the podium they're not able at this juncture to determine or delineate the extent of the liabilities owed by each of the entities. That's very

19

concerning because, in the event of substantive consolidation, of course, all of the claims of all of the creditors are all going into a pot and all of the assets of all of the entities are going into a pot. And in terms of classification of claims and potential dilution of claims, the Bracken Group has a very grave concern because the assets-to-liabilities ratio, as to each of these entities, we are not able to determine from the filings. We're looking forward to hearing evidence from the Trustee on this point.

And respectfully, Your Honor, there is a very heavy burden associated with demonstration of proof that substantive consolidation, which is essentially the most drastic of remedies available based in equity in bankruptcy court, is proper here. And it's the Bracken Group's contention that the Trustee has not carried that evidentiary burden.

The Trustee asserted in its reply that the Bracken Group's response is essentially made of conclusory statements. That is also what the motion itself is comprised of. And we look forward to hearing the evidence that the Trustee plans to put in front of the Court to show us exactly what are the liabilities and assets of each entity presently, what are the ratios of assets to liabilities, and what will the ratio be upon consolidation of all assets and liabilities.

How will the treatment of unsecured claims be impacted in the event of consolidation? What is the likelihood

20

for recovery in the event of not consolidation versus consolidation of these entities?  What is the likelihood for dilution of the claims and interests, particularly of the Bracken Group?

We also have not seen, Your Honor, a demonstration by the Trustee by its motion or otherwise to date that the creditors will in fact be benefited by virtue of a consolidation order in this case.  What we know is there are some assets in some places.  What we don't know is what this looks like in the event of consolidation.  There's no pro forma or forecast that's been provided by the Trustee.  We don't have any information or evidence concerning where the guess is coming from in terms of how much it will cost.

Commingling of assets, interests, or business activities is not sufficient under the case law.  The case law makes very clear that, while commingling and other similar types of activities which are common in affiliated business entities is often present in cases where courts have permitted substantive consolidation, it is point blank not enough.  They carry the burden to demonstrate extensive commingling to the extent of an impossibility of unraveling at a cost that is not only prohibitive, but near impossible for the estate to bear the cost and benefit to all creditors.

We have not even seen an assertion that all creditors will be benefited by substantive consolidation, much less

21

evidentiary demonstration.  Right now what Bracken Group knows is that the Trustee is in possession of AWP sale proceeds.  The AWP sale concerned hundreds of wells owned by the Bracken Group that are subject to releases, and those leases were given valuations in the AWP purchase agreement in excess of $4 billion.  And the Bracken Group has been unable to even quantify their claims.

As was mentioned in the previous hearing, Your Honor, the Bracken Group has been requesting information that they have needed in order to amend and make complete their proofs of claim.

THE COURT:  That was part of the agreement with Archrock.

MS. WILSON:  That's correct, Your Honor.  For pre-petition royalty obligations owed.  The Bracken Group did file proofs of claims as are shown by those in evidence now, but many of those proofs of claim state as the amount unknown.  And that's because in order to calculate the amounts owed, we need production records from the wells and revenue records, and we do not yet have those amounts.

The known amounts based on the calculation that was agreed to early on prior to filing of the proofs of claim based on prior payments is around a minimum of $700,000, and this is consistent with what has been reported by the Trustee's counsel to us that their investigations so far demonstrate that at

22

least that much is owed.  There was also over $200,000 owed to the Price Group, which was, according to records that we have in our possession from correspondence with PetroLedger, was being held in suspense, which the Trustee cannot account for.

It's my understanding that it disappeared or it allegedly was not ever held in suspense.  But in any event, there is case law supporting, Your Honor, that these monies, to the extent that there was production and sales revenue from the wells subject to the Bracken leases, that all of those amounts, unless and until the full amount of the unpaid royalty obligations are paid, all of those amounts are Bracken's money, and the interest held by the estate is only a -- let me see, it's a -- excuse me just a second, an equitable title, Your Honor, that the actual monies are owned by the Bracken Group, the ones who have the royalty amounts that are owed to them.  And there is a lot of case law supporting this proposition.

Also, Your Honor, it's very important to note this.  We are not here to determine the nature, extent, or priority of Bracken's liens.  But what is very clear from the applicable law here is that Bracken's liens are in fact real property liens that were automatically perfected and that are inherent by virtue of their ownership under applicable Texas law.  And Counsel is correct in the way of they are not anything like Section 56 liens, like M&M liens, because those are security interests.

23

What the Bracken Group has are actual liens, which are real property interests under Texas law. This will be litigated and determined at a later date, Your Honor, but it's very important, in my view, for purposes of this proceeding. There is no unsecured creditors' committee here. What is transpiring, in large part, is the Trustee, to the extent in cooperation with FSB, is putting before the Court what is best in their view for administrative purposes.

The case law has made very clear that administrative convenience or streamlining for administrative purposes is nowhere near close enough to carry the burden to demonstrate that substantive consolidation is proper. And it's the Bracken Group's view, Your Honor, that the Trustee has failed in a very significant way to carry their burden of demonstrating that this remedy is proper here.

THE COURT: Ms. Wilson, let me make sure. Your Proof of Claims B-1 through B-34, they were filed in the El Dorado case?

MS. WILSON: Correct, Your Honor.

THE COURT: Were they filed in any of the other cases or just El Dorado?

MS. WILSON: Only El Dorado, Your Honor. So Bracken Group's concern here, Your Honor, is that the AWP sale proceeds to which our lien, which is a real property lien, attached by virtue of this Court's sale order, will go into the pot and

24

will disappear well before possibly we even receive the data that we need to calculate the full extent of the claims, the full extent of the royalty obligations that remain owed to the Bracken Group.

By our best estimation, at minimum, it's more likely than not, Your Honor, that the Bracken Group is owed somewhere around or upwards of $1.25 million.  The statutes under Texas law provide for attorney's fees also for the Bracken Group under Section 67 liens.  The point being, Your Honor, the Trustee has admitted they have not yet been able to and/or have not calculated the royalty obligations that are unpaid and remain owing to Bracken Group.

The Bracken Group does not have the information that it needs to do that.  And the Bracken Group is gravely concerned that in the event the Court allows for the Trustee to put all of this money into a big pot and then starts paying it out, whether it's under the terms of a plan or otherwise, that the money to which Bracken Group's lien actually attached as a result of the sale of the AWP wells and leases will be gone by the time we're able to demonstrate for the Court that our lien is perfected and in fact attached to the proceeds.

THE COURT:  Why can't your claim be adjudicated before the plan?

MS. WILSON:  That would make sense to the Bracken Group, Your Honor, and is in fact very much what the Bracken

Group desires to happen here. The Bracken Group's been requesting since before the petition was filed and then repeatedly immediately upon filing and from and after the appointment of the Trustee the records required to calculate their claims because, of course, Your Honor, it's very difficult for the Trustee to pay over the amount owed to the Bracken Group if no one knows how much that is, actually.

The Bracken Group has recently retained its own independent royalties auditor who is presently in the process of working to prepare the actual amounts owed as to each of the unpaid royalty obligations subject to the leases. We are awaiting receipt of the PetroLedger data because to some extent proper reporting of production records on each of the wells through the Railroad Commission is required in order for public data to be utilized reliably to calculate the claims.

In all events, we are close to a place where on our own, even before having received any records or information from the Trustee, to being prepared to prepare and file amended proofs of claim at which point, Your Honor, the Bracken Group would like to have adjudication on the secured status of its lien and to have its claims paid.

Importantly, for example, Your Honor, even Collier makes plain that most courts who regularly adjudicate issues of royalties obligations owed both pre- and post-petition do it on first-day motions. In fact, it's one of the rules for complex

26

procedures in Texas is that debtors can pay royalties obligations owed in outstanding, including subject to and pursuant to Section 67. And the reason is because those monies are Bracken Group's.

THE COURT: Let me ask you this, and we're not getting into your claim, but I just want to get an understanding about how your client is situated. When's the last time they were paid a royalty?

MS. WILSON: The Trustee has been remitting post-petition --

THE COURT: Post-petition? Right.

MS. WILSON: Yes. Correct, Your Honor. So the periods that are missing were an unpaid period pre-petition plus post-petition pre-appointment.

THE COURT: So let's talk about, I want to understand the pre-petition. Did your client did any payments while Mr. Swarek operated? You don't have to tell me definitely. I'm just --

MS. WILSON: Well, I just have to admit, Your Honor, I don't know what period he was or wasn't operating. But they were receiving all of the required royalties payments up through, I believe, and I can check the sticky note real quick to just confirm, but I believe through May of 2023. It's June 2023 through February 2024 that have been unpaid for royalty obligations.

27

THE COURT:  That helps me.

MS. WILSON:  And so the Bracken Group's concern, Your Honor, is that unless and until the full amounts accurately of the unpaid royalty obligations owed to the Bracken Group have been calculated and, two, have been determined by this Court to be subject to Bracken Group's secured lien -- which is inherent and which automatically perfected, and which continues unless and until all unpaid royalty obligations are paid -- that this Court putting all of the assets into a big pot and then allowing all of the claims of all of the entities, especially where it's been made clear that we're not even really sure what the liabilities are of all of these entities, and we have no idea what the ratios are going to do.

To the extent that this Court didn't determine that the liens of Bracken Group are, in fact, secured, we don't have any way of determining what substantive consolidation does with respect to Bracken Group's interests.  We are confident, however, Your Honor, that upon the Court's consideration of the matter, that the Court will, in fact, determine that the Bracken Group has secured liens on and with respect to the AWP sale proceeds as a result of this Court's sale order, as a result of this sale having concerned all of the wells and the leases of the Bracken Group with unpaid royalties outstanding at that juncture.  At that point in time, the lien continues and remains in place until the full amount of unpaid royalty

28

obligations are satisfied.

Your Honor, the Bracken Group proposed carve-out protective measure for purposes of an amount sufficient to pay at least a large portion --

MR. CURRY:  Are you talking about the settlement discussion?  Are you disclosing settlement offers to the Court?

MS. WILSON:  Oh, no, excuse me, I'm sorry if it sounded that way.  No.  Proposes -- does that make sense?

Bracken Group proposes, Your Honor, that a protective measure be taken with respect to what the Bracken Group sees as being its collateral subject to its secured lien and would otherwise be fine with proceeding with substantive consolidation.  But the Bracken Group requires assurances that its funds that are subject to its secured liens won't be lost, dissipated, or used to pay claims of other creditors of other debtor entities to extents which remain entirely unknown.

Thank you, Your Honor.

THE COURT:  Mr. Curry?

MR. CURRY:  Thank you, Your Honor.

David Curry on behalf of First Service Bank.

Your Honor, you asked a really important question early on, which is what happens if we don't substantively consolidate.  Apparently, the Bracken Group's position is that our cash collateral should be the only cash collateral that should be used to fund this case.  We don't think that that's

29

appropriate. We also don't think that we're proposing to use their cash collateral, but that's not what today's about.

One last thing on their lien, which is the issue is not an adjudication of whether or not a lien exists. A lien exists. This is a secured claim valuation issue. We have to identify the collateral and determine whether or not that collateral was or was not there on the date of the petition and what the value of that collateral was when we're valuing the claim. The problem that the Brackens are going to deal with is the fact that their collateral was dissipated by the debtor pre-petition, and there's nothing that this Court can do to fix that.

But on sub-con, this Court has heard an abundant amount of evidence regarding the complications and problems that have arisen just in administering the Chapter 11 case, dealing with the corporate confusion, the title issues, and everything else. So there's certainly been a showing up before now, and sub-con has been talked about numerous times at multiple hearings.

But at the end of the day, we get to choose where our cash collateral is spent and how it is spent. And at the end of the day, the cost of a forensic analysis that it would take to even begin to determine if and how that unscrambling would proceed is so burdensome that our client is not willing to allow their cash collateral to fund that process.

So where that leaves us is, is we can move forward with a plan if there's a path to getting a plan done and, if we can't, then the case is over as an 11. It converts to a 7. And --

THE COURT: Just bottom line it. Are you saying that if the case doesn't consolidate, we're looking at 7s?

MR. CURRY: We are also looking at potentially just keeping it in an 11, but that has its own problems. And without a path to a plan, and there is no path to a plan without sub-con. It's more than just a cost issue. There's -- just getting everything in place that would need to be done to satisfy creditor claims and put together a plan, I mean, you have some debtors where it's not even clear whether they have assets or not, and yet they may have creditors, and whether they had operations -- or all the questions that we've been dealing with throughout these cases.

And so while it's not a coin toss, right, if sub-con is not granted, then the only thing that can happen is convert it to a 7. But it is the most likely outcome.

THE COURT: On behalf of the UST? Anyone else before we get started with the testimony?

(No audible response)

THE COURT: Ms. Hopkins, are you ready to proceed?

MS. HOPKINS: Yes, Your Honor.

I'd like to call Ms. Ragan, Ms. Dawn Ragan, to the

stand, please.

DAWN RAGAN, TRUSTEE'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. HOPKINS:

Q    Good morning.  Can you please state your name for the record?

A    Dawn Ragan.

Q    Ms. Ragan, can you please -- I know we all know this, but really just to get our record straight, can you please explain your role in these different cases?

A    I am the Chapter 11 Trustee for El Dorado and Hugoton.  I am an independent director for World Aircraft, and I am the independent manager for Bluestone.

Q    Do you recall an approximate time period when you were appointed as Trustee and appointed as the independent director and independent manager for the respective entities?

A    I was appointed as the Trustee for Hugoton in late January of 2004.  I was appointed as the Trustee for El Dorado, I think it was February 2nd.  It was early February of 2024.  And I believe the corporate authority order appointing me as independent director and manager, I think, I'm not certain, but I think it was in May --

Q    Okay.

A    -- of 2024.

Q    Okay.  Are you familiar with the sub-con motion that's

Ragan - Direct/Hopkins                     32

being considered today?

A    Yes.

Q    And did you include information related to your personal knowledge of investigating in these cases?

A    Yes.

Q    Was there a prior motion requesting sub-con filed earlier in these cases?

A    Yes, Mr. Sheehan filed a motion for sub-con.

Q    Do you know approximately when that was filed?

A    I think it was just before I was appointed as the Trustee in El Dorado. So --

Q    Okay.  So, sometime around when you were appointed as the Trustee of Hugoton?

A    Yeah, early February of '24.

Q    Okay.  At that time, had you completed an investigation and made a determination as to sub-con of those two debtors? Sorry, Hugoton and El Dorado.

A    I had not made any determinations at that point in time.

Q    And why is that?

A    Because I had just been appointed, I didn't have any information yet.

Q    Sure.  So now that you've filed this motion, is it safe to say you can represent that you have done, to the best of your ability, a full investigation and made a determination as to the appropriateness of sub-con?

Ragan - Direct/Hopkins                33

A     Yes.

Q     And we'll kind of go into specifics regarding your investigation, but can you tell me generally why you believe sub-con is appropriate in your business judgment?

A     As indicated in my status reports and in testimony in various matters in this Court, we've discussed time and time again how the debtor kept their books and records.  It was basically a consolidated enterprise.  It was all treated as one.

So El Dorado is the parent.  It was viewed as the parent and the primary entity.  Vendors, employees, everybody viewed it as El Dorado and/or Swarek.  And money moved freely between accounts based on where money was and where they had to pay a bill, with a lot of it coming from El Dorado.  El Dorado was generally the check-writer and the one that got the benefit of the cash.  And El Dorado was the parent entity for tax purposes.
So all the entities were consolidated under the El Dorado umbrella.

Q     Thank you.  And again, we'll go into a little more detail as to each of those different topics you mentioned, but I think that's helpful to get a good general understanding.

The relief requested in the motion, is it a full sub-con or is it more of a limited scope?

A     Limited.  So not looking to change the structure of the

Ragan - Direct/Hopkins                    34

entities.  It's limited to the extent of administering the assets of the estate and making distributions under a plan.

Q    Okay.  And just for clarification, which, when we say the entities today, without further delineation, who are we referring to as the entities?

A    Well, there's the four debtors and then there's a non-debtor entity that's an AKA or a DBA, El Dorado Oil & Gas, as opposed to El Dorado Gas & Oil.

Q    Okay.  So the four debtors, El Dorado -- so EDGO, El Dorado Gas & Oil, Hugoton, World Aircraft, Bluestone, as well as El Dorado Oil & Gas, EDOG, you're requesting, to the extent it's a separate entity, you're requesting this limited sub-con for all of those entities?

A    Yes.

Q    Do you believe that the scope of the requested sub-con is appropriate based on the circumstances present here?

A    Yes.

Q    Are you seeking, I think you mentioned, you know, not trying to affect corporate structures.  Are you seeking to impact any pre- or post-petition liens or security interest?

A    No.

Q    Are you seeking to impact any collateral rights via sub-con?

A    No.

Q    Do you believe that sub-con for the entities is in the

best interest of the creditors?

A    Yes.

Q    And why is that?

A    Well, first, I think it would be impossible to untangle this mess and determine what the entities would look like if they had to be deconstructed.  I think it's important to remember that there are not just four debtor entities.  Mr. Swarek created over 100 entities, plus the Escambia Entities, and so money moved between a variety of entities, not just the four.

So if you were going to deconstruct, I'd have to hire a forensic accountant, and they would have to build out all of the activity for all of those entities and trace all of the money movement.  And then there's the question of how far back do you go.

Q    Okay.  We can revisit that in a minute.  I want to talk a little more and focus on your investigation first and kind of how you made this determination that sub-con was appropriate.

A minute ago, you mentioned a number of things, such as Hugoton was a parent under the tax return, all of those things.  Can you explain the corporate structure of the entities and their relationship?

A    So El Dorado is considered the parent.  El Dorado is owned 100 percent by Tom Swarek.  El Dorado is the direct or indirect parent of the other three debtors.  So on the tax return, it

shows that it owns 100 percent of Hugoton.  Hugoton owns 100 percent of Bluestone, so that flows up to El Dorado.  And World Aircraft is not listed specifically or independently on the tax return, but the global notes and the schedules and statements and the petition, everything that was filed for World Aircraft indicated that El Dorado was the parent.

Q    Okay.  Who were the officers and directors of these entities?

A    Mr. Swarek was the only officer and/or director of all of the entities that he created, to the extent that I researched them.

Q    To your knowledge, were there any other decision-makers?

A    Not to my knowledge.

Q    And who formed the entities?

A    Mr. Swarek did.

Q    Okay.  Can you go through from operations standpoint and tell us what did each of these entities do?  What were their operations?

A    El Dorado owned oil-and-gas leases.  It operated some of its own oil-and-gas leases.  Hugoton owned a few minor amount of oil-and-gas leases in its name, but it was primarily the owner of the Bluestone stock, and it was the operator of Bluestone, Hugoton, and some El Dorado leases.

Bluestone wasn't really an entity other than to own in name those leases.  It didn't operate.  It didn't have any bank

accounts. And World Aircraft was formed as a tax-exempt entity to buy and sell -- I don't remember if it was to buy and sell aircraft or buy and sell equipment, but buy and sell equipment.

Q    Okay. Let's kind of group the oil-and-gas entities together, so Hugoton, Bluestone, and El Dorado and talk about those first. Did those oil-and-gas entities, did they provide any services to each other?

A    Yes.

Q    Great. And I think you kind of mentioned Hugoton being the operator. Was there any other services?

A    The entities did not provide any services to any third parties that I have ever ascertained were in my investigation interviews with management and office people. They only provided services to each other.

Q    Did Bluestone have any independent operating business?

A    No.

Q    And then for any entity that was a recipient of these services, did they pay in exchange for these services?

A    No. As an operator, so Hugoton, for instance, I would have expected that they would get a management fee or an operator fee, but there were no contracts, no agreements, no payments. And that's, again, one of the things that would have to be established if you were trying to deconstruct the entities. You'd have to try to ascertain what would be the appropriate value of services provided.

Q    So what about operating expenses with third parties?  Did the Oil & Gas Entities pay for those to the extent it was provided to them?

A    The Oil & Gas Entities paid vendors who provided services to them, but there was not a clear delineation of those services being provided to, I'm going to just lump Hugoton and Bluestone together, versus El Dorado.  There was a lot of confusion with the invoices in that regard.

Q    Okay.  And let's talk about that.  For invoices that were subject to like a contract or agreement, did each entity enter into separate contracts and agreements that were clear who the party was to that agreement?

A    The only real legitimate contracts that I recall were those related to compression.  I think everything else was, for the most part, month-to-month agreements, and the vendors would invoice one entity or the other, but it wouldn't necessarily be the appropriate legal entity.

Q    Were those invoices actually paid and, if so, do you know where the funds came from?

A    So, as we've discussed, cash is fungible, so there might be cash in an El Dorado account, and bills would come in and get paid by El Dorado.  There might have been a bill that came in from Hugoton, and there might have been cash in a Hugoton account, and it might have been paid out of a Hugoton account.  It also might have been paid out of an El Dorado account, or

money might have been transferred from one entity to the other entity to pay that bill.

There was no discretion or I should say it wasn't discreet. There was no recordkeeping. It was not clear. There were no clear lines as to where things should have been paid as opposed to where they were actually paid.

Q    Okay.

A    And there was no tracking at all of the intercompany movement of cash.

Q    Essentially, when bills were being paid, it sounds like the entities just kind of paid out of wherever the account had money, despite who was the owner of that account. Is that right?

A    That's correct.

Q    Okay. And what about oil-and-gas production? Was the revenue expenses related at production taken care of? Were funds reconciled? Can you tell us a little bit about that?

A    So there was an account set up called AWP, and there was another account set up that was called Blackbeard, which related to the Bluestone acquisition.

And if an entity bought -- well, let me back up. So entities like a Kinder Morgan or a Plainfield or whoever would buy production from the debtors, oil-and-gas production, primarily gas. And the debtors did not invoice them. So the wells have meters and they have charts and whatnot that define

what the production is.  And then all of that production information is reported every month to the Railroad Commission, so it's all publicly available what the production was.

Then we take -- I'm sorry, the debtors would take that same production and they would report it to PetroLedger. PetroLedger -- which used to operate under a different name -- PetroLedger would then take that production and they would take the data that they had from the leases related to royalty percentages, allowable deducts and things like that, and they would compute what the royalties would be.

I think if I'm going too far afield of your question.

Q   Oh, that's okay.  We can kind of -- it segues into my next question.  You just mentioned PetroLedger would assist in determining the amount of the royalties to be paid. Once that occurred, did the debtors, did the entities actually pay the royalties?

A    Oh, thank you.  So an entity -- so there was not invoicing was where I was going with my point.  And then let's say Kinder Morgan, for instance.  Kinder Morgan would buy production that might come from AWP wells and it might come from what they refer to as the Blackbeard or the Bluestone wells.  Kinder Morgan would write one check and they would deposit it in, you know, whichever account.  So there would be a deposit made into an account that was called AWP or Blackbeard, but it might have been paying for production that was for two different debtors.

Ragan - Direct/Hopkins                        41

Q    So somebody, for example, Kinder Morgan as a purchaser didn't differentiate between the different Oil & Gas Entities, didn't specify what it related to, they just --

A    They would show on the data that they sent in what they were paying for, but they would write one check as if the entities were, you know, the same.

THE COURT:  Ms. Hopkins, can I ask one question here?

MS. HOPKINS:  Absolutely.

THE COURT:  Ms. Ragan, when you talk about the debtor wasn't invoicing, should the debtors have been invoicing?

THE WITNESS:  Not necessarily.  We follow the same procedure today.  So the information is all publicly reported every month and that same data goes to PetroLedger and the lease accounting is pretty intricate and involved.

And so we have a regulatory person who will compare every month what the production is versus what's paid.  And if there were an issue, then we could go back to somebody with an invoice discrepancy, which was incidentally how we came up with the issue with Mr. Pena, understanding that we didn't get paid, that, you know, someone else got paid for Kinder Morgan production because we reconciled each month.

THE COURT:  Thank you.

BY MS. HOPKINS:

Q    So pre-petition and using this -- well, let's go back to what you said, Kinder Morgan would submit one check.  Once that

Ragan - Direct/Hopkins                    42

check was -- or payment, one payment -- once that payment was received by the entities, did the entities, did they delineate the amount attributable to each entity's production?

A    No, they just deposit or record the deposit that they received.  Most payments, strong majority of payments are just ACH'd.  There are a few hand checks that they would deposit.  Whether it's the ACH or a hand check, they would just deposit it in whatever account it was made out to.

Q    Okay.  So if the account -- if the ACH was submitted to a Hugoton bank account, the debtors pre-petition did not, you know, transfer a portion that was attributable to El Dorado or another debtor entity.  I mean, they didn't transfer it to another account to make sure that the proper entity received the proper payment?

A    No.

Q    Okay.

A    No.  The debtors believed it was all Swarek, all one entity, so it didn't matter.

Q    Okay.  Were royalties paid pre-petition?  I mean, were they actually paid and paid timely?

A    They were paid, as I understand it, pretty regularly up until the summer of 2003.  Not even a consistent bright line cutoff going through the PetroLedger data.  It seemed like there were -- everybody got paid through April.  Some people got paid May and June.  I think most people did not get paid in

Ragan - Direct/Hopkins                    43

July.  There were a couple of manual checks that went out.  I think he was just paying the squeaky wheel.  But sometime in the summer, May, June, July, was when regular payments stopped.

Q    Okay.

A    Of '23.

Q    And you mentioned that the entities did not transfer funds even if they were attributable to a different entity's production.  Were there any other corporate formalities followed by the Oil & Gas Entities in connection with revenue and payment of -- receipt of revenue and payment of expenses?

A    Not that I could ascertain.

Q    Okay.  Was there ever any confusion related to mineral interest owners or vendors based on the lack of corporate formalities?

A    Yes.  When I was first appointed, I got many phone calls from people, from mineral owners, from vendors, saying, I don't know what to do.  I got this information in the mail about filing a claim.  I don't know how to fill it out.  I don't know how to determine my amount, which is a reasonable expectation that mineral owners wouldn't have been able to do that themselves.

      I mean, there is the baseline data, the public data.  But as I said, PetroLedger looks at other adjustments and whatnot.  Vendors would say, you know, I don't know what the difference is between Hugoton and El Dorado.  What should I do?  And I

Ragan - Direct/Hopkins                              44

would tell them, you know, either file it where you think is appropriate or you can file it in both cases and put a note in there, you know, explain, you know, attach your backup. But there definitely was a lot of confusion.

Q   Let's talk about the operations of World Aircraft. I think you mentioned a minute ago it was formed to buy and sell personal property.  What kind of personal property did it buy and did it ever sell any property, to your knowledge?

A   Most of the World Aircraft activity that I evaluated related to Mr. Swarek was using Main Street loan proceeds to buy personal property and equipment at auctions.  And he bought a few planes or plane carcasses.

Q   Are you aware, I mean, was it the normal operations of World Aircraft to sell property that it purchased?

A   In my investigation, I don't recall finding that Mr. Swarek ever sold anything.  But I am told that over time there was a piece of equipment sold here, a piece of equipment sold there, but that sale would get recorded on the El Dorado books.

THE COURT:  Ms. Hopkins, can I ask a question about World Aircraft?

MS. HOPKINS:  Yes.

THE COURT:  When was World Aircraft created by Mr. Swarek?  Do you know?  Has it ever operated, I guess in other words, as something else?  I'm trying to figure out what was the purpose of World Aircraft.  Was it just a holding company

Ragan - Direct/Hopkins                    45

for this equipment?

THE WITNESS:  I don't recall the date that it was formed.  I can go back and look that up on a break.  But it's my understanding that Mr. Swarek was a pilot and that he wanted to expand and buy some other planes and have some aircraft.  But ultimately, the purpose that I saw in my investigation was that it was the title holder for the assets that he was buying at auction.

THE COURT:  Thank you.

BY MS. HOPKINS:

Q    Can you explain the typical process -- well, you did a little bit about the auction.  How did World Aircraft purchase personal property and then how was the purchase funded?

A    That was probably one of the first things I investigated because it was so confusing to me.  So, World Aircraft didn't have any money and it didn't have an operating business.  So, I didn't understand how it was acquiring these assets and how these assets were titled to World Aircraft.

In a nutshell, basically what I discovered is that Mr. Swarek would bid on assets at auctions.  He would register the buyer as World Aircraft.  The auction house would invoice World Aircraft and they would do the bill of sale to World Aircraft, but the payment came from El Dorado.  In some cases, there were some payments that came from Escambia, but most of the payments came from El Dorado.  And I don't think the auction house cared

Ragan - Direct/Hopkins                                    46

who gave them the money.

Q    Do you know why a payment was made that way?

A    I believe that there might have been other reasons, but I believe that it was done that way for two reasons.  One is that Mr. Swarek could then avoid paying taxes if he did it through World Aircraft because he formed it as a tax-exempt entity for buying and selling equipment.  And the other reason the payment was made that way is because all the cash was in El Dorado.

Q    So was it a similar type of process as we discussed with the Oil & Gas Entities that typically El Dorado, but really wherever, whomever held accounts where money was held could have been used and often was used to pay the purchase price of the equipment?

A    Yes.

Q    Okay.  When the personal property was purchased, did World Aircraft update any title or registration documents that needed to be updated?

A    I don't know if there was anything that was ever updated. It is certainly possible that there were some things that were updated, but in going through the Tiger sale process, we found that there were many, many instances, if not, I probably shouldn't say all, but the majority of time that we were selling assets and trying to transfer them to the buyer, the title was not in a name that we could transfer.

It might have been in the name of World Aircraft, but it

might have also been in the name of the entity that the assets were acquired from, because if Mr. Swarek registered them, he would have had to pay the tax and registration fees. And so we had to go through a lot of machinations and jump through hoops with the Tiger sale process to actually transfer the assets, because we first had to either get title in the name of the debtor or we had to just do bills of sale without title.

Q   And you mentioned the Tiger sale process. What are you referring to there?

A   Tiger is the company that we hired to sell all the equipment assets.

Q   Have substantially all of World Aircraft's personal property assets, to your knowledge, been already sold?

A   Yes.

Q   Okay. In that process, have you and the debtors' team worked to correct title or any issues related to that, maybe worked to do so in connection with purchases at auctions, post-petition auctions?

A   Yes. Where we had to because a purchaser wanted to have a title, we would do the registration, we would file the documents. We would pay the tax and registration fees. But in other cases, we were able to just do a bill of sale, so we didn't have to pay to register and then have the buyer pay again.

Q   Okay. And the relationship between the entities, you

Ragan - Direct/Hopkins                    48

mentioned it's all Swarek, all of that, did they function as one, or were they separate entities, or was it almost like internal divisions of one of the entities?

A    It was more like internal divisions, if you could even go so far as to say there was enough separation to call them a division.  They viewed Hugoton as an operator, World Aircraft as the holder of equipment assets, so divisions within El Dorado --

Q    Okay.

A    -- or segmentation within El Dorado.

Q    For any of the intercompany transfers, were those recorded in the books of the entities?

A    No.

Q    And what about ad valorem taxes?  I'm kind of skipping around a little bit here on some of these remaining points. But for ad valorem taxes, were all of these accounts, tax accounts in the proper name?

A    No.  We found ad valorem tax bills that might have, for instance, been the name of Hugoton, but Hugoton was the operator.  The title was actually El Dorado.  So there were some instances where we found that, that the taxing authority, the county, was putting down the owner's name as Hugoton instead of El Dorado.

Q    Okay.  Let's move on to employees and service providers. Were there separate employees for each of the entities?

Ragan - Direct/Hopkins                        49

A      Yes and no.

Q      Can you expand on that?

A      There are basically three groups of employees.  There are the folks in the corporate office, which I generally refer to as Gulfport, and then there's the folks in the field.  The folks in the field were basically divided into AWP and they refer to them as Zapata.  Zapata was South Texas-Hugoton-Bluestone.

They were paid by a third party, another Swarek entity.  So the group, the original group that was servicing the AWP assets were paid by an entity called Excell, which was owned by, I believe, Mr. Swarek's daughter and son-in-law.  And then after he acquired Bluestone, he set up another, we call them PEOs, another payroll entity called Zapata Excell, and that entity paid the employees who came with that transaction.

But over time, the employees in the field all moved around.  They were servicing, you know, all assets.  If Mr. Swarek needed something over here, you know, he might send somebody from over there.  So they all viewed themselves as working for Mr. Swarek and El Dorado.  I don't think there was any distinction as far as, like, Excell was concerned.

THE COURT:  Who owns the Zapata Excell?

THE WITNESS:  The same.  To my understanding, it was his daughter and son-in-law, Michael and Lisa Booth.

BY MS. HOPKINS:

Q    Did the employees ever provide any benefit to the entities via their services?

A    Sure.  They were, you know, providing the operating and bookkeeping services.  So they were paid by a third party, technically employed by the third party, but for the benefit of the debtors.

Q    Okay.  So I believe what I'm hearing is that the employees were not aware of which entity they were really employed by. They just worked for the whole organization.

A    Yes.

Q    Okay.  Did they have any need -- did the employees see any need to distinguish between the different entities?

A    No.

Q    Okay.  What about third-party vendors?  Did the third-party vendors distinguish between the different entities?

A    So some of them may have had an awareness of World Aircraft.  I don't recall anybody ever mentioning Bluestone to me at all.  And as far as Hugoton and El Dorado were concerned, there was some awareness that there were two entities, but most people, most vendors that I spoke to always referred to the enterprise as either El Dorado or Swarek.

Q    Okay.  When invoices were received from third-party service providers, was it ever the case that it was listed as one name on the invoice like El Dorado, but the actual underlying property and services related to that property were

Ragan - Direct/Hopkins                    51

owned by, for example, Hugoton?

A    Yes.

Q    So it was invoiced to the wrong party.

A    We found many instances where a third party vendor would create an invoice to an entity like El Dorado, for instance, but then when they wrote down the service they were providing and if they named a well or an area that might very well be a Hugoton, Bluestone type well.  So there was confusion and crossover with vendors all the time.

Q    Okay.  So if that kind of confusion existed where El Dorado received an invoice and it was for Hugoton, services that benefited Hugoton's property, how were the payments made? Was it again from El Dorado's account and/or transferred to Hugoton or what happened there?

A    So pre-petition, as I said, it was cash-fungible, money was moving all around.  Where was their cash and where did they need to pay a bill?  One vendor might have gotten a check at one point in time from El Dorado.  They might have gotten a check from Hugoton at another point in time.

Post-petition, under the DIP loan, we primarily treat it as El Dorado.  So the money that we borrow came into an El Dorado account and the checks we wrote came out of an El Dorado account.

Q    Okay.  So going on to the recordkeeping and financial

Ragan - Direct/Hopkins                          52

reporting --

THE COURT:  Ms. Hopkins, before you move on, just two small questions.  Who funded the payroll entities?

THE WITNESS:  Again, the same thing, Your Honor.  The cash would go from El Dorado and/or Hugoton into that entity for that entity to fund the payroll, and it was not necessarily Hugoton funding Zapata Excell and El Dorado funding Excell.  It was, where's the cash?  Both entities, both debtors might fund both PEO entities, both Excell entities.

THE COURT:  With respect to the third-party vendors, did vendors send their invoices to one specific person or one specific location or were the invoices received (indiscernible)?

THE WITNESS:  The majority of invoices went to Gulfport.  In some cases, they were sent to Zach Maxey at Bullzeye, who was overseeing operations in the field.  And there were two field offices.  So there were occasions where a vendor might have just dropped their invoice at that field office and the field office personnel would then transmit a copy to Gulfport.

THE COURT:  Is it fair to say that all invoices were processed out of Gulfport?

THE WITNESS:  Yes.

BY MS. HOPKINS:

Q    And just to confirm, that was for all of the entities?

Ragan - Direct/Hopkins                    53

A    Yes.

Q    Did the entities follow legal corporate formalities, like did they have corporate meetings, keep minutes?  Did they do any of that?

A    Generally, the answer is no.  However, when there was a requirement, for instance, a borrowing if they were doing a new loan and that loan required a corporate resolution or meeting minutes or something that said that the entity was authorized to enter into that borrowing, it was my understanding that they would create minutes that said whatever it was, was authorized.  But there were no official meetings, no official minutes.

Q    Okay.  Do the books and records distinguish among the different entities?

A    No.  Everything was kept as one set of books.

Q    Okay.  Can you explain to us how the recordkeeping was done?

A    So all of the entities reported on a cash basis.  So they would take the cash activity from each bank account and they would create Excel spreadsheets of all the debits and credits of each account.  They would send that to their accounting firm and that accounting firm would record the activity as El Dorado.

Q    Okay.  So my understanding is that they were consolidated for all of the entities under the El Dorado umbrella?

Ragan - Direct/Hopkins                         54

A     Yes.

Q     Okay.

A     There was no recordkeeping either by the accounting firm or by the Gulfport folks for different entities.  It was just cash accounting.

Q     Okay.  And that also, just to clarify, because I know we're talking about reporting, but that's the same for the financial statements specifically?

A     Yes.  Cash, financials, tax, all the same.

Q     Okay.  Were there any separate financial reporting schedules included or still just all consolidated?

A     No.  In fact, when we tried to do -- so it's normal in the oil and gas to have what we call LOEs or LOSs, lease operating expenses, lease operating statements.

     And part of the reason why we were stymied in our first attempt to do a sale of the assets was because the buyers were looking for LOEs and we didn't have the correct reporting for all of the well history of what had been spent for the wells. So between then and when we did the second sale process, we tried to create LOEs by going back and looking at the detail.

Q     Okay.  And again, that's something that's customary within the oil-and-gas industry to keep those LOEs?

A     Yes.

Q     Are there any due-to or due-from accounts?

A     No.

Ragan - Direct/Hopkins                      55

Q    Are you able to easily identify if one entity is a creditor of another entity?

A    No.

Q    You mentioned tax filings a minute ago, but just to confirm, all the entities are essentially consolidated on one federal tax return?

A    Yes.

Q    Okay.  If you could just look at exhibit, what's been admitted as Exhibit Number 6.  This is -- and tell us what is this document?

A    The consolidated tax return for fiscal 2022.  The debtor doesn't have a calendar fiscal year.  So it's actually from December of '22 to November of '23.

Q    Okay.  And apologies as this document does not have page numbers, but if you can go about, it's about halfway through the document, there is a document called Form 851 Affiliations Schedule at the top.  So if you just let me know when you're there and the Court, as well.  Form 851 Affiliations Schedule.

A    Okay. Got it.

Q    Okay.  Perfect.  So on the first page, do you see Part 1 where it says, number one, corporate parent corporation?

A    Yes.

Q    And there's a number of parties listed under that column.  Then if you turn the page, it's the same form.  It's just expanded to include some additional parties under Part 1.

Ragan - Direct/Hopkins                    56

Does this -- what does this evidence?

A    So this shows, for tax purposes, the entities that consolidate up under the parent entity, El Dorado Oil & Gas. So there's ten on the first page and four more on the second page.  So 14 entities.

Q    Are there any debtor entities listed here?

A    On the first page, no.  On the second page, Hugoton Operating Company.

Q    Okay.  And then what's the name, if you look at the top of the document, what's the name of the common parent corporation that's listed here?

A    El Dorado Oil & Gas.

Q    So is that -- was this another basis on why you concluded that EDGO and EDOG were essentially one and the same?

A    One of the factors, yeah.

Q    Sure.  And then is World Ag -- excuse me, World Aircraft, Inc., is it included in this affiliation schedule?

A    No.

Q    And if you can turn to what's been admitted as Exhibit Number 7.  Let me know when you're there.

A    I'm there.

Q    Okay.  What is this document?

A    This is the debtors' accounting firm, accounting and tax firm, that prepares their tax returns, and it is a letter that was prepared that identifies that World Aircraft rolls up under

Ragan - Direct/Hopkins                          57

El Dorado.

Q    Okay.

A    And it says El Dorado Gas & Oil as opposed to Oil & Gas.

Q    But by the reference of El Dorado Gas & Oil, is it your understanding that they were still referring to El Dorado Oil & Gas?

A    Yes, because there's no separate return.  It says El Dorado Gas & Oil tax return, but the tax return name is Oil & Gas.  So I found in my discussions with the tax accountant that they had confusion, as well, including regarding the EIN number.

Q    Okay.  So does this letter from the accountant explain why World Aircraft is not included or referenced specifically in the tax return?

A    It's their explanation.  I think I would say it probably should have been listed separately, but this was their explanation.

Q    Okay.  You mentioned the tax ID number.  Do any of the entities use the same tax ID number?

A    Yes.  And in this letter it says that World Aircraft uses the same tax ID number, but I will --

Q    As El Dorado?

A    As El Dorado.  El Dorado Gas & Oil, El Dorado Oil & Gas, World Aircraft, sometimes Hugoton use the same number.

     But I note that the same number that they used was the

Ragan - Direct/Hopkins                          58

wrong number.  They were filing their returns, and every document that I saw that they filled out pre-petition had one digit that was wrong in the tax ID number.

THE COURT:  Tax ID number, another Swarek entity, or just we have no idea whose number that is?

THE WITNESS:  I do know what the numbers are.  If we flip back to the tax return.

BY MS. HOPKINS:

Q    Sure, and we can -- go ahead.

A    It lists the tax ID number in Exhibit 6 as 71-1544581. But the actual number pursuant to the IRS documentation is 71-0544581.  And I asked the tax accountant why they repeatedly filed the return with the wrong number, and they said they didn't know it was wrong.

Q    Okay, thank you.

If we could turn to what's been admitted as Exhibits 9 and 20.  I'm going to reference these collectively.  And when you have those, let me know.

Q    Okay.  So what is Exhibit 9 and 20, respectively?

A    9 is the petition for Bluestone, and 20 is the petition for World Aircraft.

Q    Okay.  So on Exhibit 9, that's Bluestone's voluntary petition, the first page, what is listed as the EIN number there?

A     The incorrect El Dorado number --

Q     Sure, can --

A     -- and the same for World Aircraft.

Q     So do these two numbers match from Bluestone's voluntary petition to World Aircraft's voluntary petition?

A     Yes.

Q     Do they also list the same address for the principal place of business?

A     Yes.

Q     Okay.  So is it safe to say that El Dorado and the entities essentially treated -- El Dorado treated itself and its subs as one entity for tax and reporting purposes?

A     Yes.

Q     Okay.  We've talked a little bit about EDOG.  Again, that's El Dorado Oil & Gas.  And you discussed it a little bit, but let me talk about some additional issues.  How did you determine that EDOG is a DBA/AKA for EDGO, El Dorado Gas & Oil?

A     So in the beginning of the case, it was unclear to me.  I assumed that they were separate entities.  As I spent more time in the case, I did more investigation, I talked to people, I got more phone calls from folks, it became clear to me that they were really one and the same.

      What also significantly persuaded me that they were one and the same is when I reviewed the FSB bank accounts and the FSB loan documents, many of them said one DBA the other or one

Ragan - Direct/Hopkins 60

AKA the other. Both names were listed on the checks, on the bank statements, and in the loan documents. And I inquired of the bank as to why that was, and they said Mr. Swarek always said, you know, it's all El Dorado, it's all me, it's all the same. So they were trying to make sure that they captured whatever was appropriate.

Q Okay.

A In my discussions with others, it was the same thing. It all seemed to be the same.

Q So EDOG and EDGO represented the two outside parties that they were the same?

A Yes.

Q Let's look at a couple of exhibits. Let's look at Exhibit 10. This is kind of the revised Exhibit 10, which is going to be the full proof of claim, Claim Number 21. Let me know when you're there.

A Oh, Proof of Claim 21. Okay, I'm there.

Q So in the -- you know, a few inches down the page, there is a title called "Guarantee." Who is listed as the guarantee of this loan?

A El Dorado Gas & Oil AKA El Dorado Oil & Gas.

Q Okay. Moving on to Exhibit 11. Turn to that one, please; what's been admitted as Exhibit 11. So on this -- what is this document?

A It's one of the documents related to one of the loans that

Ragan - Direct/Hopkins                           61

FSB made to the World Ag borrower with certain of the debtors being listed as guarantors.

Q    Okay.  Who's listed?  Which debtor is listed as a guarantor of this loan?

A    Again, El Dorado Oil & Gas AKA El Dorado Gas & Oil.

Q    Okay.  Let's turn to Exhibit 12 that's been admitted.  Again, on this document, is this another loan document with FSB?

A    Yes.

Q    Who's listed as the borrower here?

A    El Dorado Gas & Oil AKA El Dorado Oil & Gas.

Q    Okay.  So now let's look at, has the debtor made any representations in this bankruptcy case that it is -- that EDGO and EDOG are essentially the same?  Like, for example, the voluntary petition?

A    Yes.  When the El Dorado petition was filed, it noted both names.  And I don't remember whether the petition said DBA or AKA, but it did note both names.

Q    Okay.  And actually, I have that as an exhibit if we want to turn to Exhibit 5.  This has been admitted, as well.  Were you involved with the filing of this bankruptcy?

A    No, this predated me.

Q    Okay.  This was in December of 2023?

A    Yes.

Q    Okay.  And for the record, can you tell us what is listed

Ragan - Direct/Hopkins                    62

as the debtors' name on the voluntary petition?

A    The debtors' name is El Dorado Gas & Oil, and it says other names the debtor has used, and it lists El Dorado Oil & Gas.

Q    Okay.  And what about the EIN number?  Is that the same or similar to any of the other ones we've been discussing?

A    It shows the number with the 15 digit, which is what the debtors always used, and then it shows in parentheses the correct number, which is the 05 digits.

Q    So is the 15, the first number, is that the same number that World Aircraft and Bluestone indicated on its voluntary petitions?

A    Yes.

Q    Okay.  And what's the address listed as the principal place of business for El Dorado?

A    Gulfport office.

Q    Okay.  Were there any different creditors between EDGO and EDOG?

        THE COURT:  Before we get into this line of questioning, can we take just a little (indiscernible)?

        MS. HOPKINS:  Absolutely.

        THE COURT:  What are the lunch plans?

        MS. HOPKINS:  We do not have any lunch plans, but happy to go with the group and the Court as to defer to you all

on what you want to do.

THE COURT:  Flight plans.

MS. HOPKINS:  Oh, flight plans.  We have a flight at 6.  I think Ms. Ragan's flight is at 3:50.

THE WITNESS:  Which I will happily change if needed.

THE COURT:  Well, it's up to you all.  I don't know if you want to break for lunch, we can break for a short lunch.  If you want to take a short break and plow on through.  Either way is fine with the Court.

MS. HOPKINS:  I probably have 20 to 30 more minutes of questioning.  I'll defer.

THE COURT:  Ms. Wilson, how long do you think your cross is to be?

MS. WILSON:  Longer than I would like to go without a snack at least, but I'm up for going for whatever the Court would like to do.

UNIDENTIFIED SPEAKER:  Yes, I'm (indiscernible).

THE COURT:  Mr. Curry, do you have preference, flights?

MR. CURRY:  My flight's at 5.

THE COURT:  How quickly do you think you all can have lunch?

MS. HOPKINS:  Probably pretty quickly.

UNIDENTIFIED SPEAKER:  (Indiscernible).

THE WITNESS:  Or less.

Ragan - Direct/Hopkins                    64

THE COURT:  Why don't we take an hour for lunch?  Ms. Ragan, that's going to push you for the 3:30.

THE WITNESS:  Oh, that's fine, Your Honor.

THE COURT:  But if we're going to be here all day, I don't want to not let people have lunch.

MS. HOPKINS:  Ms. Ragan will be our only witness, just to confirm.

THE COURT:  Why don't we do, come back at 12:45.

Mr. Sheehan, are you here only for the application for compensation?

MR. SHEEHAN:  I'm here for this hearing, Your Honor.

THE COURT:  And you're here for this hearing, as well?

MR. SHEEHAN:  (No audible response).

THE COURT:  Okay.  I wasn't sure.  I have not gone through your application all the way because I spent so much time getting ready for the substantive consolidation.  Could we roll your application to the next hearing?  Because I'm not sure if I'm going to get to look at it on a break this afternoon, to be honest.

We can roll it, and then we can roll it to a day.  If you don't have anything else, I'll let you just call in.  But it sounds like we're going to spend most of the day on substantive consolidation.  And I'll be real honest, I spent the last week getting ready for this hearing, and it's been my

Ragan - Direct/Hopkins                    65

primary focus.  So I'll let Candace get some dates for you while we're on lunch, and then when we get back, we'll reschedule that.

All right.  We'll be adjourned until 12:45.

MS. HOPKINS:  Thank you, Your Honor.

THE COURT:  Thanks.

MS. WILSON:  Thank you, Your Honor.

MS. HOPKINS:  May Ms. Ragan be excused?

THE COURT:  Yes.  Of course.

(Recess at 11:42 a.m./Reconvened at 12:46 p.m.)

THE COURT:  All right, it's 12:46.  And we're back on the record in the El Dorado Gas & Oil case, Case 23-51715.

Ms. Ragan, you're still under oath.

Ms. Hopkins, before we get started, I had one thing I wanted to circle back to when we broke for lunch and I went back and looked through my notes.

Ms. Ragan, you testified early in your testimony that Mr. Swarek had over a hundred other entities.  Is it your testimony that if you had to try to untangle all of these entities, that you would have to go back and include all hundred of those entities or only the entities that are subject to the sub-con motion?

THE WITNESS:  If you were going to untangle, you would have to look at every place that cash moved, and I don't know how many of those entities had cash movement.

Ragan - Direct/Hopkins                    66

THE COURT:  But you know that cash moved outside of the sub-con entities?

THE WITNESS:  Yes.

THE COURT:  Okay.  All right, thank you.

MS. HOPKINS:  Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MS. HOPKINS:

Q    We were -- and I guess just kind of piggybacking off what the Court has mentioned.  For purposes of sub-con today, we're only asking for these four different entities to be sub-conned.  Why are you not including all of these other entities, the other hundred plus?

A    In my investigation, most of the activity is centered around the four.  The other places where I found, and again I haven't done the deep forensic dive, but the things that I found that were obvious, where I found where there were some entities like the Family Worship Center, which owns the Jackson plant, El Dorado Gas & Oil, Oil & Gas, I forget which operating company, which owned a working interest, which we were back in front of the Court related to the Mecom sale, trying to get that resolved.  Dorado Drilling, we've talked about in the past.

So there are some that hold real estate and things that, you know, are not significant to the rest of the estate.

Q    Would it be safe to say, I guess, that substantially all

Ragan - Direct/Hopkins                                    67

of the transfers or the movement amongst the hundred entities, at least with respect to these debtors, it was the four entities that are subject to this motion for sub-con?

A    I can't speak to the other hundred entities.  I did go through the entities that were on the tax return with Ms. Chapman and say, does this entity have any business, does it have any assets.  And my discussion with her is that the bulk of those, the ones that are names that we've never discussed in this case, except maybe for Sunnyside, have no current business or assets or operations.  But they did at some point previously, but I don't know what that time frame was.

Q    Okay.  So as a result of your investigation, have you determined that sub-con, the scope of sub-con is appropriately limited to the four entities here?

A    Yes.  For our purposes here, yes, I believe that's correct.

Q    Okay.  Just a minute ago we were talking about, before the break, we were discussing El Dorado Gas & Oil versus -- EDGO versus El Dorado Oil & Gas, EDOG.  Do you know, were there different creditors between these two entities?

A    El Dorado Gas & Oil and El Dorado Oil & Gas?

Q    Yes.

A    I think the only obvious one is First Service Bank that might have had some loans at one point that were just in one name as opposed to the other.  But otherwise, I don't believe

Ragan - Direct/Hopkins                    68

that there were any separate creditors.

Q    Did EDOG have any separate business than EDGO?

A    No.

Q    Did it have -- did EDOG have any separate income stream than EDGO?

A    No.

Q    Okay.  Was there any property owned by EDOG?

A    Yes.  I have found several pieces of real property that are titled in the name of EDOG, Oil & Gas.

Q    So based on your determination --

A    Which were acquired, to the extent I've investigated them. I don't know that I've investigated all of them, but the ones that I did, they were acquired with El Dorado funds.

Q    And when you say El Dorado, that's EDGO?  El Dorado Gas & Oil?

A    El Dorado, yeah.

Q    Okay.  So ultimately is it your conclusion that EDOG and EDGO are the same entity and should be treated as the same entity?

A    Yes.

Q    However, to the extent for some reason they're separate entities, have you also included them in the request for sub-con?

A    Yes.

Q    Did the entities, the four entities, ever guarantee other

Ragan - Direct/Hopkins                            69

entities' loans?

A     Yes.

Q     Okay.  Can you look at what's been admitted as Exhibit 14?
Let me know when you're there.

A     I'm there.

Q     Okay, so this is an excerpt from Proof of Claim 29.  Can
you please let us know, what is this document?

A     It's one of the loan documents related to a specific loan
which was filed by the bank at Proof of Claim 29 where only El
Dorado Oil & Gas was named as the borrower, but other
subsidiaries, World Aircraft and World Ag, were listed as
guarantors.  And World Aircraft is also listed as a
hypothecator.

Q     Okay.  That was going to be my next question.  In addition
to this loan, were there other loans where one of the entities
would pledge property that they owned in connection with a loan
of another entity so that their own property would serve as
collateral for a separate entity's loan?

A     Yes.  It's my understanding that when another entity
pledged its collateral, that's when they were named as the
hypothecator.

Q     Okay.  So let's just look at what's been admitted as
Exhibit Number 13.  Let me know when you're there.

A     I'm there.

Q     Okay.  So this is an excerpt from Proof of Claim 28.  Can

you tell us what is this document that we're looking at?

A    It's another one of the loan documents.  And each loan had multiple documents, loan agreement, note, security agreement, et cetera.  And so this was related to the loan that was filed at Proof of Claim Number 28.  It lists El Dorado Oil & Gas as the borrower.  And hypothecators were World Ag, Hugoton, World Aircraft, and other non-debtors.

Q    Okay.  So how did the creditors view the entities?  Did they view them as one entity?  Did they view them as separate entities?

A    I think generally whether we're talking about the bank or we're talking about the vendors, that they viewed them as one, either as Swarek or El Dorado.  All one enterprise.

Q    Okay.  Let's move on to a discussion about your ability to segregate and/or ascertain assets and liabilities.  After completing your investigation here, were you able to amend the schedules?

A    I amended the schedules for El Dorado and, depending on the outcome of this hearing, I will likely amend the other debtors --

Q    Okay.

A    -- I potentially will need to amend the other debtors, but right now I've only amended El Dorado.

Q    What was the purpose of amending El Dorado's schedules?

A    So, generally, you know, schedules are filed at the

Ragan - Direct/Hopkins                                    71

beginning of the case, very little is known and, as you find out more information or material information, you amend them, and as this case has gone on we found out additional information.

The two big items that were different were basically related to the assets of what was or was not El Dorado as compared to how they were filed originally. For instance, the real property, like I said. Family Worship Center is the titled owner of the Jackson facility. It was listed in the first set of schedules, but I believe we took them off in the amended schedules because they're not -- because El Dorado is not the title holder in the amended, and we put notes in the global notes. And then the other big change was we added in all the mineral owners.

Q   Okay. Let me go back, you mentioned the global notes, if you'll look at what has been admitted as Exhibit Number 4. Let me know when you get there.

A   I'm there.

Q   Okay. So, go to page 5 and on page 5 there's a -- number 3 is called "Methodology," and below that, on section B, "substantive consolidation." Do you see where I am?

A   Yes.

Q   Okay. Will you go ahead and just read -- it goes to the next page, page 6 as well, but will you go ahead and read that sub-con section for us?

A    "Trustee intends to file a motion to substantively consolidate all debtors together with El Dorado Oil & Gas for the purpose of administering assets and making distributions. The El Dorado named entities have functioned as a DBA of each other, and the debtors have operated effectively as one business unit, all owned or controlled by Thomas L. Swarek," Swarek in parentheses.

"Assets and liabilities have not been distinguished across the debtors, and formal corporate governance and separation was not maintained.  Accordingly, the prior and these amended SOFA and schedules may include assets or liabilities and payments related to several of the debtors for purposes of administering assets and making distributions on a consolidated basis in connection with administration of debtors' Chapter 11 estate."

Q    Thank you.  Why did you include this comment?

A    Well, given the timing of us amending the schedules and knowing that we were going to be filing a motion for sub-con, and that we were intending to file a plan thereafter and expecting that we would have sub-con, I thought it was important to point out those issues given the timing of when we got the schedules amended.

Q    And as of today, based on the current landscape of the cases, have you updated the information in the schedules to the best of your ability?

A    Yes.

Q    And the same thing for the SOFAs, have you updated those to the best of your ability?

A    Yes.

Q    So post-investigation, you know, over the last year and a half of your appointment, have you been able to make a determination as to your ability to segregate the liabilities of each of the entities?

A    I'm sorry, what's the question, have I been able to investigate?

Q    Have you made post-investigation.  We've been talking about everything you've done to investigate and some of your conclusions here and there, but for purposes of the record, I mean, what has your determination been when it comes to your ability to segregate each debtors' -- each entities' assets?

A    I can't do that based on the record keeping --

Q    And what about --

A    -- which is a big part of why I'm asking for sub-con?

Q    And what about liabilities?

A    Same answer.

Q    Okay.  Are you able to ascertain some of the different entities' assets?

A    The assets, yes, some of them, that's a little bit clearer.  So I can, for instance, determine that AWP assets were bought for X dollars and where that money came from because it was a large transaction.  Same thing with Bluestone,

Ragan - Direct/Hopkins                                        74

I knew how much was paid for those assets and where the money came from, but that's about all that's clear.

Q    Okay.  So it's -- the ability to segregate liabilities is not something you believe you can do?

A    No.

Q    Okay.  And what do you think -- if you were to undertake that process, what do you think would be done, what would have to be done to segregate the liabilities as well as assets?

A    So, not to be granular, but I think it's important to understand the magnitude of the scope.  I would have to hire a competent, qualified accounting firm; it doesn't necessarily have to be the Big Four, but it also can't be the little guys that were doing the El Dorado financials, they got it all wrong.

I would have to explain to them what I would need, I would have to explain to them that there are, you know, four, five, six entities that I can talk a lot about, but there are a hundred entities of which I know nothing about and I don't know anything about the cash movement, and that I would need for them to go back and reconstruct the records for the assets, the liabilities, and the payments.  I can't tell them whether the movement was across six entities or 106 entities.  I haven't investigated the other hundred, I've only looked at what happened with the debtors and then the few other things that I came across.

Ragan - Direct/Hopkins                           75

Then I would have to ask them to come up with valuation information and market information.  So, for instance, to the extent that Hugoton provided operating services to El Dorado and wasn't compensated, what were those services worth and what were the intercompany due-tos, due-froms across all of these entities.  So it would be a monumental exercise and the accounting firm would -- because it's so vague would not be able to give me a budget for dollars, nor would they be able to give me a budget for time, and that is one of the big issues.

My expectation knowing the caliber of accounting firm that I would have to hire is that we'd be talking about seven figures of fees, and it wouldn't surprise me at all if it took a year to go through because you have to go back to at least 2020 when the MSL facilities loan was made.

Q   So, when you're talking about -- you referenced the Big Four and my understanding is that you're very familiar with financial -- being a financial adviser, the accounting world, can you just make sure everyone knows who you're referencing when you say the Big Four?

A   Oh, Deloitte --

Q   Big Four accounting --

A   -- Ernst & Young, KPMG, PWC.

Q   So you're talking about international, very sophisticated accounting firms?

A   Yes, and I'm not sure that they would even take on this

exercise, so I'd be looking at, you know, at least the second tier or maybe the third tier.

Q    Like you said, that would be likely very expensive and very time-consuming?

A    Yes.

Q    Do you think that that process would ultimately result in an outcome that was to the creditors' benefit?

A    I do not think it would result in an outcome to anybody's benefit, but I don't believe it's even possible to take on the exercise.

Q    Okay.

A    I don't have unencumbered cash to do that.

Q    So I guess that's my next question, can the cases even support that exercise?

A    I don't believe so.

Q    Okay.  So what would happen to the cases if sub-con is not granted?

A    Well, I know Mr. Curry said earlier something about Chapter 7, but -- I'm speculating here, but my guess would be that FSB would move to lift the stay to take their collateral and go home, and then we'd be doing a Chapter 7 of the carcass.

Q    Okay.  So, for clarification, a benefit to creditors here, would the creditors benefit by avoiding the process that you were explaining earlier?

A    Yes.

Ragan - Direct/Hopkins                          77

Q    So, if the motion is granted, what are the next steps for these cases?

A    We would tighten up the analysis that we've started on claims and then we would incorporate that into the structure of the plan that we've put together, we would get all that finalized and tightened up.  We would file the plan and look to confirm a liquidating plan.

Q    So, post-approval of the sub-con, I mean, the plan would reflect that treatment?

A    Yes.

Q    Okay.  So are you aware of the Bracken objection to the sub-con motion?

A    Yes.

Q    Has anyone else objected to your knowledge?

A    No.

Q    Has anyone else expressed any concern to you about the motion and the requested relief?

A    No.

Q    So are you aware that Bracken asserts that they have a lien that will be impacted by sub-con?

A    I'm aware they asserted that.

Q    Sure.  To your knowledge, the requested relief that we seek, will it actually impact any of the liens?

A    I don't believe so, no.  I think we've said in our motion we specifically don't intend to impact liens or

Ragan - Direct/Hopkins                    78

collateral.

Q    And as indicated in their objection, Bracken's alleged lien -- or at least they assert that it relates to all of the AWP sale proceeds, do you agree with that -- with that contention as to what their lien could possibly extend to?

A    It wouldn't extend to any of the AWP sale proceeds.  We sold leases.

Q    What would a lien -- a royalty interest owner like Bracken, what would their lien extend to?

A    Proceeds of oil and gas production.

Q    So, earlier counsel for Bracken discussed the fact that Bracken has allegedly asked for production, documentation, bank statements, et cetera, do we already have an agreement with Bracken that you will provide that information within a set of time frame?

A    Yes, I believe the order was entered Friday, so I have 14 to 21 days from the entry of that order to provide data.  I have received a significant amount of data from PetroLedger to enable me to provide that data, which I'm in the process of reviewing.

Q    Okay.  And then, once you have finished that review, is it your intention to provide that to the Bracken Group within the estimated time frame?

A    Yes.

Q    Another allegation that was discussed in opening by

Ragan - Direct/Hopkins                                    79

counsel for the Bracken Group was that there's also an issue, I believe, with respect to Price Partners, who is a member of the Bracken Group; are you familiar with Price?

A    Yes.

Q    Are you familiar with the allegations about this money being held in suspense?

A    Yes.

Q    Do you want to go ahead and explain that for us and what we believe the -- your position is as to the disconnect?

A    So, Price for this purpose is a member of the Bracken Group, the proofs of claim that counsel submitted.  It's my understanding that, I believe beginning at -- I might be a little bit off, but I believe it was at the end of 2021 that there was an estate or probate issue with Price, and there needed to be some adjustments based on probate.  And so there needed to be a change in the division order with PetroLedger in order to adjust the calculations for royalties.  And why it took so long I have no idea, but it's my understanding that the resolution of whatever those probate issues were in getting the division order finalized didn't occur until the spring or so of '23, which was the same time that the debtors stopped paying everybody.

So the information that I got from PetroLedger showed that there was approximately $200,000 for the Price Partners group that was considered to be in suspense.  And so what that means

Ragan - Direct/Hopkins                                    80

is that when they calculate the royalties and checks that get sent out, they do not calculate a disbursement for anything that's deemed to be in suspense, and it was in suspense because of this probate issue, whatever they were trying to get reconciled. So they calculated what would be owed, but anything that's in suspense is not payable.

Q  So, often in the oil and gas industry when we say that monies are being held -- or should be held in suspense, are held in suspense, do most operators actually hold that money in suspense for the benefit of that other party, whether they're trying to figure out a probate issue, whether it's an address that is no longer valid, can you tell us what's the ordinary course of business?

A  I don't think I can fairly say what most operators do from a cash perspective, but from a reporting and bookkeeping perspective they will absolutely keep the records of what is supposed to be paid, but hasn't been paid and is called suspense.

Q  Okay. So, did the debtors actually hold any money related to Price Partners, did they hold anything in suspense, like real funds versus an accounting function?

A  No, the debtors never, to my knowledge, had a cash account set aside for suspense funds.

Q  Did PetroLedger ever have any control over what was held in suspense, or were they more so providing accounting

Ragan - Direct/Hopkins                                    81

information?

A    They would do the calculations and the debtor relied a hundred percent on their calculations, but PetroLedger had no control of cash.  So, logistically what would happen is PetroLedger would run all of the accounting and then they would tell the debtor, okay, Hugoton owes X dollars, they would cut the checks, and they would say AWP or El Dorado owes Y dollars, and they would run that check run, and then El Dorado and Hugoton would transfer money into those clearing accounts to have the checks that PetroLedger ran clear against.

      So, El Dorado had its general corporate coffers and when they were told how much the check run was for royalties they would then transfer the money into that account.  So they would only transfer the actual amount of the check run, so there was no provision for unpaid amounts, it was just bookkeeping.

Q    Just to clarify, if PetroLedger made a representation that X amount was being held in suspense, did they have any control over the money?

A    Not over the money.  If they said something was held in suspense, they mean on the books.

Q    Okay.

      THE COURT:  I guess that's where I'm getting a little bit of a disconnect.  So, I understand they held it on their books in suspense, for lack of a better term, but are you

Ragan - Direct/Hopkins                         82

saying that that 200,000 or whatever it was, it went to the debtor and then we don't know what happened to it?  Was the money actually paid to the debtor, did the debtor receive the money?

THE WITNESS:  Pardon me, Your Honor.  The debtors' cash was generated from production receipts, and so the debtor always had control of a hundred percent of its cash.  There was a separate account that was set up to clear checks that PetroLedger would run, and they would take money out of the corporate coffers and transfer it into that account for the checks to clear against.

THE COURT:  And then -- sorry to interrupt you, I want to make sure I'm following you -- that you're telling me that because sometimes accounts would be in suspense that that suspense amount wouldn't be in the amount that PetroLedger told the debtor to pay?

THE WITNESS:  That's correct.

THE COURT:  Got it.  All right.

MS. HOPKINS:  I think I'm going to go ahead and pass the witness.

THE COURT:  Okay.

MS. HOPKINS:  Thank you.

THE COURT:  Mr. Curry, do you want to go ahead?

MR. CURRY:  Thank you.  For the record, David Curry on behalf of First Service Bank.

Ragan - Cross/Curry                      83

CROSS-EXAMINATION

BY MR. CURRY:

Q    Ms. Ragan, just a few questions for you.

     Since this is its own contested proceeding, could you just go over your professional background a little bit for the Court for this record?

A    I'm an accounting undergrad; I have an MBA.  I spent the first nine years of my career in investment banking and I've spent 20-something after that, without dating myself, of doing what I'm doing, financial advisory.  I've served as a trustee, as an expert witness, a financial adviser, other fiduciary capacities.

Q    So, in your capacity as a fiduciary or financial adviser, is it fair to say that you through your professional career have become rather familiar with, say, GAAP or standard accounting practices for good corporate hygiene?

A    Yes.  I couldn't quote all the rules to you, but, yes, I'm very familiar with GAAP.

Q    So, in other words, if you go in and evaluate the accounting, you're not starting blindly, you have some experience there?

A    Yes.

Q    We've talked a lot about the hundred-plus entities and the tax subs, but you're aware, correct, that there are other Swarek-owned entities that have Chapter 11 cases pending before

this Court as well, correct?

A    Yes.

Q    The Escambia, *et al.* cases?

A    Yes.

Q    Okay.  And I think it's clear in the motion, but just for the record, we are not asking for any kind of substantive consolidation with any of the Escambia entities?

A    No.

Q    All right.  And just, I think, to give a good contrast, can you explain at a basic level how you're able to tell roughly what is Escambia and what is El Dorado?

A    Well, the simplest way is geography.  All of the Escambia assets are in Alabama, everything for El Dorado is either Mississippi or Texas.  And Escambia is one of the few things where they actually had a separate person doing the books.

Q    And was that separate person also officed in the same office as El Dorado?

A    She was in Gulfport, but she was in a different building.

Q    So you testified earlier about your reliance on El Dorado's tax returns and the tax subs.  In your review of the debtors' business practices and records, would you say that Mr. Swarek or the El Dorado office consistently represented the status of those entities as being subsidiaries to outsiders?  In other words --

A    I don't think Mr. Swarek ever used the terminology

Ragan - Cross/Curry                                    85

subsidiary.  All of the feedback that I got was that it was represented as being the same; it's all El Dorado, it's all Swarek, those are the things that I would hear consistently.

Q    And were there times where you would hear Mr. Swarek say I own X and then, later, El Dorado owns the same thing?

A    Yes.

Q    And I think you testified about that with some of the assets and the schedules, but it was the same thing with the corporate entity ownership, correct?

A    Yes.

Q    Just real quick.  Earlier, the Court asked you about the formation of World Aircraft.  If I represented to you that per the Secretary -- Mississippi Secretary of State that that was done about mid-2008, does that sound right to you?

A    Yes, I did look it up over the break, it was 2008.

Q    The Family Worship Center building, I want to ask you a little bit about that, and you mentioned you took it off the schedules because you determined that the title was in a non-debtor entity, right?  Was El Dorado or any of the entities for which you have requested sub-con, did any of those entities use the Family Worship Center facilities?

A    El Dorado used it to store a significant amount of the assets that were bought by Mr. Swarek at the auctions.

Q    And were those assets secured when you took over?

A    I would have to say probably no.  I mean, they did have a

Ragan - Cross/Curry                    86

body there at the warehouse, but I had also just been told immediately after I started that people were stealing stuff out the back.  So I can't really say it was secured.

THE COURT:  Mr. Curry, is the Family Worship Center really the storage unit?

MR. CURRY:  Yes, Your Honor, that's where I was going.  It's not really a storage unit, it's an old commercial -- abandoned commercial building, but --

THE COURT:  Not a church?

MR. CURRY:  It's not a church.

THE COURT:  It's a storage facility?  And is this the same storage facility that the trustees visited one day when we were here for a hearing?

MR. CURRY:  Yes, Your Honor.

THE COURT:  Okay, I understand which one we're talking about now.

MR. CURRY:  This is where the Escambia trustee and Ms. Ragan and her team went to identify assets that were being held there of each estate, that's kind of where we're going.

BY MR. CURRY:

Q    So, back --

A    I've heard, Your Honor, that Mr. Swarek thought that he could do some type of communal outreach to -- I believe it was to prisoners, that there was going to be, you know, some -- it was going to be used for some type of outreach to have --

Ragan - Cross/Curry                                    87

THE COURT:  I just don't think --

THE WITNESS:  -- services.

THE COURT:  -- we referred to it way back when the trustees went out to do the inspection, I think we referred to it as the Family Worship Center.

MR. CURRY:  Right.

THE COURT:  I just understood it was a storage facility.

MR. CURRY:  Yes.

THE WITNESS:  Yeah, I don't think --

MR. CURRY:  And at the time --

THE WITNESS:  -- I knew --

MR. CURRY:  -- it was listed on the --

THE WITNESS:  -- Family Worship Center, yeah.

MR. CURRY:  -- on El Dorado's schedules as being an El Dorado real property.

BY MR. CURRY:

Q    So, during this case, though, have you had to spend estate assets to maintain or keep secure the building that is titled in the Family Worship Center entities' name?

A    I did until the end of May.

Q    Once El Dorado's equipment was sold?

A    Yes.  Once the equipment was sold and I had an offer for the warehouse, Mr. Swarek wouldn't agree to sell.  Given how low the offer was, it didn't seem to make sense to pursue

litigation at the time.  So I told him that I was going to stop paying for the security.

MR. CURRY:  That's all I have, Your Honor.

CROSS-EXAMINATION

BY MS. WILSON:

Q    Good afternoon.  Have you reviewed the production reports from the wells subject to the Bracken Group's claims?

A    No.

Q    Are you in possession of those production reports?

A    No.

Q    Is PetroLedger in possession of those production reports?

A    Yes.  They're all public, they're on the RRC website.

Q    You mean the Railroad Commission's website?

A    Yes.

Q    Are you aware there was some previously reported differences in the data that was reported on the comptroller's website versus the information provided to the royalty owners?

A    I don't know what you're referring to.

Q    We'll come back to that email in just a minute.

So, let's see.  You have not reviewed the production reports from those wells.  When did PetroLedger come into possession of those production reports?

A    So, every month the production is reported via meters or charts, and is collected by our regulatory person and reported to the Railroad Commission and reported to PetroLedger.  So

Ragan - Cross/Wilson                89

every month reporting is done.

Q    When -- let me -- excuse me just a minute.

(Pause)

Q    During your testimony a little earlier you all looked at what has been I believe admitted as your Exhibit 4, the global notes.  Let's see.  Amended global notes and statement of limitations, et cetera, that's Docket 1389.  Do you still have that around there in front of you?

A    Uh-huh.

Q    Great.  So, Docket 1389 at page 5, the subsection entitled "Royalties."  In this paragraph, when it's referenced a third party firm, is that referring to PetroLedger?

A    Yes.  It used to go by a different name, but yes, that's its name.

Q    Okay.  What was the former name?

A    ARI, I think stood for Associated Resources.

Q    Okay.  So when did the trustee re-engage the company now known as PetroLedger?

A    Almost immediately after I was appointed -- or soon thereafter when we started looking at turning wells back on.  So, the first person I re-engaged was the regulatory person, and then I think PetroLedger was after that.

Q    The period that's been referred to as the period during which PetroLedger was not calculating royalties, what period was that?

Ragan - Cross/Wilson                                90

A    So, PetroLedger, like everybody else, stopped getting paid in the same period of time; what exact month, I don't recall, but in the spring/summer of '23.  I believe that they continued to work for some period in the beginning while they weren't getting paid and then at some point they just went pencils-down.  So, exactly when they stopped working, I don't know, but when I contacted them to re-engage them, they told me that they had -- my recollection is, I think they said they had nine months of work to catch up.

Q    Has PetroLedger as of yet completed its calculations of royalties obligations owed for the period of June 2023 through February 2024?

A    So PetroLedger has given me a variety of data related to my request over time, sometimes there's issues with it and they have to redo it, but I believe that the most recent data that I got from them is materially correct.  So I would say, yes, I believe that their work is materially done at this point regarding royalties unpaid, slash, in suspense.

Q    What is the estimated total of unpaid royalty obligations owed?

A    My estimate right now of total prepetition unpaid royalties is an amount somewhere in the vicinity of $6 million, but a significant amount of that relates to Hugoton and prior suspense and disputes that Mr. Swarek had with certain mineral lease -- mineral owners; the extent of those disputes I have

not investigated.  So what the real number would be when that's all evaluated, I don't know, but the PetroLedger data appears to me to look like $6 million -- and that's, I'm sorry, for -- going back for four years.

Q    So, just to make sure I understand, going back over four years prepetition or from present?

A    Prepetition.

Q    Okay.

A    So that's August of '23 for Hugoton and December of '23 for El Dorado.

Q    Four years prior to those dates?

A    Yes.

Q    What is of that approximate, presently-appearing, potentially six million is owed by El Dorado?

A    I don't know that I can tell you the exact number El Dorado versus Hugoton.  I was expecting you to ask me the number for Bracken.

Q    We'll get there, but of course because today we're looking at the effect of the proposed substantive consolidation I'm wondering the amount of royalty obligations that are unpaid, owed as to each of the entities subject to the motion.

A    So my recollection, based on what I looked at -- and, again, I haven't delved into that level of detail yet, but my recollection is that the El Dorado-related prepetition unpaid royalty amount was close to a million and a half, the bulk of

Ragan - Cross/Wilson                                    92

it, the balance would be Hugoton.

Q    Of the approximate million and a half owed by El Dorado, is the bulk of that attributable to the Bracken Group?

A    Approximately 700,000 was related to the Bracken Group.

Q    We have previously discussed in correspondence with your counsel the status of the ongoing nature of the determination that you all are working on with PetroLedger to calculate the unpaid royalty obligations, and that was approximately the amount it was last reported to us that so far it had been determined.  So what data have you previously received from PetroLedger that rendered that data incomplete for purposes of calculating unpaid royalty obligations?

     That was poorly stated.  What pieces did you receive previously from PetroLedger?

A    Well, so there are a lot of iterations and I can't tell you what all of them were, and why we found some issues and why it was revised.  But like a simple example, for instance, would be at some point I said could you please give me a printout of all of the unpaid royalties, and what I didn't realize at the time is that to PetroLedger unpaid does not include suspense. They have 15 maybe different codes that they assign to things. So, when I said unpaid, to me, I mean everything, to them it was a microcosm.

     So, as we went through things and I asked questions, we would get more data.

Ragan - Cross/Wilson                                93

Q    What amount -- now, when you said six million before, did that include amounts in suspense or did it not?

A    I believe I now have the right data, which would, yes, be suspense and unpaid, together with all of their 15 codes.

Q    According to what PetroLedger has found so far, to your knowledge, of the approximate one and a half million, did you say, one and a half or 1.25, unpaid and owed by El Dorado, what amount of that is reported by PetroLedger to be in suspense?

A    I don't recall.  To me, unpaid is unpaid, I don't differentiate their codes.

Q    I understand.  So, in the event the cases are substantively consolidated, the full amount of claims as to unpaid royalty obligations would become owed by the consolidated entity, correct?

A    Yes.

Q    In the event that all of those claims were determined to be secured claims, those secured claims would then have priority based on the origination of that interest, is that right?

        MR. CURRY:  I'm going to object, Your Honor.

BY MS. WILSON:

Q    Okay, let me say it another way.  The secured claims, if they're secured, say if the claim are unpaid royalties are determined to be secured claims, that total amount will have to be paid from assets of the consolidated entity; is that

correct?

MR. CURRY:  Objection, Your Honor, that's an incomplete hypothetical, it doesn't take into account (indiscernible).

BY MS. WILSON:

Q    In the event that the entity is -- the entities are substantively consolidated, is it correct that the total amount of claims for unpaid royalty obligations will increase to the amount that you just referenced as opposed to the El Dorado amount referenced?

A    So, whether there's sub-con or not, if you're a secured creditor, you look to your collateral, and we're not looking to change liens or collateral rights.

Q    What was the total amount of production revenue for El Dorado for the period of June 2023 through February 2024?

A    I have no idea sitting here right now.

Q    Have you reviewed the Bracken Group leases?

A    No.  I have an Oil & Gas colleague.  So when I say no to your questions, I have other people on my team who are doing it, but I haven't done it.

Q    Have you or someone on your team reviewed the bank statements utilized by El Dorado for the period of June 2023 through February 2024?

A    I have reviewed February of '24 and the period of my appointment, I am in the process right now of gathering the

Ragan - Cross/Wilson                                    95

period that you referenced in connection with our agreement related to Archrock to provide those to you, but I have not yet done that, and I haven't even finished collecting all the statements.

Q    So you testified earlier that in terms of production revenue that it was frequently, for example, a third party would purchase and that payment would be for hydrocarbons produced by more than one debtor's wells, is what I understood the testimony to be.  Have you identified any instances in which AWP well production was sold together with production of another debtor's wells?

A    I personally have not done that analysis, no.  I have an awareness, as I testified, as to those things occurred, one buyer of production submitting a payment for production of both debtors, but I haven't done the analysis of those reports.

Q    Has it been confirmed that production from AWP wells was in fact sold and paid for with the production from another debtor's wells?

A    I'm not understanding that question.  It wouldn't be sold in -- you mean by a third party?

Q    Yes.

A    Okay.  Yes, it is my understanding that that occurred.

Q    Where were the proceeds from production in sales from AWP wells deposited?

A    So the debtor would keep a bank account called AWP

Ragan - Cross/Wilson                              96

revenue, I think was the name, and they kept another account that I think they called Black Beard revenue, and the third party purchasers of production from the debtors would make ACH electronic payments to those accounts, or in some cases they would send a paper check. So the production revenues would go into either one of those two accounts.

Q   Is it possible to trace the production revenue back to where the hydrocarbons were produced from?

A   It's possible, but that again is, you know, time and money that's only part of the equation.

Q   What's the rest of the equation?

A   The liabilities --

Q   You mean generally?

A   -- and the movement of cash.

Q   I'm sorry?

A   The movement of cash, the liabilities, the provision of services.

Q   And you just mean globally, is that right? Or do you mean specific to the calculation of the production revenue from the wells?

A   Yes, because it takes payroll and compression and field expenses to produce the hydrocarbons, and that is the more significant part of the exercise.

Q   Have you identified instances where labor or services were paid for on AWP wells -- excuse me -- yes, were paid for on AWP

Ragan - Cross/Wilson                                          97

wells with funds from another debtor entity?

A    So, as I said before, there were basically three groups of employees, Zapata Excell, Zapata Excell, and corporate, and corporate office people would provide services to all the debtors, people in the field would provide services to some of the wells or all of the wells.

So, for instance, a supervisor might be asked to go take care of an issue with a well that might be in South Texas or it might be in McMullen County in the middle of the state, so AWP versus Hugoton, and those kinds of things happened all the time.  The same thing with vendors, a particular vendor might service wells that were considered AWP and wells that were considered Zapata or South Texas, which is why they would often get the names wrong on the invoices.

Q    And those are like around 150 or so miles away from each other, is that right?

A    I don't remember the geography, but they were not next door.

Q    Okay.

THE COURT:  Ms. Wilson, can I jump in and ask one question --

MS. WILSON:  Yes.

THE COURT:  -- about those accounts?  The AWP reserve and the Black Beard reserve, when you came on as trustee, what was the status of those two accounts?

Ragan - Cross/Wilson                    98

THE WITNESS:  So, when I came on, I don't remember the specifics of how much was in one account, but I know that I had very limited funds.  Your Honor may recall that I -- soon after I was appointed was making an emergency request for $500,000 for payroll and to pay insurance.  So I don't remember the exact numbers or what was in which account, but I know I had very little in the way of funds.

THE COURT:  So is there anything left in those accounts?  Are those accounts still open, anything left?

THE WITNESS:  So, after my appointment, FSB became an authorized depository of the U.S. Trustee, so I maintained those accounts and converted them to DIP accounts.

THE COURT:  And do we still have the original funds in those DIP accounts?

THE WITNESS:  I'm sorry, did you say the original funds?

THE COURT:  Uh-huh.

THE WITNESS:  I don't have it segregated.  I mean, I can look up and see what was the balance in a bank account on a specific --

THE COURT:  Oh, I see what --

THE WITNESS:  -- day --

THE COURT:  -- I may be misunderstanding you.  Are you saying when you converted it to a DIP account, you're talking about the DIP account and not two separate reserve DIP

Ragan - Cross/Wilson                                    99

accounts?

THE WITNESS: So I had four or five banks with 20 or 30 different bank accounts when I started. I closed everything except for a handful of accounts at a bank called The First, which is in Mississippi, so they could -- when they got a hand check, they had someplace to go deposit it, and then the FSB accounts. And all of the -- some of the FSB accounts I closed, the other FSB accounts that remained open, we changed the name to call them debtor-in-possession accounts.

THE COURT: Okay, so they're still there --

THE WITNESS: Yes.

THE COURT: -- they're just titled as debtor-in-possessions.

THE WITNESS: Yes.

THE COURT: That's what I'm trying to understand. I just want to be very transparent about this. If the AWP reserve and the Black Beard reserves are actually accounts that held their collateral, for lack of a better term, I just want to know is it there or is it gone.

THE WITNESS: So it was a revenue account, not a reserve account --

THE COURT: And I'm sorry I'm using -- probably using the wrong terms, but I'm just trying to figure out if there's collateral still there.

THE WITNESS: There was a royalty reserve account

Ragan - Cross/Wilson                        100

which had $200,000 in it, 237 or something like that, that is still there, a hundred percent of that money.  The other accounts, the revenue accounts are really operating accounts, and so that was part of my DIP budget.

THE COURT:  Okay.  Thank you.

BY MS. WILSON:

Q    What exactly would transpire as a general matter in the way of when PetroLedger would make a direction in terms of a bookkeeping entry until the time when a check was cut and sent out for royalty payments?

A    I don't understand the question.

Q    Was there money that came out of a certain account to pay all of those royalty obligations or were the checks just coming from wherever they could find the money?

A    A little bit of both.  So, I'll explain.

Q    Okay.

A    So PetroLedger had no bank accounts, but they did the check runs.  There's thousands of checks, it was all automated. So they would print two check runs, AWP, El Dorado and Black Beard, Hugoton, Bluestone, that group, and they would tell the debtor the check run for this is -- this one is X and the check run for this is Y, and the corporate staff would then transfer funds from whatever account had money into those two clearing accounts where the checks would clear off of that PetroLedger issued and mailed.

Ragan - Cross/Wilson                      101

There were -- I don't know, I want to say like ten or twelve, some small amount of little wells that were handled out of the Gulfport office.  Why they were separate, I have no idea, but Gulfport handled cutting those checks and it was a minor amount of checks.  I am also told that once they generally stopped making the royalty payments in the spring/summer of '23 that Mr. Swarek did direct Gulfport to issue some paper checks out of the office, which they did because it was like silencing he squeaky wheel.  I had somebody who was complaining, so he authorized them to make a payment.  And I told by both the office and some of those people who called me that they got a check, but there was no backup.

So when PetroLedger sends a check, there's backup of what it relates to; what month, what the production was, what the deducts were, there's a lot of information behind it.  The checks that came from Swarek they have no detail for, they don't know what period it related to or anything else.

THE COURT:  Checks that came from Swarek, were they El Dorado checks, Hugoton checks?

THE WITNESS:  It could have been either, is what I was told.  I haven't pulled that data, but I was told by the office that the checks could have come from either.

BY MS. WILSON:

Q    When an individual from PetroLedger, or Associated Resources, as they were known at the time, says we must

Ragan - Cross/Wilson                                    102

manually release each well from suspense, so this will take a good amount of time, you understand -- can you explain to us what that means?

A     I don't know what you're reading from, but my guess would be that they meant in their accounting system they had to manually change the switch from paid or un -- I'm sorry, unpaid or suspense to pay, and then it would end up in the next check run.

Q     So in the event a document like a division order is required by PetroLedger of Price Partners, as it was in this case, in order to release these funds and pay them out, was PetroLedger the entity that would review and decide on whether or not what was received was sufficient to allow them to pay out the royalties, or was that a decision by the debtor?

A     My guess would be PetroLedger.  They have a division order group that reviews that information and when we get those inquiries we generally just pass them along to PetroLedger to deal with.

Q     So when PetroLedger says I just finished releasing the suspense on my end and have --

        MS. HOPKINS:  Objection, objection, Your Honor.  I'm not sure what Counsel is reading from, I have -- I don't know what this document is, it's certainly not in evidence.  There's some foundation to be laid here because it's likely hearsay, and I'm not sure of the relevance.

Ragan - Cross/Wilson                          103

MS. WILSON:  I'm more than happy to enter the emails, Your Honor, but I'm actually asking the question as a hypothetical based on the trustee's understanding of the process between PetroLedger and the debtor.

MS. HOPKINS:  A moment ago there was specific statements read from the document.  So, I don't know what this is --

MS. WILSON:  These are emails that you were provided copies of by us some many months ago -- let's see -- back in May, again, of this year, but these were emails from and with PetroLedger.

MS. HOPKINS:  But they weren't --

MS. WILSON:  I'm sorry?

MS. HOPKINS:  -- connected, they weren't designated on the exhibit list, so that's why I'm trying to understand what it is.

MS. WILSON:  That's right.  I mean, I don't plan to admit them.  I'm trying to find out based on the trustee's testimony given earlier the process between PetroLedger and the debtor when it comes to suspense accounts.

MS. HOPKINS:  Respectfully, Your Honor, then she can ask those questions and ask the trustee what she has personal knowledge of, she doesn't need to read from a document that's not yet been admitted.

THE COURT:  Well, just ask the trustee what her

Ragan - Cross/Wilson                                    104

personal understanding is of the process.

MR. CURRY:  And, Your Honor, that would draw asked and answered because it's already been answered.  And I've been a little bit patient on this (indiscernible) we said at the beginning we're not litigating their lien rights (indiscernible) rights.  The question is whether or not the sub-con motion (indiscernible) these questions aren't going toward.

THE COURT:  Well, that's your opinion. Go ahead, Ms. Wilson.

MS. WILSON:  Thank you.

BY MS. WILSON:

Q    Is it your understanding that when PetroLedger released suspense on PetroLedger's end and sends it over to accounting to do their part, what is your understanding of what that means?

A    I only had one interaction with PetroLedger on that and it was related to my period of appointment, and it was recently when I was asking them to give me the data for everything that was unpaid and suspense, and their report showed items that were in suspense for my period of appointment.  So of course I delved into that and said, what is this, you're supposed to be paying a hundred percent, why is there anything in suspense?

And they told me that these were the codes that were in their system to designate something as suspense.  It primarily

related to one royalty owner.  And I said, okay, do you know why it was in suspense?  They said, no.  I said, okay, release it.  And they put it in the next check run.

Q    Okay.  So where did the $260,444.51 go that was reported by PetroLedger to be being held in suspense?

A    I don't know what $260,000 is it you're referring to.

Q    So the Price Partners amount that was reported by PetroLedger to be being held in suspense.  I'm just trying to figure out the difference between held in suspense and unpaid royalty obligations.  And you testified that the debtor did receive the revenue from sales if there's money in the accounts, right?

A    The debtors received production proceeds.  When PetroLedger says something is unpaid or in suspense, practically speaking, that's the same thing.  It means they didn't put it in the check run and a check was not issued for those amounts.  The difference in their codes for people like you and me, it's irrelevant, who cares, it's paid or it's not paid.

Q    And -- okay, thank you.

Were you able to confirm that the amounts on hand at the time of your appointment did not include the money owed to Price Partners?

A    I have never had, nor did the debtor ever have prior to my appointment, a suspense account, meaning there was no cash

reserves for unpaid or suspense royalties, it was only for bookkeeping purposes.

Q    Thank you.

(Pause)

THE COURT:  Sure.

UNIDENTIFIED SPEAKER:  (Indiscernible) is it a rebuttal, Sarah --

MS. WILSON:  Yes, yes, this is about (indiscernible) --

BY MS. WILSON:

Q    I've just handed you a copy --

UNIDENTIFIED SPEAKER:  (Indiscernible) --

MS. WILSON:  What's that?  I'm sorry, you didn't file anything here for purposes of this proceeding, I don't have a copy for you.  I'll be happy to pause, though, if you all want to take a few minutes and review it.

MS. HOPKINS:  Yes, since we have not -- this was not listed on the exhibit  list, I'd go ahead and object to the untimely and prejudicial -- just handing us that, we can read it --

THE COURT:  Do you want to take a little break and let you all look at it?

MS. HOPKINS:  Yes, Your Honor.

THE COURT:  Why don't we come back at ten after 2:00, is that enough time?  Here's the copy.

Ragan - Cross/Wilson                    107

We'll be adjourned until ten minutes after 2:00.

(Recess taken at 1:58 p.m./Reconvened at 2:12 p.m.)

THE COURT:  All right, we're back on the record in the El Dorado case.  Are you ready to proceed?

MS. WILSON:  Yes, Your Honor.

May I have the hard copy that I handed you?  I can put it up on the projector.

MS. HOPKINS:  Okay.

MS. WILSON:  Your Honor, just before the break I handed counsel and otherwise a copy of this document I'd like to mark just for identification as B-35.

THE COURT:  Okay, ID only, B-35?

MS. WILSON:  Yes, Your Honor.

THE COURT:  Okay.

BY MS. WILSON:

Q    Do you recognize this?

A    Yes.

Q    Did you prepare this letter?

A    I'm assuming it's the letter I prepared, it appears to be.

Q    Did you prepare this letter and send it out to royalties obligations' owners?

A    I prepare a letter to go with royalty checks; I prepare the letter, I send it to PetroLedger, I ask them to include it in the envelope that goes with the checks.  It appears to be what I would have sent them.  I don't suppose that I need to go

Ragan - Cross/Wilson                          108

pull up my original from my laptop, but I'll just say that it appears to be like something I wrote.

Q    I mean, is this letter from you or is it not?

A    It does appear to be the letter I drafted that I gave to PetroLedger to send with one of the royalty distribution runs.

Q    Okay.  Thank you.

        MS. WILSON:  I'd like to move to admit this letter into evidence as B-35.

        THE COURT:  Any objection?

        MS. HOPKINS:  No, Your Honor.

        THE COURT:  35 will be admitted.

        (Bracken Exhibit B-35 admitted into evidence)

BY MS. WILSON:

Q    Did you get a minute to review the letter?

A    Yes.

Q    What I'm hoping from you here, I just want to ask about the errors that were discovered in the calculations and I was wondering if you could explain those for us.

A    Sure.  So the first part of the letter says -- just for the benefit of the Court, I'll just read the first sentence or two.  "Attached hereto is the royalty distribution for producing wells for the period September, November, and December.  Please note that we previously advised you with the last check that we were paying September and October; however, it was later discovered that there were errors in the software

calculations such that the September royalty amount was included and then deducted.  So the amount actually paid out did not include the majority of what was owed for September, that amount has been added to the current calculation and distribution."

So --

Q    Yes, thank you for that.

A    -- is it okay if I switch to the next page?

Q    Absolutely.  Yes, please go ahead.  I really just want to understand the nature of the errors that were discovered and who discovered those.

A    Okay.  So I'll just explain it and then I'll talk about it in the detail.

Q    Thank you.

A    So PetroLedger, as I discussed earlier, would send us the check run.  And the check run is like 1500 pages, right?  I don't go through it, I rely on them to do the accurate accounting.  And it was supposed to represent the royalties that were owed for the production for September and October, and when I glanced through the detail I see a bunch of line item entries that September-October, September-October, September-October.  I said, okay, looks right, got the right months, send it out.  And then I do my own rough calculation, what was the production, what is this percentage of the production, does it seem like it's within the realm sort of

Ragan - Cross/Wilson                                          110

thing, and I tell them to release the check.

So the next set of checks that were going to be released and when, you know, I continued to ask them for data of unpaid amounts, I got data from them that indicated a significant amount of unpaid royalties for September. And I said, what the heck, how is this possible? We paid September, we paid September and October. What's this big number? I don't understand.

So they went back and investigated and said that they didn't know why, but in their accounting system for some reason September was held. So, when you looked closer at the detail in the 1500 pages, it would be September-October, September-October, but a lot of the September stuff was duplicated and a lot of them had negatives. So, it was in and it was out, so it was netted -- not entirely, it wasn't, you know, exact amount was in and out. So, how they got those calculations, I don't know. How the lever got switched to hold something, I don't know, they couldn't explain that to me.

So that meant that that check that went out was really October, not September. So, when we did the next period, November and December, we went back and captured September. So this letter is saying September, November, and December because it's picking up what didn't previously get paid when the September-October check went out.

And if you look at the detail on page 2 in the second

Ragan - Cross/Wilson                               111

column from the left where it says date, month and year, right, you see -- if you go down those rows, you see September, September, September, November, November, November, December, December, December.  So it's picking -- and all those are positive numbers -- so it's picking up the September that didn't get paid before and adding it to the November and December distribution.

Q     Thank you for that.

When you were reviewing -- and this is the last question on this subject -- and discovered the potential error, were you reviewing actual production reports or comptroller data, or were you reviewing the production reported on PetroLedger records?

A     So someone in my position is not going to be able to review 1500 pages of production reports.  We have a regulatory person who does all this for us every month, she does the reporting to the Railroad Commission, as well as to PetroLedger, and she's the one that finds discrepancies, if there are any.  And PetroLedger takes that production data that's reported and then they apply all of the calculations related to every individual lease, what's the proper percentage, what are the allowable deductions, and then they do all those calculations, which is why it ends up being 1500 pages.

Q     Thank you.

Ragan - Cross/Wilson                                112

Have you or your regulatory person verified that all of the production information that was reported to the comptroller was accurate?

A    So what we report to the comptroller is related to paying severance taxes.  Is that what you're referring to?

A    What I am referring to is the data on production.  So if that's reported to the Railroad Commission as opposed to the comptroller, that's my question.  So have you or the person who's doing the regulatory for you been able to confirm that the data reported on production was accurate?

MR. CURRY:  Objection to form and just that there's no time frame on that, and we are talking about two very substantial differences.

MS. WILSON:  Understood and I'll rephrase.

BY MS. WILSON:

Q    Have you or someone, including -- well, excuse me.

Have you or someone on your team, or representing you or working on this matter for or with you, verified the accuracy of the data reported on production during the prepetition period of June 2023 through February 2024, which leans of course a bit into post-petition pre-appointment?

A    Our regulatory person reports and reviews the data every month.

Q    As part of that review, has that period just referenced been reviewed for accuracy of production reported?

Ragan - Cross/Wilson                                113

A    I don't know how to answer that.  I wasn't there prepetition, I don't know what happened prepetition.  I can tell you that the person who's doing the regulatory reporting for me now is the same person that the debtor used before, and I have complete confidence in her ability and accuracy.

Q    When the royalties obligations that were unpaid are calculated, will those calculations be done using the Railroad Commission data already reported or will they be done using production reports from that period of time?

A    So it's both.  The production data is reported to the Railroad Commission and to PetroLedger, PetroLedger then makes other adjustments based on what's allowed under individual leases and calculates the amount upon which to calculate royalties.

Q    Do you have any evidence that there are any royalty owners on AWP wells who believed they were leasing interests to an entity other than El Dorado?

A    If I understand the question, no, I do not have any evidence regarding people thinking they were leasing to some other entity, separate and apart from Hugoton.

Q    Or El Dorado?

A    El Dorado and Hugoton.

Q    Okay, so let me rephrase.  The leases that were all subject to the AWP sale were the party --

A    When you say AWP sale, do you mean my sale or when it was

Ragan - Cross/Wilson                              114

acquired by the debtor?

Q    I'm referring to the sale that was approved by this Court and that you executed the purchase and sale agreement --

A    Okay.

Q    -- on to Varris.

A    Okay.

Q    So, as part of that sale, were there any leases that were part of that sale who were with any debtor entity aside from El Dorado?

A    I don't recall at AWP.  I know we did have one with Mecom, I don't recall having a different entity with AWP.

Q    Thank you.

    We talked earlier in your testimony about your estimations in terms of the cost to unravel the various liabilities of the entities subject to your motion, did you obtain any cost estimate from an accounting firm for the forensic analysis that would need to be done in order to run those calculations?

A    No.  I know based on my experience and what would have to be done that a budget would not be feasible.

Q    But did you obtain an estimate from any accounting firms?

A    No.

Q    Did you receive an opinion from any forensic accountants that unraveling is impossible?

A    I think we're all aware that I haven't retained an accounting firm in this case, so no.

Q    What's the assets-to-liabilities ration for El Dorado?

A    I don't know.

Q    What about for Hugoton?

A    I don't know.

Q    What will the assets-to-liabilities ratio be for the consolidated entity in the event your motion is granted?

A    I haven't calculated that.

Q    What will the unsecured creditors be paid in the event of substantive consolidation?

A    I don't know.  We'll address that with the plan.

Q    Have you calculated the difference in treatment of unsecured creditors in El Dorado if it's not substantively consolidated versus if your motion is granted?

A    If I could make those assessments, I probably wouldn't need to sub-con.

Q    From where will the unsecured creditors be paid?  What funds do you plan to use to pay the unsecured creditors, is there a reserve?

A    Well, that would be determined in confirmation with a plan and a liquidating trust, and I assume that we will designate as part of that plan an amount for unsecured creditors that would be used to pay all of them a pro rata share of the pot, but that's a plan issue, I don't know that answer today; that's my supposition.

Q    Would you agree that the assets-to-liabilities ratio for

Ragan - Cross/Wilson                                    116

El Dorado is higher than the other entities subject to your motion?

A    I can't say yes or no to that, I haven't calculated it.

Q    What will the total amount of unsecured claims be in the event of substantive consolidation?

A    My estimate of the total unsecured claims for all four debtors, including deficiency claims of the bank, is approximately $10 million.

Q    What are those of El Dorado as a stand-alone debtor?

A    I don't know that number.

Q    The entity you all were referring to earlier as EDOG, does it have creditors, aside from potentially FSB?

A    Not to my knowledge.

Q    Have you conducted an analysis of how substantive consolidation will impact the priority of the unpaid royalty obligations claimants?

A    No, but I think we've said that we're not planning on impacting priorities and liens and collateral.

Q    Thank you.

    Are you able to testify as to the amount of proceeds from production from Bracken wells for any period of time?  For the prepetition unpaid period, for example?  I'll rephrase.

    For the June 2023 through February 2024 period, have you calculated the amount of production from the Bracken wells?

A    The only Bracken-specific production proceeds that I have

calculated relates to what I believe was pertinent to the motion and the objection, which is the amount of oil inventory that we got a purchase price adjustment for from Varris.  So we sold leases to Varris, not production, but Varris also was obligated to pay us for whatever oil we had in inventory, whatever oil was in the tanks.  And so a couple months after the sale we looked at -- we had all those accounts done and agreed on what the commodity price was, and then we went back and looked at what production that was in those tanks came from Bracken-specific wells as opposed to the total that was in the tanks to come up with a value that related to Bracken-related oil production related to the sale.

Q     Thank you.  And what was that amount?

A     Thirty seven thousand dollars.

Q     Is what you're referring to generally referred to or known as stock tank oil?

A     Yes, I believe that's correct.

Q     Do you agree that the lien under Section 67 does attach to hydrocarbons before they're severed from the ground?

        MR. CURRY:  Objection, Your Honor, it calls for a legal conclusion.  The statute says (indiscernible) --

        THE COURT:  Ms. Wilson, response?

        MS. WILSON:  The trustee is here testifying with respect to estimated amounts of secured versus unsecured claims for the purposes of substantive consolidation, six million

versus, you know, none in terms of secured claims is a pretty big difference.  So, I'll rephrase the question.

THE COURT:  All right (indiscernible) --

BY MS. WILSON:

Q    Have you reviewed Section 67?

A    Yes.

Q    And it's your testimony that the only lien is with respect to actual proceeds from production?

A    Oil and gas production proceeds, yes.

Q    So you disagree that it's attached to hydrocarbons prior to their being produced?

A    Well, the first question didn't relate to timing.

THE COURT:  Are you just trying to figure out if the trustee believes if Bracken's claims are secured or not?

MS. WILSON:  What I'm really trying to ask is whether or not the trustee intends that -- well, whether or not the trustee understands that the rights that were subject to the lease agreements in issue, that the interests subject to those liens are no longer in the trustee's or the estate's possession, but we'll move on, I'll move on.  I can't think of a better way to ask it, so I'll leave that one there.

Okay, I'm going to try to zoom through the rest really quickly, if you'll give me just a moment.

BY MS. WILSON:

Q    How are the allocations to the leases that were listed in

Ragan - Cross/Wilson                     119

the AWP purchase and sale agreement, how were those determined, allocations of value to the leases?

A     Varris made the allocations.

Q     Do you have any knowledge of what those were based upon?

A     Just generally that it was based on where there was more production or more value, but specifically more than that I don't know.

Q     Are you aware that the leases in issue with Bracken parties contain termination provisions that would have allowed them to terminate given nonpayment of royalty obligations?

A     I'm aware that most oil and gas leases contain similar provisions.  I don't recall the specifics of any particular Bracken lease, but I have a general awareness of those provisions being in most leases.

Q     And you agree that the value allocated to Bracken party leases was in excess of $4 million in the purchase and sale agreement?

A     I don't know that.  I haven't added up what the allocations were in the exhibit.

Q     Is it your understanding that, had the Bracken leases been terminated and not been part of the sale to Varris that the amount for the sale would have decreased substantially?

           MS. HOPKINS:  Objection, Your Honor.  I'm not sure of the relevance, how this pertains now to sub-con, as well as I think we're kind of getting into a speculative area when we're

Ragan - Cross/Wilson                              120

talking about a third party assessing value.

THE COURT:  What's the relevance for sub-con?

MS. WILSON:  I'm sorry, Your Honor?

THE COURT:  What's the relevance toward sub-con?

MS. WILSON:  Because the trustee testified earlier during her direct testimony that the identifiable asset that she is aware of as between the debtor entities is the AWP sale proceeds, and it's by far the largest and most substantial asset, looking to figure out, Your Honor, the effect with respect to the AWP sale proceeds in the event of substantive consolidation.

THE COURT:  I think I'm missing the disconnect -- you're trying to get to Bracken has a lien as to the value of those leases?  I understood that your claim is to the production of, not the value of the leases that might have been part of the sale process.

MS. WILSON:  According to the statute, Your Honor -- and, again, this is not what we're here to argue, but it provides that the lien is with respect to and for the full amount of royalties obligations unpaid.

THE COURT:  That's not for today.

MS. WILSON:  Yes, agree, and we'll move on.

Final scan.  Thank you for your patience.

BY MS. WILSON:

Q    Are you able to disclose to creditors or here put into

evidence the actual effect of consolidation on their ability to recover on their claims?

Said another way -- and I apologize, but I'll rephrase -- what is the financial impact of consolidation on creditors of El Dorado as opposed to in the vent of substantive consolidation?

A    So, in order to -- so the answer is I don't know.  If I was going to be able to answer that, I wouldn't have to ask for sub-con.  The records do not exist for me to separate and say with any reasonable assumptions or accuracy that I believe the range of recovery is X in this scenario and Y in another scenario, that the records just don't exist that way.

Q    Can you -- are you able to testify that creditors will not be prejudiced by virtue of a substantive consolidation?

A    I believe that's correct, they will not be prejudiced, because if we don't sub-con, I know what happens.

Q    Do you agree that El Dorado is more solvent than the other debtors that are subject to the motion?

A    I can't answer that one way or another without doing the analysis.  That's not a question that I take lightly.

Q    In the event that one debtor entity were more solvent than other debtor entities, do you agree that those creditors would be prejudiced by virtue of a substantive consolidation?

A    Well, solvency just by itself doesn't deal with value, what money is available, it's just are you -- is it positive,

Ragan - Redirect/Hopkins                        122

it could be positive a dollar, it could be positive a hundred million.  I'm just -- I'm not comfortable taking a position on that.

Q    Thank you.

MS. WILSON:  That's all, Your Honor.

THE COURT:  Ms. Marbury, anything?

MS. MARBURY:  No, Your Honor.

THE COURT:  Any redirect, Ms. Hopkins?

MS. HOPKINS:  Yes, Your Honor, only briefly.

REDIRECT EXAMINATION

BY MS. HOPKINS:

Q    Ms. Ragan, counsel for the Bracken Group brought up a letter that you sent to the mineral interest owners essentially clarifying a prior error and correcting that error, correct?

A    Yes.

Q    And was that the first letter that you ever sent to mineral interest owners in your role as trustee here?

A    No, I've sent several communications, and I always send something with the royalty checks, at least I think I have.

Q    What was your intent in sending these different letters and communications to the royalty interest owners?

A    To keep them informed.

Q    Did you ever have royalty interest owners reach out directly to you?

A    Yes.

Ragan - Redirect/Hopkins                    123

Q    Was that common?

A    Yes.

Q    So was there essentially a two-way street of communication that you established with them?

A    Not just me.  My Oil & Gas colleague, I probably had most of the communication in the beginning, but as we were getting wells turned back on he was communicating with the representatives for the different mineral owners on a regular basis.  His communications would have been more than mine, but, yes, we did try to communicate with the mineral owners, as well as their ranch managers.

Q    So, in your experience in these cases, did that line of communication prove beneficial to the estates?

A    Yes.

Q    Can you tell us how so?

A    Because with -- because they told us that with Mr. Swarek they didn't get any information and they never knew anything, and they were so happy that now that they were getting data. We told them what we were doing, that we were trying to turn wells back on, but we were prioritizing what and how we were turning them back on, you know, that we could only do so much with a limited DIP loan.  When they had issues, they would call generally my colleague Mr. Baracato, and he would immediately send somebody out to resolve whatever the issue was that they were calling about.  So, they were happy to have a resource.

Ragan - Redirect/Hopkins                            124

And then also, you know, for a significant amount of the case we had retained Smith Production as an operator to assist us and Mr. Baracato. on a day-to-day basis. So they had that resource now, so they had lots of communication with Smith and Mr. Baracato.

Q    And they were also now receiving payment for the royalties to the extent there was production?

A    Yes.

Q    There was some talk a minute ago about this estimated $6 million of potentially owed prepetition royalties and you mentioned that that was from PetroLedger, but have you determined with accuracy that the termination of six -- have you determined that that determination of $6 million in royalties is accurate?

A    No, Mr. Swarek takes exception with the amounts, and we just haven't dove into all the claims yet.

Q    Right. And typically in a case when do you normally do the claims analysis process?

A    Subsequent to confirmation a liquidating trust will go through all of the excruciating detail of the claims, file objections, negotiate, and they're treated based on whatever provisions are in the plan.

Q    All right. So it's possible that that $6 million number will actually be less than the current estimate?

A    Yes.

Ragan - Redirect/Hopkins                                    125

Q    Okay.  Just to clarify and I think we've talked about it earlier, you and I as well, but there was a lot of emphasis on the fact that you're unable to segregate liabilities and/or assets between each respective debtor.  If you were able to do that, would we be here today?

A    Likely not.

Q    Okay.  Is it your opinion and determination that the time and expense necessary to unscramble these entities' affairs is so substantial that it threatens the realization of recoveries for creditors?

A    I believe that, yes, but I don't believe that ultimately the exercise would be possible.  I think it would be futile, it would be time and money wasted.

Q    So, at the end of the day, if sub-con is not granted, will creditors be prejudiced based on your determinations and analysis?

A    I think so because I think the outcome is that FSB would move to lift the stay and take their marbles and go home, and there would be nothing for unsecured creditors because I don't have anything unencumbered.  As part of a plan, I expect to provide something to unsecured creditors.

Q    And even if FSB agreed to, you know, a seven-figure forensic analysis accounting, would that further decrease a potential recovery for creditors?

A    Absolutely.

Ragan - Recross/Curry                    126

MS. HOPKINS:  No further questions, Your Honor.

THE COURT:  Mr. Curry?

RECROSS-EXAMINATION

BY MR. CURRY:

Q    Just a couple of follow-ups, Ms. Ragan.

You testified earlier about how World Aircraft was used to purchase equipment and I think you said that, when it was titled, it was titled to World Aircraft?  I want to make sure I repeat it correctly, is that --

A    Yes.

Q    -- accurate?  Okay.

And sometimes they just didn't bother to title it, but as far as the debtors treated it, World Aircraft had purchased those assets, correct?

A    Yes.

Q    And does World Aircraft have any operations?

A    No.

Q    Does it have any creditors other than FSB?

A    It has -- so, if you look at the claims docket on World Aircraft, there are some claims that are filed by the pilots for unclaimed wages, I think that was the bulk of it.

Q    Okay.  And so if we adhere to a strict formality that World Aircraft's assets are only available for World Aircraft, would those funds ultimately make their way up to El Dorado's estate anyway?

Ragan - Recross/Curry                127

A     Yes.  After World Aircraft paid its creditors, the excess would be available to dividend to parent El Dorado.

Q     And so essentially what -- let me back up, strike that.

So the argument earlier has been that administrative convenience is not enough.  There's certainly an administrative convenience there being able to jump maybe ahead a step and make those dollars potentially available for recovery for all creditors, correct?  Cost savings?  Streamlining it save costs.

A     Yeah, I don't know if I'd call it administrative convenience, but I think it's an effort to devise an equitable solution to get a recovery to creditors.

Q     And the assets that World Aircraft bought, it doesn't have any operations, who used those -- that equipment?

A     Well, the planes were never used, to my knowledge, and that was only a small part of the assets.  The bulk of the assets were the things that Mr. Swarek bought at auction, which allegedly were oil and gas assets, but they were not all related to oil field services and oil and gas production.  A lot of it was -- you know, we've talked about before medical supplies, cardboard, Styrofoam, appliances, office supplies.

Q     And does Mr. Swarek have an interest in any business that is in the health care industry?

A     Well, there's the stem cell entity, but the ownership of that I'm still working on.

Q     Is that owned by Mr. Swarek or is that one of the tax subs

Ragan - Recross/Curry                                              128

that you were talking about earlier?

A    I think that one of the stem cell entities might have been on the tax return or -- actually, no, I don't think that's right.  Mr. Swarek had advised me that the entity, the stem cell entity was 50-percent owned by El Dorado, but I -- my recollection is that I couldn't confirm that in any of the research I did with the Secretary of State filings.

Q    Okay.  And so, similar to the Family Worship Center, El Dorado funds were expended to support non-debtor business activities, correct?

A    Yes.

Q    Okay.  Now I want to focus on the oil and gas equipment that was purchased.  So it was purchased and owned by World Aircraft, but it's used in the oil and gas operations.  Was there ever a distinction --

A    Could I interrupt you for a second?

Q    Sure.

A    Very little of it was used --

Q    I understand.

A    -- it was mostly stored.

Q    Stored.

A    Okay.

Q    Was there ever any distinction made to the extent it was used, whether it was used for parts or storage or whatever, was there ever a distinction made between El Dorado -- in the

debtors' records between El Dorado, Hugoton, or Bluestone?

A    No.

Q    Was there ever any compensation to World Aircraft for the use of its equipment from any of those entities?

A    No.

Q    So, fair to say then that those entities would have incurred operating costs using this equipment from World Aircraft, but if the World Aircraft equipment is liquidated in World Aircraft, do those creditors have a direct claim against those funds?

A    Which creditors?

Q    El Dorado, Hugoton, or Bluestone creditors, would they have a direct path to obtaining a recovery from the World Aircraft funds, aside from a distribution of the World Aircraft stock?

A    Yes, I believe so, which is why I say, to do the whole analysis, you have to look at the value of services provided.

Q    And have you looked at roughly how much it would cost in litigation costs alone to bring quiet title, fraudulent transfer, and other similar type actions to clean up this title issue?

A    Are we talking about all the title issues or one title issue?

Q    All of them.  I mean, if you're not going to do sub-con, you've got to do all of them, correct?

Ragan - Recross/Wilson                    130

A     Yes.

Q     And how much would that cost in addition to the forensic accounting?

A     Well, good point.  A lot because Mr. Swarek would object to every single one of them.

Q     And in fact we've litigated some of those issues in this case previously, correct?

A     Yes.

Q     And those have been extensive, intensive hearings that were very costly, correct?

A     Yes.

Q     And there's ever reason to believe that it would be the same thing for each title, right?

A     Yes.

          MR. CURRY:  No further questions, Your Honor.

          MS. WILSON:  May I just ask two very fast follow-up questions?  So fast, so fast.

          THE COURT:  I'll let you ask two, even though we've already gone around.  Go ahead, Ms. Wilson.

          MS. WILSON:  Thank you.

                    RECROSS-EXAMINATION

BY MS. WILSON:

Q     What's the amount of money available to pay Bracken Group claims presently from and against El Dorado?

A     I don't have a pot of cash designated for specific groups

of claims yet, it's something that we'll be dealing with with the plan.

Q    How about just for payment of claims, how much is available in the estate of El Dorado?

A    Today, I have $4 million of cash in operations, but that excludes the amount that's in clearing accounts for the royalties, the $200,000 royalty reserve from the beginning, the professional fee reserve, just the operating funds today.  I expect to add to those funds over time from the collection or the monetization of other significant assets of the estate.

Q    What amount will be available for payment of claims in the event of substantive consolidation?

MR. CURRY:  Your Honor, part of the issue here is, as this Court expressed the last time we were here, they want FSB to provide the (indiscernible) and there are negotiations going on, the plan is not on file, and I guess you could say lack of foundation as the objection, but Ms. Wilson's questions are really getting into those and I think we need to be careful.

MS. WILSON:  Your Honor, I have no idea what negotiations you're talking about -- I guess those are ones I'm not privy to, yeah, but my questions are being asked, Your Honor, because prejudice to creditors as a result of substantive consolidation is in fact a very primary, if not one of the key factors considered by courts in determining whether substantive consolidation is proper in any given case.  So I

Ragan - Recross/Wilson                    132

just wanted to ask for verification on the effect of substantive consolidation in terms of ability to pay claims of creditors.

MR. CURRY:  And, Your Honor, to elaborate, that goes into what is that carveout going to be, which is still subject to negotiation, because what Ms. Ragan has already testified today is that if there's not sub-con, then the secured lenders -- and it's not just FSB, there are others -- are going to file lift-stay motions.  This debtor has no equity without sub-con, no chance (indiscernible) and so the testimony today has been I don't know what they'll recover if we substantively consolidate, but if we don't it's more likely than not to be zero.  So I'm not sure where the disconnect --

THE COURT:  And I don't -- I don't remember, Ms. Wilson, if you were here or not for the status conference where I went through all of the amended schedules trying to verify the secured claim of FSB and as I recall that one, at the end of the day, when we got through with all the amended schedules, we had a conversation about FSB providing a pot of money in the plan for general unsecureds, but we don't know what that amount is yet because we don't know what the collateral was going to liquidate for.

And as I recall from that status conference, one thing that I did not appreciate was that the World Ag property, which has been talked about as having a lot of equity, that's

Ragan - Recross/Wilson                    133

many, many, many small farms, not one big parcel, and so we're not sure -- we weren't sure how -- the trustee wasn't sure about how that is going to be sold or what that's going to liquidate, because I had the same question as you do today.

But that was my recollection of that status conference and, I mean, she can tell you her best guess, maybe you've had a chance to look at it since our last status conference, but other than the pot that would be provided by FSB, I'm not aware of any other assets available.  Is that correct or is there something that we missed at the status conference that might be available for general unsecureds?

THE WITNESS:  I don't think there's anything.  I mean, I had Dorado Drilling assets that I sold for $15,000 and I paid $5,000 of tax.  So, by the time we talk about anything in this case, $10,000 of value will be gone.  Do I have anything else that's unencumbered?  I don't think so.

So I don't think that there's any recovery for creditors if there's no sub-con.  I think sub-con is the best chance to get a recovery; what the range of value is I can't say today, but as Mr. Curry just said, summarizing my testimony, I think it's zero if we don't sub-con.

BY MS. WILSON:

Q    When you say that's not unencumbered, when you're referring to the AWP sale proceeds that are still on hand, whose lien is encumbering those?

Ragan - Recross/Wilson                                    134

A    So I have one sale proceeds account.  I've sold AWP, Mecom, South Texas, and equipment, all of those proceeds go into the sale proceeds account.  I have a DIP budget and a cash collateral budget that have been approved at different points in time in this case that allow me to spend those proceeds.  That's the only thing I have to pay for operations of this case.

So, I have today $4 million in cash left and I expect to add to that based on the monetization of other assets in the case, which will occur over time.

Q    Just to make sure I understand, you said you have $4 million of cash left, is that from all sales you just referenced or from the AWP sale of El Dorado assets only?

A    That is all remaining cash available for operations, it excludes the amounts that are set aside as reserves, the royalties -- clear the royalties that are still outstanding for the checks that have been issued for the original $200,000 royalty reserve account when I took over, that's still sitting there, and the professional fee reserve.  I think those are the only reserves.

Q    So there's no reserve for unpaid royalty obligations aside from what you just mentioned?

A    That's right.

Q    Okay.  Thank you.

A    It would be funded out of operating cash.

135

Q    Thank you.

THE COURT:  All right.  Ms. Ragan, you may step down.  Thank you.

(Witness excused)

THE COURT:  I'm not sure if the attorneys have planned to give a close.  I honestly do not think I need closing argument.  You all gave very thorough opening statements, I'm very familiar with the case.  I've spent the last week looking at the cases on consolidation.

Unless you just have something that you really think you need to tell me in close, I do not need a closing argument.  Anybody?

(No audible response)

THE COURT:  All right.  We'll consider this matter closed and under advisement, and I'll get you an order as soon as I can.

Thank you all.

ALL:  Thank you, Your Honor.

(Proceedings concluded at 3:00 p.m.)

*  *  *  *  *

136

# **C E R T I F I C A T I O N**

We, DIPTI PATEL and TRACEY WILLIAMS, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL


/s/ Tracey Williams

TRACEY WILLIAMS

J&J COURT TRANSCRIBERS, INC.    DATE:  September 4, 2025